**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **ANGIOSCORE, INC.,**<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>**TRIREME MEDICAL, LLC.,** *et al.*,<br><br>　　　　Defendants. | Case No.: 12-CV-3393 YGR<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS CERTAIN CLAIMS IN PLAINTIFF'S FOURTH AMENDED COMPLAINT** |

**I.　INTRODUCTION**

Now before the Court is defendants' motion to dismiss certain claims in the Fourth Amended Complaint (Dkt. No. 244 ("4AC") of plaintiff AngioScore, Inc. ("AngioScore") pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 262 ("Motion").) The Motion is fully briefed. (Dkt. Nos. 264 ("Opp'n"), 279 ("Reply").) Pursuant to Civil Local Rule 7-1(b), the Court deems the Motion suitable for decision without oral argument and therefore has vacated the hearing set for September 9, 2014. (Dkt. No. 287.) As set forth below, the Motion is **GRANTED IN PART AND DENIED IN PART**.

**II.　BACKGROUND**

AngioScore is a corporation organized under Delaware law with its corporate headquarters and principal place of business in Fremont, California. (¶ 2.)[1] AngioScore is a maker of balloon

---

[1] All citations to "(¶ __)" refer to paragraphs of the Fourth Amended Complaint.

angioplasty devices whose principal product is called AngioSculpt. (¶ 46.) AngioScore's 4AC names as defendants one natural person and three business entities: (1) Dr. Eitan Konstantino; (2) TriReme Medical, LLC (f/k/a TriReme Medical, Inc.) ("TriReme"); (3) Quattro Vascular Pte Ltd. (f/k/a Proteus Vascular Systems) ("Quattro"); and (4) QT Vascular Ltd. (f/k/a QT Vascular Pte. Ltd.) ("QT"). TriReme allegedly is a Delaware limited liability company with its principal place of business in California, while Quattro and QT allegedly are Singaporean corporations. (¶¶ 3-4, 7.) QT allegedly is the parent company of both TriReme and Quattro and operates in the United States through at least one business location in Pleasanton, California. (*See* ¶¶ 8, 36.) QT allegedly was formed by the merger of TriReme and Quattro, announced via press release in July 2013, and is the sole member of the TriReme LLC. (¶ 36.) As alleged in the 4AC, Konstantino is the founder of TriReme, Quattro, and QT, and the principal decision maker with regard to what products they have sold or will sell. (¶¶ 6, 9.) TriReme, Quattro, and QT sell an angioplasty balloon catheter sold under the name "Chocolate," which competes directly with AngioSculpt. (¶¶ 22, 30.)

Konstantino and AngioScore share a history which goes beyond that of mere competitors, however. Before he founded TriReme, Quattro, or QT, Konstantino "was a founder of AngioScore in about March of 2003 and served as its first president, a position he held until about November 10, 2005 when he became Executive Vice President and Chief Scientific Officer of AngioScore." (¶ 16.) Konstantino stepped down from his position as an executive officer of AngioScore on October 17, 2006, and scaled back his employment to part-time. (¶ 17.) About six months later, on March 31, 2007, Konstantino finally terminated his employment with AngioScore. (¶ 17.) However, Konstantino remained on AngioScore's board until February 5, 2010. (¶ 18.)

As alleged in the 4AC, Konstantino's work with AngioScore was not his only activity in the angioplasty device business. In "about mid-2005," during his affiliation with AngioScore, Konstantino founded TriReme. (¶ 20.) Konstantino offered AngioScore the opportunity to participate in the TriReme business opportunity. (*Id.*) AngioScore, however, declined: TriReme was represented as intending to pursue a line of business AngioScore did not wish to enter, namely, the commercialization of "endovascular bifurcation stents and delivery systems for bifurcation stents." (*See id.*) AngioScore's board "authorized Konstantino to pursue the [TriReme] business opportunity

on a restricted basis with respect to developing proprietary information for 'bifurcation applications.'" (*Id.*)

AngioScore alleges that no later than October 2009, Konstantino, notwithstanding the limited scope of his permission from AngioScore's board to develop only "bifurcation applications" with TriReme, "secretly conceived of and began development of the Chocolate device," which "competed directly with AngioScore's primary product" and "is not an endovascular bifurcation stent." (¶¶ 22, 30.) By January 2010 Konstantino and his co-inventor, Tanhum Feld, had made substantial progress toward bringing Chocolate to market, having designed and produced prototypes, engaged in animal testing, and created a business model and begun obtaining financing. (¶¶ 23-26.) AngioScore alleges that Konstantino never disclosed either the creation of the Quattro company or the Chocolate device, and that Konstantino in fact actively concealed their existence by directly denying, on three different, specifically alleged occasions, having developed any products that competed with those of AngioScore. (¶ 27.)

