1   DAVID S. STEUER, State Bar No. 127059
    dsteuer@wsgr.com
2   STEVEN D. GUGGENHEIM, State Bar No. 201386
    sguggenheim@wsgr.com
3   DYLAN J. LIDDIARD, State Bar No. 203055
    dliddiard@wsgr.com
4   THOMAS J. MARTIN, State Bar No. 150039
    tmartin@wsgr.com
5   DANIEL W. TURBOW, State Bar No. 175015
    dturbow@wsgr.com
6   BRIAN DANITZ, State Bar No. 247403
    bdanitz@wsgr.com
7   EDMUNDO C. MARQUEZ, State Bar No. 268424
    ecmarquez@wsgr.com
8
    WILSON SONSINI GOODRICH & ROSATI
9   Professional Corporation
    650 Page Mill Road
10  Palo Alto, CA 94304-1050
    Telephone:  (650) 493-9300
11  Facsimile:  (650) 565-5100

12  Attorneys for Defendants
    EITAN KONSTANTINO, TRIREME
13  MEDICAL, LLC, QUATTRO VASCULAR
    PTE LTD. and QT VASCULAR LTD.
14
                        UNITED STATES DISTRICT COURT
15
                      NORTHERN DISTRICT OF CALIFORNIA
16
                             OAKLAND DIVISION
17
    ANGIOSCORE, INC.,                    )   CASE NO.:  4:12-cv-3393-YGR
18                                       )
              Plaintiff,                 )   **DEFENDANTS' NOTICE OF**
19                                       )   **MOTION AND MOTION FOR**
         v.                              )   **SUMMARY JUDGMENT ON**
20                                       )   **STATE LAW CLAIMS**
    TRIREME MEDICAL, LLC (f/k/a TRIREME  )
21  MEDICAL, INC.), EITAN KONSTANTINO,   )     **Date:  February 24, 2015**
    QUATTRO VASCULAR PTE LTD. and QT     )     **Time: 2:00 p.m.**
22  VASCULAR LTD. (f/k/a QT VASCULAR PTD.)     **Hon. Yvonne Gonzalez Rogers**
    LTD.),                               )
23                                       )
              Defendants.               )
24                                       )
    _____ )
25

26

27

28

DEF.'S NOTICE OF MOTION & MOTION FOR
SUMMARY JUDGMENT ON STATE LAW CLAIMS
CASE NO.:  4:12-CV-3393-YGR (JSC)

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ................................................................................1

STATEMENT OF ISSUES ...............................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................2

INTRODUCTION ............................................................................................................2

STATEMENT OF FACTS ................................................................................................3

    A.    Eitan Konstantino and AngioScore ................................................................3

    B.    Eitan Konstantino founds TriReme with AngioScore's Consent and is Given Broad Authority to Provide Services to TriReme as his Role at AngioScore Was Diminished ................................................................4

    C.    TriReme's Glider Catheter and AngioScore's Reaction to it .........................5

    D.    The Conception and Development of Chocolate ............................................6

    E.    Konstantino Advises AngioScore of Nascent "Specialty Balloon" – *i.e.,* Chocolate – in February 2010 and AngioScore's Actions Thereafter ...................7

ARGUMENT ..................................................................................................................11

I.    LEGAL STANDARD GOVERNING SUMMARY JUDGMENT ..................................11

II.    DELAWARE LAW GOVERNS THE BREACH OF FIDUCIARY DUTY CLAIMS ..................................................................................................................12

III.    PLAINTIFF'S STATE LAW CLAIMS ARE TIME-BARRED ...............................12

    A.    The State Law Claims Were Filed After The Limitations Period ......................13

    B.    Plaintiff Cannot Establish Its Entitlement To Equitable Tolling. ......................13

IV.    PLAINTIFF'S STATE LAW CLAIMS ARE ALSO BARRED BY THE DOCTRINE OF LACHES ..................................................................................15

V.    SUMMARY JUDGMENT IS WARRANTED ON PLAINTIFF'S BREACH OF FIDUCIARY DUTY CLAIMS ..................................................................16

    A.    The Corporate Opportunity Doctrine ..........................................................16

    B.    Summary Judgment Is Warranted Because Planning To Compete Is Not A Breach Of Fiduciary Duty. ..............................................................18

    C.    Summary Judgment Is Warranted Because Konstantino Did Not Usurp A Corporate Opportunity. ..............................................................18

VI.     SUMMARY JUDGMENT IS WARRANTED AS TO PLAINTIFF'S UNFAIR
        COMPETITION, AIDING AND ABETTING, SUCCESSOR LIABILITY AND
        ALTER EGO CLAIMS...................................................................................................23

CONCLUSION .................................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adams v. Jankouskas*,
452 A.2d 148 (Del. 1982)................................................................15

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...........................................................11, 12

*Astarte, Inc. v. Pac. Indus. Sys., Inc.*,
865 F. Supp. 693 (D. Colo. 1994) .........................................19

*Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*,
159 F.3d 358 (9th Cir. 1997).................................................24

*Beard Research, Inc. v. Kates*,
8 A.3d 573 (Del. Ch. 2010)..........................................18, 24

*Blue Ridge Ins. Co. v. Stanewich*,
142 F.3d 1145 (9th Cir. 1998)...............................................22

*Broz v. Cellular Info. Sys., Inc.*,
673 A.2d 148 (Del. 1996)................................................16, 19, 23

*Burrell v. Astrazeneca LP*,
No. 07C-01-412 (SER), 2010 Del. Super. LEXIS 393
(Del. Super. Ct. Sept. 20, 2010) ...........................................13

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ..............................................................12

*Equity Corp. v. Milton*,
221 A.2d 494 (Del. 1966).................................................17, 19

*Fike v. Ruger*,
752 A.2d 112 (Del. 2000)......................................................16

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
462 U.S. 611 (1983) ..............................................................12

*FTC v. Publ'g Clearing House, Inc.*,
104 F.3d 1168 (9th Cir. 1997)...............................................22

*Gen. Video Corp. v. Kertesz*,
No. 1922-VCL, 2008 Del. Ch. LEXIS 181 (Del. Ch. Dec. 17, 2008) ...........................15, 16

*Guth v. Loft, Inc.*,
5 A.2d 503 (Del. 1939).........................................................17

*Hudak v. Procek*,
806 A.2d 140 (Del. 2002)......................................................15

*Hutchinson v. Fish Eng'g Corp.*,
    203 A.2d 53 (Del. Ch. 1964) ............................................................................................ 15

*In re Alloy, Inc. S'holder Litig.*,
    No. 5626-VCP, 2011 WL 4863716 (Del. Ch. Oct. 13, 2011) ........................................ 24

*In re Dean Witter P'ship Litig.*,
    No. 14816, 1998 Del. Ch. LEXIS 133 (Del. Ch. July 17, 1998) .................................. 14

*In re Digex Inc. S'holders Litig.*,
    789 A.2d 1176 (Del. Ch. 2000) ...................................................................................... 19

*In re Tyson Foods, Inc. Consol. S'holder Litig.*,
    919 A.2d 563 (Del. Ch. 2007) ........................................................................................ 13

*Lazar v. Hertz Corp.*,
    69 Cal. App. 4th 1494 (1999) ......................................................................................... 23

*Legal Additions LLC v. Kowalski*,
    No. C-08-2754 EMC, 2010 WL 335789 (N.D. Cal. Jan. 22, 2010) .............................. 25

*Malpiede v. Townson*,
    780 A.2d 1075 (Del. 2001) .............................................................................................. 24

*Marnavi S.p.A. v. Keehan*,
    900 F. Supp. 2d 377 (D. Del. 2012) .......................................................................... 24, 25

*Nguyen v. McHugh*,
    – F. Supp. 2d –, 2014 WL 4182694 (N.D. Cal. Aug. 22, 2014) .................................... 22

*Owens v. Bank of Am., N.A.*,
    No. 11-cv-4580-YGR, 2012 WL 5340577 (N.D. Cal. Oct. 25, 2012)
    (Gonzalez Rogers, J.) ...................................................................................................... 23

*Pomeranz v. Museum Partners, L.P.*,
    No. 20211, 2005 Del. Ch. LEXIS 10 (Del. Ch. Jan. 24, 2005) ........................... 12, 13, 14

*Quill v. Malizia*,
    No. 2239-S, 2005 Del. Ch. LEXIS 37 (Del. Ch. Mar. 4, 2005) .................................... 15

*Rankin v. Frebank Co.*,
    47 Cal. App. 3d 75 (1975) ............................................................................................... 19

*Sci. Accessories Corp. v. Summagraphics Corp*,
    425 A.2d 957 (Del. 1980) ........................................................................................... 18, 19

*Shaffer v. Heitner*,
    433 U.S. 186 (1977) ........................................................................................................ 12

*Snapp & Assocs. Ins. Servs., Inc. v. Malcolm Bruce Burlingame Robertson*,
    96 Cal. App. 4th 884 (2002) ........................................................................................... 15

