1

2

3

4

5            UNITED STATES DISTRICT COURT

6           NORTHERN DISTRICT OF CALIFORNIA

7

8    **ANGIOSCORE, INC.,**                          Case No.  12-cv-03393-YGR

            Plaintiff,

9

        v.                                        **ORDER ON DEFENDANTS' MOTION TO**
10                                                **DISMISS STATE LAW CLAIMS; MOTIONS**
                                                  **FOR SUMMARY JUDGMENT ON STATE LAW**
11   **TRIREME MEDICAL, INC., ET AL.,**            **CLAIMS; MOTIONS IN LIMINE RE STATE**
                                                  **LAW EXPERTS**
            Defendants.
12

13

14         Now before the Court are three categories of motions:  (1) defendants' motion to dismiss

15   the state law claims in this action for lack of subject matter jurisdiction;  (2) the parties' cross-

16   motions for summary judgment on state law claims;  and (3) the parties' motions in limine relating

17   to the admissibility of certain expert testimony.  (Dkt. Nos. 555 ("MTD"); 468 ("Defts. MSJ");

18   478 ("Pltf. MSJ"); 462 ("Talley Mot."); 463 ("Olsen Mot. re State Law"); 466 ("Lewin Mot."),

19   respectively.)

20         On March 3, 2015, the Court held a hearing at which the parties were provided an

21   opportunity to present argument on the summary judgment and in limine motions.  At that same

22   hearing, the Court provided tentative rulings and noted that an order memorializing said rulings

23   would follow.  With one exception, those ruling remain in place.

24         On March 11, 2015, defendants filed their motion to dismiss the state law claims on the

25   basis of subject matter jurisdiction.  Plaintiff opposed in the normal course.  Defendants declined

26   the Court's invitation to expedite a reply and filed the same in the normal course. Pursuant to

27   Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7-1(b), the Court finds this motion

28   suitable for expedited resolution without oral argument, and issues the rulings herein.

United States District Court
Northern District of California

For the reasons set forth below, the Court **DENIES** defendants' motion to dismiss, **GRANTS** in part and **DENIES** in part plaintiff's motion for summary judgment, **GRANTS** in part and **DENIES** in part defendants' motion for summary judgment, **DENIES** defendants' motion to preclude the testimony of Eric Talley, AngioScore's corporate governance expert, **GRANTS** AngioScore's motion to preclude the testimony of defendants' rebuttal expert David Lewin, and **DENIES WITHOUT PREJUDICE** defendants' motion to preclude certain opinions of AngioScore's state law damages expert, Gary Olsen.

### FACTUAL BACKGROUND AND PROCEDURAL POSTURE

The facts of this case are well-known to the parties and the Court.  References to specific facts are set forth herein as necessary for the Court's ultimate rulings and to provide a brief factual background.  The Court notes that while it grants summary judgment as to portions of the claims stated herein, trial on the balance is set to begin in less than a week, and a final resolution of the claims in their entirety will result in a more fulsome order setting forth findings of fact that support its ruling at the conclusion of trial.  The Court is mindful that "the tests enunciated in *Guth* and subsequent cases provide guidelines to be considered by a reviewing court in balancing the equities of an individual case."  *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 155 (Del. 1996). Importantly, "[n]o one factor is dispositive and all factors must be taken into account insofar as they are applicable."  *Id.*  The summary judgment rulings herein are intended to promote an efficient use of public resources as the parties prepare for trial.  The final order in this case will expound on the application of each factor of the corporate opportunity doctrine to the facts of this unique case, including those discussed in this order, and whether defendant Dr. Eitan Konstantino "appropriated for himself something that in fairness should belong to [AngioScore]."  *Id.*

As a basic factual primer, the Court provides the following context.  In its Fourth Amended Complaint ("4AC"), Plaintiff AngioScore names as defendants one natural person and three business entities: (1) Dr. Eitan Konstantino ("Konstantino"); (2) TriReme Medical, LLC (f/k/a TriReme Medical, Inc.) ("TriReme"); (3) Quattro Vascular Pte Ltd. (f/k/a Proteus Vascular Systems) ("Quattro"); and (4) QT Vascular Ltd. (f/k/a QT Vascular Pte. Ltd.) ("QT").  (Dkt. No. 244.)  Konstantino founded TriReme in 2005.  (Dkt. No. 512-2 (Pltf. Resp. to Defts. Stmt. of

United States District Court
Northern District of California

Undisputed Facts) at Fact 9.)  Quattro and QT Vascular are both incorporated in Singapore; Quattro as of March 25, 2010, QT Vascular as of March 6, 2013.  (*Id*. at Fact 80, 81.)  The defendants sell an angioplasty balloon catheter sold under the name "Chocolate," which plaintiff contends competes with AngioScore's angioplasty balloon catheter, the "AngioSculpt."  Konstantino was a founder of AngioScore, and he remained on AngioScore's board of directors until February 5, 2010.  (*Id*. at Fact 44.)

The 4AC alleges both claims for patent infringement, and violations of state law stemming generally from plaintiff's contention that while on AngioScore's board of directors, Konstantino developed a device that was competitive to AngioScore's flagship product, the AngioSculpt, a specialty balloon catheter.  (*Id.* at ¶¶ 49–79.)  Chocolate is also a specialty balloon catheter with a non-deployable metallic structure made of nitinol, which sits atop a balloon.  (Dkt. No. 478 at 2.)  The Chocolate device treats blood vessel disease by applying focal forces to plaque deposits.  (*See, e.g.*, *id.* at 6-7; Dkt. No. 481 ("Parker Decl."[1]) Exs. 24, 25, 27, Garcia Dep. at 11:8-12:18; 27:5-28:4).)

After the Chocolate was released to the market, AngioScore analyzed Chocolate's design and initiated this action in 2012, alleging only patent infringement claims.  (Dkt. No. 1.)  Discovery commenced and revealed that Chocolate may have been developed while Konstantino was on AngioScore's board.  AngioScore asked for further information relating to Chocolate's development, which requests were met with resistance, necessitating motions to compel.  (*See, e.g.*, Dkt. Nos. 88, 89, Parker Decl. Ex. 16.)  Once defendants did produce this information, Angioscore discovered that Konstantino had participated in the development of Chocolate while still serving on its board of directors.  Specifically, documents produced late in discovery evince that prior to his departure from AngioScore, in the fall of 2009, Konstantino collaborated with his fellow TriReme co-founder, Tanhum Feld, to develop the Chocolate.  Such development included

---

[1] "Parker Decl." refers to the declaration of Kimball Dean Parker (Dkt. No. 479) and exhibits submitted in conjunction with AngioScore's motion for partial summary judgment, which documents appear at entries numbered 479 through 485.  "Parker Opp. Decl." refers to the Parker declaration and exhibits submitted in support of AngioScore's opposition to defendants' motion for summary judgment, which appear at docket entries 516, 520, and 521.

United States District Court
Northern District of California

1    designing the Chocolate, submitting a provisional patent application, and undertaking porcine

2    testing of the Chocolate.  Around the same time, Konstantino also prepared presentation materials

3    in order to secure investors for Chocolate.  (*See* Parker Decl. Exs. 12, 16, 17, 19, 62.)

4          After receiving this discovery, on May 6, 2014, AngioScore sought leave to amend its

5    then-operative complaint to add the state law claims of breach of fiduciary duty, aiding and

6    abetting the same, and unfair competition.  (Dkt. No. 202.)  Defendants opposed amendment,

7    arguing that the Court lacked subject matter jurisdiction over AngioScore's new claim, on the

8    basis that these new claims "relate to facts and theories of liability that are not at issue in the

9    patent case" and that even if supplemental jurisdiction existed, the Court should decline to

10   exercise it to the extent it raises novel questions of state law that would predominate over the

11   federal claim.  (Dkt. No. 209-3 at 1-2; 17-18.)  The Court rejected these arguments and permitted

12   AngioScore leave to amend.  (Dkt. No. 219.)

13         AngioScore brings these claims on the basis that Konstantino did not offer the Chocolate

14   to AngioScore, nor did he apprise AngioScore of the extent of his work on the Chocolate or its

15   development.  (Dkt. No. 478 at 5.)  Rather, in February 2010, Konstantino notified AngioScore's

16   CEO that TriReme was "contemplating" moving into the specialty balloon market.  (Parker Decl.

17   Ex. 11, Email from Konstantino to Sellers (Feb. 5, 2010).)  When AngioScore noted that this

18   would present a conflict of interest because Konstantino was a board member of AngioScore and

19   any specialty balloon catheter device would likely compete with the AngioSculpt, Konstantino

20   represented that TriReme had not decided for certain that it would enter that market, and that

21   Konstantino had approached Angioscore "before any new project [was] started." *Id.*  AngioScore

22   nonetheless asked Konstantino to resign from the board, and Konstantino did so on February 5,

23   2010.  (Parker Decl. Ex. 7.)

24         After Konstantino left the board, he further reassured AngioScore that he had not violated

25   his fiduciary obligations to the company with respect to the development of a specialty balloon

26   catheter for TriReme.  In a letter prepared by his counsel, Konstantino stated that "prior to

27   February 5, 2010, TriReme has not developed any products, nor acquired or licensed any

28   technology that competes with AngioScore's products," and that he "was not involved in any

4

United States District Court
Northern District of California

development work or licensing of angioplasty balloon technology for the coronary or periphery markets that involves specialized features such as scoring, cutting, or drug eluting elements." (Parker Decl. Ex. 22, Letter from Nguyen to Sellers (Feb. 23, 2010).)

