1

2

3

4

5

6              UNITED STATES DISTRICT COURT

7            NORTHERN DISTRICT OF CALIFORNIA

8

**ANGIOSCORE, INC.,**

9                    Plaintiff,                    Case No.  12-cv-03393-YGR

10

11        v.                                       **FINDINGS OF FACT
                                                   AND CONCLUSIONS OF LAW**
12   **TRIREME MEDICAL, INC., ET AL.,**

13                    Defendants.

14                          **INTRODUCTION**

15           This case staged a tension between the inveterate, established law of fiduciary duties held

16   by corporate directors and breach of fiduciary duty claims that arise when directors of emerging

17   companies are innovators in the technology themselves.  In such an instance, plaintiff AngioScore

18   would have innovation subverted to duty; defendants would have duty subverted to innovation.

19   Neither party's position admits of any balance, and neither can be wholly right.  As set forth in

20   this Order, the Court finds that where transparency, loyalty, and good faith predominate, a

21   director's fiduciary duties and his drive to innovate can co-exist, albeit with the duties to the

22   corporation taking precedence.

23           AngioScore brings state law claims for breach of fiduciary duty against one of its founders

24   and former directors, Eitan Konstantino, alleging that while he was a member of AngioScore's

25   board, Konstantino developed a medical device directly competitive with AngioScore's flagship

26   product.  Rather than offer the opportunity to acquire the new device to AngioScore, AngioScore

27   maintains that Konstantino instead took it for himself.  AngioScore also claims that corporate

28   defendants Quattro Vascular PTE Ltd. and TriReme Medical, Inc. aided and abetted Konstantino's

*United States District Court*
*Northern District of California*

breach, and that liability for these entities' wrongdoing runs to QT Vascular Ltd. Defendants disagree, arguing in part that the duty was not breached either because no opportunity existed, or because AngioScore was not entitled to Konstantino's intellectual property as a matter of law.

Following a six-day bench trial on AngioScore's claims, the parties submitted proposed findings of fact and conclusions of law. (Dkt. Nos. 643 (AngioScore's Opening Post-Trial Brief ("AOB"), 645 (Defendants' Opening Post-Trial Brief ("DOB"), 649 (AngioScore's Post-Trial Reply Brief ("ARB"), 650 (Defendants' Post-Trial Reply Brief ("DRB")).) Specifically, those claims pertain to Konstantino's breach of fiduciary duty; that Quattro and TriReme aided and abetted the same; QT Vascular is a successor in interest to Quattro and TriReme and therefore liable for their aiding and abetting; and finally, that defendants have violated California's Unfair Competition Law. Having reviewed the evidence of record, the arguments of the parties, and relevant case law, for the reasons set forth in these findings of facts and conclusions of law, the Court hereby FINDS for AngioScore in all material respects and AWARDS a remedy accordingly.

FACTUAL BACKGROUND[1]

I.      The Parties

Since its founding in 2003, AngioScore has designed, manufactured, and marketed specialty angioplasty balloon catheters that are used for the treatment of cardiovascular disease. Its signature product line, sold under the brand name AngioSculpt, consists of an nylon balloon surrounded by a nitinol structure. The AngioSculpt is sold in an array of dimensions and lengths to meet varying patient needs, although the structure of the balloon and cage remain unchanged in all material respects at each available sizing option. The purpose of the AngioSculpt is to treat cardiovascular disease, whereby plaque deposits along a blood vessel's wall, forming what are called lesions. The plaque deposits harden and block, or occlude, blood flow, with potentially severe health risks. The AngioSculpt is used to open occluded or narrowed blood vessels at lesion sites by inflating the balloon to compress the plaque deposits against a vessel wall. As the balloon

---

[1] Appended to the end of this order are the Court's detailed factual findings, setting forth citations to evidence of record. The following narrative factual discussion summarizes the events giving rise to this case in a manner unencumbered by extensive record citations.

United States District Court
Northern District of California

1  inflates, the AngioSculpt's nitinol wire cage expands.  The expanded cage sits atop the balloon

2  and impresses upon plaque, "scoring it," in an effort designed to "crack" the plaque and open the

3  blood vessel, without injuring or puncturing the vessel wall.  It is to this scoring feature that

4  AngioScore owes its name.  After use, the device can then deflate, returning to its original form,

5  for removal from the patient's body.

6         Defendant Eitan Konstantino invented the AngioSculpt.  An engineer by training with a

7  doctorate in laser surface treatment, optical design, and materials science, Konstantino was a co-

8  founder, President, and Chief Scientist of AngioScore, Inc.  In this role, Konstantino sought to

9  develop and bring the AngioSculpt to market, which involved gaining approval both in Europe

10  and through the United States Food and Drug Administration ("FDA").  To accomplish these

11  goals, Konstantino sought funding from investors, who in turn acquired seats on AngioScore's

12  board of directors.  Among those directors were Tom Raffin, a partner with the venture capital

13  firm Telegraph Hill Partners, and Lisa Suennen, a partner at Psilos, another such firm.

14         In 2005, the board decided that Konstantino would be better suited to a role directed to

15  research and development.  Tom Trotter then became AngioScore's chief executive officer.  When

16  Trotter assumed the position, he and Konstantino discussed what role was most appropriate for

17  Konstantino moving forward.  In light of that conversation, Trotter offered Konstantino the role of

18  Executive Vice President of Research and Development and Chief Scientific Officer.

19         AngioScore wanted Konstantino to remain on the AngioScore team because of his central

20  role at the company as a co-founder, and his skill as an engineer.  Konstantino, however,

21  expressed a desire to leave and work full time as President and CEO of TriReme Medical, Inc., a

22  company he had founded for the purpose of developing bifurcation stents.  Accordingly, in the fall

23  of 2005, Trotter started to look for a replacement for Konstantino.  Both he and Konstantino

24  interviewed the candidates.  At the same time, Konstantino requested that he be given permission

25  to work on a developing technology with TriReme:  endovascular bifurcation stents and delivery

26  systems for the same.  Although bifurcation stents are not competitive with specialty balloon

27  angioplasty catheters, AngioScore's board took this request seriously, ultimately adopting a

28

resolution that granted Konstantino permission to pursue this limited goal, and waived AngioScore's interest in the bifurcation stent technology.

In late 2006, the role of AngioScore's Vice President of Research and Development transitioned from Konstantino to Feridun Ozdil.  While the details remain unclear, the relationship between Konstantino and Ozdil soon became strained and culminated in a physical altercation. Both Konstantino and Ozdil are intelligent scientists, but both are egotistical and authoritarian. The "he said"/"he said" personality conflict was never resolved definitively.

In April 2007, Konstantino's employment with AngioScore terminated, although he remained on its Board of Directors.  In his capacity as a board member, he continued to attend AngioScore's board meetings and received updates about AngioScore's financial well-being and the status of its new product development up until he was asked to resign in February 2010.

**II.     Chocolate, the Device at Issue**

In the fall of 2009, Konstantino and his brother-like friend and colleague, Tanhum Feld, conceived of what was to become "Chocolate" during a telephone "brainstorming" session.  Feld was discussing frame ideas for a balloon; Konstantino offered the notion of a balloon surface defined by pillows and grooves.  The concept was that a nitinol cage would surround a nylon balloon.  As the balloon inflated, it would protrude through the cage.  The inflated balloon would then display a pattern of pillows and grooves, exerting force against plaque lining a vessel wall.

With the concept for Chocolate established, Feld undertook to engineer the device, directing and coordinating efforts of TriReme employees with Konstantino's approval.  By October 2009, Konstantino applied for a provisional patent application, naming himself and Feld as co-inventors.  Within just a few months, Chocolate had progressed from an intellectual concept to physical prototypes.  In January 2010, Konstantino and other TriReme employees attended animal testing at Stanford for a Chocolate prototype.

Along with supervising and directing the employees at TriReme in their efforts to develop Chocolate, Konstantino assumed the role of the businessman, conceptualizing the marketing of Chocolate and pitching it to investors under the guise of a corporate entity called "Proteus." During the second half of 2009, Konstantino met with twenty to thirty investors, offering them the

4

United States District Court
Northern District of California

1   opportunity to invest in Chocolate.  In these pitches, Konstantino represented that the Chocolate

2   was being developed by "Proteus," and that Chocolate's intellectual property, design, prototypes,

3   business model, team, and partnerships were all completed.  With representations of this sort, he

4   secured a grant from the Singapore Economic Development Board and continued to solicit

5   additional investors.

6          The similarities between AngioSculpt and Chocolate are obvious.  Both are specialty

7   angioplasty balloon catheters.  Both are comprised of a nylon balloon surrounded by a nitinol

8   structure.  Both are used to treat peripheral and coronary artery disease by inflating to open

9   occluded blood vessels.  Neither leaves any metal behind in a blood vessel after use, unlike a stent.

10  Both are sold to the same customers and make overlapping marketing claims.  Both are sold at

11  premium pricing with roughly identical list prices.  Given the similarities between the devices,

12  Konstantino himself identified AngioScore as a partner for the Chocolate opportunity in investor

13  presentations in 2009 and 2010.

14         Konstantino knew that the devices would compete with one another and contemporaneous

15  documents show that not only did he so intend, but this information was used as part of his

16  investment pitch.  In pricing Chocolate, Konstantino and employees at TriReme purposefully

17  priced Chocolate exactly $25 below the list prices for AngioSculpt and targeted the same

18  customers.  Communications between Konstantino, Feld, and TriReme employees and officers

19  from late 2009 into 2010 confirm that all those involved with the development of Chocolate –

20  Konstantino, TriReme, and Quattro – were purposefully seeking to compete with the AngioSculpt

21  in the specialty balloon catheter market.  This included touting Chocolate for all its competitive

22  advantages, including its potential as a drug-eluting balloon.

23         While he directed the development of Chocolate as both a medical device and business

24  opportunity, Konstantino nonetheless remained on AngioScore's board of directors.  Pursuant

25  thereto, he was privy to all manner of confidential financial information, market information, and

26  competitive information regarding the performance of the AngioSculpt device and AngioScore's

27  highly sensitive risk assessments.  (PX 220 (July 2009 Board Meeting presentation, including

28  strategic focus, discussions of business challenges).)  He knew that AngioScore was having

United States District Court
Northern District of California

difficulty developing a 100mm version of its AngioSculpt as of July 2009.  (*Id*.)  And, he knew that the company was interested in pursuing a drug coated specialty balloon.  (*See* PX 217 (February 21, 2009 email between board members discussing efforts to attain drug coated balloon technology); PX 220 (July 2009 board presentation outlining future business strategy including "extra long" devices of 100mm and a drug coated device).)  In addition, Konstantino knew that the financial status of AngioScore in late 2009 to early 2010 was relatively strong.  AngioScore was in a prime position to raise further capital, had considerable cash reserves, and was in the process of dedicating resources to improving its presence in the specialty balloon catheter market, even though it had just emerged from the expense of an unwarranted investigation.  Indeed, AngioScore's December 2009 Monthly Report, distributed for the board meeting, reflected that cash on hand totaled $15.3 million. The report described this figure as an "[o]utstanding result." (DX 1199.)  That AngioScore could have exploited the Chocolate opportunity, had it been offered, is not subject to reasonable dispute.

Notably, in December 2009, Konstantino had a conversation with AngioScore's CEO, Trotter, regarding TriReme's development of a plain old balloon angioplasty ("POBA") device called "Glider."  At trial, both Trotter and Konstantino confirmed that this conversation took place.  Konstantino told Trotter that TriReme was too small to commercialize the Glider product, and that he was in search of a funder.  He offered the Glider to AngioScore for distribution purposes.  In his deposition, Konstantino explained that conversation as follows:

> I share[d] with him the specifics of the product, the technical features of this product.  I share[d] with him how do we think this product may fit in the marketplace, what we view [are] the features or the advantages of this product.  And I offered him to do some sort of collaboration.  Specifically we discussed -- or I offered two collaborations or two opportunities.  I don't mean opportunities in a legal context. One was to distribute these. Told him, Tom, we are a small company.  We don't have commercial capabilities.  You have that.  This is not a product you put in the bag.  We don't have commercial capabilities.  You do.  This is another product you can put in the bag.  You can reduce the overhead or the overhead location on sale slips.  There are many perceived benefits.  And I also talked with him about the what you call the fact, maybe, that AngioSculpt was not a highly deliverable product, at least this is in the perception of physicians who are using the product.

1    (*See* Trial Transcript ("Trial Tr."[2]) at 136:23-138:1 (reading Konstantino Dep. at 643:7-644:3).)

2        Trotter confirmed that when Konstantino revealed that TriReme had been working on the

3    Glider, he expressed concern that TriReme was venturing into angioplasty balloons at all.

4    Because Konstantino had presented TriReme's Glider as an ordinary POBA, however, the Glider

5    would not be acutely competitive with AngioSculpt.  Notably absent from this conversation was

6    any mention of Chocolate, which had been in development for months, offered to others as a

7    corporate opportunity, and was about to undergo porcine testing.

8        After sitting through the February 3, 2010 AngioScore board meeting, Konstantino

9    approached Trotter and asked to meet privately.  Referencing the December 2009 conversation in

10   which he had offered AngioScore the Glider POBA balloon, Konstantino told Trotter that

11   TriReme was "considering developing a specialty balloon catheter for peripheral indications," and

12   that TriReme had been actively working on "something for the future" in specialty balloon

13   catheters.  To say that Konstantino "downplayed" the facts surrounding Chocolate would be an

14   understatement.  Konstantino did not inform Trotter that the development of TriReme's specialty

15   balloon, which by that point had been called Chocolate for several months, was well underway.

16   He did not disclose his personal role in the development and conceptualization of the device, nor

17   did he disclose that a prototype had been created, a patent application and been submitted, animal

18   testing had occurred, or that he had already engaged potential investors and funding sources.

19   Trotter was nonetheless shocked by this news.  Specialty balloons were AngioScore's focus.  He

20   was of the belief that prior to that point, TriReme had been focusing on bifurcation stents and had

21   only recently started to consider POBA devices, and even then, only the Glider POBA.  Trotter

22   informed Konstantino that he did not think further discussion was appropriate and asked him to

23   leave.

24       Immediately following that meeting, Trotter relayed the conversation with Konstantino to

25   members of AngioScore's board.  The board expressed a universal belief that Konstantino should

26

27   _____

         [2] References to "Trial Tr." refer to the consolidated transcript of trial, which appears in six,
28   sequentially paginated volumes at Docket Entries 616, 617, 622, 623, 637, and 638.

United States District Court
Northern District of California

resign as soon as possible.  If TriReme developed a specialty balloon, Konstantino would have

direct a conflict of interest.  The board was concerned that TriReme was considering potentially

competing with AngioScore.  At that point, no one at AngioScore knew that a competitive

specialty balloon device had been developed under Konstantino's direction and control.

The next day, Trotter sent Konstantino an email entitled "Board of Directors Position,"

copying AngioScore's attorney, John Sellers.  In it, Trotter restated his concerns about TriReme

moving into the specialty balloon market, and stated that the board members with whom he had

spoken saw this as a "clear conflict of interest."  The "consensus opinion" was that Konstantino

"need[ed] to resign from the Board immediately [and] probably should not have participated in

yesterday's Board Meeting."  Trotter told Konstantino that Sellers would be in touch to make

arrangements for his resignation.

Konstantino's response was brief.  Again, he did not disclose the existence, or

development status of the Chocolate device, nor did he disclose his intimate involvement with the

project.  Rather, and importantly, he began his campaign of active misdirection.  Thus, he

responded:  "TriReme has not made any decision to make such [a] change and I was giving you

very early heads up to *something that may take place in the future, or may never happen*[.]"

(emphasis supplied).

On February 4, 2010, John Sellers responded to Konstantino in an email.  Sellers informed

Konstantino that "e[]ven if you are just contemplating . . .  you have important fiduciary duties

[and] ongoing confidentiality obligations."  Later that day, the two men spoke on the telephone for

five to ten minutes.  Sellers again emphasized Konstantino's fiduciary obligations to AngioScore

as a director, including that a conflict of interest would exist if TriReme developed a potentially

competing technology.  They also discussed the logistics of Konstantino's resignation from the

Board.

The next day, February 5, 2010, Konstantino replied to Sellers, copying Trotter, Suennen,

and Raffin:

> As we discussed, I'm surprised and disappointed that you and the
> company jumped to the conclusion that I should resign from the

8

> board based on assumptions after receiving bits and pieces of information.   I am ***keenly aware of my obligations*** as a board member and this is precisely why I am coming to AngioScore [now]; ***before any new project is started***.

(PX 107 (emphasis supplied).)  To investigate the issue further, Suennen reached out to former AngioScore CEO, co-founder, and one of AngioScore's largest common stockholders, Ephraim Heller, to discuss filling Konstantino's board seat and to find out whether Heller knew if Konstantino was working on a new specialty balloon catheter at that time.  (*See* DX 1292.)  Although Konstantino had done work previously that Heller suspected may have conflicted with his obligations to AngioScore, Konstantino had reassured him that all such activities had been precleared with AngioScore.  Heller also stated that at that time, he believed that Konstantino was working to bring a "competitive product" to market, although it was not clear whether such device was the Glider, of which AngioScore was already aware, or whether it was a specialty balloon.  Suennen also spoke with Mike Lynn, a TriReme board member.  Lynn stated that he had no knowledge or recollection that TriReme was working on a specialty balloon catheter.

Based on the above, the board decided to investigate whether Konstantino or TriReme had in fact developed a competitive device.  To that end, they questioned Konstantino pointedly.  On February 10, 2010, John Sellers sent a letter to Konstantino entitled "Obligations to AngioScore, Inc." (PX 419.)  Knowing only of the Glider, AngioScore's board sought information relative to whether Konstantino had been working on a device that built off of the Glider model, such as for example adding a metal cage around the balloon structure.  The top paragraph on the second page reads:

> Our current presumption is that you have handled these matters in a manner that fully protects AngioScore and fully complies with your obligations to AngioScore.

AngioScore acknowledged that as of the date of Konstantino's resignation, he and TriReme had "every right going forward to develop products that may compete with AngioScore as long as you do not use or disclose AngioScore['s] confidential information or intellectual property." (*Id.*)  Nonetheless, Sellers requested that Konstantino confirm that no such activities

took place while Konstantino was on AngioScore's board:  "we respectfully request that you promptly provide the AngioScore Board of Directors further information regarding these activities in order to allow the Board to assess whether they are competitive to AngioScore."  (*Id.*)

In response, Konstantino's counsel sent a letter on February 23, 2010 in which Konstantino disavowed any development of a specialty balloon by TriReme and affirmed that he had no role in the development of any such device.  Specifically, Konstantino's counsel reiterated that prior to Konstantino's resignation on February 5, 2010, he was not "involved in ***any development work*** or licensing of angioplasty balloon technology for the coronary or periphery markets ***that involves specialized features such as scoring, cutting, or drug eluting elements***."  (PX 420 (emphasis supplied).)  Likewise, Konstantino represented that he was not involved "in any development or licensing of angioplasty balloon technology for the coronary or periphery markets that makes similar claims to that of the AngioSculpt product."  (*Id.*)  Konstantino restated that TriReme was "***considering, in the future, the possibility*** of entering the field of specialized balloons," but that before February 5, 2010, "TriReme ***ha[d] not developed*** any products . . . that compete[d] with AngioScore's products."  (*Id.* (emphasis supplied).)

Although the board had no factual basis at the time for believing that such representations were false, Konstantino's letter was technically non-responsive to Sellers's original question and accordingly, AngioScore continued to pursue the matter.

In an email to the board, Trotter asked for opinions and feedback on Konstantino's response, and speculated that Konstantino may have been involved in developing a scoring version of Glider to compete with AngioScore in the future.[3]  At that point, Trotter began to

_____

[3] Two days later, Jim Andrews, AngioScore's Chief Financial Officer, forwarded Trotter a TriReme press release concerning its receipt of FDA 510K Clearance for the Glider PTA Balloon Catheter.  (DX 1317.)  Trotter forwarded the press release to the board of directors less than ten minutes later.  Given that the Glider opportunity was first presented to Trotter in December of 2009, Trotter noted that "obviously this has been in the works for many months (testing, submission, approval, etc.) while Eitan was a member of our Board[.]"  (*Id.*)  He was concerned that Konstantino had developed the Glider PTA Balloon Catheter while he had possession of a "considerable amount of [AngioScore's] confidential Sales & Marketing, Product Development and Regulatory information."  (DX 1317.)  Although at that time Glider was a POBA and not a specialty balloon, Trotter was concerned that Konstantino "may be planning to add a scoring

prepare for potential legal action against Konstantino, should any "specialty balloon" come to light.  He asked AngioScore's patent counsel, Jim Heslin, to monitor new patent applications for scoring/cutting balloons to see what, if anything, Konstantino might file.  And he asked Andrews to research whether AngioScore's insurance policy provided coverage for breaches of directors' duties and obligations.

AngioScore continued to investigate its concerns regarding Konstantino's involvement developing a competitive product with Konstantino directly.  Sellers followed up with another letter on March 5, 2010 directed to counsel for Konstantino, and the boards of both TriReme and AngioScore.  In it, Sellers remarked that previous representations by Konstantino had avoided squarely addressing AngioScore's concern, namely, that during Konstantino's service as a board member, he:

> obtained proprietary and confidential information about AngioScore, the peripheral market, and the role of specialty balloons in that market, while at the same time *developing and pursuing plans* within TriReme to *pursue those same markets with another device*.

(PX 421 (emphasis supplied).)  Sellers further stated that AngioScore's board "specifically would like to know whether prior to February 5, 2010, Mr. Konstantino and/or TriReme evaluated, negotiated, or otherwise pursued the acquisition or licensing of any technology that competes with AngioScore's products, and if so, why that opportunity was not provided to AngioScore in accordance with Mr. Konstantino's duties as a Board member of AngioScore."  (*Id.*)

Again, counsel for Konstantino responded, unequivocally and unambiguously denying that any such activity had taken place.  Characterizing AngioScore's questioning as predicated on

---

element over time."  Raffin speculated that the lead time on Konstantino's success for any such scoring product would be three to five years out, and Trotter responded that while he agreed on the likely timing of any such device, AngioScore "[n]eed[s] to watch him carefully."  (*Id.*)  Raffin and Trotter both testified that at this time, they were concerned singularly on the Glider balloon, which was not directly competitive with AngioSculpt, and Konstantino's possible appropriation of that POBA platform to make a specialty balloon.  Neither suspected that there was a separate specialty balloon platform already underway.  Due to the differences between POBAs and specialty balloons like AngioSculpt, the Court finds that the fact of Glider's existence cannot be fairly said to have put AngioScore on notice of Chocolate's existence.

United States District Court
Northern District of California

1  "unsubstantiated accusations" against Konstantino, counsel informed AngioScore that should such

2  accusations continue, Konstantino will "have no choice but to consider his legal options."  (PX

3  423.)

4  　　　　With that, AngioScore considered its inquiry complete.  Konstantino's representations had

5  sufficiently assuaged any and all concerns about whether he or TriReme had developed a specialty

6  balloon.  AngioScore was satisfied that nothing of the sort had occurred.  Based on the nature and

7  strength of Konstantino's representations, a reasonable person would have come to the same

8  conclusion.

9  　　　　AngioScore only learned that Chocolate existed a year and a half later, in the second half

10  of 2011, when a sales representative called the Washington Hospital Center and heard that a

11  presentation had been made on a new device called "Chocolate."  However, it was only after

12  Feld's deposition in the spring of 2014, in connection with AngioScore's patent case, that

13  AngioScore discovered all of the facts referenced above evidencing that Chocolate had been

14  developed while Konstantino sat on AngioScore's board.  That discovery yielded the claims

15  herein addressed.

## CONCLUSIONS OF LAW

16

17  **I.**　　**As a member of AngioScore's board of directors, Konstantino breached his**
   **fiduciary duty to AngioScore and usurped a corporate opportunity when he**
18  　　**developed Chocolate for his own benefit and failed to offer the opportunity to**
   **AngioScore.**
19

20  　　**A.  The Corporate Opportunity Doctrine Framework**

21  　　　　The corporate opportunity doctrine "represents but one species of the broad fiduciary

22  duties assumed by a corporate director or officer."  *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148,

23  154 (Del. 1996).  As a fiduciary of a corporation, directors agree to "place the interests of the

24  corporation before his or her own in appropriate circumstances."  *Id.*  "At the core of the fiduciary

25  duty is the notion of loyalty—the equitable requirement that, with respect to the property subject

26  to the duty, a fiduciary always must act in a good faith effort to advance the interests of his

27  beneficiary."  *In re Mobilactive Media, LLC*, No. CIV.A. 5725-VCP, 2013 WL 297950, at *21

28  (Del. Ch. Jan. 25, 2013) *reargument denied*, No. CIV.A. 5725-VCP, 2013 WL 1900997 (Del. Ch.

United States District Court
Northern District of California

May 8, 2013) (citing *Dweck v. Nasser*, 2012 WL 161590, at \*12 (Del. Ch. Jan. 18, 2012)).

Noting that corporate directors stand in fiduciary relationship to the corporations they serve, the Delaware Supreme Court recognized in *Guth v. Loft, Inc.*, 5 A.2d 503 (Del. 1939) that:

> public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest. The occasions for the determination of honesty, good faith and loyal conduct are many and varied, and no hard and fast rule can be formulated. The standard of loyalty is measured by no fixed scale.

*Id.* at 510.  The corporate opportunity doctrine seeks to define the bounds of this duty where a director may be inclined to take a business opportunity for him or herself.  *See id.*  The rule enunciated in *Guth* is this:

> if there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of [the] corporation, the law will not permit him to seize the opportunity for himself.

*Id.* at 510-11.  Thus, under Delaware law, "[t]he elements of misappropriation of corporate opportunity are: (1) the opportunity is within the corporation's line of business; (2) the corporation has an interest or expectancy in the opportunity; (3) the corporation is financially able to exploit the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary is placed in a position inimical to his duties to the corporation."  *In re Mobilactive Media*, 2013 WL 297950, at \*21.  Once the plaintiff has shown the breach of the director's duty of loyalty, the burden

1   switches to the fiduciary to show that he or she did not seize a corporate opportunity "because

2   either the corporation was presented the opportunity and rejected it, or because the corporation

3   was not in a position to take the opportunity." *Grove v. Brown*, No. 6793-VCG, 2013 WL

4   4041495, at *8 (Del. Ch. Aug. 8, 2013).  Delaware courts further recognize that "a director or

5   officer may take a corporate opportunity if: (1) the opportunity is presented to the director or

6   officer in his individual and not his corporate capacity; (2) the opportunity is not essential to the

7   corporation; (3) the corporation holds no interest or expectancy in the opportunity; and (4) the

8   director or officer has not wrongfully employed the resources of the corporation in pursuing or

9   exploiting the opportunity." *Broz*, 673 A.2d at 155 (emphasis omitted).[4]

10          The rule set forth in the Delaware cases accords with economic and public policy, and

11   civic accountability.  Put simply, men are not angels.  We require structures to govern conduct.