In January 2011, Quattro announced that it had received clearance from European regulatory bodies to bring Chocolate to market in Europe. (¶ 33.) In December 2011, TriReme received clearance as to the United States from the U.S. Food and Drug Administration. (¶ 34.) No later than 2012, TriReme and Quattro had begun selling the Chocolate device. (*See* ¶ 45.)

On June 29, 2012, AngioScore filed the instant lawsuit, asserting a single claim of patent infringement against Konstantino, TriReme, and Quattro. (Dkt. No. 1.) Substantial litigation in the patent case followed. A new wrinkle developed, however, when, on July 11, 2013, a press release announced that Quattro and TriReme had merged to form QT. (¶ 36.) Also around this time, original defendant TriReme Medical, Inc. became current defendant TriReme Medical, LLC. (*Id.*) On November 13, 2013, the Court entered an order which, among other things, permitted AngioScore to file a Supplemental and Second Amended Complaint naming the newly formed QT as a defendant and reflecting TriReme's reorganization as an LLC. (Dkt. No. 121; *see also* Dkt. No. 118 (Supplemental and Second Amended Complaint).)

On December 9, 2013, TriReme and Konstantino filed a narrowly tailored motion for summary judgment of non-infringement. (Dkt. No. 131.) During the pendency of that motion,

3

discovery continued. Further, and of note, on April 28, 2014, QT "closed an initial public offering of its stock in Singapore generating gross proceeds in the amount of $(US)44,000,000.00." (¶ 45.)

On May 6, 2014, AngioScore sought leave to file a Third Amended Complaint which, for the first time, asserted state-law business-tort claims against defendants. (Dkt. No. 202.) On June 25, 2014, the Court issued orders granting in part and denying in part defendants' summary judgment motion (Dkt. No. 218) and granting in part and denying in part AngioScore's motion for leave to file its Third Amended Complaint (Dkt. No. 219). In sum, AngioScore's patent infringement claim survived, though certain arguments were closed off to it, and AngioScore was permitted to assert all but one of its proposed state-law business-tort claims.

On July 7, 2014, defendants moved to dismiss certain of AngioScore's business-tort claims pursuant to Rule 12(b)(6). (Dkt. No. 230.) On July 15, 2014, AngioScore amended its complaint as of right pursuant to Rule 15, filing the operative 4AC. The Court denied the pending motion to dismiss as moot. (Dkt. No. 253.) The 4AC names Konstantino, TriReme, Quattro, and QT as defendants, and asserts the following claims: (1) patent infringement, against all defendants; (2) breach of fiduciary duty under California law, against Konstantino; (3) breach of fiduciary duty under Delaware law, against Konstantino; (4) aiding and abetting a breach of fiduciary duty, against TriReme, Quattro, and QT; and (5) violation of California's Unfair Competition Law, California Business and Professions Code Section 17200 *et seq.* ("UCL"), against all defendants.

On July 31, 2014, defendants filed the motion now at bar, which seeks dismissal only of the 4AC's aiding and abetting and UCL claims.

**III.   LEGAL STANDARD**

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims for relief alleged in the complaint. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1199-1200 (9th Cir. 2003). Either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory" will justify dismissal. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). As to the sufficiency of facts, the Court must regard all allegations of material fact as true and construe them in the light most favorable to the plaintiff. *Johnson v. Lucent Techs.*, Inc., 653 F.3d 1000, 1010 (9th Cir. 2011). Thus construed, the facts must "'state a claim to relief that is plausible

on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). So long as the complaint states a plausible claim, it survives a Rule 12(b)(6) motion unless the defendant offers an alternative explanation "so convincing" as to render plaintiff's claim "*im*plausible." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (emphasis in original).