*Sonora Diamond Corp. v. Superior Court*,
    83 Cal. App. 4th 523 (2000) ....................................................................................... 24, 25

*Steele v. Ratledge*,
    No. Civ. A. 16455, 2002 WL 31260990 (Del. Ch. Sept. 20, 2002) ...................................16

*Steiner v. Meyerson*, N
    o. 13139, 1995 WL 441999 (Del. Ch. July 19, 1995) ........................................................16

*Sunrise Ventures, LLC v. Rehoboth Canal Ventures, LLC*,
    No. 4119-VCS, 2010 WL 363845 (Del. Ch. Jan. 27, 2010) .............................................13

*Sutherland v. Sutherland*,
    No. 2399-VCN, 2010 WL 1838968 (Del. Ch. May 3, 2010)............................................12

*U.S. Cellular Inv. Co. v. Bell Atl. Mobile Sys.*,
    677 A.2d 497 (Del. 1996)..................................................................................................13

*United States v. $133,4200.00 in U.S. Currency*,
    672 F.3d 629 (9th Cir. 2012)..............................................................................................22

*Villari v. Mozilo*,
    208 Cal. App. 4th 1470 (2012) ..........................................................................................12

*Whitlock Corp. v. Deloitte & Touche, L.L.P.*,
    233 F.3d 1063 (7th Cir. 2000)............................................................................................14

**STATUTES**

Cal. Bus. & Prof. Code § 17200..............................................................................................1, 23

Cal. Bus. & Prof. Code § 17208.....................................................................................................15

Cal. Corp. Code § 309 .....................................................................................................................1

Cal. Corp. Code § 2116 .................................................................................................................12

**RULES**

Fed. R. Civ. P. 56(c)..................................................................................................................1, 11

Fed. R. Civ. P. 56(e)......................................................................................................................12

**MISCELLANEOUS**

Restatement (Third) of Agency § 8.04 (2006) .................................................................................1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on February 24, 2015, or as soon thereafter as the matter may be heard, before the Honorable Yvonne Gonzalez Rogers of the United States District Court for the Northern District of California, Oakland Courthouse, Courtroom 1, Fourth Floor, 1301 Clay Street, Oakland, California, 94612, defendants Eitan Konstantino, TriReme Medical, LLC ("TriReme"), Quattro Vascular Pte. Ltd. ("Quattro Vascular") and QT Vascular Ltd ("QT Vascular") (collectively, "Defendants") will, and hereby do, move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure against AngioScore, Inc. ("AngioScore" or "Plaintiff"), on the following causes of action in the Fourth Amended Complaint ("4AC"): Second (Breach of Fiduciary Duty Against Konstantino – Cal. Corp. Code § 309); Third (Breach of Fiduciary Duty Against Konstantino – Delaware Law); Fourth (Aiding and Abetting Breach of Fiduciary Duty Against TriReme, Quattro, and QT); Fifth (Unfair Competition Against All Defendants – Cal. Bus. & Prof. Code § 17200) (collectively, the "state law claims"); the alter ego claim; and on the issue of successor liability.  This motion is supported by the Memorandum of Points and Authorities, the Declarations, the Separate Statement of Undisputed Facts, the [Proposed] Order, the arguments of counsel, and any other matters properly before the Court.

**STATEMENT OF ISSUES**

1. Whether Plaintiff's state law claims are barred by the applicable *three* year statute of limitations where the undisputed facts show, among other things, that AngioScore actually believed, more than *four* years before it brought the claim, that Konstantino had breached his fiduciary duties by developing angioplasty balloon catheters that competed with the AngioSculpt.

2. Whether Plaintiff's state law claims are barred by the doctrine of laches.

3. Whether summary judgment in favor of Defendants is warranted as to Plaintiff's breach of fiduciary duty claims because, *inter alia*, the Chocolate balloon catheter was not a corporate opportunity that belonged to AngioScore.

4. Whether summary judgment is warranted as to the unfair competition claim.

5.      Whether summary judgment is warranted as to the aiding and abetting claims.

6.      Whether summary judgment is warranted on the issue of successor liability.

7.      Whether summary judgment is warranted as to the alter ego claim.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

In May of 2014, Plaintiff AngioScore asked this Court to allow AngioScore to add a fiduciary duty claim to its patent infringement suit against Eitan Konstantino and the other defendants.  This claim is premised on the notion that because co-inventors Konstantino and non-party Tanhum Feld did some early work on the Chocolate balloon catheter product during an approximately five month period while Konstantino was still on AngioScore's board of directors, AngioScore, and not Konstantino and Feld, were the rightful owners of Chocolate.  AngioScore's belatedly-asserted claims are doomed for several reasons.

First, the claim is time-barred.  The statute of limitations for a breach of fiduciary duty claim is three years under controlling Delaware law.[1]  Here, the statute of limitations expired by February 3, 2013 at the latest, i.e. more than a year before AngioScore sought to assert this claim. This is so because AngioScore knew that Konstantino worked on what AngioScore deemed a potentially competitive product in December 2009 *before* it even asked him to resign from the Board.   In fact, the AngioScore board of directors asked Konstantino to resign in February 2010, more than four years before it sought to assert this claim, precisely *because* it believed he had breached his fiduciary duties by working on a potentially competitive product while still an AngioScore director.  Accordingly, Plaintiff's claim is time-barred.

Second, AngioScore's attempt to claim a property right in Chocolate – under the guise of the "corporate opportunity doctrine" – fails as a matter of law.  This Court has already ruled that AngioScore has no ownership interest in Chocolate because Konstantino was not under any obligation in late 2009 to assign inventions to AngioScore (as would have been the case had

---

[1]   AngioScore purports to assert fiduciary breach claims under both California and Delaware law – *see* 4AC at Claims 2, 3.  Delaware law applies under the long-settled internal affairs doctrine; however, for the limitations defense the applicable law is of no moment as AngioScore sat on its hands for more than four years, which is too long under Delaware and California law.

Konstantino been an employee of the company).  The corporate opportunity doctrine upon which AngioScore now purports to rely applies to situations in which a director learns of and misappropriates an opportunity which, by its terms, should rightfully have belonged to the corporation.  Defendants have found no case in which a court applied that doctrine to divest an outside director of an invention he himself independently developed.  At most, AngioScore's accusations – even if true – amount to a charge that Konstantino "planned to compete" with AngioScore while he was still a director of AngioScore.  But as the case law makes clear, merely "planning to compete" does not constitute a breach of fiduciary duty.

<u>Third</u> – even ignoring the untimeliness of AngioScore's claim and its misguided effort to squeeze the independent development of Chocolate into the corporate opportunity jurisprudence – the claim fails for the separate reason that Chocolate was not available for Konstantino to offer AngioScore.  Co-inventor and co-owner of Chocolate – non-party Tanhum Feld – has made clear that he never would have granted AngioScore any rights to develop the device because he did not believe in the management of AngioScore and he did not like the way they treated him.  Moreover, notwithstanding AngioScore's litigation driven assertions, the contemporaneous evidence is undisputed that AngioScore was a financially strapped "single technology platform" (i.e., scoring catheter) company that had no interest in exploiting – or ability to exploit – a new, non-scoring product like Chocolate in late 2009/early 2010.

For these and other reasons, Eitan Konstantino and the other defendants respectfully submit that the Court should grant their motion for summary judgment and summarily dispose of AngioScore's defective state-law claims based on breach of fiduciary duty.

## STATEMENT OF FACTS

### A.     Eitan Konstantino and AngioScore

Eitan Konstantino was a founder of AngioScore in March of 2003 and served as its first president, a position he held until approximately November 10, 2005, when he became Executive Vice President and Chief Scientific Officer of AngioScore.  4AC ¶ 16.  Konstantino ceased to be an officer and full time employee of AngioScore on October 17, 2006.  *Id.* ¶ 17.  However, he continued to be a part-time employee of AngioScore until March 31, 2007, at which time his

1   employment with AngioScore ended.  *Id.*  From March 2003 until February 5, 2010 Konstantino

2   was a member of AngioScore's board of directors.  *Id.* ¶ 18.

3       AngioScore describes itself as a company that "designs, develops, manufactures and

4   markets scoring balloon catheters to treat cardiovascular and peripheral artery diseases."  Ex. 1 at

5   AS1846808.  As revealed by its name, AngioScore products "score" through the plaque build-up

6   in blood vessels with a metal scoring element that floats on the surface of a balloon and makes

7   direct contact with the blockage.  Ex. 2 at AS1835354; Ex. 3 (Trotter) at 26:9-27:7; Ex. 5

8   (Bleam) at 69:2-70:1.  AngioScore was (and is) a "single technology company" (i.e., scoring

9   balloon catheter).  Ex. 4 at AS0700230; *see also* Ex. 5 (Bleam) at 69:23-71:24; Ex. 6 (Heller) at

10  34:14-36:14 (VC).[2]

11      Konstantino invented or co-invented the patents animating AngioSculpt's scoring balloon

12  products.  Ex. 7 (a)-(f); Ex. 8 (Gershony) at 13:1-8; Ex. 9 (Konstantino) at 511:21-512:9; Ex. 10

13  (Suennen) at 13:25-14:17.  In short, Konstantino is the creative force behind the technologies

14  that made AngioScore a viable company, which The Spectranetics Corporation purchased in

15  June 2014 for "$230 million in cash, along with additional contingent commercial and regulatory

16  milestone payments."  Ex. 11 at 5.