At a three-hour hearing on March 3, 2015, the Court, having reviewed the evidence of record, relevant case law, and the parties' briefing, tentatively granted in part AngioScore's motion for summary judgment and offered further tentative rulings on other outstanding motions to assist the parties with trial preparation.  At the hearing, and upon questioning from the Court, the parties advised the Court that the state law claims are equitable in nature and thus not amenable to resolution by a jury.  (*See* Dkt. No. 582, Hrg. Tr. 8:14-9:2.)  Accordingly, the Court bifurcated the trial.[2]

Neither party objected to bifurcation, but defendants did urge the Court that the patent trial should proceed first, given that the patent claim was the first filed.  Finding that trial as to the state claims would better facilitate resolution of the patent claims without imposing additional burden on the citizenry, the Court deemed bifurcation warranted and confirmed that trial on the state law claims alone would commence as originally scheduled on April 13, 2015.

### MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

On March 11, 2015, defendants filed the instant motion to dismiss for lack of jurisdiction. (Dkt. No. 555.)  It is apparent to the Court that by way of the instant motion, defendants seek to avoid the bench trial on the state law claims over which the Court has presided for approximately nine months, all discovery related thereto has concluded, and for which summary judgment and evidentiary rulings have been tentatively announced, many of which were not in defendants' favor.  Nonetheless, mindful that jurisdictional issues are foundational and that it is duty-bound to ensure that jurisdiction is proper, the Court addresses this motion first.[3]

---

[2] Defendants noted that one claim for breach of fiduciary duty was not equitable in nature and carried a jury right.  (Dkt. No. 582, Hrg. Tr. at 14:8-20.)  At that point, AngioScore moved orally to dismiss that claim.  The oral motion was unopposed by defendants and granted.  (*Id.* at 15:10-22.)  Had that claim not been dismissed, bifurcation would not have been warranted.

[3] It is not lost on the Court that the arguments advanced in defendants' motion to dismiss were raised previously in connection with AngioScore's motion for leave to amend.  (*See* Dkt. No.

United States District Court
Northern District of California

# I.   LEGAL STANDARD

"Federal courts are courts of limited jurisdiction.  They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted).  Relevant to the instant motion, the supplemental jurisdiction statute, 28 U.S.C. § 1367, provides, in relevant part:

> [I]n any civil action in which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a).  In construing the bounds of the federal courts' reach, a state law claim is understood as part of the same case or controversy when it shares a "common nucleus of operative fact" with the federal claims and the state and federal claims would normally be tried together.  *Bahrampour v. Lampert*, 356 F.3d 969, 978 (9th Cir. 2004).

Even if supplemental jurisdiction is proper under Section 1367(a), the Court has discretion to decline such jurisdiction if, after undertaking a case-specific analysis, it finds that declining

---

209-3.)  Although in its order granting that motion the Court did not specifically address these arguments, in resolving the motion it did consider whether amendment was proper in full view of all arguments made, including defendants' jurisdictional argument.  The Court notes that following its order granting leave to amend, defendants did not move for clarification of that order, or for reconsideration on any basis, including on the question of whether supplemental jurisdiction is proper.  Neither did defendants move to dismiss the as-amended complaint for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  In substance, then, defendants' motion to dismiss is a motion for reconsideration of the Court's prior ruling.

In this District, motions for reconsideration must adhere to the Local Rule and the instant motion does not.  (Civil. L. R. 7-9.)  First, the motion was not diligently made.  The claims with which defendants now take issue have been part and parcel of this case since amendment was permitted.  Discovery has concluded; expert opinions have been rendered.  The argument concerning subject matter jurisdiction could have, and indeed *was*, presented in mid-2014, yet defendants filed the instant motion in March of 2015.  Defendants have fallen far short of the reasonable diligence standard.  Second, the local rules require that any motion for reconsideration be accompanied by a motion for leave to so file; defendants have also failed to comply with this requirement.  (Civil. L. R. 7-9(a).)  Third, motions for reconsideration are limited to specific substantive instances:  where, for example, there is an error of law or a material change in fact or law.  (Civil. L. R. 7-9(b).)  Defendants have not demonstrated that such is the case here.

6

supplemental jurisdiction "comports with the underlying objective of most sensibly accommodat[ing] the values of economy, convenience, fairness and comity." *Executive Software N. Am., Inc. v. United States Dist. Court,* 24 F.3d 1545, 1557–58 (9th Cir. 1994) (alteration in original) (internal quotations and citations omitted) (overruled on other grounds, *Cal. Dept. of Water Resources v. Powerex Corp.*, 533 F.3d 1087, 1093 (9th Cir. 2008)).  Section 1367(c) states that a court may decline to exercise jurisdiction over a supplemental state law claim if:

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

## II.   ANALYSIS

The Court finds that the federal and state law claims are sufficiently, and indeed substantially, connected and therefore that the exercise of supplemental jurisdiction is proper.

At the heart of this case is the Chocolate specialty balloon catheter, which AngioScore claims was developed by a former member of its board, Konstantino, in contravention of his fiduciary duties, and infringes AngioScore's patent.  Once the Chocolate came to market in 2011, AngioScore analyzed it and initiated this action, alleging patent infringement.  In the course of discovery relative to that claim, AngioScore sought documents relating to the conception and development of the Chocolate device.  After considerable use of judicial resources to compel the production of relevant discovery, AngioScore learned that Konstantino and other defendants had developed Chocolate while Konstantino was still on AngioScore's board.  After obtaining requested discovery, AngioScore sought leave to amend its complaint to add the state law claims now at issue.  (Dkt. No. 202.)

Against this backdrop, defendants now argue that the infringement and fiduciary duty claims are not sufficiently related such that this Court may exercise jurisdiction over the state law claims.  The position strains credulity.  As a practical matter, the Court finds that there is a substantial overlap of evidence between the federal and state claims and therefore a common

nucleus of operative fact.  As stated above, the core of this case concerns the Chocolate device – whether it infringes an AngioScore patent, and whether Konstantino's development of the device was a violation of his duties to AngioScore.  Critically, Konstantino's role and relationship to AngioScore will be at issue in both the patent and state law claims.  Viewing the issue holistically, the overlap is obvious:  AngioScore is alleging that the patent infringement is willful and that Konstantino both developed the infringing device and took it for himself and his own benefit. Defendants' attempt to parse the claims down to their elements myopically to isolate the legal differences between the patent and state law claims cannot undermine the coherence of the factual narrative from which all of AngioScore's claims flow.

The nuances of AngioScore's affirmative case further reveals the extent of this overlap. One example of this is in the damages calculation context.  The extent, if any, to which Chocolate competes with the AngioSculpt remains relevant in terms of calculating both patent and state law damages.  The same experts who calculated patent damages also opined on damages relating to the state law corporate opportunity doctrine claim.  In addition, the witnesses and documents used to support the claims substantially overlap.  Tellingly, an abundance of the documents underpinning the state law summary judgment claims were produced in the context of patent discovery (*see* Dkt. No. 579 ("Caruso Decl.") ¶¶ 22, 23), because again, both claims flow from the development of the allegedly infringing device.  Witnesses also overlap, as evidenced by the fact that witnesses set to be called in the imminent bench trial on state law issues were deposed while the case was purely a patent case.

The fundamentally related nature of the federal and state law claims cannot be ignored. Both turn on proof concerning exactly what the Chocolate is, how it was developed, and its import relative to AngioScore both in terms of lost profits if found to be infringing, or its value as a potential corporate opportunity.  Defendants cannot escape the logical proposition that AngioScore "would ordinarily be expected to try [ . . . ] all [such claims] in one judicial proceeding." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966); *see also BLT Rest. Grp. LLC v. Tourondel*, 855 F. Supp. 2d 4, 11 (S.D.N.Y. 2012) (in assessing the propriety of supplemental jurisdiction, "the court should look to whether the evidence likely to be used in the specific case in

8

United States District Court
Northern District of California

addressing the federal claim is likely to substantially overlap that used to address the state-law claims.  Indeed, it is only by such an assessment that one can fairly determine whether a plaintiff 'would ordinarily be expected to try them all in one judicial proceeding.'" (citing *Lyndonville Sav. Bank*, 211 F.3d at 704 (quoting *Gibbs*, 383 U.S. at 725) (further internal citations omitted))).

Defendants' reliance on (i) the Court's decision to bifurcate trial on these claims, and (ii) any representations the parties have made in the Delaware court, does not compel a different result.