12   *See* FEDERALIST NO. 51.  The corporate structure necessarily requires a separation of ownership

13   and control, which produces a conflict:  the shareholders are the principle bearers of risk, but the

14   board of directors are vested with the power to make managerial decisions.  (*See* Trial Tr. at

15   646:7-21 (Testimony of Prof. Eric Talley).)  Centralizing decisionmaking authority in a board of

16   directors presents efficiencies insofar as shareholders can diversify their interests, which, in turn,

17   has contributed to substantial economic growth and development.  (*Id*. at 646:22-647:21.)

18   However, the concentration of decisionmaking power in individuals who do not necessarily bear

19   the risk creates a misalignment of interests.  (*Id*. at 647:23-649-9.)  The general purpose of

20   _____

21          [4] The parties dispute the precise interplay between the test enunciated in *Guth*, and the
     counter-test, or corollary test, enunciated in *Broz*.  The first test sets forth the elements of

22   misappropriation of a corporate opportunity; the second test recognizes circumstances whereupon
     a director or officer may take a corporate opportunity for himself.  Although the tests appear at

23   variance, in substance, they are concordant.  The fundamental question is whether a corporate
     director, standing in fiduciary relation to a corporation he serves, has fallen short of "the most

24   scrupulous observance of his duty not only affirmatively to protect the interests of the corporation
     committed to his charge, but also to refrain from doing anything that would work injury to the

25   corporation, or to deprive it of profit or advantage which his skill and ability might properly bring
     to it, or to enable it to make in the reasonable and lawful exercise of its powers." *Guth*, 5 A.2d at

26   511.  That these tests are concordant is evident from their overlap.  Critically, both the *Guth* test
     and the *Broz* corollary test turn on whether the corporation had an interest or expectancy in the

27   opportunity.  Because the Court finds that AngioScore did have an interest or expectancy in the
     Chocolate, under both tests, Konstantino has breached his duty of loyalty.

28

United States District Court
Northern District of California

corporate governance principles, specifically, the duties of care and loyalty, is to control for the moral hazards that arise when directors either shirk their responsibilities or self-serve.  (*Id*. at 649:10-650:25.)  Without strong corporate governance principles, the trust that underpins a shareholder's decision to invest will dissolve, with broader economic consequences to follow.  (*Id*. at 651:17-652:10.)

Whether a corporate opportunity has been usurped is "a factual question to be decided by reasonable inferences from objective facts."  *Guth*, 5 A.2d at 513.

### B.  The Corporate Opportunity Doctrine applies to a director who is also an inventor.

Throughout this case, defendants have argued that the corporate opportunity doctrine cannot apply where, as here, a director invents a technology, even where such technology is directly competitive with that of the corporation he serves.  Defendants maintain that because Chocolate was intellectual property belonging to Konstantino and the product of his own innovation, this necessarily obviates any fiduciary obligation to offer Chocolate to AngioScore.  (DOB at 2-3.)  The Court disagrees.

The fact of inventorship does not absolve a director of his fiduciary obligations with respect to inventions he may develop that compete with the corporation he serves.  To hold otherwise would work an absurdity.  Directors of corporations would be free to invent and develop competing technologies for their own benefit, concealing the same from the companies they serve, even where elements of those inventions would likely benefit the companies.  This scenario stands in stark opposition to the foundational principles of corporate governance, which demand that directors exalt the interests of the companies they serve above their own.  *Guth*, 5 A.2d at 510 ("the rule . . . demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers.").  Most seriously, the extension of defendants' preferred rule would have directors entertain divided loyalty.  The

United States District Court
Northern District of California

15

position is untenable.  *See id.* ("[t]he rule ... demands that there shall be no conflict between duty and self-interest").  The rule makes logical sense.  A director can leave the corporation thereby dissolving the duties he owes.  A corporation cannot and therefore relies on untarnished fidelity.

Defendants cite no case holding conclusively in their favor, but rather argue by analogy to *Equity Corp v. Milton*, 221 A.2d 494 (Del. 1966).  That case is distinguishable.  First, the facts of *Milton* counseled against a finding that the opportunity to that interest rightfully and in fairness belonged to the corporation.  *Milton*, 221 A.2d 497; *see also Thorpe v. CERBCO, Inc.*, No. CIV.A. 11713, 1993 WL 443406 (Del. Ch. Oct. 29, 1993) ("While courts have considered a number of criteria in evaluating whether a director has usurped a corporate opportunity, the essence of this doctrine is 'that a director may not appropriate something for himself that in all fairness should belong to his corporation.'") (citing *Milton*, 221 A.2d at 497).  Applying this standard, the *Milton* court determined that the claimed opportunity was not, in fairness, one belonging to the corporation – it was not of practical advantage to the corporation (*see id.* at 497), in keeping with the business of the corporation, nor did it fit into an established corporate policy (*see id.*).  Having laid this foundation, the court stated, "if any doubt remains," the shares that had previously been controlled by Milton were later reacquired by him; simply put, the entire transaction from start to finish concerned Milton's property.  Essentially, because there was nothing wrong with a corporate officer owning and controlling stock of his corporation, the court found that the duty of loyalty is not violated when a director shifts that ownership as he sees fit.  (*Id.* at 498-99.)  Thus, there was conclusively no corporate opportunity at issue in *Milton*.[5]

---

[5] Likewise, defendants' reliance on *Science Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957 (Del. 1980) does not aid their position.  The question presented in *Summagraphics* was exceedingly narrow:  did the trial court's finding that no corporate opportunity existed (which finding was *not* appealed to the Delaware Supreme Court), leave room for a separate claim for breach of fiduciary duty?  *Id.* at 962 ("The thrust of SAC's fiduciary breach of duty argument is that the trial court's conceded finding that Brenner's concept was not an opportunity available to SAC but one that defendants could take for themselves is not determinative of SAC's right to equitable relief by reason of defendants' breach of so-called "independent" fiduciary duties owed to SAC.").  The Delaware Supreme Court thus considered the scope of fiduciary duty law and concluded that where no corporate opportunity is found to exist, as was the case in *Summagraphics*, that conclusion "finally determines the right of the corporate officer to treat the opportunity as his own."  *Id.* at 964 (quotation omitted)).  The fact that no corporate opportunity

The logic enunciated in *Milton* does not compel a finding in defendants' favor here. The essential question is whether a director has appropriated something for himself that, in all fairness, should belong to his corporation. The determination of this question is always one of fact to be determined from the objective facts and surrounding circumstances. *Johnston v. Greene*, 121 A.2d 919, 923 (Del. 1956). Here, the Court is confronted with facts establishing that Konstantino, aware of AngioScore's competition-sensitive information, its then-existing financial condition, design challenges, and business objectives, developed a competing device while on AngioScore's board and took affirmative steps to exploit it himself while concealing it from AngioScore. At the same time, Konstantino was aware that he owed AngioScore fiduciary duties. On these facts, that Konstantino invented the competitive technology does not serve his argument that he should be absolved of his fiduciary obligations to AngioScore. Rather, it works the opposite effect: Konstantino's failure to abide by his duty is plainly all the more offensive. For these reasons, the Court finds that it cannot indulge defendants' position and find that the corporate opportunity doctrine does not apply.

At the same time, AngioScore's position is equally untenable. AngioScore posits that by virtue of Konstantino's position as a director, AngioScore had a right to the Chocolate outright, and that therefore Konstantino was obligated to *give* the opportunity to AngioScore. The logical extension of this position demonstrates its implausibility. Were this the case, Konstantino's invention assignment agreement would have been superfluous in the first instance, and so, too,

---

existed in *Summagraphics* was critical to the court's reasoning, and essential to its holding. *See id.* ("No case authority has been cited by appellant to support the proposition that key corporate personnel are under a duty to disclose to their employer and not divert from him a business proposition that has been found not to be available and essential to the corporation."). Furthermore, to the extent defendants argue that *Summagraphics* sanctions an employee's acts in anticipation of eventual competition, the limits of this freedom are well-defined: a fiduciary's right to make such arrangements is "by no means absolute," particularly in instances where the fiduciary engages in "usurpation of [the] employer's business opportunity," and "the ultimate determination of whether an employee has breached his fiduciary duties to his employer by preparing to engage in a competing enterprise must be grounded upon a thoroughgoing examination of the facts and circumstances of the particular case." *Id.* at 965 (citations, quotations omitted). Here, the Court finds that Konstantino did usurp (indeed, created and then usurped) a corporate opportunity, and that his machinations were not merely preparatory.

would all invention assignment agreements between directors and the corporations they serve. The Court cannot overlook the effect such a rule would work in the context of intellectual property and emerging technologies.  Critically, holding that directors who are also innovators must relinquish to the corporations they serve technologies falling within that corporation's line of business, in which the corporation has an interest or expectancy, or which aligns with its business purpose and objectives, would serve to undermine innovation.  Indeed, holding as AngioScore requests would subvert fundamental principles of intellectual property respecting inventors' rights, which are designed to encourage, not discourage, ingenuity and innovation.  The fact that this case concerns a medical device, which is currently being used in medical procedures in this country, only serves to underscore the public interest in innovation.

With these positions, the parties posit a tension:  do fiduciary duties extend so far as to compromise, potentially fatally, innovation; or, by contrast, does a director's ingenuity and innovation provide an escape route from his fiduciary duties?  Neither extreme prevails.  A court must apply the principles of the law in such a way that balances the wise public policy behind the *Guth* rule, with the public policy counseling in favor of innovation.  For this reason, the Court finds that although AngioScore was owed fiduciary duties by Konstantino, those duties did not entitle AngioScore to outright ownership of the Chocolate opportunity at any point in time. Rather, what Konstantino's fiduciary duty demanded was that he offer AngioScore the *opportunity to acquire* the rights to the Chocolate.  The Court need not venture as to specifics of such a transaction, but having chosen to remain on AngioScore's board, the offering must occur to satisfy both the law of fiduciary duties and the public interest in innovation.  Offering an opportunity to AngioScore meets Delaware's demand that directors not undertake any activity that would work harm to the corporation they serve and prioritize the interests of those corporations above their own. *See In re Mobilactive Media, LLC*, 2013 WL 297950, at *21 ("At the core of the fiduciary duty is the notion of loyalty . . . with respect to the property subject to the duty, a fiduciary always must act in a good faith effort to advance the interests of his beneficiary.").  It also accords with directors' duty not to "do anything" that would "deprive" the corporations they serve "of profit or advantage which [their] skill and ability might properly bring to it." *Guth*, 5 A.2d at 510.  And, it

United States District Court
Northern District of California

1   remains faithful to the general principle that a director can establish conclusively no breach of his

2   fiduciary duty where, in keeping the interests of the corporation he serves first in mind, the

3   corporation is presented the opportunity and rejects it.  *See Grove*, 2013 WL 4041495, at *8.  By

4   ensuring that transparency and good faith predominate, the application of the rule in this manner

5   assures that any conflict will be resolvable.

### C.  Application of the Corporate Opportunity Doctrine

> **1.  *Chocolate was an "opportunity" when Konstantino was on AngioScore's Board, and as such, falls under the Corporate Opportunity Doctrine.***

10      Longstanding law requires that certain "opportunities" be offered to the corporation.  The

11   definition of an "opportunity" is "a favorable juncture of circumstances" or "a good chance for

12   advancement or progress."  MERRIAM-WEBSTER, New Collegiate Dictionary (9th ed. 1988).  The

13   evidence adduced in this case establishes conclusively that as of the date Konstantino resigned

14   from AngioScore's board of directors, Chocolate was a concrete business opportunity.   By that

15   point, Chocolate had developed from a mere idea into a concrete opportunity.  It had been in

16   development for approximately five months.  The initial "brainstorming" discussions in the second

17   half of 2009 had resulted in the creation of many engineering design models, followed by physical

18   models and prototypes.  By January of 2010, the Chocolate design was so complete that

19   prototypes were suitable for testing, and in fact, was the subject of a porcine study at Stanford,

20   which TriReme employees and Konstantino attended.

21      Not only was Chocolate sufficiently developed to enable testing, development of

22   Chocolate had advanced to the point that Konstantino felt it appropriate to market it as an

23   opportunity for investors.  The fact that much development remained is no relevant to whether the

24   opportunity had already manifested.  Defendants cannot escape that during the second half of

25   2009, Konstantino offered between twenty and thirty investors the opportunity to invest in

26   Chocolate.  In preparation for investor meetings, Konstantino prepared slide presentations in

27   which he described the Chocolate technology, extolled its competitive, medical virtues, and

28   delineated the phases for potential investment.  In a November 2009 presentation seeking funding

United States District Court
Northern District of California

19

from the Singapore Economic Development Board, Konstantino stated that the Chocolate "IP, Concept design, Prototypes, business model, Team, [and] partnerships" were all "completed." In furtherance of his financial objectives, Konstantino corresponded with potential investors. In such communications, he represented that Chocolate's "initial design already works well and attracts a lot of attention" and that Chocolate's product design was completed.

Such claims were not mere puffery designed to solicit investment. In early 2010, design of the Chocolate was essentially complete. Indeed, Chocolate's 510K application in 2011 referenced testing completed on Chocolate's nitinol cage designs created in January 2010. Based on these facts, that Chocolate had been developed to the point sufficient to render it a concrete business opportunity prior to Konstantino's resignation from AngioScore's board of directors cannot be reasonably disputed. If the Chocolate opportunity was sufficiently concrete for twenty to thirty investors, it was sufficiently developed to be offered to AngioScore. The Court so finds.

### 2. *Chocolate falls within AngioScore's line of business.*

An opportunity is within a corporation's line of business if it is "an activity as to which [the corporation] has fundamental knowledge, practical experience and ability to pursue, which, logically and naturally, is adaptable to its business having regard for its financial position, and is one that is consonant with its reasonable needs and aspirations for expansion." *In re Mobilactive Media*, 2013 WL 297950, at *21 (citing *Guth*, 5 A.2d at 514). This factor is to be broadly construed. *Id*. (citing *Dweck*, 2012 WL 161590, at *13).

The Court finds that Chocolate falls within AngioScore's line of business. Since its founding in 2003, AngioScore has designed, manufactured, and marketed angioplasty balloon catheters surrounded by a nitinol structure that are used for the treatment of cardiovascular disease and sold under the brand name AngioSculpt. The evidence demonstrates conclusively that AngioSculpt and Chocolate are similar in both purpose and function. AngioSculpt and Chocolate are both angioplasty balloon catheters consisting of a nitinol cage surrounding a semi-compliant balloon. Both are used to open occluded or narrowed blood vessels at lesion sites by inflating to compress plaque deposits against the vessel wall and then deflating for removal from the patient's body. Both devices were cleared by the FDA with overlapping indications for use. Indeed, there

are no indications for which the peripheral Chocolate device is cleared that the peripheral AngioScore device is not and the devices make similar marketing claims. Both specialty balloons and as such, enjoy premium pricing over that of plain old balloon angioplasty (POBA) products. In fact, Chocolate is priced at $25 per unit less than the AngioSculpt. Moreover, as set forth in more detail below, Chocolate is a competitor to the AngioSculpt with a common customer base.

Under Delaware law, the "line of business" element is to be broadly construed. The Court finds it met here. The similarities in terms of purpose and function establish that AngioScore had "fundamental knowledge and practical experience" to pursue Chocolate. That AngioScore has historically focused on products that "scored" plaque is of no moment, for the devices are materially similar and their differences amount to variations on a common theme. For example, both devices are comprised of nylon balloons encased in nitinol cages. No other specialty balloons on the market use nitinol cage on a semi-compliant balloon – the Boston Scientific Cutting Balloon uses surgical steel, and the Vascutrak uses stainless steel guide wires.[6] Further, given the overlapping features and design, AngioScore's manufacturing and distribution process could have easily been modified to accommodate Chocolate. All of Chocolate's component parts were essentially the same as those of the AngioSculpt.

Based on the above findings, the conclusion is inescapable that Chocolate is "logically and naturally . . . adapt[ed] to [AngioScore's] business." *See In re Mobilactive Media*, 2013 WL 297950, at *21 (citation omitted).

### 3. *AngioScore had an interest or expectancy in Chocolate.*

"[F]or a corporation to have an expectant interest in any specific property, there must be some tie between the property and the nature of the corporate business." *Grove*, 2013 WL 4041495, at *8 (internal quotes omitted). By requiring "a tie to the 'nature of the corporate business,'" this factor "implicates many of the issues" discussed above concerning AngioScore's line of business. *See Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 973 (Del. Ch. 2003) (citing *Broz*, 673 A.2d at 156). Even if there is a "tie" between the line

---

[6] Nonetheless, those devices also compete with AngioSculpt.

United States District Court
Northern District of California

of a corporation's business and the potential opportunity, however, the Court may decline to find an interest or expectancy where facts establish that a corporation is shifting away from its historical line of business, where it disavows such interest, and where it lacks the capacity to capitalize on the interest.  In *Broz*, for example, the Delaware Supreme Court found that there was no interest or expectancy where a corporation was divesting in the area of venture from which the potential opportunity arose, and where its business plan did not contemplate any new acquisitions. *Broz*, 673 A.2d at 156.  The inquiry requires a court to use its judgment to discern whether, given the factual context of each particular case, the corporation had an interest, "*actual or in expectancy*," or whether the acquisition of property for a director's own use "may hinder or defeat the plans and purposes of the corporation in the carrying on or development of the legitimate business for which it was created."  *Johnston*, 121 A.2d at 924 (citations omitted) (emphasis in original).

> As detailed in the preceding discussion, the Court finds that "some tie" exists between Chocolate and the nature of AngioScore's business.  The devices are both angioplasty balloon catheters that serve similar purposes and are constructed from the same materials.  Well beyond the loose connection that the "some tie" standard evokes, however, the Court finds that in 2009 and early 2010, AngioScore had an actual and expectancy interest in Chocolate by virtue of its then-existing needs and business purposes, as well as Chocolate's unique features and potential benefits to AngioScore.  The Court so finds for three main reasons:  (1) Chocolate's design configuration could have proven helpful, and at a minimum, would have been seriously considered in solving AngioScore's then-existing problem with creating AngioSculpt devices at 100mm lengths; (2) Chocolate's potential as a drug-eluting specialty balloon technology was in keeping with AngioScore's business goal to bring such a device to market; and (3) AngioScore had an interest in keeping a direct competitor out of the relatively small specialty balloon market. Collectively, these conclusions compel a finding that AngioScore had an interest and expectancy in Chocolate as of, at the latest, the date Konstantino resigned from its board.  The Court elaborates:

First, in late 2009, AngioScore needed a balloon design amenable to longer length catheters.  AngioScore was facing design challenges with its 100mm AngioSculpt.  At the same time, drawings and prototypes of 100mm Chocolate balloons existed.  Jeffrey Bleam, AngioScore's Vice President of Research and Development, explained the company's difficulty executing its 100mm AngioSculpt balloon.  Part of the engineering challenge had to do with ensuring that the balloon would inflate uniformly while inside the nitinol cage.  In the longer lengths, the balloon was less likely to inflate uniformly every time.  The concern was that uneven inflation would result in an uneven distribution of force, jeopardizing the safety and effectiveness of the device.  The company devoted significant resources to resolving this problem.  Although research began in 2009, AngioScore did not release a 100mm balloon until 2011.  Even as AngioScore finalized its first generation 100mm AngioSculpt, there remained issues with deployment.  The company then devoted further engineering resources to design a second generation balloon.  Ultimately, the engineering team discovered that by adding cross-lengths to the metal struts, they were able to ensure more even deployment of the balloon.  The second generation 100mm balloon was released in 2013, presenting the critical cross-struts.

Had AngioScore known about the importance of the cross-struts back in 2009 and 2010, it likely never would have released the first generation 100mm AngioSculpt.  To that end, the Chocolate's design would have been of considerable help.  The cross-lengths added to the AngioSculpt 100mm resemble, at least conceptually, those which present as radial struts on the Chocolate device, and which had been a part of the Chocolate design since its early development in 2009.  Bleam testified that had he gained access to the Chocolate, its unique elements could have benefitted the design of the 100mm AngioSculpt.  He stated that the radial strut configuration was "pretty interesting, specifically," and its cross-application was relatively obvious.  Accordingly, the Court finds it plausible that Chocolate's design would have aided AngioScore's pursuit of a 100mm balloon.

Second, the Court finds that Chocolate's avowed potential as a drug-eluting specialty balloon as of late 2009 accorded with AngioScore's business goal of bringing a drug-eluting balloon to market, and AngioScore would have therefore been interested in such technology.  As a

United States District Court
Northern District of California

23

member of AngioScore's board, Konstantino knew that AngioScore's strategy included bringing drug-eluting balloon to market.  In fact, the issue was discussed at AngioScore's 2010 board meeting, which Konstantino attended.  (*See* PX 246 (AngioScore February 2010 Board Meeting presentation, giving overview of then-existing cash balance, notably above budget, research and development items, including drug-coated devices).)  The fact that Konstantino was soliciting investments upon representations that Chocolate was an "ideal platform for drug delivery" (*see* PX 85) establishes conclusively that Chocolate would have aligned with AngioScore's stated business objectives, long-term research and development plan, and business purpose.  Moreover, Konstantino's attendance at AngioScore's board meetings confirms that he both knew and understood AngioScore's desire to enter this portion of the market.

Third, the Court finds that based on the evidence adduced at trial, AngioScore would have been interested in Chocolate because *rejecting* the Chocolate opportunity carried financial implications for the company:  namely, the potential entry of a competitive device into the specialty balloon catheter marketplace and a likely reduction in AngioScore's market share.  In so finding, the Court notes that AngioScore competes in a relatively small, specialty balloon catheter market.  In late 2009 and early 2010, there were only two general types of balloon catheters in the specialty balloon market – those that scored or cut, as in the case of the Boston Scientific Cutting Balloon and the AngioSculpt, and the Vascutrak, which possesses stainless steel guide wires.  The market was thus defined by the nature of the devices then available.  Chocolate presented a paradigm-shifting design:  a cage designed to create pillows and grooves in such a way as to create focal force on the balloon surface as it pushes through the openings in the cage.  The entry of such a device into a small, competitive marketplace previously limited to devices whose purpose was to have metal come into contact with a vessel wall would have significant implications for revenues.  As a young company, revenue growth was a primary concern for AngioScore.  (*See* Trial Tr. at 488:17-22; 489:15-490:4 (Raffin).)  The business judgment revealed during the course of testimony, in combination with common sense, leads the Court to conclude that AngioScore would not have simply done nothing had Chocolate been offered in a timely fashion.

Defendants advance primarily three arguments in opposition to the interest and expectancy element.  (*See* DRB at 7-8.)  The Court finds none persuasive based on the evidence in this case.  First, defendants argue that AngioScore would have rejected Chocolate because it was focused singularly on developing the AngioSculpt line of scoring balloons.  Second, defendants argue that AngioScore disclaimed any interest in Chocolate when Konstantino's invention assignment agreement terminated at the conclusion of his employment with AngioScore, and relatedly, that the only entities with legally cognizable interests in Chocolate were Konstantino and Feld, Chocolate's inventors.  Third, defendants maintain that AngioScore would have passed on the Chocolate opportunity due to personality conflicts with Konstantino.  The Court addresses, and rejects, each in turn.

As to the first argument, for the reasons set forth above, the Court is not convinced that AngioScore would not have been interested in Chocolate.  Put differently, the Court is not persuaded that AngioScore would have refused the opportunity.  The fact that Chocolate does not engage in an identical mechanism of action to that of the AngioSculpt is not enough to overcome the weight of evidence supporting the Court's finding that AngioScore would have been interested in Chocolate.

Defendants argue that AngioScore's 2009 rejection of an unnamed scoring device establishes that AngioScore would not have been interested in Chocolate.  AngioScore's mid-2009 rejection of a new scoring balloon was based in part on Trotter's belief that there was no strong need to add another scoring device to the market.  (*See* DX 1099.)  The Court is not convinced that this decision bears on whether AngioScore had an interest or expectancy in Chocolate.  The opportunity presented in early 2009 related to another concrete product.  AngioScore was permitted to evaluate the design features.  In light of this concrete opportunity, Trotter explained that AngioScore declined to pursue the proposed technology because "there was nothing particularly impressive about it."  (Trial Tr. at 627:25-628:1 (Trotter direct).)  He further added that he "didn't see that there was any innovation there that would be valuable to AngioScore."  (*Id.* at 628:1-2.)  The fact that Chocolate represented a new concept – focal force through the creation of balloon pillows, rather than scoring – sets it apart from the opportunity AngioScore

1   contemplated and rejected.  Moreover, as set forth above, AngioScore would have been interested

2   in Chocolate for its presentation of longer lengths and for its potential as a drug-eluting device.

3        Defendants further rely on answers board members provided in response to a survey

4   conducted by a consultant, Sarah Lugaric.  Board members were directed to answer the following

5   question: "Do you support acquiring another company, technology, or product line?  (yes/no,

6   timing, description)."  The board's responses fell onto a spectrum – some directors were open to it,

7   others less so.  Three of the seven directors were opposed to acquiring another company,

8   technology, or product line; four indicated that they would be open to it with certain reservations.

9   Defendants seize on these answers to argue that the board never would have been interested in

10  Chocolate.  The Court disagrees.  First, the Lugaric question was hypothetical and abstract.

11  Second, the question related to members' inclination to acquire more than simply a new product –

12  it also concerned whether the members would be interested in the acquisition of another company.

13  The directors were not considering a concrete, potentially paradigm-changing technology.  They

14  did not know that Chocolate existed.  The answers to this survey thus cannot undermine the

15  Court's finding that AngioScore had an interest or expectancy in the Chocolate.

16       Defendants' second argument reduces to this:  AngioScore did not renew Konstantino's

17  invention assignment agreement.  Therefore, AngioScore had no interest in Konstantino's

18  inventions.  Chocolate was one such invention.  Therefore, AngioScore had no interest in

19  Chocolate. (DRB at 7.)  Under the terms of an invention assignment agreement and as a matter of

20  contract law, this would appear to make sense.  However, the rights and obligations to which

21  parties agree in the context of an employee/employer invention assignment agreement are

22  fundamentally different from the nature of the issue presented here:  whether, in developing

23  Chocolate, and secreting it from the corporation he served for his own personal benefit,

24  Konstantino violated his duty of loyalty to AngioScore.  Simply because AngioScore would no

25  longer automatically have property rights in anything Konstantino invented does not obviate

26  Konstantino's obligation to adhere scrupulously to his duty to place the interests of AngioScore

27  above his own financial gain.  The lack of an invention assignment agreement does not absolve a

28  director of his fiduciary obligations with respect to inventions he may develop that compete with

United States District Court
Northern District of California

26

the corporation he serves.  To hold otherwise would undermine the basic fabric upon which the

duty is based.

Last, defendants maintain that AngioScore would have passed on the Chocolate

opportunity due to personality conflicts between Konstantino and members of the AngioScore

board.  Throughout the trial in this case, the defense returned to its theory that at some point

between 2006 and 2010, members of AngioScore's board had essentially blacklisted Konstantino.