## IV. DISCUSSION

### A. AIDING AND ABETTING A BREACH OF THE FIDUCIARY DUTY OF LOYALTY

As a threshold matter, the Court observes that its jurisdiction over the aiding and abetting claims is supplemental in nature, *see* 28 U.S.C. § 1367, and that the Court therefore is bound to apply state law to them, *e.g.*, *Mason & Dixon Intermodal, Inc. v. Lapmaster Int'l LLC*, 632 F.3d 1056, 1060 (9th Cir. 2011). Here, AngioScore asserts a single aiding and abetting claim, asserting it as to Quattro, TriReme, and QT, and without specification of which body of state law governs. Given that there must be an underlying breach of fiduciary duty for those defendants to aid and abet, the Court looks to the underlying claims of breach. AngioScore asserts two, both against Konstantino solely, one under California law and the other under Delaware law. (¶¶ 55-65.) In briefing the aiding-and-abetting portion of their Motion, defendants cite California and Delaware law essentially interchangeably. AngioScore responds in kind, and neither party identifies any conflict between those two bodies of law. Nor is any apparent, despite some differences in phrasing. Accordingly, the Court applies the law as presented by the parties.

Under California and Delaware law, to state a cause of action against a corporate entity for aiding and abetting a fiduciary's breach of his or her duty of loyalty, a plaintiff must allege (1) knowledge of the fiduciary's breach and (2) substantial participation in the breach. *See Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1144 (Cal. Ct. App. 2005); *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).[2] Here, defendants contend that AngioScore has failed to allege facts sufficient to support either element. The Court addresses the two challenged elements in turn.

---

[2] To be precise, California law recognizes "two different theories pursuant to which a person may be liable for aiding and abetting a breach of fiduciary duty." *Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1477 (Cal. Ct. App. 2014), as modified (May 27, 2014). The first focuses on the aider and abettor's knowing provision of "substantial assistance" to the breaching
///

**1.     Knowledge of the Breach**

Under both California and Delaware law, the requirement of *knowing* participation means plaintiff must plead that the defendant had actual knowledge that the acts of the fiduciary constituted a breach. *See In re First Alliance Mortgage Co.*, 471 F.3d 977, 993 (9th Cir. 2006) ("[T]o satisfy the knowledge prong, the defendant must have 'actual knowledge of the specific primary wrong the defendant substantially assisted.'" (quoting *Casey*, 127 Cal. App. 4th at 1148)); *Malpiede*, 780 A.2d at 1097 ("Knowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach."). It is not sufficient merely to have "a vague suspicion of wrongdoing," in the nature of a hunch that "something fishy was going on." *First Alliance Mortgage*, 471 F.3d at 993 n.4 (quoting *Casey*, 127 Cal. App. 4th at 1149 (emphasis omitted)). But "[a] plaintiff may prove actual knowledge through inference or circumstantial evidence." *Simi Mgmt. Corp. v. Bank of Am., N.A.*, 930 F. Supp. 2d 1082, 1099 (N.D. Cal. 2013) (applying California law); *see also Gatz v. Ponsoldt*, 925 A.2d 1265, 1276 (Del. 2007) (inference of knowledge permitted under sufficiently suspect circumstances).

Here, Konstantino allegedly breached his fiduciary duty of loyalty to AngioScore by developing the Chocolate device and failing to offer it as a business opportunity to AngioScore. (¶¶ 56, 61.) Assuming *arguendo* for purposes of this Motion that such conduct constitutes a breach of fiduciary duty, the question under both California and Delaware law is whether each individual defendant knew that its acts contributed to Konstantino's alleged breach of developing and commercializing Chocolate without offering AngioScore the opportunity to do so. The analysis is different for QT than for TriReme and Quattro, owing to its later date of incorporation.

Turning first to TriReme and Quattro, the Court concludes that the facts alleged amply support an inference of knowledge on their part. AngioScore alleges that Konstantino himself was a

---

fiduciary while the second may "arise[] when the aider and abettor commits an independent tort." *Id.* (citations omitted). Here, AngioScore relies on the first theory only. (*See generally* Opp'n at 5-6.)