17      **B.      Eitan Konstantino Founds TriReme with AngioScore's Consent and is Given
              Broad Authority to Provide Services to TriReme as his Role at AngioScore
18            was Diminished**

19      As outlined above, Konstantino's day-to-day role with AngioScore diminished over the

20  years: from President in 2003 to part-time employee in late 2006, until his employment with

21  AngioScore was severed entirely on March 31, 2007.  *See* 4AC ¶¶ 16-17.  As Konstantino's role

22  at AngioScore wound down, he ramped up his work at TriReme Medical, LLC, with

23  AngioScore's knowledge and consent.

24      TriReme was founded by Konstantino and others in about mid-2005, and initially sought

25  to develop and commercialize "'endovascular bifurcation stents and delivery systems for

26

27      [2] "VC" indicates that a video clip can be viewed for the deposition excerpt cited by clicking
        on the hyperlink on the CD-ROM version of this document.  Bold is added for emphasis
28      throughout.

1  bifurcation stents.'" *Id.* ¶ 20.  AngioScore's Board reviewed but declined to participate in

2  TriReme, having no interest in bifurcation stents, and authorized Konstantino (who was then an

3  AngioScore employee and director) to pursue the business.  *Id.*; *see also* Ex. 12.  In a November

4  10, 2005 letter from CEO Tom Trotter to Konstantino – and in conjunction with Konstantino's

5  demotion from President of AngioScore to Chief Scientific Officer – AngioScore acknowledged

6  Konstantino's right to an expanded role at TriReme.  Ex. 13.  Specifically, after acknowledging

7  the AngioScore Board's July 26 "TriReme Consent," Tom Trotter, on behalf of AngioScore,

8  stated that "in addition to the services" authorized by the TriReme Consent, you [Konstantino]

9         are also permitted to join the board of directors of Trireme and ***may provide other***
       ***services to TriReme so long as such services (i) are performed on your personal time,***

10         ***(ii) do not interfere with your duties as an officer and full time employee of the***
       ***Company . . . , and (iii) are performed without using the Company's facilities,***

11         ***equipment, or intellectual property***.

12  *Id.* at TR0027160.

13       Subsequently, AngioScore acknowledged that upon his termination as an employee–

14  which occurred by April 1, 2007 – Konstantino owed no invention assignment obligation to

15  AngioScore, and further noted that Konstantino did not require any "waiver" from AngioScore

16  "to be involved with TriReme."  Ex. 14 at AS0791745; Ex. 15 at AS1862584; Ex. 16 (Sellers) at

17  48:20-49:9 (VC).

18      **C.**    **TriReme's Glider Catheter and AngioScore's Reaction to it**

19       While at TriReme, Konstantino developed a non-scoring balloon catheter with a unique

20  ability to cross through obstructed vessels – named "Glider."  Ex. 17 at BELSON00619.

21  AngioScore learned that Konstantino was developing the Glider angioplasty balloon in

22  December 2009.  Ex. 18 (Trotter) at 41:14-43:12 (VC); *id.* at 80:15-82:16.  On or about

23  December 16, 2009, Konstantino and Trotter met to discuss Glider which AngioScore considered

24  to be "a product that is directly in the AngioScore line of business in terms of balloon

25  angioplasty catheters."  Ex. 18 (Trotter) at 41:14-43:12, 47:12-48:4 (VC); *see also* Ex. 9

26  (Konstantino) at 642:13-644:3; Ex. 19 at TR0000017.  During the December meeting,

27  Konstantino told Trotter that "they were, in fact, commercializing a product called the Glider

28  balloon" and asked whether AngioScore would be interested in distributing the product.

1   AngioScore declined.  Ex. 18 (Trotter) at 42:15-43:7, 78:15-80:14 (VC); Ex. 19 at TR0000017.

2   In declining, AngioScore never so much as suggested that it had a property interest in Glider by

3   virtue of the fact that Konstantino developed that product while on the AngioScore board of

4   directors.  Ex. 18. (Trotter) at 78:15-80:14, 80:15-81:12.  Trotter told Konstantino that his pursuit

5   of Glider "**was a direct violation of his fiduciary responsibility to the company**" and that "it

6   was inappropriate for [Konstantino] to remain on the board of directors of AngioScore."  Ex. 3

7   (Trotter) at 64:12-65:11 (VC); *see also id.* at 67:17-68:13.  Following this meeting, Trotter

8   informed "the members of the board of directors and expressed [his] concern as to this

9   development," but the board took no action.  Ex. 18 (Trotter) at 43:24-46:10 (VC).

10           **D.      The Conception and Development of Chocolate**

11          Chocolate – a non-scoring, distributed force, or pillowed balloon catheter[3] – was

12   conceived of in a telephone call between Konstantino and Tanhum Feld at some point in the

13   latter half of 2009 (i.e., long after Konstantino had left AngioScore's employ), approximately

14   three to four months before Konstantino was first asked to resign from the AngioScore Board.

15   Ex. 20 (Feld) at 10:22-12:25; Ex. 21 (Konstantino) at 147:17-149:15.  Thereafter, Feld worked

16   on the design of the product (Ex. 20 (Feld) at 12:13-16:8 (VC); Ex. 21 (Konstantino) at 150:19-

17   152:12 (VC)) – with occasional assistance from TriReme employees (Ex. 22) – while

18   Konstantino (and others at TriReme) attempted to secure interest in the concept from doctors and

19   potential investors.  Ex. 23 (Ong) at 112:25-114:3; Ex. 24 at AS0796028-29; Ex. 25.  Some of

20   this development work – including design drawings, a preliminary porcine vessel study of a

21   prototype and preliminary financing work (no resources were raised at that time) occurred prior

22   to Konstantino's departure from the AngioScore board on February 5, 2010.  Ex. 23 (Ong) at

23   112:25-114:3; Ex. 24 at AS0796028-29; Ex. 25; Ex. 26; Ex. 20 (Feld) at 16:17-17:5.  However,

24   the vast majority of the development and financing work occurred after that, as reflected by the

25   fact that (i) the earliest tranche of funding for Chocolate via Quattro was not secured until

26   August 2010, nearly six months after Konstantino resigned from the AngioScore board, (Ex. 21

27   _____

28          [3] Although Chocolate has a nitinol constraining structure ("CS"); when used as prescribed
     the balloon inflates through the CS to form pillows.

1   (Konstantino) at 46:19-47:4), (ii) the Chocolate PTA Balloon Catheter did not receive approval

2   for sale in Europe until mid-January 2011 (Ex. 27), and (iii) the device did not receive FDA

3   approval for sale in the U.S. until December 2011, nearly two years after Konstantino's

4   resignation. Ex. 28.

5          Contrary to AngioScore's allegations (*see* 4AC ¶¶ 22, 27), there was no grand conspiracy

6   by Konstantino (or anyone) to hide the work on Chocolate. Indeed, Konstantino pitched the

7   concept to potential investors – which included a slide deck showing the concept and revealing

8   Konstantino's history with AngioScore – without requiring the potential investors to sign an

9   NDA. Ex. 9 (Konstantino) at 551:7-552:8, 601:5-602:21. Likewise, Konstantino and his

10   assistant, GimMoey Ong, discussed Chocolate with leading doctors in the angioplasty field

11   (including showing them drawings), again without requiring that NDAs be signed,  (*see* Ex. 9

12   (Konstantino) at 601:5-602:21, 620:2-21:7; Ex. 23 (Ong) at 316:15-317:5). AngioScore's

13   allegation is more directly refuted by the undisputed fact that Konstantino did, in fact, disclose

14   the Chocolate concept to AngioScore in early February 2010.

15          **E.      Konstantino Advises AngioScore of Nascent "Specialty Balloon" – *i.e.*,**
          **Chocolate – in February 2010 and AngioScore's Actions Thereafter**
16

17          At the February 3, 2010 board meeting – the one following the December 16 meeting –

18   Konstantino met with Trotter to inform him that TriReme was also moving into "specialty

19   balloons"[4] for peripheral indications and to show him a presentation about Chocolate. Ex. 18

20   (Trotter) at 48:16-50:1; Ex. 24 at AS0796029; Ex. 9 (Konstantino) at 533:5-534:1 (VC); *see also*

21   *id.* at 547:6-548:25 ("I told Tom that we are moving into specialty balloons, and I have

22   information I want to share with him. I had the presentation on my laptop."). Specifically,

23   Konstantino told Trotter "that TriReme -- they were now looking at potentially entering the

24   specialty balloon angioplasty market, well beyond the Glider balloon." Ex. 18 (Trotter) at 49:1-

25   14. As Trotter testified:

26          I was even more distressed over the idea that they were now going to move that
          into a further step in entering actually **the specialty balloon catheter market**, or
27   _____

28      [4] AngioScore never viewed Glider as a "specialty balloon" – but rather, merely as "plain old
balloon angioplasty" or POBA. Ex. 3 (Trotter) at 44:19-45:13; Ex. 18 (Trotter) at 76:21-78:13.