With respect to bifurcation, the record reflects, and the Court reaffirms here, that its decision to bifurcate was influenced by a host of factors.  First, the Court was prepared to try all the claims in this case together before a jury, when, at the March 3, 2015 hearing, AngioScore acknowledged that all but one of its state law claims was equitable in nature, and dismissed the lone jury claim: breach of fiduciary duty under California law.  (March 3, 2015 Hrg. Tr. at 15:2-22.)  The dismissal of AngioScore's California fiduciary duty claim rendered a bench trial possible on the remaining equitable claims.  The Court further considered AngioScore's representation that resolution of the state law issues would potentially facilitate out-of-court resolution of the patent claims.  The Court did not understand AngioScore to be representing that it was, *in any way*, declining to further pursue its patent claim or conceding that its patent claim was not valid, but rather, that there was a potential efficiency in trying the state law claims separately first.  Second, the Court noted that its calendar is exceedingly heavy with trials, and that the trial date set in this case could not be altered.  Third, the Court noted that the state claims are of an equitable nature and therefore not suitable for a jury to decide, and that the elements of these claims differ from the question of patent infringement.  The Court understands that jury service presents a burden on ordinary citizens, and seeks to respect their time by ensuring that, where possible, jurors not be subject to unnecessary inconvenience.  That these considerations weighed in favor of bifurcation does not undermine the fact that there is substantial overlap between these claims such that they would ordinarily be tried together.  Moreover, defendants' delay in bringing the instant motion for the nine-month period wherein all parties operated under the assumption that the claims would be tried together undermines their present position that these claims ever should have been

considered as part of the same case to begin with.  (*See* Dkt. No. 555 at 3 n.2.)

Next, with respect to certain representations made to the Delaware Court during the course of Konstantino's action seeking advancement of legal fees, defendants' argument is unavailing. There, the relevant inquiry was whether under an indemnification agreement, certain fees should be advanced by AngioScore for Konstantino's legal defense.  Arguments related thereto did not address the standard for determining whether supplemental jurisdiction is proper, but rather related to determining the separability of fees.  (*See* Dkt. No. 579-12, 579-13; 557-1.)  Defendants' position that AngioScore in some way conceded the jurisdictional question – assuming that such a statement could be dispositive of the issue –does not persuade.

In defendants' final argument, they maintain that even if supplemental jurisdiction exists, this Court should nonetheless decline to exercise it in this case.  The Court disagrees.  As set forth above, 28 U.S.C. section 1367(c) provides that a federal district court may decline to exercise jurisdiction over a supplemental state law claim if:

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

The Court does not find that any of these four factors justifies dismissing AngioScore's state law claims.[4]  As to the first factor, the Court finds substantial guidance from Delaware case law, which sets forth a multi-factor test to be applied in corporate opportunity cases, and which contemplates that the application of these factors is intensely fact-specific.  The facts of the instant case do not, in and of themselves, present such a departure from what the Delaware courts have articulated that this Court is left without guidance as to how to apply Delaware law.  Indeed, defendants themselves sought summary judgment in this forum based on the application of that body of law to the facts of this case.

---

[4] Further discussion of the novelty of this case, and why the Court finds that it may apply the relevant Delaware principles of law to the facts presented here, is set forth in Section III(B)(1), *infra*.

United States District Court
Northern District of California

Second, the Court finds that the state law claims are not substantially predominating this case. The patent claim is being litigated fully by plaintiff and was the subject of its own summary judgment and claim construction motions practice. That AngioScore may want to proceed first with the state claim in the final chapter of this hard-fought, years-long case does not mean that the patent claim has been substantially predominated by the state law claims. In fact, the patent claim was the first claim brought, and it was through patent discovery that AngioScore uncovered documents that led it to seek leave to bring these state law claims.

The third factor does not apply. The federal patent claim is still a part of this case. The most that can be understood from AngioScore's representation at the March 3, 2015 hearing is that AngioScore would be inclined to seek an out-of-court resolution of the patent claim following trial on the state law claims. By definition, such a resolution would be mutual and does not negate the existence of the federal claim.

Finally, the Court can discern no exceptional circumstances that justify declining jurisdiction in this case. Defendants' position that judicial economy will not be served by retaining jurisdiction is nonsensical. For one thing, substantial party resources have been expended in litigating these claims. In point of fact, *defendants themselves* filed briefs seeking summary judgment in their favor on the very claims for which they now seek dismissal. So, too, has the court expended substantial judicial resources in order to assist the parties resolve these claims, both in terms of resolving motions, discovery disputes, and aiding in mediation.

For these reasons, the Court finds that it may properly exercise supplemental jurisdiction over the state law claims, and that no reasonable basis for declining such jurisdiction exists.[5] The motion is **DENIED**.

_____

[5] Because it finds conclusively that it may properly exercise supplemental jurisdiction over the state law claims, the Court does not consider separately AngioScore's alternative argument that the Court also has original jurisdiction under 28 U.S.C. section 1338, which "'is a jurisdictional statute, giving the district court jurisdiction to hear certain state or [other non-] federal unfair competition claims' when joined with a substantial and related claim under the patent laws." *Mars Inc. v. Kabushiki-Kaisha Nippon Conlux*, 24 F.3d 1368, 1372 (Fed. Cir. 1994) (citing *Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 669 (Fed. Cir. 1988), *cert. denied*, 488 U.S. 968 (1988)). The Court notes, however, defendants' concession that the test for whether the state claims and the patent claim "form part of the same case or controversy" is the same under

United States District Court
Northern District of California

## MOTIONS FOR SUMMARY JUDGMENT ON STATE LAW CLAIMS

Plaintiff contends summary judgment in its favor is appropriate on three of four elements of the corporate opportunity doctrine. Defendants cross-move that the corporate opportunity doctrine cannot, as a matter of law, apply to the facts of this case, and that alternatively, plaintiff's claims are untimely. In addition, defendants seek summary judgment as to plaintiff's remaining claims: successor liability, aiding and abetting, and alter ego liability.

### I.   LEGAL STANDARD

Summary judgment is appropriate if, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party, there are no genuine disputed issues of material fact, and the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co. v. GTE Corp*., 594 F.2d 730, 738 (9th Cir. 1979).

Federal Rule of Civil Procedure 56(a) states that "[a] party may move for summary judgment, identifying each claim or defense—or the *part* of each claim or defense—on which summary judgment is sought." (Emphasis supplied.) Under this plain language "summary adjudication on individual parts of claims brought against a party" is allowed. *Bushnell v. Vis Corp.*, No. C-95-04256 MHP, 1996 WL 506914, at *11 (N.D. Cal. Aug. 29, 1996).

### II.   THE CORPORATE OPPORTUNITY DOCTRINE

The corporate opportunity doctrine "represents but one species of the broad fiduciary duties assumed by a corporate director or officer." *Broz*, 673 A.2d at 154. As a fiduciary of a corporation, directors agree to "place the interests of the corporation before his or her own in appropriate circumstances." *Id*. "At the core of the fiduciary duty is the notion of loyalty—the

---

either Section 1338 or Section 1367. (Dkt. No. 585 at 8.) As discussed at length above, the Court finds this requirement met.

equitable requirement that, with respect to the property subject to the duty, a fiduciary always must act in a good faith effort to advance the interests of his beneficiary." *In re Mobilactive Media, LLC*, No. CIV.A. 5725-VCP, 2013 WL 297950, at *21 (Del. Ch. Jan. 25, 2013) *reargument denied*, No. CIV.A. 5725-VCP, 2013 WL 1900997 (Del. Ch. May 8, 2013) (citing *Dweck v. Nasser*, at *12).

Noting that corporate directors stand in fiduciary relationship to the corporations they serve, the Delaware Supreme Court recognized in *Guth v. Loft, Inc.*, 5 A.2d 503 (Del. Sup. Ct. 1939) that:

> public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest. The occasions for the determination of honesty, good faith and loyal conduct are many and varied, and no hard and fast rule can be formulated. The standard of loyalty is measured by no fixed scale.

*Id.* at 511. The corporate opportunity doctrine seeks to define the bounds of this duty where a director may be inclined to take a business opportunity for him or herself. *See id.* The rule enunciated in *Guth* is this:

> if there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of the corporation, the law will not permit him to seize the opportunity for himself.

*Id.* at 510-11. Thus, under Delaware law, "[t]he elements of misappropriation of corporate opportunity are: (1) the opportunity is within the corporation's line of business; (2) the corporation

13

has an interest or expectancy in the opportunity; (3) the corporation is financially able to exploit the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary is placed in a position inimical to his duties to the corporation." *In re Mobilactive Media*, No. 5725-VCP, 2013 WL 297950, *21 (Del. Ch. Jan. 25, 2013).  Once the plaintiff has shown the breach of the director's duty of loyalty, the burden switches to the fiduciary to show that he or she did not seize a corporate opportunity "because either the corporation was presented the opportunity and rejected it, or because the corporation was not in a position to take the opportunity." *Grove v. Brown*, No. 6793-VCG, 2013 WL 4041495, at *8 (Del. Ch. Aug. 8, 2013).

Delaware courts further recognize that "a director or officer may take a corporate opportunity if: (1) the opportunity is presented to the director or officer in his individual and not his corporate capacity; (2) the opportunity is not essential to the corporation; (3) the corporation holds no interest or expectancy in the opportunity; and (4) the director or officer has not wrongfully employed the resources of the corporation in pursuing or exploiting the opportunity." *Broz*, 673 A.2d at 155.

### III.   JUDGMENT ON ELEMENTS OF THE CORPORATE OPPORTUNITY DOCTRINE

Plaintiff moves for summary judgment on three of the four factors listed above; each is discussed in turn below.  On cross-motion for summary judgment, defendants contend that Konstantino has established each of the four elements proving as a matter of law that he did not usurp a corporate opportunity.  Having considered the arguments and evidence presented, the Court **GRANTS** in part plaintiff's motion, and **DENIES** defendants' cross-motion.