While the Court agrees that personality conflicts may have existed, defendants' resort to

overstatement undermines their credibility and any relevance the true facts might have had.  With

the exception of Ozdil, with whom Konstantino had previously had an altercation, and possibly

Tom Trotter, who was less than pleased to hear that in December 2009 Konstantino and TriReme

were embarking on building a POBA (the Glider), the Court finds that Konstantino was generally

well-regarded and respected by his other fellow board members in the time period leading up to

his resignation.  No board members who testified stated that prior to the events giving rise to this

litigation, they had anything but amicable and professional interactions with Konstantino.  None

witnessed any effort by any other board member to push Konstantino off the board, nor did any

board member witness any hostility between AngioScore and Konstantino.  No evidence, besides

Konstantino's ruminations, supports any inference that board members possessed anti-Semitic

feelings toward Konstantino.  Board members Raffin and Suennen testified credibly that no one

harbored such feelings and that they themselves are Jewish.  Konstantino's claim that he was

ostracized at AngioScore is further undermined by evidence that AngioScore's CEO, Trotter, was

helping Konstantino further his non-AngioScore business pursuits, including fundraising for

TriReme, around the same time Konstantino and Feld were developing Chocolate.  Specifically, in

August of 2009, Trotter emailed Ivan Pirzada in an attempt to get Konstantino funding.  (PX 234.)

In December 2009, Trotter sent Konstantino a tip on potential funders for TriReme.  (PX 241.)

The Court thus finds that there is no merit to Konstantino's claim that AngioScore would not have

worked with him on Chocolate.  Furthermore, and to state the obvious, personality conflicts

between board members do not obviate their fiduciary duties to the companies they serve.  The

law expects and demands that board members rise above such concerns.

United States District Court
Northern District of California

1    Accordingly, the Court finds that AngioScore had an interest and expectancy in the

2   Chocolate opportunity.

3        **4.   *AngioScore had the financial capacity to exploit the Chocolate***

4             ***opportunity.***

5        The Court finds that AngioScore had the financial ability to exploit Chocolate.  In so

6   finding, the Court is mindful that under Delaware law, this prong implicates broader policy

7   concerns more favorable to the corporation.  Such concerns stem from the inherent conflict

8   between, on the one hand, a director who has control and responsibility for the financial security

9   of the corporation he serves, and on the other hand, the director's potential personal interest in

10   ensuring that the company not have secured financial footing so as to permit usurpation of what

11   otherwise might be a corporate opportunity.  Thus, once the plaintiff has made such a *prima facie*

12   showing of financial ability, a fiduciary "faces a significant burden in establishing that a

13   corporation was financially unable to take advantage of a corporate opportunity."  *Norman v.*

14   *Elkin*, 617 F. Supp. 2d 303, 312 (D. Del. 2009) (citing *Gen. Video Corp. v. Kertesz*, No. 1922-

15   VCL, 2008 WL 5247120, at *19 (Del. Ch. Dec. 17, 2008) (finding financial inability must amount

16   to insolvency such that the company is practically defunct); *but see Yiannatsis v. Stephanis by*

17   *Sterianou*, 653 A.2d 275, 279 (Del. 1995) (declining to adopt "the 'insolvency-in-fact test'";

18   stating instead that courts should consider "a number of options and standards for determining

19   financial inability, including but not limited to, a balancing standard, temporary insolvency

20   standard, or practical insolvency standard")).  Defendants have not established AngioScore's

21   inability to capitalize on the Chocolate opportunity.  To the contrary, AngioScore has established

22   that it could have capitalized on Chocolate had Konstantino offered the opportunity.

23        Evidence regarding what it would have cost to develop Chocolate varies, but in all events,

24   reflects an initial amount that fell *below* the amount of cash AngioScore had on hand at the end of

25   2009 and beginning of 2010.  According to an email from November 17, 2009, Konstantino

26   estimated capital requirement of approximately $3 million. (PX 70.)  By May 2010, Konstantino

27   had secured sufficient capital to pursue the Chocolate "all the way to first commercial sale"; the

28   total raised to that point was $4.5 to 5 million.  (PX 547; Belson dep., discussing Feb 2010

Chocolate presentation that placed the cost of developing Chocolate at roughly $2 million USD beyond the Singaporean EDB grant, PX 78).)   Finally, with respect to the amount of money required to acquire an assignment of the intellectual property rights to Chocolate, the record places that value in the amount of $370,000 cash and a royalty of 5%.  (Trial Tr. at 237:8-18.)  In the event such right was acquired, however, there is nothing to suggest that AngioScore would have been obligated to develop Chocolate.

Based on the above figures, even assuming that Chocolate would have cost $5 million to develop, the Court finds that AngioScore was able to exploit this opportunity through several avenues.  First, AngioScore had approximately $17 million cash on hand in October 2009, and in excess of $15 million cash on hand at the end of 2009.  Second, as a going concern with existing relationships, AngioScore could have obtained funds from external investors, such as Oxford Finance, or other venture capital funds.  In December 2009, for example, Oxford Capital expressed a willingness to lend between $10 and $20 million to AngioScore.  Third, AngioScore could have redirected research and development money it was currently using to fix the design problems for its 100mm AngioSculpt product.  This financial position existed notwithstanding the downsizing and resources expended in response to a Department of Justice investigation.

The practicalities of new technology companies further support the Court's conclusion. Konstantino himself admitted that startup companies in Silicon Valley, such as AngioScore and TriReme, are frequently short on cash and face the prospect of running out of money.  He further stated that the fact that such a company is not "profitable" doesn't mean that the company is "not successful."  For example, TriReme was not able to sell its Antares product, a stent, in the United States, and Antares made only negligible sales abroad.  Despite TriReme's limited financial position, TriReme was able to develop Chocolate.

Based on the foregoing, the Court finds that AngioScore was able to exploit the Chocolate opportunity.  Despite having been privy to AngioScore's confidential financial documents as a member of AngioScore's board of directors (*see e.g.*, PX 246, February 2010 board meeting presentation including proposed budget, discussion of cash on hand), Konstantino never broached the subject of Chocolate with AngioScore.

United States District Court
Northern District of California

### 5. *By taking the Chocolate for himself, Konstantino placed himself in a position inimical to his fiduciary duties to AngioScore.*

The result of the above findings compels the conclusion that by taking the Chocolate opportunity for himself and companies he preferred, to the exclusion of AngioScore, Konstantino placed himself in a "position inimicable to his duties to the corporation." *Broz*, 673 A.2d at 155. In essence, he became a competitor to AngioScore. It is axiomatic that as such, absent some knowing waiver by AngioScore, Konstantino could never fulfill his duty of loyalty to AngioScore. Any financial gain Konstantino enjoyed stemmed from Chocolate's success in the limited specialty balloon market, in which AngioScore is a key player. Indeed, while sitting on AngioScore's board, Konstantino participated in a strategy where, by design, Chocolate would compete with AngioScore. Chocolate's price was explicitly tied to AngioSculpt pricing, *i.e.* *exactly* $25 less than AngioScore's products. That Chocolate was priced just below the AngioSculpt was intended to "drive rapid adoption" and "get faster uptick" in the specialty balloon catheter market. Moreover, Konstantino himself extolled the advantages of Chocolate compared to scoring balloons, including AngioScore's devices, as he sought to secure funding for Chocolate.

This factor is therefore met, as is each element of AngioScore's breach of fiduciary duty claim.

## II.     The Statute of Limitations does not bar AngioScore's claims.

"A claim for breach of fiduciary duty accrues at the time of the wrongful act." *Sutherland v. Sutherland*, No. CIV.A. 2399-VCN, 2010 WL 1838968, at *8 (Del. Ch. May 3, 2010); *see Pomeranz v. Museum Partners, L.P.*, No. CIV.A. 20211, 2005 WL 217039, at *8 (Del. Ch. Jan. 24, 2005). The parties agree as follows: (i) the relevant statute of limitations for breach of fiduciary duty claims is three years[7]; (ii) the acts giving rise to the instant claim occurred in 2009

---

[7] Under Delaware law, the doctrine of laches governs the timeliness of claims brought in equity. Courts sitting in equity will apply by analogy the statute of limitations for substantive claims in order to apply the doctrine of laches. *Pomeranz*, 2005 WL 217039, at *2. Here, three years is the relevant limitations period.

1   and 2010;  and (iii) more than three years elapsed between those acts and when plaintiff brought

2   its claim (here, June 27, 2014).  The central issue is whether equitable tolling is available.

3   Plaintiff bears the burden of establishing that such tolling is warranted.  *Pomeranz*, 2005 WL

4   217039, at *2.  Defendants claim the statute has run because AngioScore was on notice by no later

5   than February 5, 2010, the date of Konstantino's resignation.

6         Three bases for tolling exist under Delaware law: (1) the inherently unknowable doctrine

7   (the "Discovery Rule"), (2) equitable tolling, and (3) fraudulent concealment.  As set forth in

8   *Smith v. McGee*, No. CIV.A. 2101-S, 2006 WL 3000363, at *3-*4 (Del. Ch. Oct. 16, 2006), the

9   contours of each of these bases is as follows:

> A limitations period may be tolled under the inherently unknowable
> doctrine so long as "the discovery of the existence of a cause of
> action is a practical impossibility."  Specifically, "there must have
> been no observable or objective factors to put a party on notice of an
> injury, and plaintiffs must show that they were blamelessly ignorant
> of the act or omission and the injury."  Plaintiffs may establish
> "blameless ignorance" by showing justifiable reliance on a person
> whom they have "no ostensible reason to suspect of deception."
> Such proof tolls the limitations period until a plaintiff had "reason to
> know" of a wrong.
>
> Equitable tolling is appropriate "where a plaintiff reasonably relies
> on the competence and good faith of a fiduciary."  Underlying this
> doctrine is the idea that "even an attentive and diligent [investor]
> relying, in complete propriety, upon the good faith of [fiduciaries]
> may be completely ignorant of transactions that ... constitute self-
> interested acts injurious to the [Partnership]."  This doctrine also
> tolls the limitations period until an investor knew or had reason to
> know of the facts constituting the wrong.
>
> Fraudulent concealment, unlike the doctrines of inherently
> unknowable injuries and equitable tolling, "requires an affirmative
> act of concealment by a defendant-an 'actual artifice' that prevents a
> plaintiff from gaining knowledge of the facts or some
> misrepresentation that is intended to put a plaintiff off the trail of
> inquiry."  Nevertheless, "mere ignorance of the facts by a plaintiff,
> where there has been no such concealment, is no obstacle to
> operation of the statute."  Like the previously mentioned doctrines,
> tolling exists only "until his rights are discovered or until they could
> have been discovered by the exercise of reasonable diligence."

*Id.*  (citing *In re Dean Witter P'ship Litig.*, 1998 WL 442456 (Del. Ch. July 17, 1998)).  Under

United States District Court
Northern District of California

1    Delaware law, tolling is proper only until a plaintiff is properly put on inquiry notice.  "When

2    plaintiffs are on inquiry notice, the statute of limitations begins to run.  Inquiry notice does not

3    require full knowledge of the material facts;  rather, plaintiffs are on inquiry notice when they

4    have sufficient knowledge to raise their suspicions to the point where persons of ordinary

5    intelligence and prudence would commence an investigation that, if pursued, would lead to the

6    discovery of the injury."  *Pomerantz*, 2005 WL 217039, at *3 (citation omitted).

7            The Court finds tolling appropriate here based on the third of these theories:  namely,

8    Konstantino's purposeful, fraudulent concealment, although much of the analysis would also

9    overlap with the first two approaches.  Tolling is warranted because Konstantino "engaged in

10   fraudulent concealment of the facts necessary to put [AngioScore] on notice of the truth."  *Albert*

11   *v. Alex. Brown. Mgmt. Servs., Inc.*, No. CIV.A. 762-N, 2005 WL 1594085, *19 (Del. Ch. June 29,

12   2005).  Specifically, Konstantino's "affirmative act[s] of concealment" in early 2010, during the

13   time in which AngioScore sought information relating to whether he had developed a specialty

14   balloon, constitutes "an 'actual artifice'" that prevented AngioScore from gaining knowledge of

15   the facts.  *In re Dean Witter*, 1998 WL 442456, at *5 (citation omitted).  Having reviewed the

16   evidence of record and observed the testimony at trial, the conclusion is inescapable that letters

17   authored by Konstantino's counsel contained intentional misrepresentations that were intended to

18   put AngioScore "off the trail of inquiry."  *Id.*

19           In Konstantino's February 3, 2010 meeting with Trotter, Konstantino told Trotter that

20   TriReme was "considering developing a specialty balloon catheter for peripheral indications," and

21   that TriReme had been actively working on "something for the future" in specialty balloon

22   catheters.  (Trial Tr. at 574:8-12; 602:22-25 (Trotter); *see* PX 107.)  This conversation itself was

23   deceptive in nature, for Konstantino did not in any way indicate that the development of

24   TriReme's specialty balloon, which by that point had been called Chocolate for several months,

25   was well underway.  Nor did he disclose his personal role in the development and

26   conceptualization of the device, that a prototype had been created, that animal testing had

27   occurred, or that he had already engaged potential investors and funding sources.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1

Even lacking these details, the news of a possible specialty balloon at TriReme resulted in

2 an investigation led by AngioScore's lawyer. Trotter sent Konstantino an email entitled "Board of

3 Directors Position," copying AngioScore's counsel, John Sellers. (PX 107.) In it, Trotter restated

4 his concerns about TriReme moving into the specialty balloon market, and stated that the board

5 members with whom he had spoken saw this as a "clear conflict of interest."

6       Konstantino then engaged in a series of communications intentionally designed to assuage

7 AngioScore's concerns, disavowing that any such device existed or had been developed, much

8 less that he had any personal role in the development of a specialty balloon. For example, in

9 response to Trotter's email, Konstantino stated that "TriReme has not made any decision to make

10 such a change and I was giving you very early heads up to *something that may take place in the*

11 *future, or may never happen*[.]" He added, "there is *no reason to be trigger happy*." (PX 107

12 (emphasis supplied).)

13      Thereafter, Konstantino continued in his misdirection. The next day, February 5, 2010,

14 Konstantino wrote an email to Sellers, cc'ing Trotter, Suennen, and Raffin. (*Id.*) In it, he stated:

15          As we discussed, I'm surprised and disappointed that you and the
           company jumped to the conclusion that I should resign from the
16          board based on assumptions after receiving bits and pieces of
           information. I am *keenly aware of my obligations* as a board
17          member and this is precisely why I am coming to AngioScore now;
           *before any new project is started*.
18

19 (*Id.* (emphasis supplied).)

20      The board nonetheless continued investigating whether Konstantino or TriReme had in fact

21 developed a competitive device. At that point, Konstantino himself was the most authoritative

22 source of information regarding what activities, if any, he had actually undertaken with respect to

23 bringing a competitive product to market. Thus, the board undertook to ask Konstantino whether

24 he had done so.

25      What followed were several letters from Konstantino, through counsel, in which

26 Konstantino unequivocally refuted any notion that he had worked on a specialty balloon catheter,

27 or that any such device had been developed, while he was on AngioScore's board.

28

33

United States District Court
Northern District of California

In the first such letter, dated February 23, 2010.  Konstantino's counsel specifically reiterated that prior to Konstantino's resignation on February 5, 2010, he was not "involved in ***any development work*** or licensing of angioplasty balloon technology for the coronary or periphery markets ***that involves specialized features such as scoring, cutting, or drug eluting elements***." (PX 420 (emphasis supplied).)  Likewise, Konstantino represented that he was not involved "in ***any development*** or licensing of angioplasty balloon technology for the coronary or periphery markets that ***makes similar claims*** to that of the AngioSculpt product." (*Id*. (emphasis supplied).) Konstantino restated that TriReme was "***considering, in the future, the possibility*** of entering the field of specialized balloons for peripheral applications" but that before February 5, 2010, TriReme "***ha[d] not developed*** any products . . . that compete[] with AngioScore's products." (*Id*. (emphasis supplied).)

In response, AngioScore expressed concern that during Konstantino's service as a board member, he:

> obtained proprietary and confidential information about AngioScore, the peripheral market, and the role of specialty balloons in that market, while at the same time **developing and pursuing plans** within TriReme to **pursue those same markets with another device**.

(PX 421 (emphasis supplied).)  Again, Konstantino unequivocally and unambiguously denied that any such activity had taken place.  (PX 423.)  Characterizing AngioScore's questioning as predicated on "unsubstantiated accusations" against Konstantino, counsel informed AngioScore that should such accusations continue, Konstantino will "have no choice but to consider his legal options." (*Id*.)

At that point, Konstantino's representations had sufficiently assuaged any and all concerns about whether he or TriReme had developed a specialty balloon.  AngioScore was satisfied that nothing of the sort had occurred.  Given the nature and strength of Konstantino's representations, a reasonable person would have come to the same conclusion.

"Equitable exceptions to statutes of limitations are narrow and designed to prevent injustice." *Pomeranz*, 2005 WL 217039, at *13 (citations omitted).  The equitable exception to

the normal rule is warranted here.  AngioScore acted diligently in its 2010 investigation.  That Konstantino now disavows the intent of his obvious affirmative, misleading representations, particularly those cloaked in formality as letters from his attorneys, is self-serving and bears on his credibility for truthfulness.[8]  He cannot now hide behind the "actual artifice" he constructed to prevent AngioScore from gaining knowledge of the facts.  AngioScore undertook an earnest, broad-based inquiry into the nature of Konstantino's activities.  Instead of answering AngioScore's queries in good faith and with candor, Konstantino's answers were designed to put AngioScore "off the trail of inquiry" and disabuse AngioScore of the notion that any fiduciary breach had occurred.  The truth was sharply at odds with Konstantino's representations.

Because Konstantino's artifice worked to his desired ends, the three-year statute of limitations cannot now shield him from AngioScore's claim.  AngioScore was not on inquiry notice until it learned, in connection with the discovery in its patent case, that Chocolate had been developed before Konstantino left AngioScore's board.  It filed this claim mere months after that.  The claim is timely.

### III.    TriReme and Quattro aided and abetted Konstantino's breach of fiduciary duty.
#### A.  The standard for aiding and abetting liability is met.

Under California law, "'[l]iability may . . . be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person.'"  *Casey v. U.S. Bank Nat'l*

---

[8] As a prime example of Konstantino's artifice, in 2009, while he was on AngioScore's board he filed a patent application for Chocolate.  In March 2010, after engaging in correspondence with AngioScore's lawyers, he switched patent counsel and filed a second provisional patent application.  The strategy underpinning Konstantino's second patent application decision is apparent.  By filing a second provisional patent application in March 2010, Konstantino sacrificed five months of patent priority.  However, by citing the March 2010 application instead of the earlier 2009 application in his March 2011 patent application, Konstantino was able to ensure that the patent application from 2009, which listed him as a co-inventor of Chocolate at a time when he was on AngioScore's board, would not become public.

United States District Court
Northern District of California

1   *Ass'n*, 127 Cal. App. 4th 1138, 1144 (2005) (citations omitted); *Neilson v. Union Bank of*

2   *California, N.A.*, 290 F. Supp. 2d 1101, 1133 (C.D. Cal. 2003) (noting that California courts cite

3   Restatement (Second) of Torts section 876 to hold that "liability may properly be imposed on one

4   who knows that another's conduct constitutes a breach of duty and substantially assists or

5   encourages the breach.") (citations omitted).  AngioScore must establish that defendant

6   corporations TriReme and Quattro actually knew of Konstantino's fiduciary duty breach.  *Casey*,

7   127 Cal. App. 4th at 1145 ("[E]ven 'ordinary business transactions' . . . can satisfy the substantial

8   assistance element of an aiding and abetting claim if the [defendant] actually knew those

9   transactions were assisting the [fiduciary] in committing a specific tort [breach of fiduciary duty].

10  Knowledge is the crucial element.").  Additionally, "causation is an essential element of an aiding

11  and abetting claim," and AngioScore must show that the aiders and abettors provided assistance

12  that was a substantial factor in causing AngioScore's harm.  *Neilson*, 290 F. Supp. 2d at 1135.

13      For corporations, "[i]t is the general rule that knowledge of an officer or director of a

14  corporation will be imputed to the corporation."  *See Brown v. Brewer*, No. CV 06-3731-GHK

15  (JTLx), 2008 WL 6170885, at *7 (C.D. Cal. July 14, 2008) (quoting *Teachers' Ret. Sys. of La. v.*

16  *Aidinoff*, 900 A.2d 654, 671 n.23 (Del. Ch. 2006)).  California follows the well-established

17  principle that the acts and knowledge of an officer or agent can be attributed to a corporation or

18  principal.  *In re Cal. TD Inv. LLC*, 489 B.R. 124, 129 (Bankr. C.D. Cal. 2013).[9]

United States District Court
Northern District of California

---

25      [9] As was recognized in *In re Cal. TD Inv. LLC*, the attribution or imputation rule is subject
26  to the "adverse interest" exception, whereby an officer's acts adverse to a corporation will not
    generally be imputed to the corporation, which is in turn subject to the "sole actor" exception,
27  where courts may impute the actions of officers even where adverse to the corporations if the
    officer is the "sole person in control of [the corporation]."  489 B.R. at 129-30.  Defendants have
28  not argued that any such exception would apply in this case.

1

### 1. *TriReme knowingly provided substantial assistance.*

2      The Court finds that TriReme knew Konstantino's conduct constituted a breach of duty

3  and gave substantial assistance or encouragement for Konstantino to persist in his breach.

4  Accordingly, TriReme is liable for aiding and abetting Konstantino's breach of fiduciary duty.

5      First, the record is replete with evidence that TriReme employees provided substantial

6  assistance to Konstantino at every step of the design and modeling process for Chocolate. While

7  Konstantino remained on AngioScore's board of directors, TriReme engineers helped him develop

8  and build the Chocolate device. Such individuals included Feld[10]; Jayson Delos Santos, a senior

9  engineer; Maria Pizarro, TriReme's Director of Research and Development[11]; and Gary Binyamin,

10  TriReme's technology manager. These individuals were engaged in creating and fine-tuning the

11  engineering design of Chocolate. They created prototypes of Chocolate and undertook testing of

12  the devices. They attended the porcine study of the Chocolate device at Stanford in January 2010.

13  Not only did TriReme employees design and test the Chocolate idea prior to the time Konstantino

14  left AngioScore's board, they did so under his general supervision. Konstantino, as TriReme's

15

16      [10] The role of Feld with respect to TriReme at this time is unclear. On TriReme's

17  September 2009 board meeting, Feld is identified as TriReme's Vice President of Research and
   Development. However, in his testimony, Feld stated that around this time, he was a consultant

18  for TriReme. (Trial Tr. at 863:17-21.) The Court is wary of letting the distinction, however, exalt
   form over substance. Feld was a cofounder of TriReme. He testified that he speaks to

19  Konstantino at least weekly, if not more. Even as a consultant, he was paid by TriReme on a
   monthly basis, had access to all the TriReme employees who were working on Chocolate, and

20  used TriReme employees in the pursuit of Chocolate. (Trial Tr. at 863:17-864:20.)

21
        [11] During trial, Pizarro persisted in her efforts to obfuscate the true nature of TriReme's

22  involvement in the Chocolate opportunity. During cross-examination, however, this quickly
   became apparent. For example, after acknowledging that she had been involved in a December

23  2009 presentation to MedTronic regarding the status of TriReme's projects, including Chocolate,
   Pizarro denied that "there was development work performed on Chocolate in 2009," disputing the

24  meaning of the word "development." (Trial. Tr. at 1069:2-1070:9.) The evidentiary record,
   however, was starkly to the contrary – as Pizarro well knows. As early as October 2009, Pizarro

25  was on emails concerning Chocolate prototypes, relaying engineering updates including such
   information as: "we are building the 100mm balloons over as we speak." (PX 89.) Despite the

26  obvious connection, Pizarro maintained that only "possibly" did such reference refer to Chocolate.

27  (Trial Tr. at 1071:23-25.) Similar attempts to equivocate and evade continued throughout her
   testimony, compromising fatally any shred of credibility.

28

United States District Court
Northern District of California

CEO, was on emails contributing to the discussion.  TriReme's HR and Marketing Manager provided critical support to Konstantino's efforts by applying for funding for a grant from the Singaporean government.

Second, the Court finds that based on the evidence of record, TriReme employees and management knew that Konstantino was on AngioScore's board while such work was undertaken. The conclusion is all but inescapable that they knew Konstantino's work on Chocolate constituted a violation of his fiduciary duties as a board member.  Throughout the later part of 2009 and early into 2010, TriReme employees, as well as Konstantino, knew well – indeed, *intended* – that Chocolate would compete with AngioScore, and that Konstantino remained on AngioScore's board of directors.  As TriReme's CEO, Konstantino knew he owed AngioScore fiduciary duties solely by virtue of his board seat.  (PX 101 (February 2009 letter Konstantino signed confirming that he remained bound by fiduciary duties as a director).)  Pizarro, a former AngioScore engineer, knew AngioScore's line of business and knew that Konstantino was serving on AngioScore's board of directors while Chocolate work was done at TriReme.  (Trial Tr. at 1028:17-23; 1093:25-1094:3.)  Feld knew not only that Konstantino remained on AngioScore's board of directors and remained subject to fiduciary duties, and that Chocolate competed with AngioSculpt, but also that Konstantino had previously obtained a waiver from AngioScore for purposes of working on bifurcated stents with TriReme.  Ong, TriReme's HR Manager, also knew that Konstantino remained on AngioScore's board while she helped him obtain financing for a product directly competitive with AngioScore's products.

### 2.   *Quattro/Proteus knowingly provided substantial assistance.*

The Court finds that during the development of Chocolate, Quattro existed as "Proteus," an unincorporated association.  In March of 2010, "Proteus" incorporated under the name Quattro. For the reasons set forth below, the Court finds that Quattro/Proteus is liable for aiding and abetting Konstantino's breach.

First, Proteus was an "unincorporated association" that predated Quattro and was capable of being sued.  Under California law, an "unincorporated association" is defined in California Corporations Code section 18035.  Subsection (a) of that provision provides that an

"Unincorporated association" is an unincorporated group of two or more persons joined by mutual consent for a common lawful purpose, whether organized for profit or not.  Cal. Corp. Code § 18035 (West).