As for Delaware law, its cause of action for aiding and abetting treats knowledge and participation as a single element, and formally includes three other elements. *In re Del Monte Foods Co. Shareholders Litig.*, 25 A.3d 813, 836 (Del. Ch. 2011). However, "knowing participation" is the "critical element." *Id.* The other elements—the existence of a fiduciary duty, a breach thereof, and damages proximately caused by the breach—have not been put in issue here.

6

"founder, officer, and/or . . . member of" the respective boards of directors of TriReme and Quattro (as well as QT). (¶ 43.) AngioScore alleges that, given this relationship, those corporations "knew or should have known of Konstantino's service until February 2010 on AngioScore's Board of Directors." (*Id.*) That is plausible. Indeed, defendant supplies no reason why Konstantino's own personal knowledge of his fiduciary obligations to AngioScore cannot be imputed to TriReme and Quattro for pleading purposes. When speaking of what corporations "know," courts necessarily speak in terms of a legal fiction; corporations know things through the persons that work for them. *See* 9A FLETCHER CYC. CORP. § 4589 ("[C]orporations, being artificial legal entities, can have only the knowledge that is imputed to them under principles of agency law."). AngioScore alleges that Konstantino served as an officer and/or board member for TriReme and Quattro. That suffices to allege TriReme and Quattro's knowledge of Konstantino's alleged breach.

As to QT, the analysis is different in light of the undisputed fact that QT did not exist as a corporate entity at the time of Konstantino's alleged breach. The 4AC provides no date of incorporation for QT, alleging only that its formation was announced by press release on July 11, 2013. (¶ 36.) However, AngioScore does *not* contend that QT came into existence as a distinct corporate entity much earlier than the announcement of its existence or that it existed during the period of Konstantino's alleged breach. (*See generally* Opp'n at 6.) Rather, AngioScore relies on a theory of successor liability. (*Id.*) AngioScore does not engage carefully with the standard for successor liability, which under applicable state law generally is limited to specific circumstances. *See*, *e.g.*, *Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 159 F.3d 358, 361-63 (9th Cir. 1997).[3] However, the facts pleaded with respect to QT's formation by the merger of TriReme and Quattro plausibly suggest circumstances that may support successor liability.

---

[3] *Atchison* outlined four limited circumstances in which successor liability typically is available: (1) where liability is expressly assumed; (2) a de-facto merger or consolidation; (3) the purchasing corporation is a "mere continuation" of the selling corporation; and (4) fraudulent transactions to escape liability. 159 F.3d at 361. The four circumstances set forth in *Atchison* technically derived from federal common law, but the *Atchison* court commented that state law regarding successor liability was "largely uniform" and consistent with the circumstances it set forth. *Id.* at 363.

Further, defendant offers no compelling reason why such liability would be unavailable here. In essence, defendants contend merely that the 4AC fails to put them on notice as to successor liability because it has no separate claim titled "assumption of liabilities," and does not say the magic words "successor-in-interest." (*See* Reply at 4.) Defendants cite no authority supporting their tacit assumption that failure to set forth such claims or plead such magic words is grounds for dismissal of a claim. Defendants' argument exalts form over substance. A fair reading of the 4AC discloses facts sufficient to put defendants on notice of AngioScore's successor liability theory as to QT. (*See* ¶¶ 36 (QT formed through merger of TriReme and Quattro; QT "is responsible for the[ir] actions and liabilities"), 69 (QT "assumed the liabilities" of Quattro and TriReme).) AngioScore adequately pleads QT's liability for any aiding-and-abetting liability incurred by TriReme and Quattro prior to their merger. Whether AngioScore will be able to *prove* such liability in light of applicable standards remains an open question, but the Court concludes that the 4AC alleges facts rendering such liability plausible.

Also unavailing is defendants' argument that the 4AC's own allegations prove fatal to its aiding and abetting claim. (Motion at 8; Reply at 4-5.) AngioScore alleges that "[t]here exists . . . a unity of interest between Konstantino and TriReme, Quattro, and/or QT such that any individuality and separateness between them have ceased to exist." (¶ 47; *see also id.* ¶ 48 (alleging that TriReme and Quattro are "mere shell[s]" for Konstantino and that treating them as distinct from Konstantino "would permit abuse of the corporate privilege").) Seizing on this, defendants argue, in essence, that AngioScore has pleaded its aiding and abetting claims out of court "because it is axiomatic that an individual (or entity as the case here) cannot aid and abet himself." (Motion at 3.) AngioScore responds that the 4AC simply pleads two alternative theories: aiding and abetting on the one hand and, on the other, an alter-ego theory. (Opp'n at 6-8.) Defendants reply that this cannot be so because the 4AC's aiding and abetting claim incorporates *all* of the foregoing factual allegations, i.e., it fails to exclude those allegations now identified as pertaining to the alter-ego theory, and because the 4AC does not assert the alter-ego allegations "as separate or alternative claims." (Reply at 5.)