1    were considering doing so.  I believe that's what he told me at that time.  And so I
     would say my concern about this was heightened after that meeting, and I believe
2    I then did communicate that same information to our board of directors.

3    *Id.* at 50:20-51:3 (VC).  Trotter understood "the specialty balloon market" to involve "some sort

4    of structure" (typically "metal of some sort") that "is added to the balloon catheter that allows it

5    to perform better in more difficult and challenging lesions."  *Id.* at 51:4-19.

6          Trotter then demanded that Konstantino "leave the premises immediately."  Ex. 9

7    (Konstantino) at 547:6-549:21.

8          A flurry of activity by AngioScore followed this disclosure by Konstantino.

9          Later that same day (February 3), Trotter discussed with AngioScore board members "the

10   change in direction for TriReme . . . specifically, moving into 'specialty balloons' for Peripheral

11   indications" that Konstantino had told Trotter about.  Ex. 24 at AS0796029.  Trotter also

12   discussed the matter with outside counsel John Sellers, and "the consensus opinion" was that

13   Konstantino needed to resign from AngioScore immediately.  *Id.*

14         In a February 4, 2010 email, Trotter asked Konstantino to resign.  *Id.*  Konstantino – who

15   did not believe that the non-scoring Chocolate device would compete with AngioSculpt's scoring

16   balloon (*id.*) – responded that Trotter/AngioScore was "trigger happy," and explained that

17   "Trireme has not made any decision to make such change and I was giving you very early heads

18   up [on] something that may take place in the future, or may never happen, ***depending on the***

19   ***investors coming to the table and as you can imagine we are talking with many.***"  *Id.* at

20   AS0796028-29.  Trotter responded:  "The fact that Trireme is even contemplating the

21   development or marketing of an angioplasty device of any kind for the treatment of peripheral

22   artery disease **which could compete with the AngioSculpt has created a serious conflict of**

23   **interest** for you as a Board Member of AngioScore."  *Id.* at AS0796028; *see also* Ex. 29 at

24   AS0796032 (outside counsel John Sellers reiterating this point).[5]  Notably, it was not until May

25   2014, more than four years later, that AngioScore first contended that such planning to compete

26

27         [5]  Also on February 4, 2010, Trotter emailed two board members and said that Konstantino
     "now has a clear conflict [of interest] with AngioScore **and has violated his written**
28   **commitment as a Board member not to do so**."  Ex. 30 at AS0074379.

1    by Konstantino while still on the AngioScore Board was more than simply a conflict, but in fact

2    gave AngioScore a property interest in Konstantino's products.  Trotter ended his email by

3    saying that Sellers would follow up with Konstantino.  Ex. 24 at AS0796028.

4        Konstantino and Sellers spoke by telephone later that day.  During that call, Konstantino

5    described Chocolate and explained that he did not believe there was any conflict "because the

6    product that I came to show Tom Trotter on February 3rd . . . is **a less traumatic balloon with**

7    **pillows, [that] actually, I viewed as opposite of scoring**."  Ex. 9 (Konstantino) at 533:22-534:8;

8    *see also id.* at 549:22-550:21 ("I told [Sellers] that **we're working with [a] specialty balloon . .**

9    **. that is not designed to score [or] cut.  On the contrary, it has pillows** . . . .").  In addition,

10   Konstantino offered to have the parties agree on a mutually acceptable third party to "review the

11   conflict" and see if one actually exists; but that offer was not pursued.  Ex. 31 at

12   HELLER_0001370.

13       Konstantino resigned from the Board on February 5, 2010.  Ex. 32.  It is undisputed that

14   Konstantino was asked to resign because the AngioScore Board believed he was breaching his

15   fiduciary duties by developing a device that was competitive to the AngioSculpt.  Ex. 3 (Trotter)

16   at 36:10-16 (VC); Ex. 33 (Armstrong) at 67:20-71:11 (VC) (and confirming "I have not

17   waivered" [sic] in that belief); Ex. 34 (Welsh) at 97:2-20 (VC) (and confirming that she still

18   believes that today).

19       Subsequently, Lisa Suennen, Chairwoman of AngioScore's board, contacted Mike Lynn,

20   a TriReme board member, and asked him about TriReme's "specialty catheter" product pipeline.

21   Ex. 35 at JW000013.  Suennen also contacted Ephraim Heller, a co-founder and former CEO of

22   AngioScore.  In a February 6, 2010 email to the board, Suennen relayed her understanding of her

23   discussion with Heller: "Ephraim was fairly horrified to learn of our recent revelations from

24   Eitan and also *confirmed to me that he believes Eitan is working to bring a competitive product*

25   *to the market.  I told him we were going to use any means necessary to protect AngioScore and*

26

27

28

1   *that there was a reasonable chance this thing could get fairly ugly fairly fast.*" Ex. 36 at

2   AS1892557.[6]

3          There also ensued an exchange of letters from outside counsel for both AngioScore and

4   Konstantino, wherein AngioScore raised concerns that Konstantino had breached duties owed to

5   AngioScore by working on balloon catheters and Konstantino responded that any concerns were

6   unfounded because, primarily, none of the balloons in question were scoring balloons, like the

7   AngioSculpt product line.  *See* Ex. 19; Ex. 39 at TR0027168.  Indeed, while AngioScore has

8   attempted to explain away its failure to take legal action for more than four years by pointing to a

9   February 23, 2010 letter from Konstantino's counsel about Konstantino's development activities

10  prior to his resignation from the AngioScore Board (4AC ¶ 27), contemporaneous evidence

11  demonstrates that AngioScore did not, in any way, rely upon that response.  Thus, Trotter

12  emailed the board and expressed his belief that the February 23, 2010 letter was "***weak and in***

13  ***many ways non-responsive***" and did

14          **not in any way address the central core issue in the dispute which is the fact**
        **that Eitan, while he was a Board Member of AngioScore and up until his**
15      **resignation on February 5th, obtained proprietary and confidential**
        **information about the Peripheral Market and the role of Scoring Balloons in**
16      **that market while at the same time developing plans within Trireme to pursue**
        **those same markets with a competitive device.**
17

18  Ex. 40 at AS1893019.

19          On February 25, TriReme announced FDA approval for Glider, and Trotter commented:

20          Obviously, this has been in the works for many months (testing, submission,
        approval, etc) while Eitan was a member of our Board and took possession of a
21      considerable amount of confidential Sales Marketing, Product Development and
        Regulatory information ***in blatant violation of his fiduciary responsibilities as a***
22      ***Board member of AngioScore***.

23

24  Ex. 41 at AS0796692.

25          Board Chair Lisa Suennen, responded: "I am eager to hear what our respective lawyers,

26  including IP counsel, think of this."  *Id*.

27  _____

28          [6]  Contemporaneous notes by Lynn from a call with Heller confirm that AngioScore was
    advised of the "2nd balloon."  Ex. 37; Ex. 38 (Lynn) at 97:15-99:20.

1        On March 2, 2010, in an email titled "D&O," CFO James Andrews informed Trotter that

2   he "just spoke with [AngioScore's D&O insurance broker] about the potential claim involving

3   Eitan." Ex. 42. For reasons known only to AngioScore, AngioScore's "board of directors

4   agreed not to take any legal action at that time." Ex. 3 (Trotter) at 36:10-39:19 (VC).

5        Ultimately, the Chocolate device was not approved for sale in Europe until January 2011

6   (Ex. 27), nearly a year after Konstantino resigned from the AngioScore Board, and it was not

7   approved for sale in the United States until nearly two years after his resignation (December

8   2011) (Ex. 28). Although, as set forth above, AngioScore believed at the time of Konstantino's

9   resignation that he had "obtained proprietary and confidential information about the Peripheral

10   Market and the role of Scoring Balloons in that market while at the same time developing plans

11   within Trireme to pursue those same markets with a competitive device," (Ex. 40 at

12   AS1893019), AngioScore did not assert a breach of fiduciary duty claim against Konstantino

13   either when the Chocolate product was approved in Europe in January 2011 or in December

14   2011, when it was approved in the United States. Nor did Plaintiff assert that claim when it

15   commenced its patent infringement lawsuit on June 29, 2012. Instead, AngioScore waited until

16   May 6, 2014 before it sought leave to amend to add its state law claim. Notably, roughly two

17   weeks earlier, on April 26, 2014, defendant QT Vascular had successfully completed its initial

18   public offering. Ex. 43 at TR0054432. When it sought leave to amend, Plaintiff claimed among

19   other things that, by reason of the alleged usurpation of Chocolate as a corporate opportunity,

20   AngioScore was entitled to a constructive trust over the entire proceeds of that public offering

21   (Dkt. No. 202-1 at 15). On May 27, 2014, The Spectranetics Corporation formally announced

22   that it would acquire AngioScore. Ex. 1.