#### A.  Plaintiff's Motion

##### 1.  *Line of business*

An opportunity is within a corporation's line of business if it is "an activity as to which [the corporation] has fundamental knowledge, practical experience and ability to pursue, which, logically and naturally, is adaptable to its business having regard for its financial position, and is one that is consonant with its reasonable needs and aspirations for expansion." *In re Mobilactive Media*, 2013 WL 297950, at *21 (citing *Guth*, 5 A.2d at 514).  This factor is to be broadly construed.  *Id*. (citing *Dweck v. Nasser*, 2012 WL 161590, at *13 (Del. Ch. Jan. 18, 2012).

United States District Court
Northern District of California

1    Plaintiff argues that the following undisputed evidence entitles it to judgment on this

2    element:  Since its founding in 2003, AngioScore has designed, manufactured, and marketed

3    angioplasty balloon catheters surrounded by a nitinol structure that are used for the treatment of

4    cardiovascular disease and sold under the brand name AngioSculpt.  AngioSculpt and Chocolate,

5    TriReme's device, are both angioplasty balloon catheters used to open occluded or narrowed blood

6    vessels at lesion sites by inflating to compress plaque deposits against the vessel wall and then

7    deflating for removal from the patient's body.  Both devices were cleared by the FDA for identical

8    clinical indications:  both are "intended for balloon dilatation of lesions in the peripheral

9    vasculature, including the iliac, femoral, ilio-femoral, popliteal, infra-popliteal, and renal arteries.

10   NOT for use in the coronary or cerebral vasculature."  (Parker Decl. Ex. 25, Chocolate PTA

11   510(k) Summary (Dec. 14, 2011); Parker Decl. Ex. 24, AngioSculpt PTA 510(k) Summary (Mar.

12   22, 2010).)  In addition, plaintiff argues that defendants' own documents recognize the Chocolate

13   as a competitor to the AngioSculpt, and that a portion of TriReme's Chocolate customers are or

14   were AngioScore's customers.  (*See, e.g.*, Parker Decl. Ex. 36, Email from Haig (Dec. 15, 2012) at

15   TR 0838519.)  The evidence demonstrates that the devices are similar in both purpose and

16   function.

17   By contrast, defendants argue the technical differences between the devices to conclude

18   that they do not fall within the same line of business.  For example, defendants argue that

19   AngioSculpt scores accumulated plaque, whereas Chocolate does not, and that Chocolate has

20   "pillows" that impress upon the plaque, which the AngioSculpt lacks.  (Defts. Opp. to Pltf. MSJ at

21   4-5.)  Defendants also place much emphasis on the fact that AngioScore was a purportedly self-

22   avowed "single technology company," with a fixed focus on "scoring" balloons to the exclusion of

23   other types of balloon angioplasty catheters.  (*See id*. at Ex. 16 at AS0700230.)  Finally,

24   defendants contend that the FDA indications for use are not dispositive of whether the Chocolate

25   falls within AngioScore's line of business, because a broad array of balloon catheters, including

26   plain old balloon angioplasty ("POBA") devices, would also fall within that scope.

27   The Court finds defendants' arguments unavailing.  Under Delaware law, the "line of

28   business" element is to be broadly construed.  The undisputed similarities in terms of purpose and

United States District Court
Northern District of California

15

United States District Court
Northern District of California

1  function establish that AngioScore has "fundamental knowledge and practical experience" to

2  pursue the Chocolate under the broad notions underpinning the "line of business" element.

3  Moreover, that AngioScore has historically focused on products that "scored" rather than

4  impressed on plaque relates more to the interest or expectancy element below.  Here, the evidence

5  not reasonably subject to dispute establishes that the Chocolate is "logically and naturally ...

6  adapted to [AngioScore's] business" based on AngioScore's experience in the specialty balloon

7  catheter market.  *See In re Mobilactive Media*, 2013 WL 297950, at *21 (citation omitted).  The

8  fact that the devices may differ technically does not create a triable issue of material fact as to this

9  element.  Even defendants' presentations from 2009 and 2010 list AngioScore as a *potential*

10  *partner* for the Chocolate, and defendants' documents have recognized Chocolate as a competitor

11  to AngioSculpt.  (*See e.g.*, Parker Decl. Ex. 21, Singapore-SV Chocolate Presentation (Dec. 30,

12  2009), at TR1044052; Parker Decl. Ex. 32, Chocolate Presentation (Feb. 2010), at TR0027514;

13  Parker Decl. Ex. 37, Email from Crater (Mar. 27, 2013), at TR0845859; Parker Decl. Ex. 38,

14  Email from Benjamin (Oct. 25, 2011).)

15       In light of the evidence presented, and Delaware's broad notions of the "line of business"

16  factor, the Court finds that no material dispute of fact exists to be tried.  Accordingly, the Court

17  **GRANTS** plaintiff's motion summary judgment on this factor.

18                    *2.    Interest or Expectancy*

19       "[F]or the corporation to have an expectant interest in any specific property, there must be

20  some tie between that property and the nature of the corporate business."  *Grove*, 2013 WL

21  4041495, at *8 (internal quotes omitted).  By requiring "a tie to the 'nature of the corporate

22  business,'" this factor "implicates many of the issues" discussed above concerning AngioScore's

23  line of business.  *See Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d

24  961, 973 (Del. Ch. 2003) (citing *Broz*, 673 A.2d at 156).  Even if there is a "tie" between the line

25  of a corporation's business and the potential opportunity, however, the Court may decline to find

26  an interest or expectancy where facts establish that a corporation is shifting away from its

27  historical line of business, where it disavows such interest, and where it lacks the capacity to

28  capitalize on the interest.  In *Broz*, for example, the Delaware Supreme Court found that there was

no interest or expectancy where a corporation was divesting in the area of venture from which the potential opportunity arose, and where its business plan did not contemplate any new acquisitions. *Broz*, 673 A.2d at 156.

Defendants argue vociferously that AngioScore had no interest in developing the Chocolate.  (Defts. Opp. to Pltf. MSJ at 12-19.)  In support of this position, defendants advance three arguments.  First, defendants argue that during 2009 and 2010, AngioScore was focused on developing the AngioSculpt.  Based thereon, defendants urge that AngioScore's interest at that time was to the exclusion of all other devices including the Chocolate.  Second, defendants argue that AngioScore granted Konstantino "broad consent" to work on projects like Chocolate with TriReme and that AngioScore arguably knew and approved of Konstantino's work with TriReme on devices like Chocolate.  Third, defendants argue that AngioScore was focused singularly on the AngioSculpt and that in December 2009, the board of AngioScore was not interested in acquiring a new company, technology, or product line.

As demonstrated in the previous section, the Court finds that there is undoubtedly "some tie" between the Chocolate and the nature of AngioScore's business.  The devices are both angioplasty balloon catheters that serve similar purposes.  Indeed, defendants acknowledged as much as far back as 2009 when they identified AngioScore as a potential partner for the Chocolate.

However, at this juncture the Court finds that material questions of fact persist as to whether AngioScore had an interest or expectancy in the Chocolate.  Evidence adduced to date raises questions as to whether AngioScore was focused singularly on its own product, AngioSculpt, and relatedly, whether AngioScore's board of directors would have favored capitalizing on the Chocolate opportunity.  (*See, e.g*., Dkt. No. 512-2 (Pltf. Resp. to Defts. Stmt. of Undisputed Facts) at Issue 1, Fact 7 and evidence cited therein.)  In *Broz*, despite a finding that the subject opportunity fell within a plaintiff corporation's line of business, the Delaware Supreme Court nonetheless determined that the corporation did not have an interest or expectancy in that opportunity.  In so finding, the court considered evidence such as board members' testimony relating to whether the Michigan-2 license would have been of interest to the CIS board even

United States District Court
Northern District of California

17

absent certain financial impediments to acquisition, and CIS's articulated business plan, which did not contemplate any new acquisitions.

Here, the Court notes that the parties dispute strongly what conclusions may be drawn from the evidence presented thus far.  In the December 2009 AngioScore board meeting, members may have evinced disinclination to even consider an opportunity such as Chocolate.  Defendants argue that the members' responses to the question "Do you support acquiring another company, technology[,] or product line?" conclusively establish that the consensus was that AngioScore was not interested and had no expectancy in a new opportunity such as the Chocolate.  Plaintiff, in opposition, contends that the responses to the question were not so conclusive, and furthermore, points out that defendants have offered misleading characterizations of this evidence.

Based on its own analysis of the evidence, the Court finds that AngioScore's actual, then-existing disposition on the question of acquiring another opportunity and the Board's degree of preference for developing the AngioSculpt solely, are in dispute.  Furthermore, as explained below, questions linger concerning AngioScore's financial capacity to exploit the Chocolate.  Accordingly, the Court declines to rule that either party may obtain summary judgment on this factor.  The parties' motions for summary judgment on this element are therefore **DENIED**.