Although case law on this provision generally concerns entities like churches, political parties, professional or trade associations, social clubs, and homeowners associations, the doctrine and the breadth of what qualifies as an "unincorporated association" was explained in *Barr v. United States Methodist Church*, 90 Cal. App. 3d 259 (1979).  There, the court of appeals explained that the trend in the state and nation was to "assure legal status where in fairness it is appropriate" and included in such consideration the dictates of fairness where "persons dealing with the association contend their legal rights have been violated."  *Barr*, 90 Cal. App. 3d at 266-67.  An unincorporated association need not have the formalities of quasi-corporate organization.  "Courts have even assessed liability against a church association with no officers where there were only nine persons whose sole business transaction (aside from small purchases of printed religious material) was the purchase, by down payment, of a station wagon."  *Id.* at 267 (citation omitted).  Likewise, criminal street gangs have been found to qualify as "unincorporated associations" capable of being sued.  *People ex rel. Totten v. Colonia Chiques*, 156 Cal. App. 4th 31, 41 (2007).[12]

Proteus easily satisfies the criteria under Section 18035.  During the development of Chocolate, Proteus was held out as if a corporation.  It consisted of at least three members, James Dreher, Konstantino, and Feld, and was formed for the lawful purpose of raising money and

---

[12]  In *Totten*, a criminal street gang was found to be an unincorporated association capable of being sued for injunctive relief.  The court noted that "[s]tatutes must be given a reasonable and common sense construction in accordance with the apparent purpose and intention of the lawmakers—one that is practical rather than technical and that will lead to a wise policy rather than mischief or absurdity."  *Id.* (citation omitted).  Upon review of the purpose of California Corporations Code 18035, and in view of legislative history, the court of appeal found that "it would border on absurdity to conclude that, by the 2004 addition of Corporations Code section 18035, subdivision (a) [which included the element of "lawful purpose" in the definition of an unincorporated association], the Legislature intended to shield criminal street gangs from liability and injunctive relief by rendering them immune from civil suits.  *Totten*, 156 Cal. App. 4th at 41.

United States District Court
Northern District of California

United States District Court
Northern District of California

investor interest in the Chocolate technology.  Investors were informed that "Proteus" was the entity developing Chocolate and seeking funds therefor, and Konstantino represented himself as Chairman of the entity.  As Proteus's chairman, Konstantino signed a contract to raise funds for Chocolate's development.  Fairness would dictate that investors who gave money to Proteus would have been able to seek recourse against Proteus.  *Barr*, 90 Cal. App. 3d at 266-67.  Konstantino held himself out as a Chairman of Proteus, signed contracts as such, sought money from individuals under the guise of this entity, and later, to investors, characterized Proteus's transition to "Quattro" as merely a name change.  Not only did Konstantino himself understand that Quattro was "previously Proteus," but by characterizing the transition from Proteus to Quattro as a simple change in name, he was able to retain for Quattro the benefits Proteus had obtained.  Indeed, the lack of distinction between Quattro and Proteus is so complete that on the basis that the difference between these entities was merely one of nomenclature, contracts signed between "Proteus" and third parties were amended to substitute the name "Quattro Vascular Pte Ltd" for "Proteus Vascular Systems Pte Ltd."  (PX 7.)  The unfairness of immunizing Quattro is amplified here, where defendants now offer a hypertechnical argument that because Quattro did not formally exist as an incorporated entity at the time of Konstantino's breach, it cannot be liable for acts it undertook when it was known as Proteus.[13]  It is not lost on the Court that almost exactly one month after Konstantino resigned from AngioScore's board, the name change occurred and Quattro officially incorporated, with the agreement of Dreher, Konstantino, and Feld.  Thereafter, Quattro continued in Proteus's efforts.  Defendants cannot hide posthumously behind the name change.

Proteus/Quattro was inextricably involved in, and had actual knowledge of, Konstantino's breach.  Indeed, it was formed with the specific purpose of furthering that breach.  Konstantino, as

---

[13] Even the term "Proteus" carries a meaning that pointedly undermines defendants' position.  Proteus was a Greek sea god capable of assuming different forms.  MERRIAM-WEBSTER, New Collegiate Dictionary (9th ed. 1988).  An entity presenting "protean" qualities has the "ability to assume different forms."  *Id.*  The Court finds that Proteus lived up to its name by later assuming the name "Quattro" while retaining its original essence.

Proteus's Chairman and Quattro's Director, formed the organization for purposes of raising funds for Chocolate, which included seeking funding from the Singaporean government, and later, used Quattro as the corporate entity to hold intellectual property rights in Chocolate.  Dreher implemented a business strategy for seeking early investors and funds.  On this basis, the Court finds that Proteus, as an unincorporated association, knowingly aided and abetted Konstantino's breach of fiduciary duty.  In March of 2010, when Proteus incorporated as Quattro, it maintained its debts and liabilities.  *See Sec.-First Nat. Bank of L.A. v. Cooper*, 145 P.2d 722, 731 (Cal. Ct. App. 1944).

**IV.    QT Vascular is liable as a successor in interest to the liabilities of Quattro and TriReme.**

The decision whether to impose successor liability involves broad equitable considerations. *See Ray v. Alad Corp.*, 19 Cal.3d 22, 34 (Cal. 1977); *see also Rosales v. Thermex–Thermatron, Inc.*, 67 Cal. App. 4th 187, 196 (Cal. Ct. App. 1998).  Each case of successor liability must be assessed on its own unique set of facts.  *See CenterPoint Energy, Inc. v. Super. Ct.*, 157 Cal. App. 4th 1101, 1122 (Cal. Ct. App. 2007).  Under California law, a corporation that purchases the assets of another does not assume the liabilities of the selling corporation unless: "(1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." *Ray*, 19 Cal.3d at 28.

As a preliminary matter, successor liability under California law requires an asset transfer, not merely the purchase of stock.  *Sunnyside Dev. Co., LLC v. Opsys Ltd.*, No. C 05 0553 MHP, 2007 WL 2462142, at *6 (N.D. Cal. Aug. 29, 2007); *Potlatch Corp. v. Superior Court,* 154 Cal. App. 3d 1144, 1150-51 (Cal. Ct. App. 1984).  The evidence on this point is admittedly limited. However, in view of the evidentiary record, including its observation of the critical witness on this issue, the Court finds that an asset transfer occurred.  This conclusion is based on testimony from defendants' 30(b)6 corporate designee, Momi Brosh, QT Vascular's Vice President of Business Operations.  Brosh was designated by defendants to testify on the relationship between QT

1   Vascular, Quattro, and TriReme.  He testified that QT Vascular assumed both the assets and

2   liabilities.  (*See* Brosh Dep. at 277:19-281:15[14].)  Specifically, Brosh testified that the shareholders

3   of Quattro and TriReme agreed to form QT Vascular.  In exchange, the shareholders would

4   receive shares of QT Vascular stock, and QT Vascular would receive "100% of all existing stock,

5   shares, assets, and liabilities in each of Quattro, [and] TriReme."  (*Id*.)

6        Persons designated as corporate representatives "[shall] testify as to matters known or

7   reasonably available to the organization."  Fed. R. Civ. P. 30(b)(6).  A Rule 30(b)(6) deposition

8   notice serves a unique function: it is the sworn corporate admission that is binding on the

9   corporation.  *Hardin v. Wal-Mart Stores, Inc.*, No. 08-CV-0617 AWI BAM, 2011 WL 11563217,

10  at *2 (E.D. Cal. Dec. 2, 2011) (citing *Gales v. Winco Foods*, 2011 WL 3794887 (N.D. Cal. 2011)

11  ("As a 30(b)(6) witness, her testimony is a sworn corporate admission binding on the

12  corporation.").  If the notice of deposition or subpoena served on the entity sufficiently describes

13  the matters on which questions will be asked, the entity is under a duty to designate and produce

14  "one or more officers, directors, or managing agents, or designate other persons who consent to

15  testify on its behalf . . . ."  Rule 30(b)(6); *Mitchell Eng'g v. City & Cnty. of S.F.*, 2010 WL

16  455290, at *1 (N.D. Cal. Feb. 2, 2010) ("A 30(b)(6) witness testifies as a representative of the

17  entity, his answers bind the entity and he is responsible for providing all the relevant information

18  known or reasonably available to the entity.") (quotation marks and citation omitted); *Great Am.*

19  *Ins. Co. of N.Y. v. Vegas Constr. Co., Inc.*, 251 F.R.D. 534, 541 (D. Nev. 2008).  Still, other courts

20  hold that "testimony given at a Rule 30(b)(6) deposition is evidence which, like any other

21  deposition testimony, can be contradicted and used for impeachment purposes[,]" and that such

22  testimony does not "bind" the designating entity "in the sense of [a] judicial admission."  *A.I.*

23  *Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 (7th Cir. 2001).  The Ninth Circuit has not yet

24

25

26        [14] Designated portions of Brosh's two-day video deposition testimony were played during
    trial (*see* Trial Tr. at 970) and the designated transcript for that testimony appears at the end of

27  Day Five of the trial transcript.  (*See* Dkt. No. 637 (Trial Transcript Volume Five) at 205.)
    Citations to Brosh's deposition include only designated portions played during trial.

28

                                        42

1   decided the issue.  *Coalition for a Sustainable Delta v. McCamman*, 725 F. Supp. 2d 1162, 1172

2   (E.D. Cal. 2010).

3       In the absence of specific direction from the Ninth Circuit, the Court joins those courts

4   who have adopted a middle ground and holds that defendants cannot rebut the testimony of their

5   Rule 30(b)(6) witness when, as here, the opposing party has relied on the Rule 30(b)(6) testimony,

6   and defendants have provided no adequate explanation for the rebuttal offered at trial.  *See MKB*

7   *Constructors v. Am. Zurich Ins. Co.*, 49 F. Supp. 3d 814, 829 n.11 (W.D. Wash. 2014); *Hyde v.*

8   *Stanley Tools*, 107 F. Supp. 2d 992, 993 (E.D. La. 2000), *aff'd* 31 Fed. App'x. 151 (5th Cir. 2001)

9   (per curiam) (unpublished); *State Farm Mut. Auto. Ins. Co. v. New Horizon*, 250 F.R.D. 203 (E.D.

10  Pa. 2008) ("The better rule is that the testimony of a Rule 30(b)(6) representative, although

11  admissible against the party that designates the representative, is not a judicial admission

12  absolutely binding on that party," but the party still may not "retract prior testimony with

13  impunity" and courts can disregard inconsistent testimony when the movant has relied on it); *Tex.*

14  *Technical Inst. v. Silicon Valley, Inc.*, No. H–04–3349, 2006 WL 237027, at *5 (S.D. Tex. Jan. 31,

15  2006) (affidavit did not create an issue of material fact because it conflicted without explanation

16  with Rule 30(b)(6) testimony).

17      With this in mind, the Court expounds on the basis for its finding.  Brosh testified that he

18  prepared for the deposition.  He went over materials, spoke with the defendants' financial team,

19  and with the research and development engineers.  (Brosh Dep. at 33:11-19.)  He provided specific

20  names of individuals with whom he spoke.  (Brosh Dep. at 34:06-35:24; 36:09-14.)  He estimated

21  that he spent approximately twenty hours preparing for the deposition, and that he met with

22  counsel in preparation.  (Brosh Dep. at 34:06-35:24; 62:08-19; 62:23-63:05.)  He also spent time

23  preparing on his own, including reading the QT Vascular IPO documents.  (Brosh Dep. at 72:18-

24  73:06.)  Because Mr. Brosh is not a native English speaker, a translator was present for his

25  deposition, as was his English-speaking counsel, and he was free to ask for translation assistance

26  during the deposition.  (*See* Brosh Dep. at 59:09-12.)

27      In addition, the pattern of questioning by AngioScore's counsel during the critical

28  moments of Brosh's deposition permitted both sufficient review of the relevant documents, and

United States District Court
Northern District of California

43

1    was sufficiently clear to provide Brosh an opportunity to understand what was being asked and

2    answer accordingly.  Each question was constructed in the following format:  counsel identified a

3    document and presented it to Brosh.  She then read a brief sentence or phrase from the document

4    supporting a conclusion that certain factual events occurred.  She would then ask if the relevant

5    sentence or phrase accurately set forth what actually happened.  (*See* Brosh Dep. at 272:07-10;

6    273:19-21: 273:24-274:04; 277:19-277:22; 280:03-11; 281:02-15.)  She did this no fewer than

7    four times.  Brosh agreed every time.  (*See id*.)

8         To the extent Brosh's answers were inaccurate or erroneous, he was free to submit errata

9    following the transmittal of his deposition transcript.  He elected to do so.  Indeed, Brosh

10   submitted fairly extensive errata, in two parts, wherein he amended his answers for purposes of

11   accuracy *fifty-five* times.  (Dkt. Nos. 593-7, 593-8.)  Tellingly, Brosh did not seek to amend or

12   correct the answers given with respect to QT Vascular's acquisition of assets from TriReme and

13   Quattro.  To the extent defendants believed that his testimony remained in some way deficient,

14   they were free to offer another person for deposition as to these issues.  They did not do so.

15        Moreover, Brosh's testimony that an asset transfer and liability assumption took place was

16   corroborated by contemporaneous documents reflecting that QT Vascular would be the product of

17   a merger between TriReme and Quattro.  (PX 32; PX 43.)  It is therefore not wholly controverted

18   by the evidence of record.  At trial, defendants offered public statements of the corporate group

19   (comprising QT Vascular, TriReme US, TriReme Singapore, and Quattro), such as their initial

20   public offering documents and their 2013 annual report, to controvert Brosh's statements.  Those

21   documents purport to demonstrate that by virtue of an arms'-length corporate reorganization, QT

22   Vascular acquired all stock in Quattro and TriReme, with only certain liabilities.  In exchange

23   therefor, the shareholders in each of TriReme and Quattro received shares of QT Vascular's stock.

24   The Court is not convinced that these representations, standing alone, overcome the weight of

25   evidence to the contrary –  Brosh's testimony, the manner in which the defendants' key players,

26   including Konstantino, Brosh, Haig, Pizarro, and Feld, conducted business affairs, and the fact that

27   the bulk of the management of these three defendant companies is entrusted to the same people.

28   Although some of these individuals simultaneously occupy different roles in the various defendant

United States District Court
Northern District of California

44

corporations, these roles do not appear to be distinct.  It also cannot be overlooked that Brosh, an insider himself, reviewed the IPO document in preparation for his testimony and nonetheless testified that QT Vascular acquired all assets and liabilities of TriReme and Quattro.

Based on the foregoing, the Court finds Brosh's answers to the questions most relevant to whether QT Vascular assumed all of TriReme's and Quattro's assets and liabilities and that given the sufficiency of their reliability, AngioScore appropriately relied upon his answers.  To the extent that defendants seek to rely on contradictory testimony provided by Randall Farwell, QT Vascular's CFO, who was never deposed, and was first disclosed as a witness on the eve of trial, long after discovery had closed, they cannot do so.  Rule 30(b)(6) is a powerful and necessary discovery tool, and AngioScore was entitled to rely upon Brosh's representations in developing its case.  To the extent Brosh's testimony on this subject was inaccurate, there were multiple ways for defendants to correct or clarify the evidentiary record and they have failed to provide any adequate reason for why they did not do so, or why Brosh's testimony should be rebutted.  Their failure to do so cannot be the basis for permitting an eleventh-hour witness to offer defendants' preferred version of events.  To hold otherwise would be to permit a trial by ambush, which the federal discovery rules are designed to avoid.

Having found that underlying the formation of QT Vascular was a transfer of assets and liabilities from TriReme and Quattro, the Court now turns to whether QT Vascular is a successor in interest to the liabilities of Quattro and TriReme.  Again, a corporation acquiring the assets of another corporation will be found to have succeeded in interest to the acquired corporation's liabilities if any one of the following applies: "(1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts."  *Ray*, 19 Cal.3d at 28.

AngioScore argues that the first and second of the above theories apply here.  As to the first – express or implied agreement to assume liabilities – as explained above, the Court finds that

United States District Court
Northern District of California

1   QT Vascular assumed the liabilities of Quattro and TriReme.  Accordingly, imposing successor

2   liability is proper.

3          As to the second –  whether the transaction amounted to a de facto merger – the Court also

4   finds that evidence supports a finding that this occurred.  The *de facto* merger doctrine applies

5   under California law when "one corporation takes all of another's assets without providing any

6   consideration that could be made available to meet claims of the other's creditors" or when "the

7   consideration consists wholly of shares of the purchaser's stock which are promptly distributed to

8   the seller's shareholders in conjunction with the seller's liquidation." *Ray*, 136 Cal. Rptr. at 578.

9   To determine whether a transaction "cast in the form of an asset sale actually achieves the same

10  practical result" as a merger, the Court considers the following factors: "(1) was the consideration

11  paid for the assets solely stock of the purchaser or its parent; (2) did the purchaser continue the

12  same enterprise after the sale; (3) did the shareholders of the seller become shareholders of the

13  purchaser; (4) did the seller liquidate; and (5) did the buyer assume the liabilities necessary to

14  carry on the business of the seller?" *Schwartz v. Pillsbury Inc.*, 969 F.2d 840, 846 (9th Cir. 1992)

15  (citing *Marks v. Minn. Mining and Mfg. Co.*, 187 Cal. App. 3d 1429, 1436 (Ct. Ct. App. 1986)).

16         Here, QT Vascular assumed the assets and liabilities of Quattro and TriReme, and in

17  consideration, gave QT Vascular stock to the former shareholders of Quattro and TriReme.  The

18  purchasing company, QT Vascular, continued in the enterprise of Quattro and TriReme after its

19  formation:  manufacturing and selling the Chocolate device.  The shareholders of Quattro and

20  TriReme became shareholders of QT Vascular, and QT Vascular assumed the liabilities of each.

21  It cannot be said that under these facts, the transaction resulting in QT Vascular did not achieve

22  the same practical result as a merger.  *See Marks*, 187 Cal. App. 3d at 1437-38 (finding a

23  "reorganization" between a parent and a subsidiary constituted a de facto merger).

24         For these reasons, the Court finds that QT Vascular is the successor in interest to the

25  liabilities of Quattro and TriReme.

26

27

28

United States District Court
Northern District of California

**V.     By usurping a corporate opportunity, defendants violated California's Unfair Competition Law.**

Under California Business and Professional Code section 17200, *et seq.*, "any unlawful, unfair or fraudulent business act or practice" is prohibited.  Cal. Bus. & Prof. Code § 17200 (West).  "Because . . . section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent . . . ."  *Aleksick v. 7–Eleven, Inc.*, 205 Cal. App. 4th 1176, 1184 (Cal. Ct. App. 2012).  AngioScore argues that one of these three bases apply here:  that defendants' acts constitute "unlawful" predicate acts to establish liability under California's Unfair Competition Law ("UCL").[15]

A "violation of another law is a predicate for stating a cause of action under the UCL's unlawful prong."  *Graham v. Bank of Am., N.A.*, 226 Cal. App. 4th 594, 610 (Cal. Ct. App. 2014) (citing *Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal. App. 4th 1544, 1554 (Cal. Ct. App. 2007)). "By proscribing any unlawful' business practice, [S]ection 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable. Virtually any law—federal, state or local—can serve as a predicate for a [UCL] action."  *Law Offices of Mathew Higbee v. Expungement Assistance Servs.*, 214 Cal. App. 4th 544, 553 (2013) (quotations omitted); *Cel-Tech Commc'ns, Inc.*, 20 Cal. 4th at 195 (Kennard, J., concurring and dissenting)  (explaining that in 1963, the state legislature added "unlawful" business practices to the list of proscribed conduct and thereby "expanded the definition of unfair competition with respect to conduct violating statutory prohibitions, for now any business practice that violated an independent statutory duty was an instance of unfair competition that could be enjoined even if the underlying statute did not specifically authorize injunctive relief") (citation omitted).  Common law violations may suffice as predicate acts under the UCL.  *Yanting Zhang v. Superior Court*, 57 Cal. 4th 364, 380 (Cal. 2013).  Under the statute, "[p]revailing plaintiffs are

---

[15]  Although in prior briefing, AngioScore argued that defendants' actions qualify as "unfair" predicate acts for purposes of establishing UCL liability, the Court understands that AngioScore has essentially withdrawn that argument.  (Dkt. No. 658 ("AngioScore does not request that the Court find that Defendants' conduct also constitutes "unfair" acts and practices under the UCL.")).

United States District Court
Northern District of California

1    generally limited to injunctive relief and restitution." *Korea Supply Co. v. Lockheed Martin*

2    *Corp.*, 29 Cal.4th 1134, 1144 (Cal. 2003) (quoting *Cel-Tech Commc'ns, Inc.*, 20 Cal.4th at 179).

3    Accordingly, the Court addresses the issue below.

4         AngioScore seeks the extraordinary remedy of injunctive relief and asks that the Court

5    permanently enjoin defendants from continuing to sell Chocolate.  In evaluating this request, the

6    Court has considered whether AngioScore has met its burden to establish that: (1) it has suffered

7    an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to

8    compensate for that injury; (3) considering the balance of hardships between the plaintiff and

9    defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a

10   permanent injunction.  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 390 (2006).  Having

11   considered these factors, the Court declines to award AngioScore's requested injunction.

12        The Court possesses broad discretion in imposing equitable remedies upon finding a

13   violation of the UCL.  *Yanting Zhang*, 57 Cal. 4th at 371 (citations omitted).  Even when an unfair

14   business practice has been shown, the UCL does not require the imposition of equitable relief.  *See*

15   *Cortez v. Purolator Air Filtration Prods. Co.,* 23 Cal.4th 163, 180 (Cal. 2000) ("The court's

16   discretion is very broad. Section 17203 does not mandate restitutionary or injunctive relief when

17   an unfair business practice has been shown.").  Here, the Court is satisfied that the remedies set

18   forth below fully and fairly compensate AngioScore for its past and future harms, and adequately

19   addresses defendants' wrongdoing.  AngioScore has conceded that the existence of such relief

20   obviates the need for an injunction.  (Dkt. No. 658 at 5.)  *See E.B.C. Trust Corp. v. JB Oxford*

21   *Holdings, Inc.*, 2005 WL 6214851, at *5 (C.D. Cal. Aug. 26, 2005) (injunctive relief "requires a

22   showing that other adequate relief is not available" and where "the plaintiff pursues other remedies

23   in addition to seeking relief under [UCL] the court may conclude that those other remedies obviate

24   the need for injunctive relief.") (citations omitted).  Furthermore, as discussed more below, an

25   injunction is directly contrary to the public interest.  Accordingly, the Court declines to award

26   AngioScore its requested injunction.

27

28

United States District Court
Northern District of California

<strong>R</strong>EMEDY

**I.      Legal Framework**

The law abhors one who betrays his or her fiduciary duty.  Thus, "[i]f an officer or director of a corporation, in violation of his duty as such, acquires gain or advantage for himself, the law charges the interest so acquired with a trust for the benefit of the corporation, at its election, while it denies to the betrayer all benefit and profit."  *Guth*, 5 A.2d at 510.  The bounds of this rule are considerable, for it rests upon the "broader foundation of a wise public policy that, for the purpose of ***removing all temptation***, ***extinguishes all possibility*** of profit flowing from a breach of the confidence imposed by the fiduciary relation. Given the relation between the parties, a certain result follows; and a constructive trust is the remedial device through which precedence of self is compelled to give way to the stern demands of loyalty."  *Id.* at 270 (emphasis supplied).  Where a plaintiff has proved that its interests have been subverted by a disloyal fiduciary, "the corporation may elect to claim all of the benefits of the transaction for itself, and the law will impress a trust in favor of the corporation upon the property, interests and profits so acquired."  *Id.* at 273.

While it is true that damages flowing from a breach of fiduciary duty are to be liberally calculated, *Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 444 (Del. 1996) (citing *Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 543 (2d Cir. 1994)), the Delaware Supreme Court has held that where certain claimed damages were not proximately caused by the breach, those damages were not recoverable.  *Id.*  Thus, causation remains a consideration for damages even in the context of fiduciary duty breaches.  *Thorpe*, 676 A.2d at 444;  *Boyer v. Wilmington Materials, Inc.*, 754 A.2d 881, 907 (Del. Ch. 1999) (noting lack of causal relationship; finding authority to award damages where the breach of duty caused economic harm to a corporation) (citing *Thorpe*, 676 A.2d at 445).  So, too, does causation remain at issue in the case of aiding and abetting the commission of a tort.  *See Bancroft-Whitney Co. v. Glen*, 64 Cal. 2d 327, 352 (1966) ("It is clear from the evidence . . . that Bender was aware of or ratified Glen's breach of his fiduciary duties in all but a few respects, that he cooperated with Glen in the breach, and that he received the benefits of Glen's infidelity . . . . Under all the circumstances, Bender and

United States District Court<br/>Northern District of California

49

1    Bender Co. must be held liable for their part in Glen's breach of his fiduciary duties.  They

2    encouraged the sowing and reaped the benefit.  They cannot now disclaim the burden.").

3        **II.        Defense of Causation**

4            Defendants have argued throughout this case that AngioScore has failed to prove that

5    defendants' behavior caused harm to AngioScore either because (i) the devices do not compete, or

6    (ii) Feld had an independent right to develop Chocolate.  The Court is unpersuaded.

7            First, Chocolate and AngioSculpt compete.  More than sufficient evidence exists in the

8    record to support a finding that Chocolate's presence in the market has harmed AngioScore.  The

9    Court explains:

10            In the angioplasty balloon market, there are two basic categories of products.  First are the

11   plain old balloon catheters, or POBAs, which come in three basic forms:  compliant, semi-

12   compliant, and non-compliant.  Within that field, POBAs come in different types (small, large,

13   standard, and high-pressure).  (PX 294 at 251.)  POBAs are priced between approximately $150 to

14   $200  per unit.  (Trial Tr. at 412:7-9 (Viano direct).)  Specialty balloons comprise a sub-market

15   within the broader angioplasty balloon market, and are priced as high as $1000, depending on

16   length.  (*See id*.)  Within that sub-market, there are relatively few players.  (*Id*. at 249.)  As of

17   2013, the specialty balloon catheter market was primarily occupied by four companies:  Boston

18   Scientific, C.R. Bard, Abbott Laboratories, and AngioScore.  The market share at that time reflects

19   that AngioScore was in close competition with Boston Scientific's flagship product, the Cutting

20   Balloon:  AngioScore occupied 48.1% of the specialty balloon market and Boston Scientific

21   occupied 47.1%.  C.R. Bard held only 3.3% of the market with its specialty balloon, the

22   Vascutrak.  Abbott Laboratories held only 1.3%.  (PX 294 at 249.)

23            The similarities between Chocolate and AngioSculpt from a competitive viewpoint are

24   overwhelming.  Both are specialty balloons.  Both contain balloons made with nylon elements.

25   Both have a nitinol cage surrounding the balloon.  Neither device leaves anything behind in a

26   vessel after it has inflated; no stent remains, for example.  The purposes for the devices are the

27   same: to open occluded blood vessels and enable more blood flow.  The devices share the same

28   target customers, both of which are specialized: interventional cardiologists and vascular surgeons.

United States District Court
Northern District of California

50

1    (Trial Tr. at 407:20-408:3 (Viano).)    The fact that the two products do not use identical

2    mechanisms of action does not mean that they do not compete.

3           The obviousness of the competitive relationship between the devices becomes undeniable

4    upon a review of defendants' own pre-litigation communications regarding their goals for

5    Chocolate, then being developed and marketed.  Konstantino himself made multiple written

6    references that touted the competitive benefits of the Chocolate compared to the AngioSculpt.