Defendants' focus on formal technicalities does little to undermine the well-pleaded factual allegations of the complaint. Even post-*Twombly*, federal pleading requires plaintiffs to set forth

8

only their "claims for relief, not causes of action, statutes or legal theories." *See Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008); *see also Self Directed Placement Corp. v. Control Data Corp.*, 908 F.2d 462, 466 (9th Cir. 1990) (inferring claim from facts alleged); *Holman v. Indiana*, 211 F.3d 399, 407 (7th Cir. 2000) (plaintiffs "need not use particular words to plead in the alternative," only "a formulation from which it can be reasonably inferred that this is what they were doing"); *cf. Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (recognizing that "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era"). The 4AC alleges the essentials of an alter-ego theory, perhaps with less than ideal clarity, but plainly enough. (¶¶ 47-48.)[4] "Pleadings must be construed so as to do justice," Fed. R. Civ. P. 8(e), and the Court perceives no justice flowing from dismissal of an otherwise well-pleaded claim because of its less-than-careful incorporation of allegations, especially given the procedural posture and history of this case.

### 2. Substantial Participation in the Breach

The Court turns now to the second aspect of knowing participation, the requirement of an act performed in furtherance of the breach of fiduciary duty. AngioScore alleges that Quattro and TriReme participated in the alleged breach in six ways: "(1) drafting engineering drawings; (2) production and testing of Chocolate prototypes; (3) development of a business model, a development team, and partnerships for developing the Chocolate device; (4) performance of finite element analysis of the Chocolate design; (5) animal testing of a Chocolate prototype; and (6) seeking financing for the development of the Chocolate device." (Opp'n at 5 (citing ¶¶ 22-23, 28, 32, 44).)

---

[4] The reason for refusing to impose the technical strictures suggested by defendants is clear in light of the argument frequently advanced in Rule 12(b)(6) motions that a plaintiff's purported "claim" should be dismissed because it is *no more than an articulation of a separate legal theory and not a claim in and of itself*. For example, in tort cases, plaintiffs commonly plead claims for both negligence and negligence *per se*, even though the latter technically is not a separate claim for relief but rather a method of proving negligence. *See*, *e.g.*, *R.H. v. Los Gatos Union Sch. Dist.*, 5:11-CV-03729-LHK, 2012 WL 4068674 (N.D. Cal. Sept. 14, 2012) (dismissing negligence per se "claim" as duplicative and because, considered as an evidentiary presumption, it would not apply). Were plaintiff here to plead as separate "claims" legal theories such as alter-ego or successor-liability which do not in actuality comprise distinct claims for relief, but rather methods of proving one's entitlement to relief from a particular defendant, it would only subject itself to a different line of attack on a Rule 12(b)(6) motion. A purpose of the Federal Rules, however, is to *minimize* that sort of emptily formal motion practice.

The issue is whether these activities constitute substantial participation. Defendants contend that they do not because (i) they are merely activities any company would conduct to provide support to its CEO, (ii) they suggest, at most, only that TriReme and Quattro were involved in developing Chocolate, and (iii) they do not support an inference that they were undertaken "for the purpose of" assisting the alleged breach. (Reply at 3.)