23                      **ARGUMENT**

24   **I.    LEGAL STANDARD GOVERNING SUMMARY JUDGMENT**

25        Summary judgment is appropriate where the moving party establishes that "there is no

26   genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.

27   R. Civ. P. 56(c). A factual dispute between the parties will not defeat a motion for summary

28   judgment unless it is both genuine and material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247-48 (1986). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has carried its burden under Rule 56, the nonmoving party must affirmatively present specific admissible evidence sufficient to create a genuine issue of material fact for trial.  *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 325.

## II.  DELAWARE LAW GOVERNS THE BREACH OF FIDUCIARY DUTY CLAIMS

Under the internal affairs doctrine, the law of the state of incorporation governs liabilities of officers or directors to the corporation and its shareholders.  *Shaffer v. Heitner*, 433 U.S. 186, 215 n.44 (1977); *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 621 (1983) ("[T]he law of the state of incorporation normally determines issues relating to the *internal* affairs of a corporation."); *see also* Cal. Corp. Code § 2116 (liability for actions taken by officer or director of a foreign corporation is determined "according to any applicable laws of the state or place of incorporation" regardless of whether alleged misconduct occurred "in this state or elsewhere"); *Villari v. Mozilo*, 208 Cal. App. 4th 1470, 1477 n.8 (2012). Because AngioScore is a Delaware corporation, Delaware law governs Plaintiff's fiduciary duty claims.

## III.  PLAINTIFF'S STATE LAW CLAIMS ARE TIME-BARRED

Delaware Code Title 10, Chapter 81, § 8106 establishes a three year statute of limitations for the Plaintiff's breach of fiduciary duty claim.  "A claim for breach of fiduciary duty accrues at the time of the wrongful act."  *Sutherland v. Sutherland*, No. 2399-VCN, 2010 WL 1838968, at *8 (Del. Ch. May 3, 2010); *Pomeranz v. Museum Partners, L.P.*, No. 20211, 2005 Del. Ch. LEXIS 10, at *9 (Del. Ch. Jan. 24, 2005) (the statute of limitations begins to run "'at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action.'") (citation omitted). Under Delaware law, a plaintiff may toll the limitations period by specifically alleging that the facts were so hidden that a reasonable plaintiff could not have made timely discovery of an injury necessary to file a complaint.  "[A] plaintiff bears the burden of showing that the statute

1   was tolled, and relief from the statute extends only until the plaintiff is put on inquiry notice." *In*

2   *re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 585 (Del. Ch. 2007).  "Inquiry notice

3   does not require a plaintiff to have actual knowledge of a wrong, but simply an objective

4   awareness of the facts giving rise to the wrong – that is, a plaintiff is put on inquiry notice when

5   he gains 'possession of facts sufficient to make him suspicious, or that ought to make him

6   suspicious.'" *Sunrise Ventures, LLC v. Rehoboth Canal Ventures, LLC*, No. 4119-VCS, 2010

7   WL 363845, at *7 (Del. Ch. Jan. 27, 2010) (citation omitted).  Once a plaintiff suspects

8   wrongdoing, "she is obliged to diligently investigate and to file within the limitations period as

9   measured from that time." *Pomeranz*, 2005 Del. Ch. LEXIS 10, at *48.  "'[W]hatever is notice

10  calling for inquiry is notice of everything to which such inquiry might have led . . . .'" *Id*. at *55

11  (quoting *U.S. Cellular Inv. Co. v. Bell Atl. Mobile Sys.*, 677 A.2d 497, 503 n.7 (Del. 1996)).

12          **A.      The State Law Claims Were Filed After The Limitations Period.**

13          On its face, Plaintiff's breach of fiduciary duty claims are untimely.  The allegedly

14  actionable events began in 2009 and ended no later than February 5, 2010 with Konstantino's

15  resignation from AngioScore's Board.  4AC ¶¶ 21-22.  AngioScore did not sue Konstantino for

16  breach of fiduciary duty until its Third Amended Complaint dated June 27, 2014—well after the

17  expiration of these claims.

18          **B.      Plaintiff Cannot Establish Its Entitlement To Equitable Tolling.**

19          As noted above, in asserting tolling, the burden of proof is on Plaintiff, not on

20  Defendants:  all that Defendants need to do is show that suit was commenced more than three

21  years after the events, and then the burden shifts.  *Burrell v. Astrazeneca LP*, No. 07C-01-412

22  (SER), 2010 Del. Super. LEXIS 393, at *7, *16 (Del. Super. Ct. Sept. 20, 2010); *U.S. Cellular*,

23  677 A.2d at 504.  This means that, at summary judgment, Plaintiff must now produce a sufficient

24  basis to carry the burden at trial of establishing its entitlement to tolling.  Plaintiff cannot do so in

25  light of the undisputed facts in this case.

26          To establish tolling, Plaintiff relies upon "the letter from Konstantino's counsel to

27  AngioScore's counsel dated February 23, 2010 which 'reiterate[s]' Konstantino's statements to

28  Tom Trotter 'during their December 16, 2009 and February 3, 2010 discussions' that TriReme

1   'has not developed any products, nor acquired or licensed any technology that competes with

2   AngioScore products.'"  4AC ¶ 27; *see also* Ex. 39 at TR0027168.  However, Konstantino's

3   belief that the angioplasty balloon devices he was developing would not compete with

4   AngioSculpt[7] because they do not involve "specialized features such as scoring, cutting, or drug

5   eluting elements" does not change the fact that Plaintiff <u>actually knew</u> that Konstantino was

6   developing angioplasty balloon catheters which *AngioScore* believed competed, and could have

7   investigated further.  *Pomeranz*, 2005 Del. Ch. LEXIS 10, at *37, *42, *52 (plaintiffs not entitled

8   to equitable tolling where they contended they were "lulled into believing that [their investment]

9   was thriving"; "[p]laintiffs must remain alert to red-flags that should prompt 'an inquiry by

10  plaintiffs'" (citation omitted)); *In re Dean Witter P'ship Litig.*, No. 14816, 1998 Del. Ch. LEXIS

11  133, at *39 (Del. Ch. July 17, 1998) ("[p]laintiffs were not entitled to sit idly by, blindly relying

12  on defendants' assurances"); *see also Whitlock Corp. v. Deloitte & Touche, L.L.P.*, 233 F.3d

13  1063, 1066 (7th Cir. 2000) ("Simple denials of liability do not toll the period of limitations or

14  estop the adverse party to rely on it").  Indeed, AngioScore's belief that Konstantino had

15  developed a competing product was the entire reason he was asked to resign from the

16  AngioScore board of directors.  *See supra* at 5-10.

17          Moreover, the undisputed facts show not only that Plaintiff <u>actually knew</u> that

18  Konstantino was developing angioplasty balloon catheters that AngioScore believed competed

19  with AngioScore's own products, but that Plaintiff believed Konstantino had used AngioScore's

20  proprietary information and materials to develop these devices, and believed Konstantino had

21  breached his fiduciary duties to AngioScore by developing these devices while he sat on

22  AngioScore's board.  *See supra* at 5-10.  While AngioScore *alleges* that its concerns were

23  allayed by the February 23, 2010 letter from Konstantino's counsel, the contemporaneous and

24  undisputed evidence from AngioScore demonstrates that this claim is false.  *See supra* at 9-10.

25  To the contrary, at the time, AngioScore affirmatively considered suing him for breach of his

26

27          [7]  TriReme documents from early 2010 show that Chocolate was intended to displace stents
    used in angioplasty.  Ex. 44 at TR0307712; Ex. 45 at TR0167599; *see also* Ex. 46 (Haig) at
28  113:3-114:4.  As Trotter acknowledged, stents "are not, in essence, competitive products."
    Ex. 18 (Trotter) at 126:10-22.

1  fiduciary duties. *See supra* at 9-10. Yet rather than bringing suit in 2010 against Konstantino for

2  breach of fiduciary duty, AngioScore waited more than four years. Plaintiff's undue delay

3  beyond the limitations period requires termination of the breach of fiduciary duty claims.[8]

4  **IV.    PLAINTIFF'S STATE LAW CLAIMS ARE ALSO BARRED BY THE
           DOCTRINE OF LACHES**

5

6          "'Laches is an equitable principle that operates to prevent the enforcement of a claim in

7  equity where a plaintiff has delayed unreasonably in bringing suit to the detriment of the

8  defendant or third parties.'" *Gen. Video Corp. v. Kertesz*, No. 1922-VCL, 2008 Del. Ch. LEXIS

9  181, at *91 (Del. Ch. Dec. 17, 2008) (citation omitted); *see also Adams v. Jankouskas*, 452 A.2d

10 148, 157 (Del. 1982) ("Equity aids the vigilant, not those who slumber on their rights.");

11 *Hutchinson v. Fish Eng'g Corp.*, 203 A.2d 53, 63 (Del. Ch. 1964). "The doctrine of laches

12 protects defendants from prejudice by prohibiting the unreasonably slow filing of equitable

13 claims." *Quill v. Malizia*, No. 2239-S, 2005 Del. Ch. LEXIS 37, at *51 (Del. Ch. Mar. 4, 2005).