### 3.  *Financial Ability*

The third prong of the corporate opportunity analysis focuses on whether AngioScore had the financial ability to take the Chocolate opportunity.  "If the directors are uncertain whether the corporation can make the necessary outlays, they need not embark it upon the venture; if they do, they may not substitute themselves for the corporation any place along the line and divert possible benefits into their own pockets."  *Irving Trust Co. v. Deutsch*, 73 F.2d 121, 124 (2d Cir. 1934) (recognizing "the wisdom of a rigid rule forbidding directors of a solvent corporation to contract on the plea of the corporation's financial inability to perform").

Under Delaware law, this prong implicates broader policy concerns more favorable to the corporation.  Such concerns stem from the inherent conflict between, on the one hand, a director who has control and responsibility for the financial security of the corporation he serves, and on the other hand, the director's potential personal interest in ensuring that the company not have

United States District Court
Northern District of California

secure financial footing so as to permit usurpation of what otherwise might be a corporate opportunity.  Thus, once the plaintiff has made such a *prima facie* showing of financial ability, a fiduciary "faces a significant burden in establishing that a corporation was financially unable to take advantage of a corporate opportunity."  *Norman v. Elkin*, 617 F. Supp. 2d 303, 312 (D. Del. 2009) (citing *Gen. Video Corp. v. Kertesz*, No. 1922-VCL, 2008 WL 5247120, at *19 (Del. Ch. Dec. 17, 2008) (finding financial inability must amount to insolvency such that the company is practically defunct); *Yiannatsis v. Stephanis by Sterianou*, 653 A.2d 275, 279 (Del. 1995) (stopping short of adopting "the 'insolvency-in-fact test' "; stating instead that courts should consider "a number of options and standards for determining financial inability, including but not limited to, a balancing standard, temporary insolvency standard, or practical insolvency standard")).

Here, the Court finds that disputes as to material fact remain as to whether AngioScore was in a position to exploit the Chocolate opportunity, and that such disputes preclude a finding in AngioScore's favor at this time.  Of material concern is the ongoing dispute regarding the amount of capital required to exploit Chocolate.  Without this initial figure, the Court cannot ascertain whether AngioScore would have been able to take advantage of the Chocolate opportunity. (*Compare* Parker Decl. Ex. 32, Chocolate Presentation (Feb. 2010) at TR0027513 (noting that Chocolate could have been developed for $3.5-4 million); Parker Decl. Ex. 45, Belson Dep. (Nov. 21, 2014) at 238:12-239:19 *with* Dkt. No. 504-16 ("Danitz Opp. Decl."[6]) Ex. 45, Konstantino Dep. 618:3-15 (noting that it took "tens of millions of dollars" to bring Chocolate to market), Danitz Opp. Decl. Ex. 129.)  Accordingly, summary judgment is not warranted given the current state of the record.

---

[6] "Danitz Opp. Decl." refers to the declaration of Brian Danitz (Dkt. No. 500) and exhibits submitted in conjunction with defendants' opposition to AngioScore's motion for partial summary judgment, which documents appear at entries numbered 500, 502, 504, 507-509.  "Danitz Decl." refers to the declaration of Brian Danitz submitted in support of defendants' motion for summary judgment, which appears at docket entries numbered 469, 472-477.

## B.  Defendants' Cross Motion and Counter-Arguments

Defendants move for cross-summary judgment on the four counter-prongs to the corporate opportunity doctrine, discussed above, and two arguments of a more overarching nature, namely, that (i) the corporate opportunity doctrine does not apply to the circumstances of this case, and (ii) the statute of limitations bars AngioScore's claims.  All of defendants' arguments are unpersuasive.  The Court first addresses the broader arguments, and then addresses the remaining counter-prongs.

### 1.  Applicability of the Corporate Opportunity Doctrine

Defendants contend that Chocolate was not a corporate opportunity for AngioScore because Konstantino and co-inventor Tanhum Feld conceived of the idea for Chocolate on their own.  They thus assert that Chocolate was solely the inventors' opportunity and not AngioScore's.  (Defts. MSJ at 16-17.)  The Court is unpersuaded based on the record before it.

As an initial matter, the Court acknowledges the broad bedrock principles espoused in *Guth*.  The corporate opportunity doctrine stems from "the general rule that demands of an officer or director the utmost good faith in his relation to the corporation which he represents."  *Guth*, 5 A.2d at 510.  However, the rule to be applied in determining whether such a violation has occurred, as enunciated in *Guth*, is fact-intensive in its application.  Each prong of the multi-step test demands a nuanced understanding of the facts unique to each case.  All factors must be considered; no single factor is dispositive.  *See Broz*, 673 A.2d at 157 (weighing the "totality of the circumstances" in light of "the situation only as it existed when the opportunity was presented").  Given that the analysis is so fact-intensive, the standard understandably proves amenable to a variety of circumstances.

Defendants rely principally on *Equity Corp. v. Milton*, 221 A.2d 494 (Del. 1966) for their position that an opportunity of a director's own making is not an opportunity owed to the corporation.  *Equity* does not persuade.  There, the corporate opportunity doctrine was used to challenge a fiduciary's owning part of the corporation's outstanding stock.  In finding no breach, the court states that "there is nothing wrong in a corporate officer owning or controlling stock of his corporation."  *Id.* at 499.  This is not an inherently controversial proposition.  But ultimately,

*Equity* does not offer guidance on the question presented here: whether a director who invents a product falling within a corporation's line of business and works with other companies to develop it is unencumbered by, or absolved of, his duty of loyalty to the corporation he serves.

In any event, given the lack of direct authority to support defendants' contention, and the lack of a full factual record, the Court does not find a basis for ruling on the issue as a matter of law.[7] Furthermore, the case law suggests that the doctrine could apply to such circumstances. Thus, in *Guth*, the Delaware Supreme Court noted that the duty of loyalty:

> demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to ***deprive it of profit or advantage which his skill and ability might properly bring to it***, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest.

*Guth*, 5 A.2d at 510 (emphasis supplied). The rule contemplates that directors owe the companies they serve the benefit of their skills and expertise and is not suggestive of the exception defendants espouse. To permit otherwise does not just conflict with this rule – it subverts it.

Accordingly, defendants' motion for summary judgment on this ground is **DENIED**.[8]

---

[7] Defendants allude to the fact that Konstantino was an "outside director" of AngioScore, but cite no case for the proposition that the fiduciary duties attendant to such a role differ in any way from those of any other sort of director. (*See* Dkt. No. 535 ("Defts. MSJ Reply") at 7.) Moreover, even if co-inventor Tanhum Feld did not want AngioScore to partner on Chocolate, the Court is not convinced given the factual record to this point, that this would obviate Konstatino's fiduciary obligations. Plaintiff has raised a triable issue of fact on this point.

[8] Defendants present two other theories supporting their contention that the corporate opportunity doctrine does not apply in this case: first, that the opportunity was presented to Konstantino in his individual capacity because he invented it, and second, that he was merely planning to compete. Neither persuade.

As noted above, the Court finds that the doctrine may be applied to this case. Moreover, the Court finds that plaintiff has raised a material disputed question as to whether the Chocolate opportunity "was [. . .] 'presented' to Konstantino in his 'individual . . . capacity'" rather than in his corporate capacity. Defendants' contention that because Konstantino invented the Chocolate he avoided his fiduciary obligations to AngioScore thus does not warrant summary judgment in their favor. (Defts. MSJ at 19.)  Moreover, the record contains facts sufficient to raise a

### 2. *Statute of Limitations and Laches*

"A claim for breach of fiduciary duty accrues at the time of the wrongful act." *Sutherland v. Sutherland*, No. 2399-VCN, 2010 WL 1838968, at *8 (Del. Ch. May 3, 2010); *see Pomeranz v. Museum Partners, L.P.*, No. CIV. A. 20211, 2005 WL 217039, at *8 (Del. Ch. Jan. 24, 2005). The parties agree as follows: (i) the relevant statute of limitations for breach of fiduciary duty claims is three years[9]; (ii) the acts giving rise to the instant claim occurred in 2009 and 2010; and (iii) more than three years elapsed between those acts and when plaintiff brought its claim (here, June 27, 2014). The central issue is whether equitable tolling is available. Plaintiff bears the burden to show that such tolling is warranted. *Pomeranz*, 2005 WL 217039, at *2. Defendants claim the statute has run because AngioScore was on notice by no later than February 5, 2010.

Three bases for tolling exist under Delaware law -- (1) the inherently unknowable doctrine (the "Discovery Rule"), (2) equitable tolling, and (3) fraudulent concealment. Because it finds that the last most strongly supports tolling in this case, the Court considers the fraudulent concealment test first. Pursuant thereto, tolling is warranted "if a defendant engaged in fraudulent concealment of the facts necessary to put a plaintiff on notice of the truth." *Albert v. Alex. Brown. Mgmt. Servs., Inc.*, No. CIV. A. 762-N, 2005 WL 1594085, *19 (Del. Ch. June 29, 2005). Tolling is justified if there is "an affirmative act of concealment by a defendant, an 'actual artifice' that

---

reasonable inference that Konstantino developed Chocolate in his corporate capacity as a board member of AngioScore, by, for example, sharing AngioScore's market data with TriReme and possibly using his knowledge of the AngioSculpt to inform his innovation and development of the Chocolate. Accordingly, defendants' request for summary judgment on this prong is **DENIED**.