7    (*See* PX 66 (November 2009 Chocolate presentation referencing that Chocolate would "reduce

8    dissections"; dissections would occur with a scoring balloon, *i.e.*, AngioSculpt); PX 124 (January

9    2010 email from Konstantino forwarding information memorandum outlining benefits of

10   Chocolate as Proteus's proprietary device; identifying AngioScore as one of "only a couple

11   companies" marketing specialty balloon products); PX 132 (October 2011 email from Vardit

12   Benjamin to Konstantino and Haig attaching "TriReme's Competitor Analysis" spreadsheet;

13   identifying the AngioSculpt as competitor); PX 127 (February 2011 email Konstantino forwarded

14   his wife for purposes of his patent application background discussion, identifying AngioSculpt as

15   an "alternative tool" to Chocolate).)  Chris Haig further confirmed the market similarities between

16   Chocolate and AngioSculpt.  As Chocolate was being developed, TriReme faced the question of

17   where to price its new specialty balloon catheter device.  In October 2011, an email from Steve

18   Dreaden entitled "AngioScore Competitive Information" relayed "competitive field intel on

19   AngioScore" in terms of their pricing.  (PX 130.)  The email itself and responses make clear that

20   TriReme priced Chocolate just $25 under AngioScore's prices. (*See also* PX 135.)

21          Thus, for every size Chocolate was available, it was priced at exactly $25 below its

22   AngioScore counterpart.  Notably, Haig admitted that pricing for the Chocolate was keyed off

23   AngioSculpt, as opposed to Vascutrak, because AngioSculpt was "on the higher side" of the

24   pricing spectrum and had higher clinical value.  However, at that time they were first pricing

25   Chocolate, TriReme *lacked* clinical data on the value of Chocolate, further evidencing that

26   defendants believed AngioSculpt was the "closest competitor" to Chocolate.  (PX 143.)

27   Konstantino himself approved the pricing.

28

1   Ample other evidence of record reveals that TriReme considered Chocolate competitive

2   with AngioSculpt.  On December 30, 2011, following Chocolate's 510K approval, for example,

3   Haig forwarded a powerpoint deck to Konstantino extolling the virtues of Chocolate.  (PX 137.)

4   Included was a slide entitled "Chocolate – pricing strategy" that stated that Chocolate was "price

5   competitive to other "specialty" catheters to drive rapid adoption" and noted specifically that

6   AngioSculpt was priced at $852.  (*Id.*)  Sales discussions at TriReme focused substantially on

7   distinguishing Chocolate from AngioSculpt in order to gain market share over the other

8   competitive specialty balloons.  To that end, in December 2012, high level discussions occurred at

9   TriReme concerning such things as how to describe Chocolate's relative advantages compared to

10  the AngioScore and Vascutrak when communicating with potential customers.  (PX 142.)

11  Although the devices are different in some ways, "all of these balloons fall under the "specialty

12  balloon" category."  (*Id.*)  The differences are finely tuned.  In defendants' parlance, AngioScore

13  was described as a "focal force" balloon; Chocolate was described as a "distributed force" balloon.

14  Defendants maintain that Chocolate is "the opposite of a scoring balloon" because when inflated,

15  the balloon itself protrudes through the nitinol cage, forming crowns or pillows that impress upon

16  the plaque.  This, they claim, contrasts with the AngioSculpt, which is designed such that the

17  nitinol element itself presses into the plaque.  Again, the Court finds that these differences do not

18  do not demonstrate lack of competition.  TriReme acknowledged as much when it was marketing

19  Chocolate.  The differences, to the extent the parties' documents acknowledge them, were focused

20  on helping each side market its own product *as against* the other side's product – indeed, the

21  Court finds that such documents, on the whole, reaffirm that the devices were competing with one

22  another, *not* that they were so different that they did not compete.

23  Defendants' succeeded in their attempt to compete with the AngioSculpt.  Frank Viano,

24  Eastern Area of VP of Sales for Spectranetics (which acquired AngioScore), testified on the

25  competitive relationship between Chocolate and AngioSculpt.  With over 20 years of experience

26  in the area of selling cardiovascular angioplasty devices, including experience working with

27  AngioScore's other competitors such as Boston Scientific, Viano attested that he has personally

28  seen sales of AngioScore products affected by the advent of Chocolate.  According to Viano,

United States District Court
Northern District of California

52

Chocolate is the closest competitor to AngioSculpt in the field of specialty balloons.  Viano also

confirmed that POBAs and stents are not competitors with AngioSculpt.

Loss of AngioSculpt sales have been directly attributed to Chocolate.  (Trial Tr. at 444:20-

445:21 (Viano, discussing losing five to ten units a month to Chocolate, including its sales to Dr.

Garcia, defendants' industry expert).)  Viano testified that he has been asked to reduce prices for

AngioSculpt approximately twenty-five to thirty times.  Corroborating that testimony, in March

2013, for example, Viano was asked via email by a sales and service representative in Maryland

and Rhode Island to reduce the AngioSculpt price because Chocolate had been offered at a lower

price.  (PX 152.)  He estimated that requests to reduce prices for AngioSculpt sales have occurred

at approximately ten to fifteen percent of the 200 or 250 hospitals falling under his jurisdiction.  In

response to the competition from Chocolate, Viano explained that he has directed his sales

representatives to provide more sales focus time on the AngioSculpt, to "sell our features, clinical

success, and track record to the hospitals in a much more robust fashion."  (Trial Tr. at 418:18-

419:5 (attesting to diversion of resources at AngioScore due to counter market threats by

Chocolate and including lowering prices for AngioSculpt).)

Defendants place much reliance on the fact that AngioScore initially disclaimed any

similarity between the devices when Chocolate was first released.  The Court finds such

arguments unpersuasive.  Initial reactions to Chocolate on behalf of AngioScore's marketing team

expressing skepticism that Chocolate could compete with AngioSculpt,[16] are not dispositive of the

question of whether, in fact, these devices compete.  As explained above, the fact that the devices

are different in design does not undermine their competitiveness with one another.  Based on

similar reasoning, the fact that in June 2014, Viano created a chart outlining the advantages of

AngioSculpt as compared to Chocolate for distribution to the AngioSculpt sales team does not

support a finding that the devices are not competing with one another.  If anything, it affirms it.

---

[16] Notwithstanding these assessments, which the Court finds reflected an optimistic
viewpoint designed to motivate AngioScore's sales force, Viano confirmed that even at the
beginning he viewed Chocolate as a "competitive threat" to the AngioSculpt and instructed his
sales team to "knock it down right away."  (DX 1581.)

United States District Court
Northern District of California

(DX 1770.)  Viano testified that he and a colleague created the chart in response to TriReme's recent acquisition of a 510(k) clearance for their Chocolate PTCA Balloon.  At that point, they understood that the Chocolate device was an "immediate competitive threat."  Accordingly, the chart was designed to identify all the ways in which AngioScore's device was superior.

Defendants' criticism that AngioScore's submission of sales documents do not demonstrate a direct corroboration or one-to-one link between decrease in sales, and, in particular, Chocolate as the source of the loss, is not dispositive.  The proffered evidence more than meets the legal standard.  Leaving aside the weight of evidence confirming that AngioScore was forced to lower its prices on its products due to pressure from Chocolate, and that defendants themselves claimed that clinicians were replacing AngioScore devices with Chocolate (PX 164), defendants argue that Chocolate did not impede AngioScore's market share because the two devices are "complementary."  The only practitioner evidence directly supporting this notion is testimony from Dr. Garcia, defendants' industry expert.  Defendants place more weight on this testimony than it can bear.  Dr. Garcia, whose testimony is of marginal weight given his pre-existing relationship with the defendants, testified that Chocolate and AngioSculpt are complementary, and stated that Chocolate and AngioSculpt can be used "in concert, in the same patient."  (Trial Tr. at 911:16-25.)  But Dr. Garcia himself could not recall ever having used a Chocolate and AngioSculpt in this manner.  Nor could he recall any medical studies recommending such complementary usage.  Furthermore, he admitted that defendants' promotional materials did not tout Chocolate as "complementary" to another product.  (Trial Tr. at 932:4-933:3.)  Indeed, defendants' goal was to have physicians replace their use of AngioSculpt with Chocolate, and gain market share.  (PX 164 (noting that clinicians are replacing the use of Scoring/Cutting (AngioScore) devices with Chocolate).)

Defendants' second argument is that due to Feld's independent right to assign his interest in Chocolate, defendants enjoyed an independent right to develop Chocolate.  Thus, they reason that AngioScore cannot demonstrate that their actions caused AngioScore's harm, and that AngioScore cannot establish that had the opportunity been offered by Konstantino, it would have

54

been able to acquire an exclusive right to Chocolate.  The Court rejects this conclusion as contrary to the facts of record and reasonable inferences therefrom.

Defendants' position hinges on the notion that Feld would never have assigned his rights to AngioScore under any circumstances.  The Court finds this argument implausible.  Feld testified that while he was the engineering leader on the device, Konstantino was the one with the business acumen.  Indeed, in deposition, Feld stated that he had no involvement with "the business side." (Trial Tr. at 862:21-863:1.)  He had incomplete knowledge of who Chocolate's first investors were and was not involved in determining who could be a potential partner for Chocolate.  (Trial Tr. at 863:10-14.)  Konstantino was responsible for handling such things.  Based on this and other of Feld's testimony, the Court finds that Feld would have assigned his interest wherever and to whomever Konstantino recommended.  That Feld was subject to Konstantino's business decisions and did not exert any independent control over these decisions is further evidenced by the fact that despite Feld's critical role in designing the device, he was paid only $70,000 for his interest in Chocolate while Konstantino was paid $250,000.  Feld's undeniable deference to Konstantino's independent business decisions is further underscored by the fact that Konstantino received a 2.85% royalty in Chocolate where Feld received only 2.15%.  Had Konstantino offered the opportunity to AngioScore, the Court is steadfastly confident that based on Feld's lack of business acumen, allegiance to Konstantino, and fundamental character, he would have followed Konstantino's lead.  For this reason, defendants' insistence that Feld's independent right somehow undermines AngioScore's harm does not persuade.  Feld's claim he disliked AngioScore and would not have wanted Chocolate to belong to AngioScore, is belied by the objective facts and only raised conveniently in the context of ongoing litigation.

In sum, the Court finds that plaintiffs have offered sufficient evidence to establish that defendants' conduct – Konstantino's breach and defendants' aiding and abetting that breach – intentionally, and directly caused AngioScore harm.

United States District Court
Northern District of California

III.    **Remedy Awarded**

A.    **Konstantino may retain no benefit he received as a result of his breach.**

Under *Guth*, the remedies available in a breach of duty case are designed to "den[y] to the betrayer all benefit and profit." *Guth*, 5 A.2d at 510.  AngioScore has proved that its interests have been subverted by a disloyal fiduciary, and may now "elect to claim all of the benefits of the transaction for itself." *Id.* at 273; *see also Thorpe*, 676 A.2d at 445 ("Once disloyalty has been established, the standards . . . require that a fiduciary not profit personally from his conduct, and that the beneficiary not be harmed by such conduct.").

Accordingly, Konstantino may retain no benefit of his breach.  The result, while potentially viewed as harsh, is designed to deter such conduct from occurring in the first place.  It differs from contractual remedies and does more than return AngioScore to the position that it would have been in had the breach never occurred.  It serves to deter future transgressions.  To wit, Konstantino's personal disgorgement shall include the $250,000 he received in agreeing to assign his intellectual property rights to Chocolate, as well as the 2.85% royalty on Chocolate sales.  It also includes his shares in QT Vascular stock, which total roughly 15 million, and his existing stock options.  Furthermore, Konstantino must disgorge any and all monies he collected in any sale of such stock, the monies he has received relative to his royalty share, and any monies he has made in connection with his monthly consulting retainer relative to Chocolate.

B.    **The Court awards AngioScore its past and future lost profits as the most appropriate equitable remedy.**

In light of the fact that the underlying claim is equitable in nature, the Court has broad discretion to address inequity.  *See Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 175 (Del. 2002) (citing *Weinberger v. UOP, Inc.*, 457 A.2d 701, 715 (Del. 1983) (noting "the broad discretion of the Chancellor to fashion such relief as the facts of a given case may dictate"); *Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 439 (Del. 2000) (noting that this Court "defer[s] substantially to the discretion of the trial court in determining the proper remedy")).  Beyond the disgorgement of benefits Konstantino personally received as a result of his breach, the Court finds it appropriate, given the totality of the circumstances, to fashion a remedy

56

in order that defendants may be deterred from future breaches and to compensate AngioScore, as "the beneficiary must not be harmed by such conduct." *Boyer*, 754 A.2d at 906.

As set forth above, AngioScore has proved that Chocolate's market presence has cost it market share and resulted in lower profits; the causation element is satisfied. But it must be noted that the harms resulting from defendants' wrongdoing are difficult to quantify, especially given the industry and the infancy of Chocolate. The Court, "fortunately, has broad discretion to tailor remedies to suit the situation as it exists." *Cantor Fitzgerald, L.P. v. Cantor*, No. CIV.A. 16297, 2001 WL 536911, at *3 (Del. Ch. May 11, 2001). Cognizant of this framework, AngioScore has presented myriad alternative remedies that it believes would work to the same equitable ends. For example, AngioScore has presented measurements of the following alternative remedies: (i) disgorgement of defendants' past profits from Chocolate; (ii) an injunction on the sale of Chocolate; (iii) awarding AngioScore its lost profits sustained to date, and a reasonable estimate into the future; and (iv) awarding AngioScore the present value of Chocolate, which represents its value into the future. The Court first explains why a lost profits award is, in its estimation, the most appropriate for this case, and next explains why the other proposed remedies are wanting.

The Court finds that AngioScore's calculated lost profits, reflective of both its harm to this point and into the future, is sufficiently well-established to remedy AngioScore's harm, and represents an appropriate degree of opprobrium for defendants' wrongful behavior. Thus, the Court awards AngioScore (i) its current lost profits of $2.97 million, representing the profits it would have generated had business not been diverted to defendants, and (ii) its future lost profits where, as here, the Court declines to issue an injunction and permits Chocolate to stay on the market. That value is $17.064 million, representing AngioScore's lost profits on future sales from 2014 through the second quarter of 2019. (PX 383; Trial Tr. at 759:22-760:2.)

Defendants' dispute as to AngioScore's lost profits calculation centers on the definition of the "market" in which AngioSculpt and Chocolate compete, and the corresponding market share used to calculate AngioScore's lost sales.[17] For reasons explained extensively above and

---

[17] As explained extensively above, although defendants maintain that Chocolate has not caused AngioScore to suffer lost profits, the Court disagrees. The evidence demonstrates

United States District Court
Northern District of California

1    incorporated by reference, the Court finds the specialty balloon market to be the relevant market

2    for purposes of analysis, not the whole angioplasty balloon catheter market.  Of particular import

3    is that specialty balloons are priced significantly higher than POBAs and are designed to address

4    more complex medical problems where only four devices are employed:  AngioSculpt, Chocolate,

5    Vascutrak, and Cutting Balloon.  Defendants themselves have long recognized that Chocolate

6    would compete with AngioSculpt and priced their device accordingly.  Thus, AngioScore's lost

7    profits model, which limits the relevant market to that of specialty balloons rather than POBAs,

8    provides an accurate estimation of losses AngioScore has suffered due to Chocolate's market

9    presence.[18]  Having addressed this objection, the Court awards AngioScore $2.97 million,

10    representing its lost profits from December 2011, when Chocolate entered the market, to June

11    2014, when AngioScore filed its claim.

12       Next, AngioScore is awarded $17.064 million, which represents one measure to address

13    future harms, namely, AngioScore's calculation of its future lost profits through mid-2019.[19]  In

14    declining to award AngioScore's estimated present values for Chocolate, which total either $46 or

15    $96 million, the Court weighed and balanced myriad considerations.  The Court has endeavored to

16    remain faithful to the purposes of remedies for breach of fiduciary duty: the deprivation to the

17    wrongdoer of benefits borne of the breach, and the goal of ensuring that a plaintiff will not

18    continue to be harmed.  The Court also finds that an award must be commensurate with the

19

20

21    conclusively that the devices do compete, and that defendants in fact intended that AngioScore
would experience lower profits due to Chocolate.

22    [18] Defendants' expert, Prowse, used an iData report in his competing calculation.

23    Although in their briefing, defendants do not dispute the suitability of the Millennium Research
Group Reports for the calculation AngioScore's relevant market share 2013 and 2014, and upon

24    which Gary Olsen, AngioScore's expert, relied in formulating his market share lost profits
analysis, the Court notes that both parties use the Millennium Research Group reports regularly in

25    the course of their business.  Thus, the Court finds it the more reliable of the two for purposes of
this analysis.

26

27    [19] The end date certain is defined by the useful life of the AngioSculpt product with which
Chocolate has been shown to compete.  (Trial Tr. at 761:19-762:2.)  Notably, the time period here

28    reflects a conservative approach.  (Trial Tr. at 763:3-8.)

highest degree of opprobrium for defendants' wrongful conduct, cognizant that here, had Konstantino resigned from AngioScore's board before Chocolate became an opportunity, this dispute would not exist. AngioScore possessed no right to be offered the Chocolate opportunity absent Konstantino's board membership. Thus, the appropriate remedy is also one that does not work to the destruction of new innovative technology. This is critical, as there is a public benefit derived from healthy advancement and competition in the marketplace, particularly in the area of medical devices. Put differently, the Court finds that equity demands that any remedy be sufficient to repair and deter without being gratuitously extreme.

With these principles in mind, AngioScore's alternative remedies are less satisfying. For example, AngioScore's first proposed remedy – an injunction barring the sale of Chocolate – is not appropriate here, where the parties concede that a monetary award will serve as an adequate remedy. Moreover, the Court cannot overlook the harm such an injunction would work on the public interest. That AngioScore asks the Court to remove from the quiver of practicing physicians one arrow with which they might treat a patient is brazen, particularly where they also seek monetary damages, albeit as an alternative. The Court sees limited benefits in removing from the avowedly limited field of specialty balloon catheters a device that has been approved for medical use in treating complex disease. An injunction is plainly inappropriate.

Next, given the infancy of Chocolate, calculating an award based on defendants' past profits is less satisfying.[20] Here, AngioScore contends that profits defendants have earned to date due to Chocolate total $5,038,000. (ARB at 21.) Unsurprisingly, defendants dispute this amount. The disagreement turns on the fact that Chocolate is a new product being developed in a start-up environment.

---

[20] In cases concerning aiding and abetting a breach of fiduciary duty, disgorgement is one available remedy. *See Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1481 (2014), *as modified* (May 27, 2014); *see also Triton Const. Co. v. E. Shore Elec. Servs., Inc.*, No. CIV.A. 3290-VCP, 2009 WL 1387115, at *28 (Del. Ch. May 18, 2009) *aff'd*, 988 A.2d 938 (Del. 2010) (finding that where defendants aided and abetted the breach of fiduciary duty, they are jointly and severally liable for the damages imposed to remedy those breaches) (citing *Gotham Partners*, 817 A.2d at 173).

United States District Court
Northern District of California

AngioScore's calculation centers on the delta between the sales price of the device less the actual cost to manufacture, less a deduction for some marginal costs. Defendants, by contrast, argue that all their research and development ("R&D") costs should be considered in determining past and future lost profits. Both positions suffer from want of certainty, and were proffered to the Court without any industry context or a fulsome record,[21] as R&D costs can be treated in various ways from an accounting perspective.[22] Further, Defendants cannot dispute that the product has been successful enough to generate revenues of approximately $11 million in 2014 and an anticipated $20 million in 2015; and that optimism in the product is great, as evidenced by defendants' ability to raise $40 million in an initial public offering and a market capitalization estimated at $170 million. On the whole, this approach is not as compelling as a remedy based on AngioScore's established record of profits.

---

[21] For example, AngioScore contends that the only evidence the Court should consider with respect to defendants' costs should be the testimony of defendants' 30(b)(6) witness. (Brosh Dep. at 235:04-14.) The position does not persuade. Brosh was designated as a witness to answer questions relating to annual revenues and annual profits realized in connection with the manufacture and sale of Chocolate devices in the United States and worldwide. (Dkt. No. 593-3 at 4, Topic 5.) The topic, although connected conceptually to the notion of R&D costs, did not expressly state that Brosh's testimony would concern the same. Importantly, counsel's questions of Brosh, which form the substance of his designated testimony, did not seek to elicit testimony concerning the R&D costs associated with Chocolate. Rather, the designated portions of his deposition concern the costs to defendants of manufacturing each unit, the amount TriReme pays Quattro for the manufactured units, and the profit margin realized upon market sale. (*See* Brosh Dep. at 228:01-05; 228:14-17; 229:06-14.) Thus, Brosh was not asked, nor did he testify to, costs incurred as part of defendants' development of Chocolate. AngioScore cannot reasonably be heard to argue that it in any way understood Brosh's designated testimony to concern such costs, nor that the testimony of Randall Farwell, QT Vascular's Chief Financial Officer, as to such costs, should be barred. Accordingly, the Court finds the Brosh testimony inconclusive and unhelpful in the Court's endeavor to discern the most appropriate measure for assessing defendants' profits in this particular industry for this particular product. *See* Restatement Third of Restitution § 51, com. h ("Denial of an otherwise appropriate deduction, by making the defendant liable in excess of net gains, results in a punitive sanction that the law of restitution normally attempts to avoid.").

[22] Not only are R&D costs treated differently across industries, but at times they are sunk costs. Further, prior to Chocolate, defendants had never manufactured a specialty balloon. Thus, they had to invest in some amount of infrastructure in order to develop Chocolate. It is not clear that such costs should not be considered sunk costs as well. Ultimately, defendants chose not to be fully forthcoming with their financial information, with the result that they cannot now hide behind their own lack of disclosures and claim no profit.

1        Next, the Court finds both of AngioScore's present value calculations lack adequate

2   foundation.  First, AngioScore relies upon terminal value for purposes of determining Chocolate's

3   present value.  Such calculations formed the basis for Gary Olsen's present value calculation.  (*See*

4   PX 381; PX 383.)  The use of a terminal value is most commonly used to evaluate the value of a

5   firm, rather than the future value of a discrete device or invention.  (Trial Tr. at 1220:1-17.)[23]  The

6   application of a terminal value to a going concern company assumes that the company will

7   continue beyond an explicit forecast period.  Plaintiffs have failed to provide sufficient foundation

8   showing that such a measurement is appropriate in the context of valuing a new device or product.

9        As an alternative to its terminal value calculation for Chocolate's present value,

10  AngioScore contends in its post-trial briefing that the application of a multiple to current revenue

11  in order to calculate Chocolate's present value is appropriate.  Applying that multiple to

12  AngioScore's 2014 revenue results in a total of $35 million, which AngioScore argues represents

13  another measure of Chocolate's present value.  The Court finds that this, too, lacks foundation.

14  Olsen's testimony does not support a finding that this is a satisfactory method of calculating the

15  value of a technology, as opposed to a going concern.  As with the use of a terminal value,

16  AngioScore's proof at trial concerning the appropriateness of using a revenue multiple effectively

17  relied on the fact that this valuation technique was used in valuing QT Vascular as a going concern

18  with a stabilized revenue stream, not the Chocolate as a new technology.  (Trial Tr. at 777:5-13

19  (Olsen, testifying that use of a revenue multiple is a common way to value a company and noting

20  that AngioScore and QT Vascular have been valued using a multiple applied to revenue); Trial Tr.

21  at 780:2-7; *see also* Trial Tr. at 1246:18-1251:25 (Prowse, testifying that such measures are used

22  to value companies).)

23  _____

24      [23] Terminal value calculations play a part in appraisal proceedings which require valuation
    of a company.  *See* Del. L. of Corp. and Bus. Org § 9.45 VALUATION IN A DELAWARE APPRAISAL

25  PROCEEDING, 2006 WL 2454231 (noting that the discounted cash flow analysis utilizing a terminal
    value is a valid methodology for purposes of determining the value of appraised shares; "the value

26  of a company is equal to the present value of its projected future cash flows").  AngioScore's cited
    case in support of applying a terminal value, *In re Orchard Enterprises, Inc.*, No. CIV.A. 5713-

27  CS, 2012 WL 2923305 (Del. Ch. July 18, 2012), concerned an appraisal of stock values and did
    not apply a terminal value to a brand new technological device.

28

United States District Court
Northern District of California

1    In sum, the Court finds that equitable considerations counsel in favor of awarding

2    AngioScore a remedy in the form of its past and future lost profits.  Such a remedy repairs and

3    deters without being punitive.

4        **C.  Corporate defendants are liable for damages AngioScore has sustained.**

5        As aiders and abettors of Konstantino's breach of fiduciary duty, defendants are jointly and

6    severally liable.  *See Casey*, 127 Cal. App. 4th at 1144; *Neilson*, 290 F. Supp. 2d at 1133 (noting

7    that California courts cite Restatement (Second) of Torts section 876 to hold that "liability may

8    properly be imposed on one who knows that another's conduct constitutes a breach of duty and

9    substantially assists or encourages the breach.") (citations omitted); *see also Gotham Partners*,

10   817 A.2d at 160.  Based upon the detailed discussion above, this liability should extend to the

11   corporate defendants.  *See Bancroft-Whitney*, 64 Cal.2d at 352 (finding that where defendant

12   aiders and abettors were "aware of or ratified a director's breach of his fiduciary duties in all but a

13   few respects, . . . cooperated with [the director] in the breach, and . . .  received the benefits of [the

14   director's] infidelity . . . . [they] must be held liable for their part in the director's breach of his

15   fiduciary duties.  They encouraged the sowing and reaped the benefit. They cannot now disclaim

16   the burden.").

17                              CONCLUSION

18       In summary, the Court finds that Konstantino not only breached his fiduciary duties, he

19   actively hid his transgressions to avoid detection.  As a result, he exploited the Chocolate

20   opportunity for his own gain rather than providing the opportunity to AngioScore, as he was duty

21   bound to do.  While such a duty would not have existed had he resigned before Chocolate became

22   an opportunity, Konstantino's breach resulted in measurable harm to AngioScore.

23       A director's duty to the corporation he serves cannot be ignored under the mantra of

24   innovation.  Should a director walk that path, the innovation must be offered, the conduct

25   transparent, and the fidelity to one's duty paramount.  While conflicts between the desire to

26   innovate and the obligations of board membership may arise, a director always has the option to

27   resign.  Here, Konstantino did neither, and thus, a remedy must be awarded to address the breach.

28   The Court further finds that Quattro and TriReme aided and abetted the breach of fiduciary duty,

United States District Court
Northern District of California

and that QT Vascular is liable for the acts of Quattro and TriReme.

Accordingly, the Court **ORDERS** the following measures of damages:

1. Konstantino shall disgorge the benefits he obtained by way of his breach; and

2. Defendants are liable for AngioScore's past and future lost profits, totaling $2.97 million and $17.064 million, respectively, for a total of $20.034 million.

No later than **July 13, 2015**, the parties shall submit a joint statement including language for a form of judgment, approved as to form, to be issued upon conclusion of the patent trial.