Courts have found the standard for testing "substantial participation" to be less than abundantly clear. *First Alliance Mortgage*, 471 F.3d at 994 (citing *Casey*, 127 Cal. App. 4th at 1145). The focus of a challenge to an aiding-and-abetting claim generally is whether participation was *knowing*, as opposed to whether it occurred at all. *Cf. Casey*, 127 Cal. App. 4th at 1145 (finding no California case directly addressing "substantial participation" in banking context but observing that "[k]nowledge is the crucial element"). Nevertheless, at least one principle emerges from the cases cited to the Court: provided that an entity takes *some* action, even routine operations may constitute substantial participation if done with knowledge that the action will further a breach of fiduciary duty. *See id.* (observing, in banking context, that "common sense tells us that even 'ordinary business transactions' a bank performs for a customer can satisfy the substantial assistance element of an aiding and abetting claim if the bank actually knew those transactions were assisting the customer in committing a specific tort"); *see also Austin B. v. Escondido Union Sch. Dist.*, 149 Cal. App. 4th 860, 879 (2007) ("Mere knowledge that a tort is being committed and the failure to prevent it does not constitute aiding and abetting."); *Malpiede*, 780 A.2d 1098 (in merger context, a bidder's attempt to reduce sales price through arm's-length negotiations does not create liability for aiding and abetting but "attempts to create or exploit conflicts of interest in the board" do).

That principle alone proves dispositive of defendants' arguments. AngioScore here alleges significant actions undertaken by Quattro and TriReme, through their agents—or, as the case may be, agent, i.e., Konstantino himself—which furthered the commercialization of the Chocolate device. The Court rejects defendants' suggestion that the mere fact that these activities are capable of characterization as typical or routine activities insulates them from aiding-and-abetting liability. Were that the law, only extraordinary acts outside the usual course of business operations could give rise to liability. Defendants cite no case for such a proposition. Likewise, the Court disagrees that

the allegations give rise to no inference of purposeful participation. The actor specifically identified is Konstantino himself, in his role as officer or board member of Quattro and/or TriReme. It strains credulity to suggest that Konstantino breached his duty as a member of AngioScore's board by secretly conceiving of and commercializing the Chocolate device but, when acting as the agent of separate corporations whose purpose was to sell the Chocolate device, lacked intent to further that commercial project, even as he took the acts necessary for its success.

The Court concludes that the 4AC adequately pleads the knowing participation of TriReme and Quattro in Konstantino's alleged breach of fiduciary duty, and that it adequately alleges the successor liability of QT. The Court therefore **DENIES** defendants' Motion as to AngioScore's aiding and abetting claim.

### B.   UNFAIR COMPETITION LAW

The UCL proscribes three categories of business practices: the unlawful, the unfair, and the fraudulent. CAL. BUS. & PROF. CODE § 17200; *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (Cal. 1999). These three "prongs" of the UCL are analytically distinct and have their own separate requirements for stating a claim. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009) (citing *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 886 (1999)). Only the first two, the unlawful and the unfair, are relevant here because AngioScore disavows reliance on the third. (*See* Opp'n at 10 (characterizing itself as having alleged claims under only the unlawful and unfair prongs).) As to unlawfulness, the UCL "permits violations of other laws to be treated as unfair competition that is independently actionable." *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 949 (Cal. 2002). As to unfairness, in the competitor context applicable here,[5] the statutory term *unfair* "means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech*, 20 Cal. 4th at 187.

---

[5] *Cel-Tech* expressly limited its test to the competitor context. *Cel-Tech*, 20 Cal. 4th at 187 n.12. By contrast, in the consumer context, there is a split of authority as to what test for unfairness applies. *See, e.g.*, *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 256 (2010) (recognizing split).

1  Defendants challenge AngioScore's UCL claim on both standing and the merits.  The Court
2 addresses those issues in turn.

### 1. UCL Standing

A claim may be brought under the UCL "by a person who has suffered injury in fact and has lost money or property as a result of unfair competition."  CAL. BUS. & PROF. CODE § 17204.  This standard requires some form of economic loss.  *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 323 (Cal. 2011).  It is, however, broadly expansive as to what sort of economic injury suffices. *See id*.  The California Supreme Court instructs that "[t]here are innumerable ways in which economic injury from unfair competition may be shown."  *Id.*; *see also Law Offices of Mathew Higbee v. Expungement Assistance Servs.*, 214 Cal. App. 4th 544, 561 (Cal. Ct. App. 2013) ("[T]he notion of 'lost money' under the UCL is not limited[.]").  Loss of business to a competitor as a result of unfair competition is a paradigmatic, and indeed the original, variety of loss contemplated by the UCL.  *See Law Offices of Mathew Higbee*, 214 Cal. App. 4th at 560-61 (explaining that while the UCL has developed into an important consumer-protection statute, its "original purpose . . . was to protect against wrongful conduct in commercial enterprises which resulted in business loss to another, ordinarily by the use of unfair means in drawing away customers from a competitor" (internal quotation marks omitted)).