14 "The doctrine of laches acts as a bar to an action in equity if the defendant carries the burden of

15 persuasion that two conditions have been satisfied: (1) the plaintiff waited an unreasonable

16 length of time before bringing the suit and (2) the delay unfairly prejudices the defendant."

17 *Hudak v. Procek*, 806 A.2d 140, 153 (Del. 2002).

18         The undisputed facts demonstrate that Defendants have been severely prejudiced by

19 AngioScore's unreasonable delay in bringing its usurpation claim. In the years following

20 Konstantino's resignation from AngioScore's Board in February 2010, Defendants spent

21 thousands of hours and tens of millions of dollars developing Chocolate into a commercial

22 product that achieved FDA approval in the United States and CE Mark approval in Europe.

23 Ex. 9 (Konstantino) at 618:3-15. In the intervening four plus years, Plaintiff chose to sit on its

24

25         [8]  Plaintiff's claim under California's Unfair Competition Law ("UCL"), Business &
   Professions Code section 17200, et seq. is also time-barred. The UCL prescribes a four-year
26 statute of limitations. Cal. Bus. & Prof. Code § 17208. The statute of limitations on a UCL
   cause of action begins to run when the claim "accrues." *Id.*; *see also Snapp & Assocs. Ins.*
27 *Servs., Inc. v. Malcolm Bruce Burlingame Robertson*, 96 Cal. App. 4th 884, 891 (2002) (statute
   of limitations under UCL commenced on date cause of action accrued, not on date of discovery).
28 Accordingly, and for the reasons stated herein (sections III and IV), the claim is time-barred.

1   hands until weeks after defendant QT Vascular closed on its initial public offering in Singapore

2   in April 2014.  This delay prejudices the rights of the public who have invested in QT Vascular's

3   stock, as well as Defendants.  Indeed, even if AngioScore had first learned of Chocolate when it

4   was approved in Europe in January 2011 or in the United States in December 2011, given

5   Angioscore's clear, unmistakable belief a year earlier that Konstantino had misappropriated its

6   scoring technology, AngioScore could have claimed a property interest in Chocolate at either

7   point in time.  Instead, AngioScore bided its time and watched as Defendants developed a market

8   for the product, hired sales people, achieved approval for peripheral applications and, in fact,

9   waited until the QT Vascular IPO to do anything.  In other words, AngioScore waited "3-5

10  years" to see whether Chocolate would "achieve adoption and traction" in the marketplace[9]

11  before asserting a purported ownership interest.  Given the financial prejudice to defendants

12  resulting from AngioScore's entirely unreasonable delay in asserting an ownership interest in

13  Chocolate, the claim should be barred by laches.  *Fike v. Ruger*, 752 A.2d 112, 114 (Del. 2000);

14  *Gen. Video*, 2008 Del. Ch. LEXIS 181, at *87.[10]

## V.   SUMMARY JUDGMENT IS WARRANTED ON PLAINTIFF'S BREACH OF FIDUCIARY DUTY CLAIMS

### A.   The Corporate Opportunity Doctrine

18       "The essence of a duty of loyalty claim is the assertion that a corporate officer or director

19  has misused power over *corporate* property or processes in order to benefit himself rather than

20  advance corporate purposes."  *Steiner v. Meyerson*, No. 13139, 1995 WL 441999, at *2 (Del. Ch.

21  July 19, 1995) (emphasis added).  Thus, under the corporate opportunity doctrine, a fiduciary

22  may not "appropriate[] for himself something that in fairness should belong to the corporation."

23  *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 155 (Del. 1996).  Indeed, in the seminal decision

---

[9] Ex. 75 at AS0796720.

[10] Moreover, the delay has resulted in the loss of critical evidence.  For example, Defendants were unable to take the depositions of long-time director, Bob Elliott and board observer Jim Dreyfous, who are now suffering debilitating illnesses.  Given their views in December 2009 that AngioScore could not possibly afford another technology or product line (*see* § V.C, *infra*), their testimony would have been material.  *Fike*, 752 A.2d at 114; *Steele v. Ratledge*, No. Civ. A. 16455, 2002 WL 31260990, at *3 (Del. Ch. Sept. 20, 2002).

of *Guth v. Loft, Inc.*, 5 A.2d 503 (Del. 1939), the Delaware Supreme Court held that Guth, the

president of a chain of soda fountain shops, usurped a corporate opportunity when, in his

capacity as president, he was offered the secret formula to Pepsi and formed a corporation owned

by him alone to exploit that opportunity.  *See id.* at 515 ("[Guth] invested little or no money of

his own in the venture, but commandeered for his own benefit and advantage the money,

resources, and facilities of his corporation and the services of its officials.  He thrust upon Loft

the hazard, while he reaped the benefit.").

But to Defendants' knowledge, the usurpation of a corporate opportunity doctrine has

*never* been applied by the Delaware courts to hold that an invention that an outside director

developed without the use of the company's proprietary information or  facilities was a corporate

opportunity that an  outside director had a duty to offer to the corporation.[11]  To the contrary,

where, as here, it is undisputed that Konstantino and his co-inventor Tanhum Feld were the

individuals who independently conceived of and developed that invention, that opportunity is a

personal opportunity of Konstantino and Feld's "own making," "a situation *entirely inconsistent*

with the usual concept of corporate business opportunity."  *Equity Corp. v. Milton*, 221 A.2d

494, 499 (Del. 1966) (emphasis added) ("We think that under the circumstances of this case

there was no corporate opportunity with respect to these options.  We say this because it is quite

apparent that whatever opportunity existed was of Milton's own making.  Throughout, he was

dealing with his own property, or at least property which he controlled.").[12]

Because AngioScore's "corporate opportunity" theory defectively seeks to acquire a right

to the independently conceived of, developed, and owned property interests of Konstantino and

Mr. Feld, summary judgment on the corporate opportunity claim is appropriate.

---

[11] Nor could Plaintiff's own "corporate governance" expert, Professor Talley at Boalt Hall, name such a case when asked to do so at his deposition.  Ex. 47 (Talley) at 30:22-32:6 (VC).

[12] Indeed, this Court previously found, in denying AngioScore's motion for leave to amend to assert a claim for conversion, that AngioScore failed to plead facts showing that AngioScore had a "personal property interest" in Chocolate because, among other things, "Konstantino's Confidential Information and Invention Assignment Agreement terminated April 1, 2007 . . . and the record does not support a finding that the accused device, the 'Chocolate' angioplasty balloon catheter was developed any earlier than 2009."  Dkt. No. 219 at 2.

**B.      Summary Judgment Is Warranted Because Planning To Compete Is Not A Breach Of Fiduciary Duty.**

Although the corporate opportunity doctrine plainly does not apply here, AngioScore may contend that the development work that Konstantino did on the Chocolate catheter for the several months prior to his resignation—which AngioScore characterizes as  both "extensive" and "concealed" from AngioScore—constitutes a breach of fiduciary duty.  AngioScore is mistaken.  As a matter of law, planning to compete does not constitute a breach of fiduciary duty.  *See* Restatement (Third) of Agency § 8.04 (2006) ("an agent may take action, not otherwise wrongful, to prepare for competition following termination of the agency relationship."); *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010) ("An agent . . . is not prohibited from . . . making arrangements or preparations to compete with his principal before terminating his agency, provided he does not act unfairly or injure his principal"); *see also Sci. Accessories Corp. v. Summagraphics Corp*, 425 A.2d 957, 962, 964-65 (Del. 1980) (employees are free to "'prepare or make arrangements to compete with their employer prior to leaving the employ of their prospective rivals without fear of incurring liability for breach of fiduciary duty of loyalty'" absent any "wrongful" conduct and noting that the principles of agency law "carry over into the field of corporate employment so as to apply" to officers, directors, and key managerial personnel) (citation omitted).  Here, even assuming Chocolate is competitive with AngioScore's product now, *there was no actual competition* with AngioScore until almost *two years* after Konstantino left AngioScore's board of directors.  This is so because Chocolate could not be sold in the United States until it was approved for sale by the FDA in December 2011.  Ex. 28; Ex. 48 at 17-18.  Accordingly, Konstantino's efforts to develop Chocolate while serving as an outside director on AngioScore's board of directors were lawful and do not support any breach of fiduciary duty-based claim.