Likewise, the record does not conclusively establish that Konstantino was merely "planning to compete" and that therefore his actions are immunized from the scope of the corporate opportunity doctrine. Rather, a disputed question exists over whether Konstantino was actively taking steps to develop, fund, test, and prepare the Chocolate for market, while at the same time concealing Chocolate from AngioScore. At this juncture, a finding that Konstantino was preparing to compete with AngioScore is not without dispute. Defendants' request for summary judgment on this point is therefore **DENIED**.

[9] Under Delaware law, the doctrine of laches governs the timeliness of claims brought in equity. Courts sitting in equity will apply by analogy the statute of limitations for substantive claims in order to apply the doctrine of laches. *Pomeranz*, 2005 WL 217039, at *2. Here, three years is the relevant limitations period.

United States District Court
Northern District of California

1    prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended

2    to put a plaintiff off the trail of inquiry." *Id.* (citation omitted).

3            Under Delaware law, tolling is proper only until a plaintiff is properly put on inquiry

4    notice.  "When plaintiffs are on inquiry notice, the statute of limitations begins to run.  Inquiry

5    notice does not require full knowledge of the material facts; rather, plaintiffs are on inquiry notice

6    when they have sufficient knowledge to raise their suspicions to the point where persons of

7    ordinary intelligence and prudence would commence an investigation that, if pursued would lead

8    to the discovery of the injury." *Pomeranz*, 2005 WL 217039, at *3 (citation omitted).

9            Plaintiff posits that the statute was tolled until 2014 when they learned of Konstantino's

10   development activities.  Prior to 2014, plaintiff claims Konstantino's repeatedly and expressly

11   represented that no basis existed for any suspicion that a breach of his duty had occurred.  In

12   support thereof, plaintiff identifies a series of communications between representatives of

13   AngioScore and Konstantino in February 2010.  These are some of the same emails that

14   defendants claim should have put AngioScore on notice.

15           First, in a February 2010 email to Tom Trotter, Konstantino wrote that "TriReme **has not**

16   **made any decision** to make such a change [ i.e., to enter the specialty balloon catheter market] and

17   I was giving you very early heads up to something that may take place **in the future**, **or may never**

18   **happen**" and that there was "no reason to be trigger happy" in reference to Trotter's asking

19   Konstantino to resign.  (Parker Decl. Ex. 11 at AS0796033 (emphases supplied).)  In response, on

20   February 4, 2010, AngioScore's counsel, John Sellers, explained to Konstantino that even if he or

21   TriReme were "just contemplating this decision [he has] important fiduciary duties."  (*Id.* at

22   AS0796032.)  The next day, Konstantino replied that "I am **keenly aware** of my obligations as a

23   board member and this is precisely why I am coming to Angio[S]core at this juncture; **before any**

24   **new project is started**." (*Id.* at AS0796031 (emphasis supplied).)

25           After Konstantino resigned on February 5, 2010, John Sellers requested confirmation that

26   Konstantino was "not involved with any development efforts, or acquisition or licensing

27   negotiations, involving product applications that would be competitive to AngioScore's products."

28   (Dkt. No. 516 ("Parker Opp. Decl.") Ex. 7, Sellers Decl. ¶ 5.)  Sellers further asked about

United States District Court
Northern District of California

1   Konstantino and TriReme's development activities relating to "angioplasty balloon

2   technology…that involves specialized features such as scoring, cutting or drug-eluting element, or

3   is designed to make similar claims to that of the AngioSculpt."  (*Id.* at ¶ 6.)

4        Konstantino's final response to this request was unambiguous and unequivocal.  On

5   February 23, 2010, through counsel, he represented that "TriReme is considering in the future the

6   possibility of entering the field of specialized balloons," but that before February 5, 2010

7   "TriReme ha[d] **not developed any products . . . that compete[] with AngioScore's products**."

8   (Parker Decl. Ex. 22, Letter from Nguyen to Sellers (Feb. 23, 2010) (emphasis supplied).)  In that

9   same letter, he maintained that he "**was not involved in any development work . . .** for the

10  coronary or periphery markets that involves specialized features such as scoring, cutting, or drug

11  eluting elements."  (*Id.*)  On March 21, 2010, again through counsel, he affirmed that that "**neither**

12  Mr. Konstantino nor TriReme **evaluated**, negotiated, **or otherwise pursued** the acquisition or

13  licensing of **any technology that competes with AngioScore's products**."  (Parker Opp. Decl.

14  Ex. 9, Letter from Nguyen to Sellers (March 21, 2010) (emphasis supplied).)

15       Plaintiff further argues that Konstantino's response to AngioScore's stated concerns not

16  only affirmatively disavowed any breach, but conveyed unflinching confidence in his own ability

17  to adhere to his duties.  The Court agrees that the communications create disputed questions over

18  defendants' contention that plaintiff was (1) on inquiry notice as of, at the latest, February 5, 2010,

19  and (2) that tolling is not warranted here.

20       First, as to inquiry notice, questions persist as to whether plaintiff had "sufficient

21  knowledge" before 2014 to "raise [its] suspicions to the point where persons of ordinary

22  intelligence and prudence would commence an investigation that, if pursued would lead to the

23  discovery of the injury" of which it now complains, and if so, when.  *Pomerantz*, 2005 WL

24  217039 at *3 (citations omitted).  A factfinder could determine it was reasonable that AngioScore

25  did not bring the instant claim earlier.  Despite mention of a potential second balloon in 2010, and

26  even possible suspicions, it was not at all clear to AngioScore that Konstantino *himself* had taken

27  significant steps to develop that balloon while he was a board member.  The statements upon

28  which defendants' rely do not disclose Konstantino's involvement in the development of the

24

second balloon, or any features of that balloon; many appear to concern TriReme's business strategy in general terms.  (*See* Defts. MSJ Reply at 2-3 (listing statements).)  Moreover, some of the evidence defendants argue establishes that AngioScore was on notice of Chocolate appears to pertain to a different product entirely, the Glider catheter, which is not a specialty balloon and which AngioScore was not interested in pursuing.  But critically, even at their combined greatest weight, a reasonable factfinder could determine that these facts do not overcome the strength of Konstantino's affirmative, and arguably misleading, representations.

Second, on the question of whether tolling is warranted here, the Court finds that substantial questions remain.  As stated above, three bases exist for tolling statutes of limitations under Delaware law.  Pursuant to the "fraudulent concealment" test, tolling is warranted "if a defendant engaged in fraudulent concealment of the facts necessary to put a plaintiff on notice of the truth."  *Albert v. Alex. Brown. Mgmt. Servs., Inc.*, No. CIV. A. 762-N, 2005 WL 1594085, *19 (Del. Ch. June 29, 2005).  Tolling is justified if there is "an affirmative act of concealment by a defendant— an 'actual artifice' that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a plaintiff off the trail of inquiry."  *In re Dean Witter P'ship Litig.*, No. CIV. A. 14816, 1998 WL 442456, at *5 (Del. Ch. July 17, 1998) (citation omitted).

As stated above, a reasonable factfinder could determine that Konstantino's several intentional statements to AngioScore obfuscated the true nature of his activities while he was a board member, and affirmatively misrepresented the facts of both the Chocolate and his involvement with the Chocolate.  To the extent Konstantino concealed operative facts that prevented AngioScore's discovery of Konstantino's wrongful conduct relative to the Chocolate, tolling would be permissible.  Specifically, by the time Konstantino resigned from AngioScore's board, Chocolate's development was underway and Konstantino had been a knowing participant in that development.  In response to questions concerning the same, Konstantino's responses suggest a disavowal of any such activities.

Defendants counter that Konstantino was asked to resign from AngioScore's board apparently due to the "serious conflict of interest" created by TriReme's possible bringing to

United States District Court
Northern District of California

1    market a device that would compete with AngioScore and argue that therefore AngioScore knew

2    of this cause of action at the time of Konstantino's resignation.  (Danitz Decl. Ex. 24, Email from

3    Trotter to Konstantino (Feb. 4, 2010).)  But the intent behind Trotter's email, and his

4    understanding of the facts relative to Chocolate or any other competitive device at that time, and

5    likewise whether plaintiff had actual knowledge sufficient to put it on notice, remains the subject

6    of dispute.

7        For the reasons stated above, the defendants' motion for summary judgment on their

8    statute of limitations and laches defenses is **DENIED**.[10]

9        ### 3.   *Counter-Prongs of the Corporate Opportunity Doctrine*

10       Last, defendants argue that Konstantino did not usurp a corporate opportunity under the

11   counter-test enunciated in *Broz.*  673 A.2d at 155.  To refresh, that case stated that:

12
13       a director or officer may take a corporate opportunity if: (1) the
         opportunity is presented to the director or officer in his individual
14       and not his corporate capacity; (2) the opportunity is not essential to
         the corporation; (3) the corporation holds no interest or expectancy
15       in the opportunity; and (4) the director or officer has not wrongfully
         employed the resources of the corporation in pursuing or exploiting
16       the opportunity.

17   *Id.*  As stated above, the Court finds that defendants have not met their burden as to the first prong,

18   and finds no basis to grant either party's summary judgment on the third "interest or expectancy"

19   prong.