**IT IS SO ORDERED.**

Dated: July 1, 2015

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**FINDINGS OF FACT**

| Findings of Fact | Supporting Evidence |
|---|---|
| **1.** Konstantino and Feld began development of Chocolate while Konstantino served on AngioScore's Board. Konstantino and Feld jointly conceived of the idea for Chocolate no later than the Fall of 2009. | Trial Tr. at 846:20-847:13, 850:3-25 (Feld direct), 1290:25-1293:6 (Konstantino 4/21/2015 direct); DX 1609. |
| **2.** Konstantino was a member of AngioScore's Board of Directors from March 2003 until February 5, 2010. | Trial Tr. at 133:7-11, 1275:21-23, 1288:25-1289:3. |
| **3.** Konstantino knew he owed fiduciary duties to AngioScore as a member of its Board of Directors. | Trial Tr. at 133:7-11; PX 101 (letter of February 10, 2009, confirming matters relating to Konstantino's transition from employee and board member, to solely board member; noting that as such, he remained subject to fiduciary duties to the Company.) |
| **4.** Konstantino and non-party Feld jointly conceived of the idea for Chocolate during a telephone call. While serving on AngioScore's Board, Konstantino conceived of an idea for an angioplasty balloon that had pillow and groove formations when inflated, and had a telephone call with Feld. The two men then "brainstormed" together. Konstantino conceived of the notion of a balloon with pillows and grooves; Feld suggested this could be achieved with a nitinol cage. This was the balloon catheter that later became known as Chocolate. | Trial Tr. at 1290:25-1291:21 (Konstantino 4/21/2015 direct stating that Feld was the first to suggest a nitinol cage to achieve pillows and grooves); 1292:22-1293:6; Trial Tr. at 846:20-847:13 (Feld direct, explaining that Konstantino and Feld were "brainstorming" and Feld was talking about using a frame or cage for what would eventually become Chocolate; later clarifying that he later thought that "it might be a good idea and that I should spend some time trying to create a model for this"); DX 1609; PX 109 at 0004. |

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| **5.** While the precise extent of development of Chocolate as of February 5, 2010 is not certain, it was developed sufficiently to constitute a corporate opportunity as of that date. | Trial Tr. at 139:20-141:21 (Konstantino direct, "In 2009, and before I left the AngioScore board, I had an idea, one of three or four other ideas that I had at the same time. Around mid-January 2010, I made a decision to pursue this idea, and that's pretty much it."); 328:6-15 (Haig direct, noting that as of February 3, 2010, Chocolate was sufficiently developed such that it could be presented as part of the "scope of products that TriReme was working on"); *see also* PX 80. |
| **6.** In October 2009, TriReme's Board was notified of the Chocolate opportunity. | Trial Tr. at 1096:19-1097:11 (Pizarro cross-exam).  *See also* Trial Tr. at 1291:22-1292:3 (Konstantino 4/21/2015 direct) (Konstantino stated that he met with "maybe 20 to 30" different investors in the second half of 2009). |
| **7.** On October 12, 2009, while serving on AngioScore's Board, Konstantino drafted and applied for a provisional patent application on the Chocolate technology, naming himself and Feld as co-inventors. | Trial Tr. at 200:15-201:10; PX 63; PX 64 (October 2009 patent application listing Feld as co-inventor). |
| **8.** While Konstantino was serving on AngioScore's Board, Feld and TriReme employees assisted with the Chocolate design, prepared engineering drawings on TriReme templates, built prototypes, and performed bench tests. | Trial Tr. at 152:5-153:4, 153:11-154:21, 155:3-156:25, 850:18-851:18, 863:17-864:3, 881:5-24, 1070:17-1073:1, 1078:11-1079:8; PX 65; PX 67; PX 72; PX 74; PX 87; PX 89; PX 90; PX 91; PX 92; PX 93; PX 109 at 0004; PX 618; PX 619; PX 620; Delos Santos Dep. at 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |
| **9.** While Konstantino was serving on AngioScore's Board, a TriReme employee showed Chocolate to physicians. | PX 76 (January 2010 email between Ong, Pizarro, Haig re physician feedback; confirming Chocolate was shown to at least one physician); Trial Tr. at 364:13-365:15 (Haig direct). |

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Findings of Fact | Supporting Evidence |
|---|---|
| **10.** While Konstantino was serving on AngioScore's Board, he and seven other TriReme employees attended animal testing on Chocolate at Stanford sponsored by Quattro, then known as Proteus, in January 2010. | PX 11 (Report from Stanford study); PX 18 (recording attendees from TriReme at test); Trial Tr. at 172:13-173:6, 248:11-23. |
| **11.** While serving on AngioScore's Board, Konstantino sought to raise funds from third-party investors and the Singapore Economic Development Board in connection with Chocolate, with assistance from several TriReme employees. | Trial Tr. at 239:8-240:24, 243:19-244:3, 1292:1-3 (Konstantino direct); PX 2 (December 2009 email between Cheng and Ong re Proteus's Chocolate device, attaching powerpoint presentation for Singapore Economic Development Board); PX 3 (January 2010 engagement letter between Proteus and Maida Vale Associates signed by Konstantino referring to financial advisor arrangement for Proteus); PX 85 (December 2009 email between Konstantino, Ong, and Foo (Maida Vale) re Proteus's executive summary on Chocolate, requesting Foo sign a nondisclosure agreement); Ong Dep. at 16:3-9, 16:11-19, 16:23-17:8, 17:11, 21:4-10, 22:21-23:2, 29:22-30:17, 127:19-22, 128:4-10. |
| **12.** During the second half of 2009, Konstantino offered 20 to 30 investors the opportunity to invest in Chocolate. | Trial Tr. at 1292:1-3 (Konstantino direct); *see also* Trial Tr. at 878:15-21, 879:1-9 (Feld examination by Court, stating that Konstantino met with "dozens of investors" in the 2009 time frame). |
| **13.** In presentations seeking to raise funds for Chocolate, Konstantino described Chocolate as an "Investment Opportunity." | PX 2 at 0013 (December 2009 email between Cheng and Ong re Proteus's Chocolate device, attaching powerpoint presentation for Singapore Economic Development Board); PX 85 at 0014 December 2009 email between Konstantino, Ong, and Foo (Maida Vale) re Proteus's executive summary on Chocolate, requesting Foo sign a nondisclosure agreement). |

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| **14.** In a November 2009 presentation seeking funding from the Singapore Economic Development Board, Konstantino stated that the Chocolate "IP, Concept design, Prototypes, business model, Team, [and] partnerships" were all "completed." | PX 2 at 0010 (November 2009 presentation); Trial Tr. at 239:8-240:24; *see also* PX 85 at 0011 (email to Kah Foo transmitting November 2009 presentation); Trial Tr. at 162:12-19 (Konstantino direct). |
| **15.** In December 2009 correspondence with Dr. Kah Foo, with whom Konstantino was working to get financing for Chocolate, Konstantino represented that the "initial [Chocolate] design already works well and attracts a lot of attention." | PX 73 at 0001 (December 2009 email between Konstantino, Foo, and Ong); Trial Tr. at 160:23-25, 1319:17-1320:2 (Konstantino). |
| **16.** In January 2010, Konstantino sent Dr. Kah Foo, with whom Konstantino was working to get financing for Chocolate, a memorandum stating that the "Proof-of-Concept of the [Chocolate] design has been completed." | PX 124 at 0003 (January 2010 email wherein Konstantino transmits "Proteus Information memorandum" reflecting status of Chocolate development to that point); Trial Tr. at 144:9-13, 160:23-25. |
| **17.** Other presentations dated before Konstantino left AngioScore's Board stated that the Chocolate "product design" was "completed." | PX 585 at 0015 (October 2009 powerpoint re status of Chocolate, reflecting that "Front-end R&D: product design completed"); *see also* PX 78 at 0014 (February 2010 presentation re Chocolate). |
| **18.** The first Chocolate 510(k) was submitted on April 8, 2011. | PX 197 (510K notificaton for Chocolate PTA Balloon catheter); PX 201; Trial Tr. at 1009:14-1010:5. |

United States District Court
Northern District of California

| **Findings of Fact** | **Supporting Evidence** |
|---|---|
| **19.** The two kinds of testing on which the first Chocolate 510(k) relied to get FDA clearance—mechanical bench testing and pre-clinical animal testing—used samples of Chocolate products with constraining structure designs created before Konstantino left AngioScore's Board. | PX 11 at 0004; PX 197 at 0003, 0011 (510K notificaton for Chocolate PTA Balloon catheter); PX 599 at 0004 (Stanford report RPTA013-2, June 18, 2010, noting device used was RD 18.20); PX 618; PX 619; PX 620; Trial Tr. at 870:17-871:13, 1009:14-1011:7, 1089:20-1091:6, 1331:11-1332:22. |
| **20.** The mechanical bench testing submitted to the FDA with the first Chocolate 510(k) used samples of design version RD_20, which was drawn on January 13, 2010. | PX 197 at 0003 (510K notificaton for Chocolate PTA Balloon catheter); PX 618; PX 619; PX 620; Trial Tr. at 870:17-871:13, 1089:20-1091:6. |
| **21.** The pre-clinical animal testing submitted to the FDA with the first Chocolate 510(k) was performed on samples of design version RD_18.20, the same version used in the January 2010 animal testing. | PX 11 at 0004 (Stanford report reflecting RPTQ013-1); PX 197 at 0011 (510K notificaton for Chocolate PTA Balloon catheter noting in vivo study RPTQ-013-2); PX 599 at 0004 (Stanford report reflecting RPTA013-2, testing on RD 18.20); Trial Tr. at 1331:11-1332:22. |
| **22.** Chocolate was a sufficiently concrete concept in October 2009 for Konstantino to so describe and define in an application to the U.S. Patent and Trademark Office. | Trial Tr. at 200:15-201:10; PX 63 (October 2009 email confirming filing of patent application); PX 64 (October 2009 patent application). |
| **23.** Konstantino's filing of a provisional patent application for Chocolate evidences that Chocolate was a sufficiently concrete opportunity at that time such that an entity or individual could acquire rights. | Trial Tr. at 200:15-201:10, 201:21-23; 202:6-20 (Konstantino discussing his filing of patent applications for Chocolate); PX 64 (October 2009 patent application); PX 422; PX 427 (patent documents; applications). |

United States District Court
Northern District of California

| **Findings of Fact** | **Supporting Evidence** |
|---|---|
| **24.** Konstantino's filing of a provisional patent application was specifically identified in his presentations to investors. | PX 2 at 0007, 0013 (December 2009 email between Cheng and Ong re Proteus's Chocolate device, attaching powerpoint presentation for Singapore Economic Development Board); PX 85 at 0008, 0014; PX 124 at 0003; Trial Tr. at 144:15-145:6, 242:12-17. |
| **25.** Since its founding in 2003, AngioScore has designed, manufactured, and sold specialty angioplasty balloon catheters under the brand name AngioSculpt. | Trial Tr. at 68:12-22. |
| **26.** Konstantino was the principal inventor of AngioSculpt and filed a patent application that described a drug-coated angioplasty balloon before AngioScore was founded and incorporated. | Trial Tr. at 841:1-22 (Feld direct), 1276:15-1277:12, 1277:19-1278:4 (Konstantino 4/21/2015 Direct); DX 1371; DX 1652 at 5; DX 2015 (Konstantino's resume). |
| **27.** AngioSculpt and Chocolate are both specialty angioplasty balloon catheters. | Trial Tr. at 159:7-16, 180:6-8, 325:18-326:10, 326:20-22, 408:23-409:12, 526:12-19, 577:25-578:3, 924:5-17. |
| **28.** AngioSculpt and Chocolate both have a nitinol structure surrounding a nylon semi-compliant balloon. | Trial Tr. at 180:22-25, 410:5-21, 411:5-18, 579:13-21; PX 195 at 0002; PX 197 at 0005; PX 501. |
| **29.** No other specialty balloons on the market use nitinol cage on a semi-compliant balloon – the Boston Scientific Cutting Balloon uses surgical steel and the Vascutrak uses stainless steel guide wires. | Trial Tr. at 896: 16-23 (Garcia); 410:12-21 (Viano); Trial Tr. at 411:5-18 (Viano). |
| **30.** AngioSculpt and Chocolate are both used for the treatment of peripheral and coronary artery disease by opening occluded blood vessels | Trial Tr. at 181:1-10, 579:13-21; PX 189; PX 195; PX 201; PX 211. |

69

| Findings of Fact | Supporting Evidence |
|---|---|
| without leaving metal behind. | |
| **31.** AngioSculpt and Chocolate have both been cleared by the FDA with overlapping indications for use. | Trial Tr. at 420:12-20, 1015:12-16, 1016:8-11; PX 195; PX 201. |
| **32.** There are no indications for which the peripheral Chocolate device is cleared that the peripheral AngioScore device is not. | Trial Tr. at 1016:8-11; *see also* PX 195; PX 201. |
| **33.** AngioSculpt and Chocolate are sold to the same customers. | Trial Tr. at 181:11-20, 749:15-751:20; PX 152; PX 164. |
| **34.** AngioSculpt and Chocolate make overlapping marketing claims. | Trial Tr. at 422:11-428:5; PX 501; PX 531; PX 533. |
| **35.** AngioSculpt and Chocolate are both sold at premium pricing over plain old balloon angioplasty ("POBA") products. | Trial Tr. at 158:22-23, 159:2-3, 411:19-412:11, 746:8-749:2; PX 294 at 0219; PX 137 at 0014. |
| **36.** AngioSculpt and Chocolate have approximately the same list price. | Trial Tr. at 336:16-340:7; PX 135 (December 2011 email from Dreaden to other TriReme employees regarding Chocolate pricing, attaching tables confirming that at each available size, Chocolate is exactly $25 less per unit than AngioSculpt); PX 137 at 0014. |
| **37.** While Chocolate is a specialty balloon catheter, it is not a "scoring device." Testing of Chocolate however confirms that the device bears into or impresses upon plaque before the balloon inflates to the point of protrusion beyond the nitinol cage. | Trial Tr. at 538:9-539:9; PX 452 (photograph of molding clay). Based on its classification of the Chocolate PTCA balloon as a Class II device, the FDA does not consider Chocolate to be a scoring balloon. Trial Tr. at 995:2-14, 1002:14-20, 1003:7-13 (Kuehn direct). |

| Findings of Fact | Supporting Evidence |
|---|---|
| **38.** To determine whether Chocolate scores, Jeffrey Bleam, an AngioScore engineer with over 20 years of experience in the medical device industry, performed an experiment in which he inflated the Chocolate device within a cylinder of modeling clay.  Chocolate's nitinol struts left impressions in the modeling clay. | Trial Tr. at 538:9-539:9, 525:9-526:11; PX 452; PX 610. |
| **39.** There is no evidence of record that rebuts the findings from Bleam's test, nor any reason that the impressions in the modeling clay observed by Mr. Bleam were not reflective of how Chocolate would perform in a vessel. | *See* DX 1985; DX 1986 (noting diameter at various levels of pressure); Trial Tr. at 378:15-381:14-60, 382:5-22 (Haig testifying that Chocolate is not a scoring device). |
| **40.** A 2010 TriReme document states that Chocolate has a "[d]ual mechanism of action" whereby the first stage involves "[p]laque disruption by initial metal to plaque contact." At the second stage, when inflated, the balloon protrudes past the cage. | PX 78 at 0010; Trial Tr. at 1083:21-24, 1084:3-1085:18. |
| **41.** Defendants' FDA submissions state that Chocolate's nitinol constraining structure "provides for focal force transmission up to nominal pressure and multiple balloon pillows expanding beyond the CS at high pressure.  Pillow dilatation is regional, providing for strain relief within the vascular wall and a gentle expansion mechanism." | PX 599 at 0003; Trial Tr. at 1331:11-13. |

| Findings of Fact | Supporting Evidence |
|---|---|
| **42.** Defendants' FDA submissions state that "the inflation of the Chocolate Balloon closely resembles the commercially available VascuTrak balloon with the potential for increased focal force at low pressure." | PX 207 at 0004; Trial Tr. at 1087:2-1088:5. |
| **43.** Even if Chocolate did not score, AngioScore would still have been interested in the opportunity. | Trial Tr. at 91:22-92:6, 490:17-22, 540:9-14, 579:13-581:2; *see also* Trial Tr. at 208:24-209:7, 1295:19-1296:7; PX 2 at 0012; PX 78 at 0018; PX 85 at 0013. |
| **44.** Konstantino's actions demonstrate that he thought that AngioScore would have been interested in participating in the Chocolate opportunity. | Trial Tr. at 207:22-25, 208:24-209:7, 1295:19-1296:7. |
| **45.** Konstantino repeatedly referred to AngioScore as a potential partner in the Chocolate opportunity in presentations in 2009 and 2010. | PX 2 at 0012 (December 2009 email between Cheng and Ong re Proteus's Chocolate device, attaching powerpoint presentation for Singapore Economic Development Board); PX 78 at 0018; PX 85 at 0013; Trial Tr. at 207:22-25, 208:24-209:7. |
| **46.** On February 3, 2010, Konstantino approached Tom Trotter with the intent to present Chocolate as an investment opportunity because he thought AngioScore would be "interested in investing" in it. | Trial Tr. at 1295:19-1296:7; *see also* Trial Tr. at 207:22-25, 208:24-209:7. |
| **47.** In December 2009, Konstantino pitched Tom Trotter about AngioScore distributing the Glider product. | Trial Tr. at 136:4-138:6, 571:25-572:14; PX 423 at 0002. |
| **48.** Glider is a POBA, not a specialty balloon. | Trial Tr. at 138:7-21, 158:15-20, 571:25-572:14, 573:3-4; PX 423 at 0002. |

| | Findings of Fact | Supporting Evidence |
|---|---|---|
| **49.** | AngioSculpt is more similar to Chocolate than it is to Glider. | Trial Tr. at 138:13-21, 158:15-159:16, 325:18-326:10, 326:20-22, 408:23-409:12, 526:12-19, 571:25-572:14, 573:3-4, 577:25-578:3, 924:5-17. |
| **50.** | Distributors of medical devices sometimes also invest in the company manufacturing the device. | Trial Tr. at 247:2-10. |
| **51.** | AngioScore could have found Chocolate's nitinol cage design useful in the 2009 to 2010 timeframe to address the challenge it faced in designing devices longer than 100mm. | Trial Tr. at 87:23-88:10, 91:1-16, 530:5-16 (Bleam direct), 532:7-536:5 (describing process of adding cross-struts to the AngioSculpt device to ensure even inflation, difficulties with 100mm length balloon)s, 539:15-25 (Bleam direct, explaining that Chocolate's radial struts could have assisted AngioScore's development of a 100mm device), 540:22-541:1 (Bleam direct, stating that he would have considered Chocolate for development despite its not being a "scoring balloon," describing modeling clay experiment, stating that it is "definitely a possibility" that AngioScore could have released a more ideal 100mm balloon sooner had it been aware of Chocolate), 541:12-20 (Bleam direct, stating that had someone shown him the Chocolate design while he was working on developing the 100mm AngioSculpt, that could have affected the money AngioScore spent developing these balloons), 564:1-23 (Trotter direct, discussing July 2009 board meeting presentation referring to AngioScore's difficulty with developing extra long catheters), 579:22-581:2 (Trotter direct, discussing same, stating that Chocolate opportunity could have saved AngioScore cost and development money for its longer length balloons). |

United States District Court
Northern District of California

73

| **Findings of Fact** | **Supporting Evidence** |
|---|---|
| **52.** While Konstantino served on AngioScore's Board, drawings and prototypes of 100mm Chocolate devices existed. | PX 67 (November 2009 email between Feld and Delos Santos discussing performance of Chocolate prototypes, including a 100mm device); PX 89; PX 620; Trial Tr. at 871:10-13, 1070:17-1071:25, 1090:23-1091:6; Delos Santos Dep. at 76:23-77:7, 77:12-18, 77:21-25, 78:1. |
| **53.** The first Chocolate 510(k) submission sought FDA clearance for devices as long as 120mm. | PX 197 at 0002; Trial Tr. at 1012:4-25. |
| **54.** After the initial generation of its longer length product experienced design challenges, AngioScore introduced a new version of its 100mm AngioSculpt in 2013 with improvements. | Trial Tr. at 532:7-533:8, 534:1-535:24; PX 596; PX 622; DX 1706 at 20. |
| **55.** While Konstantino was on AngioScore's board, AngioScore was having difficulty designing a 100mm AngioSculpt, and Konstantino knew of the same. | Trial Tr. at 87:23-88:10, 91:1-16, 530:5-16; 532:7-536:5, 564:1-23, 579:22-581:2; PX 220 (July 2009 board meeting presentation discussing business challenges). |
| **56.** The Chocolate device possibly could have assisted in AngioScore's work to address the design problems associated with the 100mm AngioSculpt. | Trial Tr. at 91:1-16, 539:15-25, 540:22-541:1, 541:12-20, 579:22-581:2. |
| **57.** The Chocolate opportunity could have aided AngioScore's effort in developing longer-length specialty balloons. | Trial Tr. at 87:23-88:10, 91:1-16 (Andrews direct discussing difficulty designing 100mm AngioSculpt), 530:5-16 (Bleam direct re same), 532:7-536:5 ("the challenge for this particular device . . . [was ensuring] even deployment of the struts around the balloon" . . . "we added cross-links to the metal that goes over the balloon" to "help[] with even deployment"), 539:15-25 (testifying that knowledge of the Chocolate design could |

74

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| | have been of assistance in developing the 100mm device), 540:22-541:1, 541:12-20, 564:1-23, 579:22-581:2, 871:10-13, 1012:4-25, 1070:17-1071:25, 1090:23-1091:6; PX 67; PX 89; PX 197; PX 620. |
| **58.** AngioScore could have been interested in Chocolate in the 2009 to 2010 timeframe insofar as it presented long-term potential as a drug-eluting specialty balloon. | Trial Tr. at 490:5-16 (Raffin direct), 579:22-581:2, 697:7-698:2; PX 217 (February 2009 email between board members discussing effort to attain drug coated balloon technology; PX 220 (July 2009 board presentation outlining future business strategy including "extra long" devices of 100mm and drug coated device). |
| **59.** While Konstantino was on AngioScore's Board, AngioScore was working on developing drug-eluting specialty balloon technology. | Trial Tr. at 87:23-88:10, 164:14-165:17, 166:9-15, 214:15-215:6, 566:6-568:13, 579:22-581:2; PX 226; PX 246 (AngioScore February 2010 Board Meeting presentation, giving overview of then-existing cash balance, notably above budget (p.6), research and development items, including drug-coated devices (p.13)); DX 1199. |
| **60.** Konstantino did not disclose Chocolate or its potential as a drug-eluting specialty balloon to AngioScore.  Instead, in a letter to AngioScore's counsel dated February 23, 2010, he denied involvement in "any development work . . . of angioplasty balloon technology . . . that involves specialized features [. . .]." | PX 420 at 0004. |

75

| Findings of Fact | Supporting Evidence |
|---|---|
| **61.** While serving on AngioScore's Board, Konstantino was promoting Chocolate as an "ideal platform for drug delivery" in his efforts to obtain financing for his undisclosed project. | Trial Tr. at 160:20-162:4; PX 85 (November 2009 Proteus presentation) at 0008; *see also* PX 2 at 0007 (December 2009 email between Cheng and Ong re Proteus's Chocolate device, attaching powerpoint presentation for Singapore Economic Development Board). |
| **62.** Given the limited specialty balloon catheter market, AngioScore would not have simply done nothing had Chocolate been presented. During the relevant time period, there were only two general types of balloon catheters in the specialty balloon market – those that scored or cut, as in the case of the Boston Scientific Cutting Balloon and the AngioSculpt, and Vascutrak, which had stainless steel guide wires. Chocolate presented a paradigm-shifting design: a cage designed to create pillows and grooves in such a way as to create focal force on the balloon surface as it pushes through the openings in the cage. As a young company, revenue growth was a primary concern for AngioScore. It would have, at a minimum, issued an offer to acquire rights to the technology. | Trial Tr. at 488:17-22; 489:15-490:4 (Raffin direct; 408:18-410:21 (Viano); 438:19-439:21. |

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| **63.** AngioScore's earlier rejection of an offer of a new scoring balloon does not establish that it had no interest or expectancy in Chocolate.  The opportunity then presented related to another concrete product.  AngioScore was permitted to evaluate the design features.  In light of this concrete opportunity, Trotter explained AngioScore declined to pursue the proposed technology because "there was nothing particularly impressive about it."  He further added that he "didn't see that there was any innovation there that would be valuable to AngioScore."  The fact that Chocolate represented a new concept – focal force through the creation of balloon pillows, rather than scoring – sets it apart from the opportunity AngioScore contemplated and rejected. | *See* DX 1099; Trial Tr. 627:25-628:1 (Trotter direct); 628:1-2. |
| **64.** Personality conflict issues would not have prevented AngioScore from being interested in the Chocolate, nor would AngioScore have declined to exploit the Chocolate opportunity.  On the whole, Konstantino was well-regarded by members of the board. | FF *supra* 51-61; PX 234 (August 2009 email in which Trotter emailed Ivan Pirzada in an attempt to get Konstantino funding); PX 241 (In December 2009, Trotter sent Konstantino a tip on potential funders for TriReme); Trial Tr. at 483:14-484-1 (Raffin); 692:16-21 (Suennen). |
| **65.** As a member of AngioScore's Board, Konstantino had long-standing exposure to, and access to, AngioScore's confidential information.  Certain of this information was forwarded to others involved in the development of Chocolate. | PX 246 (February 2010 board meeting presentation); PX 444; PX 445; Trial Tr. at 174:7-15, 175:2-19, 176:4-11, 177:3-24, 213:7-15, 214:15-215:6. |