Here, defendants argue that AngioScore cannot demonstrate UCL standing because it merely alleges "lost business."  (Motion at 10; Reply at 6-7; *see also* ¶ 79.)  However, an injury to market share suffered as a result of a competitor's unfair business practice is a cognizable injury under the UCL.  *See Law Offices of Mathew Higbee*, 214 Cal. App. 4th at 556-61 (surveying UCL competitor cases where injuries to market share were deemed sufficient).  The Court concludes that the allegation of lost business, in the overall context of the complaint and its allegations of a wrongfully denied offer of a business opportunity, suffices to plead standing under the UCL's expansive standing doctrine.

### 2. UCL Prima Facie Claim

The UCL's "unlawfulness" prong permits a plaintiff to "borrow" a violation of a separate law and treat it as an unlawful practice "that the unfair competition law makes independently actionable."

12

1 *Cel-Tech*, 20 Cal. 4th at 180.  Here, as set forth in Section IV.A *supra*, AngioScore asserts a
2 violation of the law against each defendant named in the UCL claim—namely, an aiding and abetting
3 claim against TriReme, Quattro, and QT, and the unchallenged breach of fiduciary duty claims
4 against Konstantino.  That suffices to plead a UCL claim against them.  The Court therefore need not
5 and does not reach AngioScore's claim regarding unfair practices.  Fed. R. Civ. P. 8(d)(2).

### 3. Available Relief

"[N]onrestitutionary disgorgement of profits is not an available remedy in an individual action under the UCL." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1152 (Cal. 2003).  Neither are damages.  *Id.* at 1144.  Here, AngioScore seeks both.  (4AC, Prayer, ¶¶ (g), (h).)[6]  Defendants' Motion is **GRANTED**, and AngioScore's complaint **DISMISSED**, to the extent the 4AC seeks relief other than injunctive relief for defendants' alleged UCL violations.

As to AngioScore's request for injunctive relief, the Motion is **DENIED**.  Defendants base their argument against AngioScore's right to injunctive relief on the premise that "lost business" is not a cognizable injury under the UCL.  Having rejected that premise, the Court likewise rejects the argument based thereon.  The 4AC pleads an injury to competition of the type the UCL was designed to prevent and enjoin.

### C. LEAVE TO AMEND

The pleading challenged by the motion at bar is AngioScore's Fourth Amended Complaint.  Given the imminent trial of this matter and that the state-law claims now at bar have been subject to one motion to dismiss already, to which AngioScore responded by amending, the Court is disinclined to grant further leave.  To the extent that the Court has dismissed AngioScore's 4AC, the dismissal is **WITH PREJUDICE**.

///

---

[6] Plaintiff's prayer for disgorgement of the proceeds of QT's initial public stock offering is nonrestitutionary because AngioScore does not allege—nor is it apparent that AngioScore could allege—that QT obtained the proceeds of the IPO *from AngioScore itself*, as opposed to third-party stock purchasers.  *See Korea Supply*, 29 Cal. 4th at 1144-45 (explaining that restitution involves the return of money "to those persons in interest *from whom the property was taken*," while disgorgement, though it may include restitution, is not limited to the return of monies actually taken (emphasis supplied)).  What AngioScore seeks with its prayer for "disgorgement" is damages by a different name.

## V. CONCLUSION

For the foregoing reasons, the Court grants defendants' Motion in part and denies it in part. The Motion is **DENIED** as to AngioScore's fourth claim, aiding and abetting a breach of the fiduciary duty of loyalty. That claim remains undisturbed. The Motion is **GRANTED IN PART AND DENIED IN PART** as to AngioScore's fifth claim, violation of California's UCL. That claim is **DISMISSED WITH PREJUDICE** to the extent it pursues relief in the form of either (i) nonrestitutionary disgorgement of the proceeds of QT's initial public offering or (ii) money damages. To the extent the claim pursues injunctive relief, it remains undisturbed.

Defendants shall answer the Fourth Amended Complaint within 21 days of the signature date of this Order.

This Order terminates Docket No. 262.

**IT IS SO ORDERED.**

Dated: September 9, 2014

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**