**C.      Summary Judgment Is Warranted Because Konstantino Did Not Usurp A Corporate Opportunity.**

AngioScore's claim would fail even if Chocolate could somehow be characterized as a corporate opportunity.  The corporate opportunity doctrine holds that "a director or officer may

take a corporate opportunity if: (1) the opportunity is presented to the director or officer in his individual and not his corporate capacity; (2) the opportunity is not essential to the corporation; (3) the corporation holds no interest or expectancy in the opportunity; and (4) the director or officer has not wrongfully employed the resources of the corporation in pursuing or exploiting the opportunity." *Broz*, 673 A.2d at 154-55.  Here, Chocolate was not merely "presented" to Konstantino in his "individual . . . capacity," it was conceived of and developed by him in that capacity.  *See supra* § V.A.  The opportunity also was not "essential" to AngioScore and AngioScore had no interest or expectancy in the product.  *Broz*, 673 A.2d at 157 (holding that where a corporation has no expectancy to participate in an investment there is no duty on behalf of the fiduciary to present the corporation with the opportunity to invest notwithstanding the fact that the corporation might have otherwise been in competition with its fiduciary); *Sci. Accessories*, 425 A.2d at 964  (because opportunity to purchase new technology was "an 'outside' opportunity not available to SAC, defendants' failure to disclose the concept to SAC and their taking it to themselves for purposes of competing with SAC cannot be found to be in breach of any agency fiduciary duty"); *In re Digex Inc. S'holders Litig.*, 789 A.2d 1176, 1190 (Del. Ch. 2000) (denying preliminary injunction; "the perceived corporate opportunity is not really a corporate opportunity at all, but more closely resembles an individual opportunity of the shareholders . . . [b]ecause the opportunity the plaintiffs identify was not one in which Digex as a corporation had an "interest or expectancy"); *Equity*, 221 A.2d at 499.[13]

Here, the undisputed facts show that Chocolate was a personal opportunity of Konstantino's and Feld's "own making."  *Equity*, 221 A.2d at 499.  Moreover, co-inventor Tanhum Feld testified that he would not have made Chocolate available to AngioScore.  Ex. 20 (Feld) at 23:15-25:1 (VC) ("I would not want to have AngioScore on board on this project . . . [b]ecause I didn't like the mentality and the aggressiveness of the people who worked there. . . . I did not like the way the company was managed.  I did not like the attitude. . . . All the dealings

---

[13] *Cf. Rankin v. Frebank Co.*, 47 Cal. App. 3d 75, 88 (1975) (if corporation cannot engage in the opportunity "'because one refuses to deal with it,'" then 'the opportunity may be embraced by an officer or director"); *Astarte, Inc. v. Pac. Indus. Sys., Inc.*, 865 F. Supp. 693, 707 (D. Colo. 1994) (when not available to corporation, offer is not a practical corporate opportunity).

1   with them were unpleasant and very difficult.").  Because Chocolate was never available to

2   AngioScore, Plaintiff cannot show that Chocolate was a "corporate opportunity."

3        In addition, numerous contemporaneous documents demonstrate that AngioScore single-

4   mindedly pursued the development of its own "AngioSculpt platform" by creating numerous

5   iterations of a single scoring technology in various dimensions and for various uses.  *See, e.g.*,

6   Ex. 49 at AS0411702 (2/4/10 email declining a business opportunity, stating "we are currently

7   **laser focused** on driving sales penetration of our core scoring balloon products"); Ex. 4 at

8   AS0700230; Ex. 6 (Heller) at 34:14-35:15; Ex. 50 at AS0010044 (12/8/2009 board presentation

9   stating AngioScore was developing two iterations of AngioSculpt); Ex. 74 at AS0602798

10  (5/5/2009 email from CMO Gershony declining opportunity to acquire a new scoring

11  technology, stating: "At this point [AngioScore] does not want to proceed with any new projects

12  given the uncertainty of the economy"; AngioScore was "mainly focused on improving the

13  current design and adding a hydrophilic coating and developing additional sizes"; and "[s]ince

14  the sales of the current device are doing very well . . . they don't feel that there is a strong need

15  to add another type of scoring device with all the testing and clinical studies that would be

16  required to gain FDA approval"); Ex. 18 (Trotter) at 321:20-325:8 (VC); Ex. 51 at AS0399074

17  (March 2010 presentation with chart titled "New Product Development History and Projection"

18  showing only AngioSculpt products through 2014); Ex. 2 at AS1835369-70; Ex. 52 (Giofreddi)

19  at 44:11-49:11 (citing Ex. 53) (admitting product pipeline in 2009 was exclusively based on

20  AngioSculpt technology); Ex. 5 (Bleam) at 70:12-71:24 (all of "the products that AngioScore

21  introduced between 2008 and 2013" is designed to "focus the force of the balloon along the

22  mesh").  The evidence demonstrates that AngioScore's efforts to expand this single product into

23  a technology platform monopolized and strained AngioScore's R&D resources such that it would

24  have been impossible – as well as inimical to its core business strategy – for AngioScore to

25  develop and market Chocolate.

26       In fact, according to Board materials from a special strategic session during AngioScore's

27  December 2009 board meeting, the consensus was: "**Most feel the timing is not right for**

28  **AngioScore to acquire another company, technology or product line**."  Ex. 50 at

AS0010040.  In response to the question "Do you support acquiring another company, technology or product line?"  AngioScore tallied the following responses:[14]

1. CEO/Director Tom Trotter responded: "**No, this is not necessary.  The AngioSculpt Technology Platform is more than sufficient to get us where we need to go.**"  Ex. 54 at SL0000205; Ex. 55.

2. CFO Jim Andrews: "**No, not now.  The market opportunity for the existing technology is enormous. This would be a distraction and retard the company's growth during the current critical valuation creation phase.**"  Ex. 57 at SL0000210; Ex. 55.

3. CMO Gary Gershony:  "**Not at this time**.  I don't see any specific technology (other than drug coating) that would enhance the overall value of AngioScore."  Ex. 58 at SL0000192; Ex. 55.

4. Sr. VP of R&D & Manufacturing Feridun Ozdil: "**No unless it is a drug eluting balloon coating . . . Otherwise, it would defocus AngioScore.**"  Ex. 59 at SL0000177; Ex. 55.

5. VP Medical, Regulatory, and Quality Control Karin Gastineau: "Only if the acquisition was intended to bring significant value to the company by **expanding the technology platform; e.g. drug coating technology.  Any other acquisition would defocus the company and would derail the entire business.**"  Ex. 60 at SL0000167; Ex. 55.

6. Sr. VP of Sales and Marketing, Michael Gioffredi: "**Only post IPO**." Ex. 61 at AS0883432; Ex. 55.

7. Director Benjamin Schapiro: "**No!**"  Ex. 55; Ex. 62 (Shapiro) at 62:3-62:16; Ex. 63 at AS0013711-19; Ex. 64 at AS0024275.

8. Director Bob Elliott:  "**No.  Would require valuable cash.**"  Ex. 65 at SL0000187; Ex. 55.

9. Board observer Jim Dreyfous: "**I do not understand how this can help in both the short term and medium term.  Team has too much to do already.**"  Ex. 66 at SL0000162; Ex. 55.

10. Director Thomas Raffin: "Would consider.  **Not easy**."  Ex. 67 at SL0000182; Ex. 55.

11. Director Lisa Suennen:  "Potentially yes, if it is accretive or adds some strategic value."  Ex. 68 at SL0000202; Ex. 55.

[14] The responses listed in this section as items 1-11, were provided by the members of the board of directors and the senior management team at AngioScore to Sarah Lugaric, a consultant who was retained to facilitate a strategic discussion at the December 2009 Board meeting.  Ex. 56 (Lugaric) at 14:18-25:11.  Of particular note, the individuals relayed to Lugaric their views on what, if any, additional product lines or technologies AngioScore should pursue.  In her deposition, Lugaric explained how she received the responses that are quoted here and compiled them for the Board's consideration.  *Id.* at 61:8-127:10.

1    Thus, the overwhelming and undisputed evidence shows that in late 2009/early 2010,

2  AngioScore was focused exclusively on increasing sales of its core product, the AngioSculpt,

3  and had no interest in acquiring a new product line.  *See also* Ex. 69 at AS0082263 (Trotter

4  stating: "All AngioScore needs is the time and resources to fully develope [sic] the AngioScupt

5  [sic] Technology.  2010-2011 is the time frame, the question is will the resources be there?").

6  The fact that AngioScore still does not carry any product other than iterations of the AngioSculpt

7  scoring balloon catheter (http://angioscore.com/product-main-tech.html) confirms that it did not

8  even have a speculative interest in expanding its product line to encompass other technologies,

9  such as Chocolate.  Against this virtual mountain of evidence that AngioScore had no interest in

10  products outside of the AngioSculpt, the litigation-driven assertions of AngioScore's witnesses

11  that the Company would have had an interest in developing that product – even though it never

12  claimed such an interest until May 2014 – cannot create an issue of fact.[15]

13    AngioScore's after the fact claim that it would have had an interest in developing

14  Chocolate is not even logical.  Plaintiff has taken the position in this litigation that Chocolate is a

15  direct competitor of the AngioSculpt.  4AC ¶ 22.  Mr. Trotter has opined that Chocolate

16  accounted for lost sales of up to 10% of AngioScore's existing sales.  Ex. 3 (Trotter) at 19:1-

17  20:6.  And Plaintiff's expert has proffered a lost sales theory of damages that assumes that

18  Chocolate could have been kept *off* the market.  Ex. 70 at 4, 6-10 (estimating $3-3.1 million in

19  lost profits to date and a projected loss of approximately $20 million through Q2 2019).  Plainly,

20  AngioScore would not have invested the millions of dollars necessary to bring this product to

21  market– at the expense of its own R&D efforts – only to cannibalize its existing sales.