20       As to the two remaining counter-prongs, the Court finds that defendants have not met their

21   burden to compel summary judgment in their favor.  First, with respect to whether the Chocolate

22   was "essential" or "desirable" to AngioScore, the facts discussed above concerning AngioScore's

23   interest or expectancy in the Chocolate overlap with the issue of whether the Chocolate was

24   essential or desirable to Angioscore.  With all reasonable inferences drawn in AngioScore's favor,

25   _____

26       [10] As the parties conceded at argument, defendants' motion for summary judgment on
     plaintiff's unfair competition law claim is contingent upon the Court's finding that the fiduciary
27   duty claim is barred by either laches or the relevant statute of limitations.  Because the Court does
     not so find, it also finds the unfair competition claim is not appropriate for resolution on summary
28   judgment.  Defendants' motion as to this cause of action is therefore **DENIED**.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    the Court finds that at minimum, factual questions remain.

2         Similarly, with respect to the final prong – whether Konstantino did or did not wrongfully

3    employ the resources of AngioScore in pursuing or exploiting the Chocolate opportunity –

4    numerous factual questions remain.  For example, AngioScore disputes that Konstantino did not

5    use its proprietary information to develop and market the Chocolate device, and emails suggest

6    that Konstantino may have shared AngioScore's information, specifically China market data, with

7    TriReme during the time he was developing Chocolate.  (*See* Parker Opp. Decl. Exs. 23, 24.)

8    Moreover, Konstantino was on AngioScore's board of directors while he was developing

9    Chocolate.  This fact raises a reasonable inference that he was exposed to information proprietary

10   and confidential to AngioScore, and that he undertook to develop and market Chocolate with that

11   knowledge.  Such facts counsel against a summary judgment finding for defendants on this issue.

12        Accordingly, defendants' motion for summary judgment on these bases is **DENIED**.

13        **C.  Defendants' Summary Judgment Arguments on Remaining State Law Claims**

14             ***1.   Successor Liability***

15        Defendants contend that the evidence is insufficient to establish that QT Vascular is the

16   successor in interest to the liabilities of Quattro and TriReme.  The Ninth Circuit recognizes such

17   liability where a corporation that purchases the assets of another if (1) the purchasing corporation

18   expressly or impliedly agrees to assume the liability; (2) the transaction amounts to a "de-facto"

19   consolidation or merger; (3) the purchasing corporation is merely a continuation of the selling

20   corporation; or (4) the transaction was fraudulently entered to escape liability.  *Atchison, Topeka*

21   *& Santa Fe Ry. Co. v. Brown & Bryant*, *Inc.*, 159 F.3d 358, 361 (9th Cir. 1998).  Evidence

22   adduced to date creates a genuine dispute as to at least one of these factors.  For example, the

23   Summary of Terms for Proposed Merger reflects that the parties contemplated potentially that QT

24   Vascular would receive all the liability of Quattro and TriReme, and that the parties understood

25   the transaction to constitute a merger.  (*See* Parker Opp. Decl. Ex. 31 at TR1181405.)  Defendants

26   contend that the final agreement contained no transfer of liabilities, but this does not avoid the

27   suggestion that the transaction amounted to a merger.  Furthermore, defendants' corporate

28   representative Momi Brosh, in a deposition stated that QT Vascular received all of the existing

United States District Court
Northern District of California

1   stock, shares, assets, and liabilities in each of Quattro and TriReme.  (*See id.* Ex. 32, Brosh Dep. at

2   279:18-281:15.)  In sum, the Court finds that questions remain.  Defendants' motion for summary

3   judgment on this issue is therefore **DENIED**.

### 2.   *Aiding and Abetting*

5   Aiding and abetting a breach of fiduciary duty occurs when the defendant "knows the

6   other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to

7   the other to so act . . . ."  *Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1144 (Cal. App.

8   4th Dist. 2005); *see also In re Brocade Commc'ns Sys., Inc. Derivative Litig.*, 615 F. Supp. 2d

9   1018, 1050 (N.D. Cal. 2009) (citing *Casey*, 127 Cal. App. 4th at 1144).  Defendants contend that

10  Quattro cannot be held to have aided and abetted Konstantino in breaching his fiduciary duties.

11  At this juncture, the Court finds that questions of material fact exist that preclude granting

12  summary judgment on this issue.  For example, Quattro, or its predecessor, may have sponsored a

13  January 2010 study of the Chocolate, and evidence suggests that Quattro's predecessor company,

14  through Konstantino, apparently solicited money from the Singapore government for Chocolate

15  development.  Facts adduced to date support a reasonable inference that Quattro, or its

16  predecessor, was aware that Konstantino was a director of AngioScore with fiduciary obligations

17  to that company that conflicted with his undertaking to create a specialty angioplasty balloon

18  catheter.  Accordingly, summary judgment on this issue is **DENIED**.

### 3.   *Alter Ego*

20  The relevant legal principles underlying the doctrine of alter ego liability, which permits a

21  plaintiff to pierce the corporate veil between a parent corporation and a subsidiary, are set forth in

22  *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 538 (2000).

23  Alter ego liability is an "extreme remedy, sparingly used."  *Id.* at 539 (citation omitted).

24  Such relief is appropriate where there has been an abuse of the corporate privilege so severe that it

25  justifies holding the equitable ownership of a corporation liable for the actions of the corporation.

26  *Roman Catholic Archbishop v. Superior Court*, 15 Cal. App. 3d 405, 411 (1971).  For example,

27  when the corporate form is "used to perpetrate a fraud, circumvent a statute, or accomplish some

28  other wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the

corporation's acts to be those of the persons or organizations actually controlling the corporation, in most instances the equitable owners." *Sonora*, 83 Cal. App. 4th at 538 (citations omitted).

In order to pierce the corporate veil, a plaintiff must establish two things. First, that there is such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist. Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone. *Id.* (citations omitted). Factors to be considered in applying the doctrine include:

> commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, and use of one as a mere shell or conduit for the affairs of the other.

*Id.* at 538-539 (quotation and citations omitted). In addition, courts look to whether there has been "inadequate capitalization, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers." *Id.* at 539 (listing cases). Importantly, "[n]o one characteristic governs, but the courts must look at all the circumstances to determine whether the doctrine should be applied." *Id.* (citations omitted). The question of "[w]hether to hold a parent liable for acts of its subsidiary is a highly fact-specific inquiry." *Bowoto v. Chevron Texaco Corp.*, 312 F. Supp. 2d 1229, 1235 (N.D. Cal. 2004).

The Court notes first that plaintiff has advanced a theory for alter ego liability that was presented neither in its 4AC, nor in its briefing relative to the motion to dismiss that pleading. There, plaintiff appeared to plead that Konstantino had manipulated the corporate form for his own purposes and that Quattro, TriReme, and QT Vascular were his alter egos. In its current briefing, plaintiff argues that the corporations were alter egos of each other and seeks to pierce the corporate veil between them.

The Court finds that alter ego liability is not available here. Plaintiff does not advance any colorable argument that defendants engaged in fraud in the corporate restructuring of the corporate defendants. In addition, AngioScore fails to present a material issue of disputed fact regarding its alter ego theory of liability. Of primary concern is plaintiff's contention that in the absence of

United States District Court
Northern District of California

29

corporate veil-piercing, injustice would result because AngioScore could not recover all the proceeds of the sales of Chocolate.  (Pltf. Opp. to Defts. MSJ at 25.)  That is not a sufficient basis for piercing the veil.  "The inability of plaintiffs to recover for their losses is not a sufficient inequity to justify overlooking the corporate form."  *Bowoto*, 312 F. Supp. 2d at 1247; *see, e.g.*, *Seymour v. Hull & Moreland Engineering*, 605 F.2d 1105, 1113 ("Lastly, we see no injustice in the effect of the trial court's findings.  While it is true that the trustees apparently have a judgment for several thousand dollars against an insolvent defendant, their inability to collect does not, by itself, constitute an inequitable result.").  The Court finds that there is not sufficient evidence to support a finding that incorporation was undertaken in bad faith or that observing the corporate form would produce an inequitable result.

Plaintiff's reliance on *In re Hydroxycut*, 810 F. Supp. 2d 1100, 1124 (S.D. Cal. 2011) does not compel a different result.  There, in considering whether plaintiff had made a *prima facie* showing for its claim on a motion to dismiss for lack of personal jurisdiction, the court noted that the defendant had "made a conscious decision to attempt to hide behind its corporate form to avoid liability."  *Id.*  In so holding, the court likened the facts of *Hydroxycut* to those in *Craigslist, Inc. v. Mesiab*, No. C 08-05064 CW (MEJ), 2010 WL 5300883, at *7 (N.D. Cal. Nov. 15, 2010), where the defendants emailed about their strategy to avoid litigation by manipulating the corporate form.

The facts marshaled by AngioScore in support of its alter ego theory do not rise to this level.  Indeed, although it remains disputed, AngioScore argues that QT Vascular agreed to, and did, assume the liabilities of both Quattro and TriReme.  (Pltf. Opp. to Defts. MSJ at 23; Ex. 31; Ex. 32, 279:18-281:15.)  Thus, evidence upon which AngioScore relies for its successor liability argument suggests that the defendants here did not attempt to manipulate the corporate form in order to avoid liability.