United States District Court
Northern District of California

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| **66.** Konstantino used information obtained by virtue of his role on AngioScore's board when developing Chocolate. | PX 246 (AngioScore February 2010 Board Meeting presentation, giving overview of then-existing cash balance, notably above budget (p.6), research and development items, including drug-coated devices (p.13)); PX 444 (October 2009 email from Konstantino forwarding China Market information sent to AngioScore board); PX 445 (November 2009 email from Konstantino to Dreher forwarding Trotter's analysis of the VascuTrak device); Trial Tr. at 174:7-15, 175:2-19, 176:4-11, 177:3-24, 213:7-15, 214:15-215:6. That Konstantino and Feld jointly developed Chocolate does not undermine the fact that by virtue of his seat on AngioScore' board, Konstantino had access to information on the angioplasty balloon market, AngioScore's competitive standing in that market, and utilized such information in his pursuit of Chocolate. |
| **67.** Konstantino attended AngioScore's February 2010 Board meeting. | Trial Tr. at 138:22-139:4, 213:7-15. |
| **68.** At the same time Konstantino attended AngioScore's February 2010 Board meeting, TriReme's Vice President of Marketing & Business Development, Christopher Haig, traveled to Germany to meet with a drug coating technology company about Chocolate. | PX 222 (Feb. 5, 2010 email between Konstantino and Haig re meetings to discuss Chocolate); PX 223 (Feb. 9, 2010 emails re same); Trial Tr. at 163:5-164:2, 164:8-16, 331:3-333:6 (Konstantino direct discussing Haig's visit to Germany in February 2010). |
| **69.** AngioScore never disavowed an interest in Chocolate. | FF *infra* 70-85. |

| Findings of Fact | Supporting Evidence |
|---|---|
| **70.** The survey of AngioScore Board members and management by Sarah Lugaric was directed to an abstract and hypothetical opportunity—*i.e.*, the acquisition of "another company technology or product line." | PX 214 at 0002 (Lugaric survey responses summary); Trial Tr. at 578:4-15, 696:7-13. |
| **71.** The Lugaric survey did not present either the specific Chocolate opportunity or a product resembling the Chocolate opportunity—*i.e.*, a specialty balloon with a nitinol structure surrounding the balloon that would leverage AngioScore's existing sales force and that had been developed by AngioScore's co-founder and co-creator of the AngioSculpt technology. | PX 214 at 0002 (Lugaric survey responses summary); Trial Tr. at 68:14-16, 91:17-21, 131:6-21, 136:8-137:22, 159:7-16, 180:22-25, 181:11-20, 325:18-326:10, 326:20-22, 408:23-409:12, 410:5-21, 526:12-19, 577:25-578:3, 579:13-21; 924:5-17, 1276:15-17. |
| **72.** Several participants in the Lugaric survey testified that they interpreted the question about "acquiring another company, technology or product line" as referring to products outside of AngioScore's core business of specialty balloons. | Trial Tr. at 129:15-25, 578:16-579:21. |
| **73.** A majority of the Board members surveyed by Lugaric were receptive to the possibility of "acquiring another company, technology or product line." | PX 214 at 0002 (Lugaric survey responses summary). |
| **74.** Thomas Raffin responded to the Lugaric survey that he "[w]ould consider" "acquiring another company, technology or product line" and noted that this would "not [be] easy." Dr. Raffin would have considered Chocolate as such a possibility if it had been presented. | PX 214 at 0002 (Lugaric survey responses summary); Trial Tr. at 488:7-22, 489:15-490:22. |

| Findings of Fact | Supporting Evidence |
|---|---|
| **75.** Lisa Suennen responded to the Lugaric survey that she would have been "[p]otentially" interested in "acquiring another company, technology or product line," if that acquisition "is accretive or adds some significant strategic value."  Ms. Suennen was open to having AngioScore incorporate new technology into its product lineup and would have considered pursuing Chocolate had that opportunity been presented. | PX 214 at 0002 (Lugaric survey responses summary); Trial Tr. at 696:24-698:2. |
| **76.** Jeanette Welsh responded to the Lugaric survey that she would have been interested in "acquiring another company, technology or product line" "only if the acquisition leverages the very expensive Sales force AngioScore has." | PX 214 at 0002 (Lugaric survey responses summary); Trial Tr. at 131:6-21, 181:11-20. |
| **77.** Konstantino responded to the Lugaric survey that he would support "acquiring another company, technology or product line" "to leverage sales force," and that AngioScore "[c]an identify complementary or adjacent vascular technology" "[p]referably for the peripheral market" and "should be looking for product with premium pricing for distribution and[/]or acquisition." | PX 214 at 0002 (Lugaric survey responses summary). |

| Findings of Fact | Supporting Evidence |
|---|---|
| **78.** Although Tom Trotter responded to the Lugaric survey by stating that he did not think "acquiring another company, technology or product line" was necessary to get AngioScore where it needed to go, he interpreted the question as referring to products outside the area of the balloon angioplasty and would have been interested in Chocolate had it been offered. | PX 214 at 0002 (Lugaric survey responses summary); Trial Tr. at 578:4-581:2. |
| **79.** AngioScore's Board—not its management—would have made the ultimate decision whether to accept or reject the Chocolate opportunity had it been offered. | Trial Tr. at 488:23-489:13. |
| **80.** AngioScore did not consent to Konstantino's pursuit of the Chocolate opportunity, nor did it waive any interest or expectancy in that opportunity. | FF *infra* 81-85. |
| **81.** Konstantino never disclosed Chocolate to AngioScore while serving on AngioScore's Board. | Trial Tr. at 71:25-72:18, 138:7-12, 138:22-139:19, 212:25-213:15, 271:14-272:4, 272:18-19, 280:1-25, 282:6-283:24, 486:2-487:10, 523:12-16, 571:25-573:4, 580:15-17, 633:7-14, 634:5-7, 693:6-11; PX 107 at 0001, 0003; PX 420 at 0004 (February 23, 2010 letter from Konstantino through counsel); PX 423 at 0006. |

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

| **Findings of Fact** | **Supporting Evidence** |
|---|---|
| **82.** AngioScore's Board took Konstantino's request to pursue "endovascular bifurcation stents and delivery systems for bifurcation stents" with TriReme very seriously and adopted a formal resolution that granted Konstantino permission to pursue this limited business opportunity and waived AngioScore's rights solely in that particular opportunity. | PX 98; Trial Tr. at 264:6-22. |
| **83.** AngioScore's original Board resolution dated July 26, 2005 only allowed Konstantino to provide advisory services to TriReme and specified that such services would be without compensation. | PX 98 at 0001. |
| **84.** AngioScore later gave Konstantino permission to pursue additional roles at TriReme but never waived its interest in anything other than bifurcation stents. | DX 1014; Trial Tr. at 561:24-562:4, 689:4-690:13, 721:13-722:2, 864:4-8. |
| **85.** Chocolate is not a bifurcation stent. | Trial Tr. at 1322:2-3, 1322:8-9, 1322:14-16. |
| **86.** Konstantino did not offer testimony that contradicted Lisa Suennen's testimony that he told her TriReme would not compete with AngioScore. | Trial Tr. at 689:4-690:13. |
| **87.** Konstantino's claim that he did not believe he needed AngioScore's consent to develop Chocolate is not credible. | PX 101 (letter of February 10, 2009, confirming matters relating to Konstantino's transition from employee and board member, to solely board member; noting that as such, he remained subject to fiduciary duties to the Company.) |

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| **88.** On February 10, 2009, Konstantino signed a letter confirming that "[a]s a member of the Company's Board of Directors," he was "of course also . . . subject to fiduciary duties to the Company under applicable law, like all directors." | PX 101 (letter of February 10, 2009, confirming matters relating to Konstantino's transition from employee and board member, to solely board member; noting that as such, he remained subject to fiduciary duties to the Company). |
| **89.** Immediately before his resignation from AngioScore's Board, Konstantino told AngioScore that "precisely" because he was "keenly aware of [his] obligations as a board member," he approached AngioScore supposedly "before any new project is started." | PX 107 at 0001. |
| **90.** In late 2006, Feridun Ozdil and Konstantino had an argument and their relationship soured.  Despite the conflict of interest, Konstantino remained respected by other members of the board. | Trial Tr. at 1280:14-17; 1281:17- (Konstantino); DX 1993; Trial Tr. at 483:14-484-1 (Raffin); 692:16-21 (Suennen). |
| **91.** AngioScore had the financial capacity to exploit the Chocolate opportunity. | DX 1199 (AngioScore's December 2009 Monthly Report noting $15.3 million cash on hand). |
| **92.** Konstantino told potential investors that it would cost between $1.5 million and $5 million to commercialize Chocolate. | PX 547; Trial Tr. at 209:17-211:21; PX 258; PX 78 at 0017. |
| **93.** Amir Belson, a TriReme Board Member, testified that that $3.5 million to $4 million would be sufficient to commercialize Chocolate and that he had "done things like this for less." | Belson Dep. at 238:12-16, 238:21-23, 239:04-10, 239:13-19; PX 78 at 0017. |

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| **94.** Bleam, AngioScore's Vice President of R&D, testified it would cost AngioScore $1 million to $2 million to develop a "specialty balloon with nitinol over the balloon," with potentially more money needed for more complex versions. | Trial Tr. at 542:23-543:4. |
| **95.** Given that AngioScore already had the infrastructure to produce a specialty angioplasty balloon using a nitinol exterior structure, the cost to exploit Chocolate would have been incremental. All the Chocolate's component parts were essentially the same as those of the AngioSculpt. | FF *supra* 27-28; *infra* 106. |
| **96.** As of the date of its sale to Spectranetics, AngioScore had spent approximately $100 million developing different varieties of the AngioSculpt. | Trial Tr. at 582:6-15; 593:21-594:14. |
| **97.** AngioScore had approximately $17 million cash on hand in October 2009, when Konstantino filed a provisional patent application on Chocolate. | Trial Tr. at 76:4-9; PX 63; PX 64 (October 2009 patent application). |
| **98.** AngioScore had in excess of $15 million cash on hand at the end of 2009, just over a month before Konstantino resigned from AngioScore's Board. | PX 621; Trial Tr. at 74:4-75:21; *see also* PX 246 at 0016; Trial Tr. at 213:4-215:6; DX 1199. |
| **99.** AngioScore could have exploited the Chocolate opportunity by borrowing the necessary funds. | PX 242 (December 2009 email from Trotter to AngioScore board detailing meeting with Oxford Financial and Oxford's willingness to lend up to $20 million); Trial Tr. at 76:13-79:16. |

| Findings of Fact | Supporting Evidence |
|---|---|
| **100.** In December 2009, Oxford Finance stated a willingness to lend AngioScore up to $20 million, and even more if necessary. | PX 242 (December 2009 email from Trotter to AngioScore board detailing meeting with Oxford Financial and Oxford's willingness to lend up to $20 million). |
| **101.** AngioScore borrowed $10 million from Oxford in late 2010, and an additional $5 million in 2011. | Trial Tr. at 79:4-16. |
| **102.** AngioScore could have exploited the Chocolate opportunity through equity financing. | Trial Tr. at 79:18-80:3 (Andrews Direct), 696:14-697:11 (Suennen Direct). |
| **103.** AngioScore successfully raised "about $111 million" through six different equity rounds, including in 2011. | Trial Tr. at 79:18-80:3. |
| **104.** Psilos, an AngioScore investor with a Board seat, and others invested more money in AngioScore in 2011. | Trial Tr. at 696:14-697:11 (Suennen direct); PX 320 at 0050-0051. |
| **105.** AngioScore could have redirected R&D money it spent to develop the 100mm AngioSculpt in order to exploit the Chocolate opportunity. | Trial Tr. at 91:1-16, 539:15-25, 540:22-541:1, 541:12-20, 579:22-581:2. |
| **106.** AngioScore would not have needed to incur many of the post-commercialization costs that defendants attribute to Chocolate. | PX 214 at 0002; Trial Tr. at 131:6-21, 136:8-137:22, 1170:21-1172:15, 1174:12-1176:17; PX 388. |
| **107.** Several AngioScore Board members, including Konstantino, specifically called out AngioScore's excess sales capacity in responding to the Sarah Lugaric survey. | PX 214 at 0002; *see also* Trial Tr. at 136:8-137:22. |

| Findings of Fact | Supporting Evidence |
|---|---|
| **108.** By taking the Chocolate opportunity for himself, Konstantino placed himself in a position inimical to his duties to AngioScore. | *See e.g.*, FF *infra* 110-162; 200-220. |
| **109.** By taking the Chocolate opportunity for himself, Konstantino did not act in good faith or in the best interest of AngioScore. By taking the Chocolate opportunity for himself, Konstantino placed his own financial interest above AngioScore's. Konstantino did not reasonably believe he was acting in the best interest of AngioScore or in a way that was not adverse to AngioScore. | *See e.g.*, FF *infra* 110-162; 200-220. |
| **110.** Konstantino viewed placing his own interests above AngioScore's interests as acceptable. | Trial Tr. at 133:23-134:1 ("'Q. Did you believe that you had a duty to place AngioScore's commercial interests above your own personal financial interests? A. No, I did not believe that.'"). |
| **111.** While sitting on AngioScore's Board of Directors, Konstantino knew that AngioScore "might be interested" in the Chocolate opportunity. | Trial Tr. at 91:1-16, 161:12-162:4, 164:14-165:17, 166:9-15, 208:24-209:7, 530:5-16, 564:17-565:5, 579:22-581:2, 1012:4-25, 1070:17-1071:25, 1295:19-1296:7; PX 2 (December 2009 email between Cheng and Ong re Proteus's Chocolate device, attaching powerpoint presentation for Singapore Economic Development Board identifying AngioScore as potential partner for Chocolate at p. 12); PX 69; PX 78 at 0018; PX 85; PX 89; PX 197; PX 226; PX 620. |
| **112.** Konstantino profited from taking the Chocolate opportunity for himself. | Trial Tr. 775:5-13; Brosh Dep. At 228:1-5, 14-17, 229:6-14; 235:4-5, 235:21-236:14; 254:25-255:12.; PX 383; PX 388. |

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| **113.** AngioScore was harmed by Konstantino's decision to develop Chocolate, because it competes in the same specialty balloon market. | Trial Tr. at 139:20-141:23, 149:13-152:17, 159:7-16, 185:1-186:3, 186:7-189:4, 325:21-24; PX 15 at 0005; PX 66; PX 107; PX 419; PX 420. |
| **114.** While sitting on AngioScore's Board of Directors, Konstantino intended that Chocolate would compete with AngioSculpt. | PX 124 at 0007; PX 125 at 0009; Trial Tr. at 185:1-186:3 (Konstantino admitting that a December 13, 2009 presentation described Chocolate as "[a] step up from scoring," which "refer[s] to AngioScore"); *id.* at 186:7-189:4 (Konstantino admitting that a November 2009 TriReme presentation made the identical claim regarding reducing dissections that AngioScore makes). |
| **115.** Konstantino claimed that Chocolate was a "step up from scoring" balloons, such as AngioSculpt. | Trial Tr. at 185:1-186:3; PX 15 at 0005. |
| **116.** TriReme's sales force directly compared Chocolate to the AngioSculpt. | Trial Tr. at 343:19-344:7. |
| **117.** TriReme's sales force named AngioSculpt as Chocolate's "closest competitor." | Trial Tr. at 343:19-344:7; PX 127; PX 132 at 0002; PX 143; PX 154. |

United States District Court
Northern District of California

| **Findings of Fact** | **Supporting Evidence** |
|---|---|
| **118.** TriReme used AngioSculpt to set the price of Chocolate, believing it would give Chocolate a competitive advantage. | Trial Tr. 335:9-336:15 (Haig admitting that TriReme targeted "AngioScore accounts" to "get a faster uptick on Chocolate" because these were accounts where "pricing had already been established for specialty balloons"); *id.* at 336:16-340:7 (TriReme setting Chocolate list price at launch in December 2011 to be exactly $25 below the price of AngioSculpt); *id.* at 348:10-349:4 (pricing Chocolate "competitive with other specialty catheters to drive rapid adoption," and listing AngioSculpt and two other balloons); PX 130; PX 135 (December 2011 email from Dreaden to other TriReme employees regarding Chocolate pricing, attaching tables confirming that at each available size, Chocolate is exactly $25 less per unit than AngioSculpt); PX 137 at 0014; PX 143. |
| **119.** Konstantino never disclosed Chocolate to AngioScore, including during his December 2009 conversation with Trotter regarding Glider. | Trial Tr. at 71:25-72:18, 138:7-12, 138:22-139:19, 212:25-213:15, 271:14-272:4, 272:18-19, 280:1-25, 282:6-283:24, 486:2-487:10, 523:12-16, 571:25-573:4, 633:7-14, 634:5-7, 693:9-11; PX 107 at 0001, 0003; PX 420 at 0004; PX 423 at 0006.<br>Trial Tr. at 136:4-7, 138:7-12, 580:15-17. |
| **120.** While sitting on AngioScore's Board of Directors, Konstantino concealed the Chocolate opportunity from AngioScore. | PX 107 at 0001, 0003; Trial Tr. at 71:25-72:18, 138:7-12, 138:22-139:19, 212:25-213:15, 271:14-272:4, 272:18-19, 486:2-487:10, 575:19-24, 580:15-17, 633:7-14, 634:5-7, 693:6-11. |
| **121.** While serving on AngioScore's Board, Konstantino did not seek funding from any current AngioScore Board member. | Trial Tr. at 212:25-213:3 (Konstantino). |

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| **122.** Two days before Konstantino resigned from AngioScore's Board, Konstantino sat through an entire AngioScore Board meeting without disclosing Chocolate to AngioScore. | Trial Tr. at 138:22-139:4, 213:7-15 (Trotter). |
| **123.** After the February 3, 2010 AngioScore Board meeting, Konstantino had a brief discussion with Tom Trotter and told him that he and TriReme were considering pursuing a specialty balloon, and Trotter asked Konstantino to leave. | Trial Tr. at 574:1-19, 602:17-25 (Trotter). |
| **124.** During Konstantino's brief discussion with Trotter on February 3, 2010, Konstantino did not disclose Chocolate or defendants' ongoing development work on a specialty balloon. | Trial Tr. at 138:22-139:19 (Konstantino). |
| **125.** On February 4, 2010, Trotter emailed Konstantino relaying the board's unanimous belief that he should resign. Konstantino emailed AngioScore's Board on February 4, 2010 stating that AngioScore was being "trigger happy" by asking him to resign from AngioScore's Board of Directors. | PX 107; PX 108 at 0002-0003. |
| **126.** Konstantino's February 4, 2010 email to AngioScore's Board stating that AngioScore was being "trigger happy" by asking him to resign from AngioScore's Board was incorrect because defendants began developing Chocolate in 2009. | Trial Tr. at 141:1-21 (Konstantino direct, explaining that "around mid-January 2010, I made a decision to pursue this idea"), 152:5-153:4 (same, "Q. . . . [P]rior to . . . your February 5 resignation, you were involved in development work relative to Chocolate?  A. Yes, I agree with you.", 153:11-154:21 (same, discussing TriReme employee involvement in Chocolate development); 155:3-156:25 (same, discussing Stanford porcine study), 172:13-173:6 (same), |

89

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| | 883:8-23 (Feld cross, discussing development in fall 2009), 1070:17-1073:1 (Pizarro cross, discussing models), 1078:11-1079:8 (same); PX 67; PX 72; PX 74; PX 87; PX 89; PX 90; PX 91; PX 92; PX 93; PX 108 at 0002-0003; Delos Santos Dep. at 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |
| **127.** Konstantino emailed AngioScore's Board on February 4, 2010 stating that "TriReme has not made any decision to make such a change and I was giving you very early heads up to something that may take place in the future, or may never happen." | PX 108 at 0002-0003. |
| **128.** Konstantino's February 4, 2010 email to AngioScore's Board stating "TriReme has not made any decision to make such a change and I was giving you very early heads up to something that may take place in the future, or may never happen" was incorrect because defendants began developing Chocolate in 2009. | Trial Tr. at 141:1-21, 152:5-153:4, 153:11-154:21; 155:3-156:25, 171:5-172:6, 172:13-173:6, 883:8-23, 1070:17-1073:1, 1078:11-1079:8; PX 67; PX 72; PX 74; PX 87; PX 89; PX 90; PX 91; PX 92; PX 93; PX 108 at 0002-0003; Delos Santos Dep. at 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |
| **129.** Konstantino spoke to John Sellers on February 4, 2010 and did not disclose Chocolate or that defendants were already developing a specialty balloon. | Trial Tr. at 145:8-14, 271:14-272:4, 272:18-19, 318:18-19; PX 108 at 0001. |
| **130.** Konstantino emailed AngioScore's Board on February 5, 2010 stating that he was "keenly aware of my obligations as a board member and this is precisely why I am coming to Angio[S]core at this juncture; before any new project is started." | PX 108 at 0001-0002. |

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Findings of Fact | Supporting Evidence |
|---|---|
| **131.** Konstantino's February 5, 2010 email to AngioScore's Board stating he was "keenly aware of my obligations as a board member and this is precisely why I am coming to Angio[S]core at this juncture; before any new project is started" was incorrect because defendants began developing Chocolate in 2009. | Trial Tr. at 141:1-21, 152:5-153:4, 153:11-154:21; 155:3-156:25, 171:5-172:6, 172:13-173:6, 883:8-23, 1070:17-1073:1, 1078:11-1079:8; PX 67; PX 72; PX 74; PX 87; PX 89; PX 90; PX 91; PX 92; PX 93; PX 108 at 0001-0002; Delos Santos Dep. at 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |
| **132.** After Konstantino's resigned on February 5, 2010, AngioScore investigated whether Konstantino had done competitive work while on AngioScore's Board. | Trial Tr. at 693:12-694:12; DX 1292 (email from Suennen recounting conversations with Heller and Lynn); DX 1295; PX 419; PX 421; *see also*; DX 1329. |
| **133.** On February 10, 2010, AngioScore sent Konstantino a letter requesting "confirmation" that Konstantino and/or TriReme were not developing a specialty balloon prior to Konstantino's resignation from AngioScore's Board on February 5, 2010. | PX 419 at 0002. |
| **134.** Konstantino knowingly and intentionally misled his counsel and AngioScore in emails and letters in which he denied, among other things, that he or TriReme had engaged in any "development work" on balloons with "specialized features" or that "compete[] with" or "make[] similar claims" to AngioSculpt, and insisting that AngioScore was being "trigger happy." | PX 103 at 0001; PX 107 at 0001, 0003; PX 420 at 0004; PX 423 at 0006; Nguyen Dep. at 38:10-14; *see also* Trial Tr. at 150:11-24, 151:5-153:4, 153:11-154:21, 155:3-156:25, 158:6-159:14, 159:19-161:7, 161:14-162:4, 163:5-164:2, 164:8-13, 167:14-22, 168:6-169:2, 169:8-170:24, 171:5-172:6, 172:13-173:6. |
| **135.** In a letter to AngioScore's counsel dated February 23, 2010, Konstantino stated that "TriReme is considering, in the future, the possibility of entering the field of specialized | PX 420 at 0004. |

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| balloons." | |
| **136.** Konstantino's February 23, 2010 letter stating that "TriReme is considering, in the future, the possibility of entering the field of specialized balloons" was incorrect because Konstantino and TriReme had made the decision to enter the field of specialized balloons before Konstantino left AngioScore's Board. | Trial Tr. at 141:1-21, 328:6-15; PX 420 at 0004. |
| **137.** In a letter to AngioScore's counsel dated February 23, 2010, Konstantino stated that "TriReme has not developed any products . . . that competes with AngioScore's products." | PX 420 at 0004. |
| **138.** Konstantino's February 23, 2010 letter stating that "TriReme has not developed any products . . . that competes with AngioScore's products" was incorrect because TriReme began developing Chocolate in 2009 and considered Chocolate a "[d]irect competitor[]" to AngioSculpt. | Trial Tr. at 141:1-21, 152:5-153:4, 153:11-154:21; 155:3-156:25, 171:5-172:6, 172:13-173:6, 185:1-186:6, 193:21-195:6, 883:3-23, 1070:17-1073:1, 1078:11-1079:8; PX 15 at 0005; PX 67; PX 72; PX 74; PX 87; PX 89; PX 90; PX 91; PX 92; PX 93; PX 124 at 0007; PX 125 at 0009;  PX 420 at 0004; Delos Santos Dep. at 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |
| **139.** In a letter to AngioScore's counsel dated February 23, 2010, Konstantino stated that he "was not involved in any development work . . . of angioplasty balloon technology for the . . . periphery markets that involves specialized features such as scoring, cutting , or drug eluting elements." | PX 420 at 0004. |
| **140.** Konstantino's February 23, 2010 | Trial Tr. at 141:1-21, 152:5-15, 153:11- |

| Findings of Fact | Supporting Evidence |
|---|---|
| letter stating that he "was not involved in any development work . . . of angioplasty balloon technology for the . . . periphery markets that involves specialized features such as scoring, cutting, or drug eluting elements" was incorrect because Konstantino was engaged in the development of Chocolate before he resigned from AngioScore's Board and because Chocolate is a specialty balloon having a nitinol structure surrounding a semi-compliant nylon balloon. | 154:21, 155:3-156:25, 159:7-14, 171:5-172:6, 172:13-173:6, 180:20-25, 325:18-326:10, 326:20-22, 408:23-409:12, 410:5-21, 526:12-19, 575:25-578:3, 579:13-21, 883:8-23, 924:5-17, 1070:17-1073:1, 1078:11-1079:8; PX 67; PX 72; PX 74; PX 87; PX 89; PX 90; PX 91; PX 92; PX 93; PX 420 at 0004; Delos Santos Dep. at 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |
| **141.** Konstantino's February 23, 2010 letter stating that he "was not involved in any development work . . . of angioplasty balloon technology for the . . . periphery markets that involves specialized features such as scoring, cutting , or drug eluting elements" was incorrect because Konstantino was engaged in the development of Chocolate before he resigned from AngioScore's Board and because Konstantino was promoting Chocolate in 2009 as an "ideal platform for drug delivery" in his efforts to obtain financing for his undisclosed project. | Trial Tr. at 141:1-21, 152:5-153:4, 153:11-154:21; 155:3-156:25, 160:20-162:4, 171:5-172:6, 172:13-173:6, 883:8-23, 1070:17-1073:1, 1078:11-1079:8; PX 67; PX 72; PX 74; PX 85 at 0008; PX 87; PX 89; PX 90; PX 91; PX 92; PX 93; PX 420 at 0004; Delos Santos Dep. at 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |
| **142.** Konstantino's February 23, 2010 letter stating that he "was not involved in any development work . . . of angioplasty balloon technology for the . . . periphery markets that involves specialized features such as scoring, cutting , or drug eluting elements" was incorrect because TriReme's Vice President of Marketing & Business Development, | Trial Tr. at 163:5-164:2, 164:8-16, 331:3-333:6; PX 222; PX 223; PX 420 at 0004. |

United States District Court
Northern District of California

| **Findings of Fact** | **Supporting Evidence** |
|---|---|
| Christopher Haig, traveled to Germany and met with a drug coating technology company about Chocolate on February 5, 2010. | |
| **143.** Konstantino's February 23, 2010 letter stating that he "was not involved in any development work . . . of angioplasty balloon technology for the . . . periphery markets that involves specialized features such as scoring, cutting , or drug eluting elements" was incorrect because Konstantino was engaged in the development of Chocolate before he resigned from AngioScore's Board and because TriReme's contemporaneous documents state that Chocolate has a "[d]ual mechanism of action" whereby the first stage involves "[p]laque disruption by initial metal to plaque contact." | PX 78 at 0010; *see also* Trial Tr. at 141:1-21, 152:5-153:4, 153:11-154:21; 155:3-156:25, 171:5-172:6, 172:13-173:6, 883:8-23, 1070:17-1073:1, 1078:11-1079:8, 1083:21-24, 1084:3-1085:18; PX 67; PX 72; PX 74; PX 87; PX 89; PX 90; PX 91; PX 92; PX 93; PX 420 at 0004; Delos Santos Dep. at 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |
| **144.** In a letter to AngioScore's counsel dated February 23, 2010, Konstantino stated that he was "not involved in any development . . . of angioplasty balloon technology for the . . . periphery markets that makes similar claims to that of the AngioSculpt product." | PX 420 at 0004. |
| **145.** Konstantino's February 23, 2010 letter stating he was "not involved in any development . . . of angioplasty balloon technology for the . . . periphery markets that makes similar claims to that of the AngioSculpt product" was incorrect because Konstantino was engaged in the development of Chocolate before he resigned from AngioScore's Board | Trial Tr. at 141:1-21, 152:5-153:4, 153:11-154:21; 155:3-156:25, 171:5-172:6, 172:13-173:6, 181:1-10, 883:8-23, 1070:17-1073:1, 1078:11-1079:8; PX 67; PX 72; PX 74; PX 87; PX 89; PX 90; PX 91; PX 92; PX 93; PX 189 at 0002; PX 195 at 0001; PX 201 at 0001; PX 211 at 0001; PX 420 at 0004; Delos Santos Dep. at 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |

94

| Findings of Fact | Supporting Evidence |
|---|---|
| and because both AngioSculpt and Chocolate are used for the treatment of peripheral and coronary artery disease by opening occluded blood vessels without leaving metal behind. | |
| **146.** Konstantino's February 23, 2010 letter stating he was "not involved in any development . . . of angioplasty balloon technology for the . . . periphery markets that makes similar claims to that of the AngioSculpt product" was incorrect because Konstantino was engaged in the development of Chocolate before he resigned from AngioScore's Board and because both AngioSculpt and Chocolate have been cleared by the FDA with overlapping indications for use. | Trial Tr. at 141:1-21, 152:5-153:4, 153:11-154:21; 155:3-156:25, 171:5-172:6, 172:13-173:6, 420:12-20, 883:8-23, 1015:12-16, 1016:8-11, 1070:17-1073:1, 1078:11-1079:8; PX 67 (November 2009 email between Feld and Delos Santos, discussing testing of Chocolate prototypes); PX 72 (December 2009 email discussing coating for Chocolate); PX 74 (December 2009 email between Feld and TriReme employees, including Konstantino, re findings from testing Chocolate prototypes); PX 87 (October 2009 email discussing same); PX 89 (October 2009 email re shorties of Chocolate); PX 90 (November 2009 email re Chocolate prototype production); PX 91 (email re Chocolate development); PX 92 (same); PX 93 (same, referring to "upcoming animal study"); PX 195 at 0001 (AngioScore 510K Summary for AngioSculpt Scoring Balloon Catheter); PX 201 at 0001 (TriReme 510K Summary for Chocolate PTA Balloon Catheter); PX 420 at 0004; Delos Santos Dep. at 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |
| **147.** Konstantino's February 23, 2010 letter stating he was "not involved in any development . . . of angioplasty balloon technology for the . . . periphery markets that makes similar claims to that of the AngioSculpt product" was incorrect because Konstantino was engaged in the development of Chocolate before he resigned from AngioScore's Board | Trial Tr. at 141:1-21, 152:5-153:4, 153:11-154:21; 155:3-156:25, 171:5-172:6, 172:13-173:6, 422:20-428:5, 883:8-23, 1070:17-1073:1, 1078:11-1079:8; PX 67; PX 72; PX 74; PX 87; PX 89; PX 90; PX 91; PX 92; PX 93; PX 420 at 0004; PX 501 (QT Vascular website describing Chocolate product); PX 531 at 0005-0006 (AngioSculpt marketing materials); PX 533 at 0004 (AngioSculpt XL marketing materials); Delos Santos Dep. at |

| | Findings of Fact | Supporting Evidence |
|---|---|---|
| | and because both AngioSculpt and Chocolate make similar marketing claims. | 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |
| **148.** | Konstantino provided the information for, and approved the contents of, the February 23, 2010 letter to AngioScore's counsel. | Trial Tr. at 150:11-24, 151:5-16; Nguyen Dep. at 38:10-14. |
| **149.** | On March 5, 2010, AngioScore sent Konstantino a second letter inquiring whether "Konstantino and/or TriReme evaluated, negotiated, or otherwise pursued the acquisition or licensing of any technology that competes with AngioScore's products" prior to Konstantino's resignation from AngioScore's Board on February 5, 2010. | PX 421 at 0002. |
| **150.** | In a letter to AngioScore's counsel dated March 21, 2010, Konstantino stated that before February 5, 2010 "neither Mr. Konstantino nor TriReme evaluated, negotiated or otherwise pursued the acquisition or licensing of any technology that competes with AngioScore's products." | PX 423 at 0006. |
| **151.** | Konstantino's March 21, 2010 letter stating that before February 5, 2010 "neither Mr. Konstantino nor TriReme evaluated, negotiated or otherwise pursued the acquisition or licensing of any technology that competes with AngioScore's products" was intentionally misleading because defendants, particularly TriReme, were evaluating Chocolate prior to February 5, 2010. | Trial Tr. at 168:9-18, 169:8-170:13, 171:5-173:6; PX 18; PX 70; PX 93; PX 423 at 0006. |

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Findings of Fact | Supporting Evidence |
|---|---|
| **152.** Konstantino's March 21, 2010 letter stating that before February 5, 2010 "neither Mr. Konstantino nor TriReme evaluated, negotiated or otherwise pursued the acquisition or licensing of any technology that competes with AngioScore's products" was intentionally misleading because defendants thought Chocolate was a "[d]irect competitor[]" to AngioSculpt. | PX 125 at 0009; *see also* Trial Tr. at 185:1-186:6, 193:21-195:6; PX 15 at 0005; PX 124 at 0007; PX 423 at 0006. |
| **153.** In a letter to AngioScore's counsel dated March 21, 2010, Konstantino stated AngioScore made "unsubstantiated accusations" that Konstantino "somehow breached his duties as a Board member of AngioScore." | PX 423 at 0006. |
| **154.** In a letter to AngioScore's counsel dated March 21, 2010, Konstantino stated that "AngioScore has provided no details to support [] an accusation" that Konstantino has "somehow breached his duties as a Board member of AngioScore." | PX 423 at 0006. |
| **155.** In a letter to AngioScore's counsel dated March 21, 2010, Konstantino stated that AngioScore should "refrain from making these unsubstantiated accusations" or "Mr. Konstantino will have no choice but to consider his legal options." | PX 423 at 0006. |
| **156.** AngioScore sent the February 10, 2010 and March 5, 2010 letters to Konstantino to investigate the "specific details" of Konstantino's development activities prior to his resignation from AngioScore's Board | Trial Tr. at 275:19-276:4, 282:6-283:2, 283:10-24; PX 419; PX 421. |

United States District Court
Northern District of California

97

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| on February 5, 2010. | |
| **157.** Konstantino's repeated misrepresentations, misdirection, and threats of legal action prevented AngioScore from becoming aware of when defendants began developing Chocolate. | Trial Tr. at 280:1-25, 283:21-24, 522:1-523:16, 633:7-14, 634:5-7. |
| **158.** AngioScore did not file a claim in 2010 because AngioScore did not know that "Chocolate existed at that point" and was intentionally led to believe that no specialty balloon existed. | Trial Tr. at 634:5-7; *see also* Trial Tr. at 271:14-272:4, 272:18-19, 486:5-487:10; 693:9-11. |
| **159.** While serving on AngioScore's Board, Konstantino filed a provisional patent application for Chocolate in October 2009. | Trial Tr. at 200:15-201:10; PX 63; PX 64 (October 2009 patent application). |
| **160.** After receiving two letters from AngioScore's counsel, Konstantino switched patent counsel and filed a second provisional patent application sometime in March 2010 without informing either of his patent lawyers of the substantially similar application from five months earlier. | Trial Tr. at 203:19-206:18; Heslin Dep. at 88:9-18; Shay Dep. at 39:14-19; PX 64 (October 2009 patent application); PX 419; PX 421; PX 422. |
| **161.** By filing a second provisional patent application in March 2010, Konstantino lost five months of patent priority. However, by citing to the second provisional patent application from March 2010 instead of the first provisional patent application from October 2009 in his March 2011 utility patent application, Konstantino ensured that the first provisional patent application from October 2009 | Trial Tr. at 201:15-203:13, 205:2-4; PX 64 (October 2009 patent application); PX 422; PX 427. |

| Findings of Fact | Supporting Evidence |
|---|---|
| would not become public. | |
| **162.** Konstantino's actions with respect to the patent application demonstrate an intent to deceive. | *See* FF *supra* 159-161. |
| **163.** TriReme provided substantial assistance to Konstantino's breach of fiduciary duty. | PFF 146-159. |
| **164.** Before Konstantino left AngioScore's Board of Directors, TriReme engineers helped develop and build the Chocolate device.  Tanhum Feld, in his various roles at TriReme, worked with several TriReme employees to develop Chocolate, including Jayson Delos Santos, a TriReme Senior R&D Engineer, Maria Pizarro, TriReme's Director of R&D, and Gary Binyamin, TriReme's Technology Manager. | PX 109 at 0004 (September 2009 TriReme board meeting presentation containing organizational chart); PX 92 (December 2009 email between TriReme employees and Konstantino relating to design and prototype development for Chocolate); PX 87 (October 2009 email between Feld, Delos Santos, and Konstantino re same); PX 90 (November 2009 email between Feld and Delos Santos re same); Trial Tr. at 850:18-851:5, 863:17-864:15. |
| **165.** Konstantino and the TriReme employees who worked on Chocolate referred to themselves as the "Team." | PX 92; Trial Tr. at 156:4-25. |
| **166.** The TriReme Chocolate team created prototypes, solved technical issues such as bonding the nitinol cage to the balloon, and tested the device. | PX 87; PX 92; Trial Tr. at 328:23-329:14; 851:16-852:4. |
| **167.** Eight TriReme employees attended the January 15, 2010 testing of the Chocolate device at Stanford. | PX 18 at 0002 (recorded attendance at Stanford study, Konstantino included). |

United States District Court
Northern District of California

United States District Court
Northern District of California

| | Findings of Fact | Supporting Evidence |
|---|---|---|
| **168.** | In February 2010, Trireme's Vice President of Marketing and Business Development traveled to Germany to meet with a company specializing in drug coating technology about a partnership involving Chocolate. | PX 222; PX 223; Trial Tr. at 331:7-22. |
| **169.** | TriReme repeatedly listed Chocolate as a TriReme product in its presentations in late 2009 and early 2010. | PX 15 at 0005; PX 17 at 0004. |
| **170.** | By February 3, 2010 TriReme had already decided "that Chocolate was going to be brought into the scope of products that TriReme was working on." | Trial Tr. at 328:6-15; PX 80. |
| **171.** | The TriReme Chocolate team worked on Chocolate during TriReme's business hours, via TriReme's email system, using TriReme's engineering templates. | Trial Tr. at 879:17-880:6, 881:5-8, 22-24, 882:14-20; PX 65. |
| **172.** | TriReme had the requisite knowledge for aiding and abetting. | FF *infra* 173-176. |
| **173.** | Konstantino was TriReme's CEO in 2009 and 2010. | PX 109; Trial Tr. at 134:6-8. |

United States District Court
Northern District of California

| | Findings of Fact | Supporting Evidence |
|---|---|---|
| **174.** | As a co-creator of AngioSculpt and a co-founder of AngioScore, Feld knew AngioScore's line of business, knew that Konstantino was serving on AngioScore's Board, knew that Konstantino owed AngioScore fiduciary duties, knew AngioScore had only granted Konstantino a waiver to pursue bifurcated stents with TriReme, and knew that Chocolate and AngioScore were alternative tools—all while helping Konstantino develop the Chocolate device. | Trial Tr. at 840:25-843:3, 864:4-8 (Feld direct, confirming Feld's knowledge that Konstantino had been granted a waiver from AngioScore for his work with TriReme on Glider), 882:10-13 (confirming Feld's knowledge that Konstantino was on AngioScore's board while developing Chocolate), 879:13-16 (confirming that Feld knew that in such capacity, Konstantino had fiduciary duties to AngioScore); PX 127. |
| **175.** | As a former employee of AngioScore who had worked on AngioSculpt, Maria Pizarro knew AngioScore's line of business, and knew that Konstantino was serving on AngioScore's Board. | Trial Tr. at 1028:12-14, 1028:25-1029:7; 1093:25-1094:3; PX 442. |
| **176.** | GimMoey Ong, TriReme's HR and Marketing Manager, knew Konstantino was on AngioScore's Board, and knew that Chocolate would compete with AngioSculpt. | Trial Tr. at 969:10-21; Ong Dep. at 46:1-7; PX 124 at 0001, 0007; PX 125 at 0001, 0009. |
| **177.** | Proteus Vascular Systems was an unincorporated association founded in 2009 that sought to develop and market the Chocolate device. | PX 124; PX 2 at 0002-0014; Trial Tr. at 241:7-20. |
| **178.** | Proteus consisted of at least three individuals: James Dreher, Konstantino, and Feld.  Dreher "led" Proteus, while Konstantino was the Chairman of the Board. | PX 124 at 0002; PX 445. |

United States District Court
Northern District of California

| **Findings of Fact** | **Supporting Evidence** |
|---|---|
| **179.** As part of his entrepreneurial practice, Dreher would quickly form a company and raise early money, and sell the company soon thereafter.  He applied this model to Chocolate and helped attract potential acquirers. | Trial Tr. at 175:17-19; 1324:8-22; PX 70 at 0001; PX 124. |
| **180.** Konstantino recruited employees, presented Chocolate to the Economic Development Board of Singapore, and sought funds for Proteus. | PX 70; PX 2 (December 2009 email between Cheng and Ong re Proteus's Chocolate device, attaching powerpoint presentation for Singapore Economic Development Board); PX 124; Trial Tr. at 239:8-241:1; PX 3. |
| **181.** On January 1, 2010, Konstantino signed a contract as Proteus' Chairman to help raise funds for the Chocolate project. | PX 3; Trial Tr. 242:18-244:11. |
| **182.** Konstantino represented that Quattro was "previously Proteus." | PX 6 at 0002; Trial Tr. at 246:3-9; PX 7. |
| **183.** According to an addendum to the January 10, 2010 fundraising contract Konstantino had signed as Chairman of Proteus, a few months later, Konstantino represented that "[t]he name Proteus Vascular Systems Pte Ltd was changed to Quattro Vascular Pte Ltd."  The addendum noted this name change and "Quattro" assumed the role previously held by "Proteus," with its rights and obligations. | PX 7; Trial Tr. at 247:15-248:4. |
| **184.** While still serving on AngioScore's Board, Konstantino held himself out as the Chairman of Proteus and later as a Director at Quattro. | PX 3; Trial Tr. 242:18-244:11; PX 7. |

| | Findings of Fact | Supporting Evidence |
|---|---|---|
| **185.** | On January 15, 2010, the company (apparently still known as Proteus at that time) sponsored a study at Stanford involving the Chocolate device. Later that year, the report from the study was released reflecting that "Quattro Vascular Pte Ltd" had sponsored the study. | PX 11; Trial Tr. at 248:5-23. |
| **186.** | Quattro formally incorporated in March 2010. James Dreher, Konstantino, and others involved in the organization all agreed to the incorporation. | PX 1 at 0004. |
| **187.** | Konstantino and Feld assigned their rights to the Chocolate device to Quattro for a 5% royalty and a cash payment. | Trial Tr. at 237:8-13. |
| **188.** | Konstantino and Feld were founders and shareholders of Quattro when they transferred their rights to Chocolate. | PX 1 at 0004-0005. |
| **189.** | QT Vascular is the product of a merger between TriReme and Quattro. | PX 43; Trial Tr. at 256:7-21 (Konstantino discussing representation he made on behalf of QT Vascular wherein he stated that "QTV is a result of a merger between Quattro Vascular and TriReme Medical"). |
| **190.** | QT Vascular assumed the assets and liabilities of TriReme or Quattro wholesale in the final transaction. | PX 32; Brosh Dep. at 277:19-22, 280:3-11, 281:2-15. |

United States District Court
Northern District of California

United States District Court
Northern District of California

| | Findings of Fact | Supporting Evidence |
|---|---|---|
| **191.** | Momi Brosh, QT Vascular's corporate designee on the relationship among TriReme, Quattro, QT Vascular, stated that QT Vascular took on Quattro's and TriReme's assets and liabilities. | Trial Tr. at 969:22-970:2; Brosh Dep. at 277:19-22, 280:3-11, 281:2-15; PX 32. |
| **192.** | While defendants significantly changed the answers of Brosh's 30(b)(6) testimony after the fact, they did not dispute his answers on the above facts, and did not seek to amend his answers on the same. | *See* Dkt. Nos. 593-7; 593-8. Trial Tr. at 1126:6-12, 1127:22-1128:8 (Farwell direct); DX 1746 at 82-83; DX 1652 at 43-45. |
| **193.** | Documents describing the terms for the QT Vascular transaction refer to it as a merger. | PX 32 at 0001 (Summary of terms for proposed merger, signed November 5, 2012); Trial Tr. at 252:13-254:23. |
| **194.** | The TriReme Board minutes say that TriReme will merge with Quattro. | PX 30 at 0001-0002; Trial Tr. at 251:11-252:12. |
| **195.** | Quattro wrote to its shareholders that it will merge with TriReme. | PX 33 (letter to Quattro shareholders dated November 6, 2012, explaining decision to merge, need for merger between TriReme and Quattro, "a merged entity would provide a complete platform for an IPO and a far more compelling story for a potential acquirer"); Trial Tr. 254:24-255:13. |
| **196.** | Konstantino described the transaction to form QT Vascular as a merger. | PX 40; Trial Tr. at 255:19-256:6. |
| **197.** | QT Vascular presentations state that QT Vascular "is a result of a merger between Quattro Vascular and TriReme Medical." | PX 43 at 0002; Trial Tr. at 256:7-21. |

104

United States District Court
Northern District of California

| **Findings of Fact** | **Supporting Evidence** |
|---|---|
| **198.** Along with the assets and liabilities of Quattro and TriReme, QT Vascular "acquired 100% of the issued and outstanding capital stock" of Quattro and TriReme and that the "purchase consideration for the acquisition" was "satisfied by the allotment and issuance" of QT Vascular shares, "credited as fully paid." | Trial Tr. at 1328:3-17; PX 45 at 0080; Trial Tr. at 1125:16-23; 1128:5-8; PX 32 at 0001; Brosh Dep. at 277:19-22, 280:3-11, 281:2-15. |
| **199.** The shareholders of TriReme and Quattro became the shareholders of QT Vascular. | Trial Tr. at 1328:3-17; *see also* PX 45 at 0073. |
| **200.** AngioScore has experienced financial losses due to Chocolate's entry into the marketplace. | PX 152; PX 164; PX 130; Trial Tr. at 1235:1-1239:20. |
| **201.** AngioSculpt and Chocolate compete. As a result of defendants' competition and targeted pricing strategy, AngioScore lost share in the specialty balloon market. | PX 15 at 0005; PX 124 at 0007 (Proteus investor document noting AngioScore as potential competitor); PX 127 (February 2011 email between Feld and Konstantino noting AngioSculpt as competitor to Chocolate); PX 130 (October 2011 email between Dreaden, Konstantino, Haig, Benjamin re competitive information on AngioScore's pricing, discussing Chocolate pricing strategy); PX 132 at 0002 (TriReme competitor analysis spreadsheet noting AngioSculpt PTA and PTCA devices compete with Chocolate); PX 135 (December 2011 email from Dreaden to other TriReme employees regarding Chocolate pricing attaching tables confirming that at each available size, Chocolate is exactly $25 less per unit than AngioScore); PX 137 (December 2011 email re Chocolate noting pricing strategy keyed off of other balloons including AngioSculpt); PX 143 (December 2012 email between Haig and Borrell reflecting Chocolate pricing $25 less per unit than AngioSculpt); PX 154 (March 2013 sales email noting that "the closest |

| Findings of Fact | Supporting Evidence |
|---|---|
|  | comparable product [to Chocolate] is the AngioSculpt"); PX 164 (June 2013 email between TriReme sales to customer noting that "most clinicians are replacing the use of Scoring/Cutting (AngioScore) devices with Chocolate"); PX 264 at 0163 (Millennium Research Group Report table noting that AngioScore had 12.5% of specialty balloon catheter market share in 2009); PX 294 at 0251 (Millennium Research Group Report table noting that AngioScore had 48.1% of the specialty balloon market share in 2013); Trial Tr. at 159:7-16 (Konstantino direct, noting that "specialty balloon" is a balloon that costs more than an average POBA), 520:3-13 (noting field of competitive specialty balloons consists of AngioSculpt, Chocolate, Vascutrak, and the Cutting Balloon), 185:1-186:3 (Konstantino direct, establishing that Konstantino considered Chocolate competitive ("a step up") with respect to AngioSculpt), 218:6-21 (Konstantino confirming that he utilizes Millennium Research Group reports), 335:9-340:17 (Konstantino direct, re competition between Chocolate and AngioSculpt), 343:19-344:7 (Haig direct, with respect to pricing), 348:10-349:4 (same), 353:18-25 (same, discussing Millennium Research Group report), 355:25-357:1 (Haig, discussing competitive products in specialty balloon market), 571:6-11 (same, discussing metal impressing upon plaque in the case of scoring or cutting balloons), 741:10-17 (Olsen direct, discussing lost profits from the end of 2011 to the end of 2Q14 for AngioScore), 1235:1-1239:20 (Prowse cross, discussing AngioSculpt and Chocolate as competitors occupying the same market). |

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| **202.** The parties' damages experts generally agree on the methodology to calculate AngioScore's lost profits, and used the same numerical values for AngioScore's lost revenue, profit margin, and the applicable discount rate. | Trial Tr. at 1228:5-1229:25 (defendants' expert, Prowse, testifying that the material change in his calculation was with respect to market share percentages; revenue, profits, profit margin, gross profit margin remain the same). |
| **203.** Chocolate and the AngioSculpt products are specialty balloons. | Trial Tr. at 159:7-16, 180:6-8, 325:18-326:10, 326:20-22, 408:23-409:12, 526:12-19, 577:25-578:3, 924:5-17; PX 142. |
| **204.** The Chocolate and AngioSculpt products compete with each other in the specialty balloon market.  Within the specialty balloon sub-market, there are relatively few players.  As of 2013, the Millennium Research Group found the specialty balloon catheter market was primarily occupied by four companies:  Boston Scientific, C.R. Bard, Abbott Laboratories, and AngioScore.  The market share reflects that AngioScore was in close competition with Boston Scientific and its product, the Cutting Balloon: AngioScore occupied 48.1% of the specialty balloon market and Boston Scientific occupied 47.1%.  C.R. Bard held 3.3% of the market with its specialty balloon, the Vascutrak. Abbott Laboratories held only 1.3%. | FF *supra* 200-201; *infra* 205-220. PX 294 at 249-51; PX 142. |
| **205.** Once a doctor decides "to use a specialty balloon for a particular procedure," the competition narrows to just four devices: "the AngioSculpt, the Chocolate, the Vascutrak, and the Cutting Balloon" and a drug-coated balloon, which recently entered the specialty balloon market. | Trial Tr. at 520:3-13; Trial Tr. at 922:11-19, 923:11-18 (Garcia direct). |

| Findings of Fact | Supporting Evidence |
|---|---|
| **206.** AngioScore has lost sales due to Chocolate's entry into the specialty balloon catheter marketplace. | Trial Tr. at 418:18-419:5 (attesting to diversion of resources at AngioScore due to threat from Chocolate); 444:20-445:21 (Viano discussing losing five to ten units a month to Chocolate, including losing sales to Dr. Garcia, defendants' industry expert); PX 152; PX 164 (defendants' email reflecting observation that clinicians were replacing AngioScore devices with Chocolate). |
| **207.** TriReme used specialty balloons to set their initial prices for Chocolate. | PX 137 at 0014; Trial Tr. at 336:11-15, 339:19-340:7, 340:10-17, 341:16-24, 348:10-349:4. |
| **208.** TriReme's sales force targeted doctors who used specialty balloons. | PX 164; PX 124 at 0007; PX 130; PX 132 at 0002; PX 137 at 0014; PX 152; PX 154; Trial Tr. at 336:11-15. |
| **209.** Documents show that TriReme employees stated that AngioScore was Chocolate's "closest competitor." | PX 143; PX 154; PX 132 at 0002; PX 127; Trial Tr. at 343:19-344:7. |
| **210.** TriReme employees gathered pricing information on AngioScore, and strategically priced Chocolate $25 below AngioSculpt to "get faster uptick" in AngioScore accounts. | PX 130; PX 143; PX 137 at 0014; PX 135 (December 2011 email from Dreaden to other TriReme employees regarding Chocolate pricing, attaching tables confirming that at each available size, Chocolate is exactly $25 less per unit than AngioSculpt); Trial Tr. at 335:14-336:15. |
| **211.** TriReme's Vice President of Marketing & Business Development regarded AngioScore accounts as "an opportunity for TriReme" because premium "pricing had already been established for specialty balloons." | Trial Tr. 336:11-15. |

| **Findings of Fact** | **Supporting Evidence** |
|---|---|
| **212.** POBAs are priced around $150 to $200 per unit. Specialty balloons are priced much higher than that, up to $1000 per unit, depending on length. | Trial Tr. at 412:7-9 (Viano direct). |
| **213.** AngioScore and defendants use the Millennium Research Report in the course of their businesses. | Trial Tr. at 218:6-21; 353:18-25; 571:6-18. |
| **214.** No trial evidence established that either party used the iData Research Report, nor did Dr. Prowse offer any reason to use the iData Research Report to determine AngioScore's market share. | Trial Tr. at 571:19-23. |
| **215.** According to the Millennium Research Reports, AngioScore had between a 39% and 48% of the specialty balloon catheter market between 2011 and 2014. | PX 264 at 163; PX 294 at 251; Trial Tr. at 218:6-21; 353:18-25; 571:6-11. |
| **216.** Chocolate made $11,269,00 in revenue from 2011 to 2014. | PX 388; Trial Tr. 742:1-742:7; PX 381 at 0028. |
| **217.** Applying AngioScore's market share to Chocolate's revenue, AngioScore lost $5,335,000 in revenue to Chocolate. | Trial Tr. at 757:9-17; PX 264 at 163; PX 294 at 251; Trial Tr. at 218:6-21; 353:18-25; 571:6-11; PX 381 at 0028. |
| **218.** AngioScore had profit margins between 55% and 58%. | Trial Tr. at 758:5-760:2; PX 351; PX 369-372; PX 381 at 0028. |
| **219.** Applying AngioScore lost revenue shows that AngioScore lost $2.97 million to Chocolate from 2011 to 2014. | Trial Tr. at 741:10-24; PX 381 at 0028. *See also* Trial Tr. at 444:20-445:21 (Viano cross, discussing losing five to ten units a month to Chocolate, including losing sales to Dr. Garcia, defendants' industry expert). |

| Findings of Fact | Supporting Evidence |
|---|---|
| **220.** If Chocolate remains on the market through 2019, AngioScore will suffer $17.064 million in lost profits. | Trial Tr. at 759:22-760:2, 772:21-25. |
| **221.** Konstantino received $250,000 by agreeing to an invention assignment agreement of Chocolate. | DX 1435 at 0003. |
| **222.** Konstantino receives a 2.85% royalty on Chocolate sales. | Trial Tr. at 1342:13-22. |
| **223.** Konstantino has 15 million shares of QT Vascular stock. | Trial Tr. at 1336:23-1338:4. |
| **224.** Konstantino has stock options in QT Vascular. | Trial Tr. at 1336:23-25. |

United States District Court
Northern District of California