22

23  _____

[15] Plaintiff cannot create a genuine issue of material fact simply by swearing to facts contradicted
24  by the rest of the record.  *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir.
1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence,
25  is insufficient to create a genuine issue of material fact."); *Nguyen v. McHugh*, – F. Supp. 2d –,
2014 WL 4182694, at *13 (N.D. Cal. Aug. 22, 2014) (same); *United States v. $133,4200.00 in*
26  *U.S. Currency*, 672 F.3d 629, 638-39 (9th Cir. 2012) ("claimant's bare assertion . . . in the
absence of some other evidence" is "'insufficient to create a genuine issue of material fact'"
27  (citations omitted)); *see also Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1149 (9th Cir.
1998) (where the factual context of the record as a whole makes the non-moving party's claims
28  implausible, to defeat a summary judgment motion that party must present more evidence than
would otherwise be necessary).

1    Nor can AngioScore claim had it been offered the opportunity to develop Chocolate it

2    could have chosen simply not to develop that opportunity.  Where, as here, the corporation

3    manifestly had no interest in exploiting the claimed opportunity, the defendant is free to pursue

4    that opportunity himself.  *See, e.g.*, *Broz*, 673 A.2d at 156 (cellular license was not a corporate

5    opportunity where company was "divesting its cellular license holdings").

6    Finally, Plaintiff cannot show that Konstantino utilized AngioScore's resources in

7    developing Chocolate.  Indeed, the undisputed evidence shows that Tanhum Feld designed the

8    early prototype of Chocolate in his office in Israel with the assistance of an Israeli vendor and

9    other third parties.  Ex. 20 (Feld) at 14:11-17:13; *supra* at 6.  Plaintiff cannot show that

10   Konstantino utilized any of AngioScore's equipment, facilities, proprietary information, or

11   personnel to develop Chocolate.  In sum, the undisputed facts show that Chocolate was not a

12   corporate opportunity that was available to AngioScore or in which it had an interest or

13   expectancy,[16] and Plaintiff cannot produce facts to show that Konstantino breached his fiduciary

14   duties by beginning to develop the idea for Chocolate while he was on AngioScore's Board.

15   **VI.   SUMMARY JUDGMENT IS WARRANTED AS TO PLAINTIFF'S UNFAIR**
         **COMPETITION, AIDING AND ABETTING, SUCCESSOR LIABILITY AND**
16       **ALTER EGO CLAIMS**

17   ***Unfair Competition***.  California's Unfair Competition Law, Business & Professions

18   Code section 17200, et seq., prohibits "any unlawful, unfair or fraudulent business act or practice

19   and unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200.

20   "[T]he [statute] borrows violations of other laws . . . and makes those unlawful practices

21   actionable . . . ."  *Lazar v. Hertz Corp.*, 69 Cal. App. 4th 1494, 1505 (1999).  A complaint that

22   fails to allege a violation of the underlying law "necessarily fail[s]" to state a cause of action

23   under Section 17200.  *Id.*  Here, Plaintiff predicates the UCL claim on its breach of fiduciary

24   duty/corporate opportunity claims.  4AC ¶¶ 75-76.  Because Plaintiff's breach of fiduciary

25   duty/corporate opportunity claim fails, the UCL claim also necessarily fails.  *See Owens v. Bank*

26   *of Am., N.A.*, No. 11-cv-4580-YGR, 2012 WL 5340577, at *5 (N.D. Cal. Oct. 25, 2012)

27   _____

28       [16] AngioScore's expectancy interest is further eviscerated by its broad grant of permission for
     Konstantino to work at TriReme.  *See supra* at 5.

1   (Gonzalez Rogers, J.) ("Based upon the Court's ruling as to the other claims, Plaintiffs have also

2   failed to allege a basis for relief under Business & Professions Code § 17200").

3      ***Aiding and Abetting/Successor Liability***.  Once this Court dismisses the fiduciary duty

4   claims, it should also dismiss the aiding and abetting claim.  "As a matter of law and logic, there

5   cannot be secondary liability for aiding and abetting an alleged harm in the absence of primary

6   liability."  *In re Alloy, Inc. S'holder Litig.*, No. 5626-VCP, 2011 WL 4863716, at *14 (Del. Ch.

7   Oct. 13, 2011) (citing *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001)).  Even if the

8   Court were to deny summary judgment as to the fiduciary duty claim, summary judgment would

9   be warranted as to the aiding and abetting claims against Defendants Quattro Vascular and QT

10   Vascular because these entities *did not even exist* at the time of the alleged misconduct.[17]  *Beard*

11   *Research*, 8 A.3d at 604-05.  Plaintiff has attempted to get around this inconvenient truth by

12   arguing that QT Vascular is the successor-in-interest of the other corporate defendants and

13   assumed their liabilities.  *See* Dkt. No. 292 at 7 (noting "AngioScore does not engage carefully

14   with the standard for successor liability, which under applicable state law generally is limited to

15   specific circumstances." (citing *Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*,

16   159 F.3d 358, 361-63 (9th Cir. 1997))).[18]  Plaintiff cannot show that QT Vascular is the

17   successor-in-interest or otherwise assumed the liabilities for any of the corporate Defendants.  To

18   the contrary, as discussed further below, each of these entities continues to exist as a separate

19   entity and QT Vascular has not assumed their liabilities.  Accordingly, summary judgment is

20   warranted on the issue of successor liability, as well as Plaintiff's aiding and abetting claim.

21      ***Alter Ego***.  To the extent Plaintiff alleges an alter ego claim, it can provide no evidence

22   to support it.  The "alter ego" theory is "an extreme remedy, sparingly used."  *Sonora Diamond*

23   *Corp. v. Superior Court*, 83 Cal. App. 4th 523, 539 (2000); *Marnavi S.p.A. v. Keehan*,

24   900 F. Supp. 2d 377, 392 (D. Del. 2012) (piercing the corporate veil is appropriate only in

25   

---

26    [17]  Quattro Vascular was incorporated in Singapore on March 25, 2010 and QT Vascular was incorporated in Singapore on March 6, 2013.  Ex. 71; Ex. 72.

27    [18]  Plaintiff raised its successor liability argument for the first time in a single sentence in its opposition to Defendants' motion to dismiss (Dkt. No. 264 at 6) with scant analysis and no citation to allegations in its complaint.

28

1   "exceptional circumstances" (citation omitted).  The theory is based on the premise that where a

2   corporation is a mere shell created to limit the liability of an individual owner's wrongdoing, the

3   corporate veil may be pierced, allowing the individual owner to be held liable for the

4   corporation's acts.  *Marnavi*, 900 F. Supp. 2d at 392 ("'The requisite element of fraud under the

5   alter ego theory must come from an inequitable use of the corporate form itself as a sham, and

6   not from the underlying claim'" (citation omitted)).

7        There is no evidence that the corporate defendants are "mere shells."  There is no

8   evidence, for example, that Konstantino's individual funds and assets are co-mingled with those

9   of the corporate defendants, or that the corporations are not adequately capitalized, or that they

10  have disregarded corporate formalities.[19]  TriReme was incorporated in Delaware in 2005,

11  Quattro Vascular was incorporated in Singapore in 2010 and raised funds to develop Chocolate

12  through Singapore's Economic Development Board (Ex. 73), and QT Vascular is a *public*

13  *company*, incorporated in Singapore in 2013.  Ex. 43 at TR0054432.  Moreover, as alleged, the

14  corporate defendants are successful companies who have navigated governmental regulatory

15  processes to compete directly with AngioScore.  *See, e.g.*, 4AC ¶¶ 33-40, 45.  This is hardly

16  compatible with the notion that the companies are shams.  Summary judgment is therefore

17  warranted to the extent Plaintiff alleges alter ego liability.[20]

18                              **CONCLUSION**

19       For the foregoing reasons, Defendants respectfully request that their motion for summary

20  judgment against Plaintiff be granted.

21                                          Respectfully submitted,

22  Dated:  January 14, 2015                WILSON SONSINI GOODRICH & ROSATI
                                            Professional Corporation
23

24                                          By:  /s/ Dylan J. Liddiard
                                                 DYLAN J. LIDDIARD
25
                                            Attorneys for *Defendants*
26

27  [19] *See, e.g.*, *Legal Additions LLC v. Kowalski*, No. C-08-2754 EMC, 2010 WL 335789, at *6 (N.D. Cal. Jan. 22, 2010) (citing cases); *Sonora Diamond*, 83 Cal. App. 4th at 539.

28  [20]  Plaintiff's "alter ego" theory is also contradicted by its allegation that the corporate defendants are separate entities that aided and abetted Konstantino in his purported breach.