AngioScore has not presented a sufficient basis for a reasonable factfinder to disregard the corporate form and hold QT Vascular liable for the acts of its subsidiaries.  Defendants' motion for summary judgment on this basis is **GRANTED**.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MOTIONS IN LIMINE

The Court now turns to the motions relating to the admissibility of expert witness testimony on the question of state law damages.[11]  (Dkt. Nos. 462 ("Talley Motion"); 463 ("Olsen State Law Motion"); 466 ("Lewin Motion").)

## I.    LEGAL STANDARD

Rule 702 provides that "scientific, technical, or other specialized knowledge" by a qualified expert is admissible if it will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137(1999), "require that the judge apply his gatekeeping role . . . to all forms of expert testimony, not just scientific testimony." *White v. Ford Motor Co*., 312 F.3d 998, 1007 (9th Cir. 2002).

However, "far from requiring trial judges to mechanically apply the *Daubert* factors—or something like them—to both scientific and non-scientific testimony, *Kumho Tire* heavily emphasizes that judges are entitled to broad discretion when discharging their gatekeeping function." *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000).  Indeed, the Ninth Circuit has determined that a "trial court not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding *how* to determine the testimony's reliability." *Elsayed Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1064 (9th Cir. 2002) (citing *Hankey*, 203 F.3d at 1167) (emphasis in original), *overruled on other grounds, Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 467 (9th Cir.) *cert. denied*, 135 S. Ct. 55 (2014).

Concerning the reliability of non-scientific testimony, the "*Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the

---

[11] Given that the trial in this case is bifurcated and that proceedings on the state law claims will proceed first, this Order addresses only the motions in limine that pertain to the state law claims.  The motions relative to the patent claims will be addressed only after the case on plaintiff's state law claims resolve.  (Dkt. Nos. 464 ("Sheehan Motion"); 471 ("Olsen Patent Damages Motion").)

United States District Court
Northern District of California

1  methodology or theory behind it." *Hankey*, 203 F.3d at 1169; *see also Kumho Tire*, 526 U.S. at

2  150 ("Engineering testimony rests upon scientific foundations, the reliability of which will be at

3  issue in some cases. . . .  In other cases, the relevant reliability concerns may focus upon personal

4  knowledge or experience.").

5          As many courts have recognized, however, "the *Daubert* gatekeeping obligation is less

6  pressing in connection with a bench trial" where "the 'gatekeeper' and the trier of fact [are] one

7  and the same." *Volk v. United States*, 57 F. Supp. 2d 888, 896 n. 5 (N.D. Cal. 1999); *see also*

8  *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 596 n. 10 (D. N.J. 2002)

9  ("[W]here the Court itself acts as the ultimate trier of fact at a bench trial, the Court's role as a

10  gatekeeper pursuant to *Daubert* is arguably less essential."); *Fierro v. Gomez*, 865 F. Supp. 1387,

11  1395 n. 7 (N.D. Cal. 1994), *aff'd* 77 F.3d 301 (9th Cir. 1996), *vacated and remanded on other*

12  *grounds*, 519 U.S. 918 (1996), *modified on other grounds on remand*, 147 F.3d 1158 (9th Cir.

13  1998) (concluding that the better approach under *Daubert* in a bench trial is to permit the

14  contested expert testimony and "allow 'vigorous cross-examination, presentation of contrary

15  evidence' and careful weighing of the burden of proof to test 'shaky but admissible evidence'")

16  (quoting *Daubert*, 509 U.S. 579).

17      **II.    TALLEY MOTION**

18          Defendants argue that the opinions and proposed testimony of Professor Eric L. Talley

19  concerning "sound corporate governance" are inadmissible and beyond his expertise under the

20  Federal Rules of Evidence and *Daubert*.  (Dkt. No. 462.)

21          Courts have admitted expert testimony on corporate governance in breach of fiduciary duty

22  actions insofar as such testimony is used to inform the jury about the standard of care and the

23  scope of duties.  *See, e.g., In re Homestore.com, Inc.*, No. CV 01-11115 RSWL (CWx), 2011 WL

24  291176, at *10 (C.D. Cal. Jan. 25, 2011) (admitting expert testimony "on the appropriate standard

25  of behavior a CEO owes its company and shareholders" but noting that no legal conclusions could

26  be offered); *Wattel v. Browne*, No. 02-CV-2256 PHX-PGR, 2006 WL 1211186 (D. Ariz. May 3,

27  2006) (admitting expert testimony on corporate governance standards in breach of fiduciary case

28  involving directors and officers of corporation); *see also FDIC v. Jackson*, 133 F.3d 694, 700 (9th

United States District Court
Northern District of California

Cir. 1998) (referencing expert testimony submitted on summary judgment related to determination of whether a corporate director has properly discharged his duties).  The ultimate question of whether Konstantino breached these duties, however, is to be decided by the factfinder.

In light of the foregoing, the Court finds that Talley may not testify on the ultimate issue of fact in this case, specifically, whether Konstantino did or did not breach his duties.  Talley may, however, present an expert opinion on governance practices generally applied in the corporate context to control for potential conflicts of interest.  To the extent that defendants take issue with the remainder of Talley's report, those issues can come out in the crucible of cross-examination.  The motion is **DENIED**.

### III.    LEWIN MOTION

Plaintiff argues that the proposed expert testimony of Professor David Lewin should be precluded in its entirety because such testimony will not help the trier of fact to understand the evidence or to determine a fact in issue and is unreliable.  (Dkt. No. 466.)  The gravamen of Lewin's "expert opinion" is based merely upon anecdotal, self-selected examples, which defendants argue stand for the proposition that the principles of sound corporate governance practices are not consonant with real-world practices, and that Talley's opinions are "profoundly anti-competitive."  (Lewin Rpt., Dkt. No. 467-2 at 7-8.)

Ultimately, expert opinions must have a sufficient factual and foundational basis in order to be helpful.[12]  Lewin's testimony does not meet this standard.  With respect to Lewin's opinions on generally accepted principles of corporate governance, the Court finds that Lewin has failed to establish that his opinions are sufficiently rooted in factual knowledge such that they are reliable and relevant.  These opinions are not based on any methodology or analysis.  As such, Lewin's

---

[12] Defendants seek to admit Lewin's testimony insofar as Lewin rebuts Talley's testimony.  As set forth above, Talley's testimony is limited to the generally accepted corporate governance principles that govern directors' fiduciary obligations and which are directed to prevent conflicts of interest.  Accordingly, the Court need only address the substance of Lewin's opinion rebutting those opinions; Lewin's remaining opinions, addressing the excluded portions of Talley's testimony, are likewise precluded.

1    opinions lack any foundation such that they may be assistance to the trier of fact.  The motion is

2    **GRANTED**.

3    **IV.    OLSEN MOTION**

4        Defendants seek to preclude two of three damages theories offered by expert Gary Olsen

5    concerning the valuation of damages on plaintiff's state law claims.  (Dkt. No. 463.)  Specifically,

6    defendants question whether Olsen may provide testimony on his first theory of damages for

7    plaintiff's corporate opportunity claim based on the amount of revenues AngioScore purportedly

8    would have achieved had AngioScore "shelved" Chocolate and had Chocolate never been

9    developed and brought to the market.  (*Id*. at 1.)  Defendants also challenge whether Olsen may

10   provide testimony on his third theory of damages for the same claim based on a present value of

11   purported profits on sales of Chocolate after June 30, 2014.  (*Id*.)  Defendants contend that this

12   theory was not included in Olsen's prior reports and improperly fails to include any costs to

13   develop or bring the Chocolate to market prior to that date.  (*Id*.)

14       At this juncture, the Court **DENIES** the motion without prejudice.  Olsen will be permitted

15   to testify.  The Court will consider the arguments made in this motion, and any other issues that

16   arise with respect to Olsen's state law damages calculations, either in the context of the bench trial

17   or in its ultimate findings of fact and conclusions of law.

18                                     **CONCLUSION**

19       For the reasons set forth above, the Court rules as follows:

20       1.  Defendants' motion to dismiss is **DENIED**;

21       2.  Plaintiff's motion for summary judgment is **GRANTED** as to the line of business

22           factor, and **DENIED** as to the balance;

23       3.  Defendants' motion for summary judgment is **GRANTED** as to the alter ego theory,

24           and **DENIED** as to the balance;

25       4.  Defendants' motion to preclude the testimony of Eric Talley is **DENIED**;

26       5.  Plaintiff's motion to preclude the testimony of David Lewin is **GRANTED**; and

27       6.  Defendants' motion to preclude certain opinions of AngioScore's state law

28           damages expert, Gary Olsen is **DENIED WITHOUT PREJUDICE.**

United States District Court
Northern District of California

34

1    In addition, on April 2, 2014, the Federal Circuit denied defendants' petition for writ of

2    mandamus and emergency motion for a stay of the proceedings in this Court.  (Dkt. No. 587-1.)

3    Accordingly, defendants' motion to stay this action pending resolution of their petition is **DENIED**

4    as moot, as is their motion to shorten time on to that motion to stay.

5    This Order terminates Docket Nos. 462, 463, 466, 468, 478, 555, 575, and 576.

6

7    **IT IS SO ORDERED.**

8    Dated:  April 6, 2015

9    _____

10   **YVONNE GONZALEZ ROGERS**
     **UNITED STATES DISTRICT COURT JUDGE**