1  DAVID S. STEUER, State Bar No. 127059
   dsteuer@wsgr.com
2  STEVEN D. GUGGENHEIM, State Bar No. 201386
   guggenheim@wsgr.com
3  DYLAN J. LIDDIARD, State Bar No. 203055
   dliddiard@wsgr.com
4  THOMAS J. MARTIN, State Bar No. 150039
   tmartin@wsgr.com
5  BRIAN DANITZ, State Bar No. 247403
   bdanitz@wsgr.com
6
   WILSON SONSINI GOODRICH & ROSATI
7  Professional Corporation
   650 Page Mill Road
8  Palo Alto, CA 94304-1050
   Telephone: (650) 493-9300
9  Facsimile: (650) 565-5100

10 Attorneys for Defendants
   TRIREME MEDICAL, LLC,
11 QUATTRO VASCULAR PTE LTD,
   and QT VASCULAR LTD.
12

13                    UNITED STATES DISTRICT COURT

14                   NORTHERN DISTRICT OF CALIFORNIA

15                          OAKLAND DIVISION

16 ANGIOSCORE, INC.,                    ) CASE NO.: 4:12-cv-3393-YGR
                                        )
17         Plaintiff,                   ) **CORPORATE DEFENDANTS
                                        ) TRIREME MEDICAL, LLC, QUATTRO
18     v.                               ) VASCULAR PTE LTD, AND QT
                                        ) VASCULAR LTD.'S NOTICE OF
19 TRIREME MEDICAL, LLC (f/k/a          ) MOTION AND MOTION TO STAY
   TRIREME MEDICAL, INC.), EITAN        ) ENFORCEMENT OF JUDGMENT
20 KONSTANTINO, QUATTRO VASCULAR        ) [FED. R. CIV. PROC. 62]**
   PTE LTD. and QT VASCULAR LTD. (f/k/a )
21 QT VASCULAR PTE. LTD.),              ) **Date: November 24, 2015
                                        ) Time: 2:00 p.m.
22         Defendants.                  ) Hon. Yvonne Gonzalez Rogers**
                                        )
23

24        **REDACTED VERSION OF THE DOCUMENT SOUGHT TO BE SEALED**

25

26

27

28

---

CORP. DEFS.' NOTICE AND MOTION TO STAY ENFORCEMENT OF JUDGMENT
CASE NO.: 4:12-CV-3393-YGR

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ..................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................ 1

Preliminary Statement .................................................................................................................. 1

Relevant Factual Background ..................................................................................................... 2

    I.     QT Vascular's Failed Attempts To Obtain A Supersedeas Bond ............................ 2

    II.    QT Vascular's Financial Condition ........................................................................ 3

ARGUMENT ................................................................................................................................ 5

    I.     Legal Standard ........................................................................................................ 5

    II.    A Stay Without A Bond Is Appropriate Because Allowing AngioScore To Immediately Enforce The Judgment Would Prejudice QT Vascular's Other Creditors ................................................................................................................. 6

    III.   Allowing AngioScore To Immediately Execute On The Judgment Would Harm The Public Interest ........................................................................................ 9

    IV.   QT Vascular's Proposed Modified Security ......................................................... 10

CONCLUSION ........................................................................................................................... 11

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Alexander v. Chesapeake, Potomac, & Tidewater Books, Inc.*,
　190 F.R.D. 190 (E.D. Va. 1999) ................................................................................... 8, 10

*Arban v. W. Publ'g Corp.*,
　345 F.3d 390 (6th Cir. 2003) ............................................................................................. 5

*Cotton ex rel. McClure v. City of Eureka*,
　860 F. Supp. 2d 999 (N.D. Cal. 2012) .............................................................................. 6

*Dawe v. Corrections USA*,
　No. Civ. S-07-1790 LKK/EFB, 2011 WL 3875854, (E.D. Cal. Sept. 1, 2011) ................ 8

*Dillon v. City of Chi.*,
　866 F.2d 902 (7th Cir. 1988) ......................................................................................... 5, 6

*Int'l Telemeter, Corp. v. Hamlin Int'l Corp.*,
　754 F.2d 1492 (9th Cir. 1985) ....................................................................................... 5, 6

*Kranson v. Fed. Express Corp.*,
　No. 11-cv-05826-YGR, 2013 WL 6872495 (N.D. Cal. Dec. 31, 2013) ........................ 5, 6

*Miami Int'l Realty Co. v. Paynter*,
　807 F.2d 871 (10th Cir. 1986) ........................................................................................... 8

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
　786 F.2d 794 (7th Cir. 1986) .................................................................................. *passim*

*Poplar Grove Planting & Ref. Co. v. Bache Halsey Stuart, Inc.*,
　600 F.2d 1189 (5th Cir. 1979) ........................................................................................... 8

*Trans World Airlines v. Hughes*,
　515 F.2d 173 (5th Cir. 1975) ............................................................................................. 8

**RULES**

Fed. R. Civ. P. 62 ................................................................................................................. 1, 5, 6

# NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on November 24, 2015, or as soon thereafter as the matter may be heard, before the Honorable Yvonne Gonzalez Rogers of the United States District Court for the Northern District of California, Oakland Courthouse, Courtroom 1, Fourth Floor, 1301 Clay Street, Oakland, California, 94612, defendants, TriReme Medical, LLC ("TriReme"), Quattro Vascular Pte. Ltd. ("Quattro Vascular") and QT Vascular Ltd ("QT Vascular") (collectively, "Corporate Defendants," or the "Company") will, and hereby do, move pursuant to Federal Rule of Civil Procedure 62, to stay the enforcement of the judgment entered on October 14, 2015 and waive bond on plaintiff AngioScore, Inc.'s ("Plaintiff" or "AngioScore") state law claims.  This motion is supported by the Memorandum of Points and Authorities, the declarations of Randal Farwell ("Farwell Decl.") and Gina La ("La Decl."), the [Proposed] Order, the arguments of counsel, and any other matters properly before the Court.

# MEMORANDUM OF POINTS AND AUTHORITIES

# PRELIMINARY STATEMENT

The Corporate Defendants respectfully move the Court to stay execution of the judgment (Dkt. No. 812) pursuant to Federal Rule of Civil Procedure 62(d) pending the conclusion of their appeal, and further request that the stay be entered without requiring the posting of a supersedeas bond.  As detailed below, because of the Company's lack of collateral, the Corporate Defendants cannot secure a supersedeas bond for the judgment amount without substantially impairing the Company's ability to continue normal operations.  If the Court does not stay execution of the judgment and waive the bond requirement, the Corporate Defendants will likely need to seek protection of the bankruptcy laws of the United States and their equivalent under the laws of the Republic of Singapore.  In other words, executing on the judgment or collateralizing a bond for the full amount of the judgment would likely put the Company out of business.  This would harm multiple *bona fide* creditors and, as the Court recognized in denying AngiScore's request for an injunction, risk harming the public interest by disrupting Chocolate's availability to doctors and patients.  *See* Dkt. No. 665 at 59 (denying request for injunction that would "remove from the quiver of practicing physicians one arrow with which they might treat a patient").

**RELEVANT FACTUAL BACKGROUND**

QT Vascular is a publicly-traded holding company with subsidiaries, including TriReme and Quattro, that manufacture and sell Chocolate, a life-saving medical device used in the treatment of vascular disease. Dkt. No. 665 at FF 30. Chocolate first became commercially available in 2011, and QT Vascular's subsidiaries continue to sell the device today. *Id.* at FF 216, 220.

AngioScore alleged that, in violation of Delaware state law, Eitan Konstantino developed Chocolate while serving as a member of AngioScore's board of directors, and violated his fiduciary duties by failing to offer the rights to Chocolate to AngioScore. *Id.* at 1. AngioScore further alleged that the Corporate Defendants are liable because they aided and abetted Konstantino's breach. *Id.* at 1-2.

Following a six-day bench trial on AngioScore's state law claims, the Court entered its Findings of Fact and Conclusions of Law on July 1, 2015, awarding AngioScore past lost profits of $2.97 million and future lost profits of $17.064 million. *Id.* at 63. The Court entered judgment on October 14, 2015. Dkt. No. 812.

**I.   QT Vascular's Failed Attempts To Obtain A Supersedeas Bond**

The Company has explored various avenues to obtain a supersedeas bond. It has attempted to raise cash in financing transactions, contacted an insurance broker with expertise in the bonding process, contacted the Company's banker, and contacted an independent financial advisor. In each case, the result was the same: a supersedeas bond would need to be fully cash collateralized in the amount of the judgment, requiring the sequestering of cash that the Company does not have.

In and around April 2015, the Company initiated discussions with multiple lenders, including Silicon Valley Bank and Oxford Finance, LLC, to finance ongoing operations and the possible payment of damages in the event of an adverse judgment in this case. Farwell Decl. ¶ 7. In light of the uncertainty of the litigation, these discussions were suspended by the lenders. *Id.* Ultimately, the Company was only able to raise sufficient funds to support ongoing operations in the short term. *Id.*

On August 26, 2015, anticipating the Court's entry of judgment, QT Vascular sought to secure a supersedeas bond in the full amount of the expected judgment by contacting ABD Insurance and Financial Services ("ABD"). *See* La Decl. ¶ 2. ABD is an insurance brokerage firm with expertise in the underwriting of surety bonds and other financial guarantees. *Id.* In the course of investigating whether the Corporate Defendants could secure a bond, ABD requested QT Vascular's financial statements. *Id.* ¶ 3. ABD informed QT Vascular that, in light of the Company's financial circumstances, a bond would require collateral "close to 100% of the bond amount" in the form of cash or an irrevocable letter of credit. *Id.* ¶ 5 & Ex. 2.[1]

The Company also contacted its bank, Silicon Valley Bank ("SVB"), regarding obtaining a letter of credit to secure the supersedeas bond. La Decl. ¶ 4. On September 1, 2015, QT Vascular learned that SVB would only extend the letter of credit if it was fully cash collateralized (i.e., a dollar-for-dollar match between the line of credit and the cash collateral). *Id.* ¶ 6 & Ex. 3.

QT Vascular also contacted John Sailer, a venture-debt advisor, to explore alternative sources of the letter of credit to support the bond; however, this consultation resulted in the same conclusion, the letter of credit would need to be fully cash collateralized. Farwell Decl. ¶ 8.

On October 6, 2015, the Company again approached Oxford Finance, LLC to discuss the possibility of a new financing. However, Oxford replied that it is "unable to fund into the financial uncertainty having to do with litigation." *Id.* ¶ 10.

Based on this investigation, QT Vascular determined that it cannot obtain a supersedeas bond without liquidating substantial operating assets and impairing the operation of the Company. *Id.* ¶ 11.

## II.   QT Vascular's Financial Condition

The Company's unaudited and estimated assets as of October 9, 2015 total approximately ███████████, comprising non-current assets of ███████████ and current assets of ███████████.[2] Farwell Decl. ¶ 5. Approximately ███████████ of these assets consist of cash or cash

---

[1] "Ex. __" refers to exhibits attached to the La Decl. filed herewith.

[2] A non-current asset is an asset that is (1) not likely to turn to unrestricted cash within one year of the balance sheet date, or (2) not held primarily for "trading" (operational) purposes, *e.g.*, capitalized R&D. *Id.*

equivalents. *Id.* The Company needs this cash to fund ongoing operating expenses, including payroll and materials supporting the manufacture of Chocolate. *Id.* The remaining assets consist of non-liquid assets that are also needed to maintain the Company's operations, including intellectual property, laboratory equipment, inventory and work-in-progress.[3]  Farwell Decl. ¶ 5.

Because the Company does not maintain cash reserves in excess of short term operating requirements, and cannot readily sell-off its other assets without impairing its ability to continue operations, the Company does not have access to sufficient cash to satisfy the judgment or provide collateral for a bond for the judgment. Any further depletion of the Company's cash reserves would substantially impair the Company's ability to continue ordinary operations.[4]  Farwell Decl. ¶ 6.

Moreover, excluding the judgment amount in this case, as of October 9, 2015, the Company has liabilities of approximately $22.635 million that it must pay to creditors. *Id.* ¶ 4. The total liabilities include approximately $13.425 million in convertible bond borrowings and financing costs, $4.952 million in accounts payable (including received invoices from product and service suppliers, SG&A expenses, and R&D and clinical expenses), $2.460 million in accrued liabilities (representing unreceived invoices), and $1.798 million in payroll and related liabilities. *Id.* The Company's major creditors include MeKo Laserstrahl Materialbearbeitungen, Emerald Medical Services Pte. Ltd., InnoRa GmbH, CBSET Inc., SurModics Inc., and the Company's convertible bond investors. *Id.*[5]

---

[3] Other assets, such as capitalized intangibles, are not convertible into cash without a change in control or major sale of operational assets, i.e., a "liquidity" event. Farwell Decl. ¶ 5. As discussed below, the Company proposes that in the event of such a liquidity event, the Company will fund a supersedeas bond. *Id.*

[4] The Company's inability to immediately satisfy the judgment is not surprising given that, as this Court recognized, the Company is a "startup" (Dkt. No. 665 at 29) and the majority of the judgment ($17.064 million of $20.034 million) is based on AngioScore's <u>future</u> lost profits due to <u>future</u> sales of Chocolate.

[5] QT Vascular's unaudited June 30, 2015 consolidated financial statements reflect the Company's most recently reported financials. La Decl. ¶ 3. The statements reported total assets of $25.939 million, comprising non-current assets of $12.455 million and current assets of $13.484 million, $4.327 million of which are cash and cash equivalents. *Id.* ¶¶ 8-10 & Ex. 1 at 5. The Company reported total liabilities in the amount of $6.789 million. La Decl. ¶ 9 & Ex. 1 at 5. The

*(cont'd)*

Because the Company does not have sufficient cash to satisfy the judgment against it in the amount of $20.034 million (plus pre-judgment interest in the amount of $333,277), an immediate enforcement of the judgment would drive QT Vascular and its subsidiaries into insolvency. Farwell Decl. ¶ 12.  In the event of insolvency due to enforcement of the judgment, QT Vascular and its subsidiaries would likely be forced to seek the protection of the bankruptcy laws of the United States and their equivalent under the laws of the Republic of Singapore. *Id.*

In light of QT Vascular's inability to obtain a letter of credit, the Company is unable to post a supersedeas bond at this time.  In lieu of a supersedeas bond, the Company respectfully submits that the following measures may be taken to maintain the status quo during the pendency of the appeal and to ensure that a supersedeas bond will be posted as soon as practicable:

- A mutually-agreeable Monitor will be appointed to confirm that the Company is maintaining the status quo during the pendency of the appeal;
- The Company will refrain from transferring assets out of the United States except as required in the ordinary course of its existing business; and
- The Company will post a supersedeas bond upon a major sale of operational assets or a change in control of the Company.

*Id.* ¶ 13.

## ARGUMENT

**I.    Legal Standard**

Federal Rule of Civil Procedure 62(d) provides that, upon appeal, an "appellant may obtain a stay by supersedeas bond," and further provides that the "stay takes effect when the court approves the bond."  However, while a supersedeas bond entitles the appellant to a stay as a matter of right, the district court still retains discretion to modify or waive the bond requirement for a stay. *See Kranson v. Fed. Express Corp.*, No. 11-cv-05826-YGR, 2013 WL 6872495, at *1 (N.D. Cal.

---

*(cont'd from previous page)*
total liabilities include $4.026 million in accounts payable (including received invoices from product and service suppliers, SG&A expenses, and R&D and clinical expenses); $1.439 million in accrued liabilities (representing unreceived invoices); and $1.324 million in payroll and related liabilities.  La Decl. ¶ 9 & Ex. 1 at 5.

Dec. 31, 2013) (citing *Dillon v. City of Chi.*, 866 F.2d 902, 904 (7th Cir. 1988); *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 409 (6th Cir. 2003)); *Int'l Telemeter, Corp. v. Hamlin Int'l Corp.*, 754 F.2d 1492, 1495 (9th Cir. 1985). To evaluate whether to modify the bond requirement, courts in the Northern District of California look to factors from *Dillon*:

> (1) the complexity of the collection process; (2) the amount of time required to obtain a judgment after it is affirmed on appeal; (3) the degree of confidence that the district court has in the availability of funds to pay the judgment; (4) whether the defendant's ability to pay the judgment is so plain that the cost of a bond would be a waste of money; and (5) whether the defendant is in such a precarious financial situation that the requirement to post a bond would place other creditors of the defendant in an insecure position.

*Kranson*, 2013 WL 6872495, at *1 (quoting *Dillon*, 866 F.2d at 904-05) (citing *Cotton ex rel. McClure v. City of Eureka*, 860 F. Supp. 2d 999, 1028 (N.D. Cal. 2012)). This case centers on the fifth factor addressing prejudice to QT Vascular's other creditors.

**II.    A Stay Without A Bond Is Appropriate Because Allowing AngioScore To Immediately Enforce The Judgment Would Prejudice QT Vascular's Other Creditors**

A stay of enforcement of the judgment is warranted because allowing AngioScore to immediately enforce the judgment would "so interfere with [QT Vascular's] business or so jeopardize the collectability of other creditors' claims as to throw the company into bankruptcy." *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 786 F.2d 794, 799 (7th Cir. 1986). QT Vascular is a venture-backed company that has received periodic funding sufficient to meet the Company's ongoing operating expenses. *See* Farwell Decl. ¶ 2. However, as a result of the periodic funding, the Company does not maintain liquid assets sufficient to satisfy the judgment in this case. *See id.* ¶¶ 5-6. Thus, permitting AngioScore to immediately execute on its judgment would force QT Vascular into insolvency. *See id.* ¶ 12. Under these circumstances, a stay of proceedings to enforce the judgment under Rule 62 is appropriate. *See Dillon*, 866 F.2d at 904-05 (citing *Olympia*, 786 F.2d at 796).

Furthermore, the facts before the Court justify a modification of Rule 62's bond requirement. An alternative or reduced security is appropriate when, as here, the posting of a supersedeas bond would financially strain the defendant to the point that it "would put the defendant's other creditors in undue jeopardy" and put the defendant into bankruptcy. *Olympia*,

786 F.2d at 796, 799.  In *Olympia*, the defendant Western Union Telegraph Co. ("Western Union") had total assets nominally worth $2 billion, but was "financially distressed and illiquid," and thus could only obtain a bond "by persuading a bank to issue a letter of credit to the bonding company, and it contended that no bank would do this."  *Id.*  The district judge permitted Western Union to post alternate security consisting of a pledge of cash, accounts receivables, and a security interest. *Id.*  The Seventh Circuit affirmed the alternate security, noting that the judge "had to balance the interest of Olympia as a judgment creditor against the interest of the other creditors of Western Union Telegraph who might be harmed if Olympia were allowed to execute its judgment or tie up more of the defendant's assets."  *Id.* at 798.  The court recognized that the appropriate balance accounted for the contingent nature of the judgment creditor's claim in light of the appeal.  *Id.*  The Seventh Circuit concluded that the district court did not abuse its discretion in staying the enforcement of the judgment based on the alternative security.  *Id.* at 799-800.

Here, QT Vascular investigated the feasibility of obtaining a bond in the full amount of the judgment and has concluded that there is no reasonable way to obtain such a bond.  QT Vascular attempted to raise capital to fund ongoing operations and a potential adverse judgment; however those discussions were suspended by the lenders due to the uncertainty of this litigation.  Farwell Decl. ¶ 7 .  On October 6, 2015, the Company again approached Oxford Finance, LLC to discuss the possibility of a new financing.  However, Oxford replied that it is "unable to fund into the financial uncertainty having to do with litigation."  *Id*. ¶ 10.  To understand the requirements to obtain a sufficient bond, the Company contacted ABD Insurance Services ("ABD").  *See* La Decl. ¶¶ 2-3.  ABD informed QT Vascular that the bond would require a letter of credit in the full amount of the bond.  *See id.* ¶ 5.  To investigate obtaining a letter of credit, the Company contacted Silicon Valley Bank (the bank most familiar with QT Vascular's circumstances) and John Sailer (an independent venture-debt advisor with no pre-existing relationship with QT Vascular).  *See id.* ¶ 4; Farwell Decl. ¶ 8.  Both Silicon Valley Bank and Mr. Sailer informed QT Vascular that a letter of credit could only be extended based on a dollar-for-dollar deposit of liquid assets as collateral. *See* La Decl. ¶¶ 6-7; Farwell Decl. ¶¶ 8, 11.  However, in light of the dollar-for-dollar requirement, the Company lacks liquid assets sufficient to obtain a bond in the full amount of the judgment.  *See*

7

Farwell Decl. ¶ 11.  Furthermore, the Company's limited liquid assets (estimated at less than ▇▇▇▇▇▇) are required to continue operations, such as the continued manufacturing and sale of Chocolate, and cannot be sequestered as collateral.  *See id.* ¶ 5.  The Company's non-liquid assets are also needed to maintain the Company's operations or are not readily converted into cash.  *Id.* As a result, QT Vascular cannot obtain a supersedeas bond for the judgment amount and remain in business.[6]  *See* Farwell Decl. ¶¶ 11-12.

In similar situations, courts have properly exercised their discretion and granted motions to stay enforcement of the judgment without a full supersedeas bond.  *See, e.g.*, *Miami Int'l Realty Co. v. Paynter*, 807 F.2d 871, 874 (10th Cir. 1986) (affirming the district court's stay without a supersedeas bond in the full amount of the judgment where the defendant demonstrated that it "was financially unable to post a full bond and that execution on the judgment would place him in insolvency").  Courts do so in recognition of the bond requirement's underlying goal to "preserve the status quo while protecting the non-appealing party's rights pending appeal." *Poplar Grove*, 600 F.2d at 1190-91; *see Alexander v. Chesapeake, Potomac, & Tidewater Books, Inc.*, 190 F.R.D. 190, 193-94 (E.D. Va. 1999) (granting a stay on a reduced security because "any security or bond offered by defendants in this case should simply reflect and preserve defendants' current ability to satisfy the judgment").

Here, requiring a bond in the amount of the judgment would go far beyond preserving the status quo.  Rather, allowing AngioScore to execute on the judgment and force QT Vascular to bankruptcy would not only place the claims of QT Vascular's other creditors in undue jeopardy, but also promote AngioScore's position dramatically by allowing it to tie up the Company's assets. *See Olympia*, 786 F.2d at 798; *id.* at 800 (Easterbrook, J., concurring) ("The supersedeas bond is

---

[6] Forcing the Company to liquidate assets in order to obtain the bond would effectively deprive the Corporate Defendants of their right to appeal.  *See Dawe v. Corrections USA*, No. Civ. S-07-1790 LKK/EFB, 2011 WL 3875854, at *2 (E.D. Cal. Sept. 1, 2011) (reducing the supersedeas bond requirement where the defendant could only obtain a bond in the full amount by liquidating assets, imposing "an undue hardship on defendants because that requirement would deprive defendants of the ability to appeal their case"); *Poplar Grove Planting & Ref. Co. v. Bache Halsey Stuart, Inc.*, 600 F.2d 1189, 1191 (5th Cir. 1979) (citing *Trans World Airlines v. Hughes*, 515 F.2d 173, 178 (5th Cir. 1975) ("If a defendant has to liquidate all or a substantial part of his business in order to exercise the right to appeal, then the appeal may surely be of doubtful value.")).

not supposed to elevate the judgment creditor over other creditors . . . ."). AngioScore's heightened security would come at the cost of the Company's numerous other creditors (whose claims arose prior to the judgment) who would then be forced to seek repayment in bankruptcy proceedings or the equivalent under Singapore law. *See* Farwell Decl. ¶ 12. Accordingly, modification of the bond requirement is appropriate to balance the interests of the Company's existing creditors against AngioScore's contingent interest as a judgment creditor. *See Olympia*, 786 F.2d at 798 (Posner, J.) (recognizing the contingent nature of a judgment creditor's claim); *id*. at 800 (Easterbrook, J., concurring) ("So the district judge has a very difficult task—to make the judgment creditor as well off during the appeal as it would be if it could execute at once, but no better off. Where the judgment debtor lacks the assets or credit necessary to pay at once and in full, this means that the judge should give the creditor less than complete security.").

### III. Allowing AngioScore To Immediately Execute On The Judgment Would Harm The Public Interest

Permitting AngioScore to immediately execute on the judgment would risk harming the public interest by disrupting Chocolate's availability to physicians and patients. At trial, AngioScore proposed a number of alternative remedies, including "an injunction on the sale of Chocolate." Dkt. No. 665 at 57. The Court denied AngioScore's request for an injunction, and instead awarded AngioScore a total of $20.034 million, comprised of $2.97 million in past lost profits, and $17.064 million in future lost profits based on Chocolate remaining on the market through mid-2019. Dkt. Nos. 665 at 59, 63, FF 220.

In declining to enjoin the sales of Chocolate, the Court acknowledged that doing so would erode the public's interest in the availability of novel, effective medical devices. *See* Dkt. No. 665 at 59 (denying AngioScore's request for an injunction that would "remove from the quiver of practicing physicians one arrow with which they might treat a patient"). But permitting AngioScore to immediately enforce its judgment poses similar risks. As noted above, an immediate enforcement of the judgment would make QT Vascular insolvent, forcing it to file for

bankruptcy and its equivalent under Singapore law.[7] While, under ideal circumstances, bankruptcy proceedings would not affect QT Vascular's ability to continue to supply Chocolate to physicians, the practical reality is that forcing QT Vascular into bankruptcy is likely to disrupt the supply of Chocolate.

Bankruptcy proceedings inflict deadweight losses on the company. *See Olympia*, 786 F.2d at 798-99. Furthermore, filing for bankruptcy could affect the Company's relationships with its suppliers and vendors, affecting the supply and distribution chains for Chocolate. The net effect of these possible disruptions would go beyond the Court's goals for the remedy: "the deprivation to the wrongdoer of benefits borne of the breach, and the goal of ensuring that a plaintiff will not continue to be harmed." Dkt. No. 665 at 58. Instead, forcing QT Vascular and its subsidiaries into bankruptcy and potentially interfering with the availability of Chocolate for its "approved . . . medical use in treating complex disease" would risk inflicting substantial harm on the public, particularly if physicians who have determined that Chocolate presents the optimal course of treatment are constrained in their ability to acquire the device for use on their patients. Thus, a modification of the bond requirement is warranted to preserve the public's interest in the continued availability of Chocolate to treat vascular disease.

### IV. QT Vascular's Proposed Modified Security

A court's aim in fashioning an appropriate security for a stay of enforcement is "to put plaintiffs in the same position as they are now at the conclusion of appeal." *Alexander*, 190 F.R.D. at 193-94. The goal of the bond requirement is preservation; it is not intended to be used as a bludgeon for forcing a company out of business or into bankruptcy while it pursues an appeal.[8] Rather, the bond attempts to capture the company's present ability to satisfy the judgment to

---

[7] To the extent that AngioScore seeks to use enforcement of the judgment to force QT Vascular completely out of the market, such a result would be in direct conflict with the Court's decision to award money damages rather than an injunction.

[8] The *Alexander* court recognized that: "Indeed, were a greater bond required, one that fully secured the judgment and costs, a likely scenario would include defendants proceeding to pursue an appeal without a stay of the judgment, plaintiffs seeking to enforce the judgment, and defendants responding by declaring bankruptcy and seeking a discharge of the judgment debt." *Alexander*, 190 F.R.D. at 194 n.15. This is precisely the sequence of events that QT Vascular seeks to prevent with this Motion.

whatever extent is practicable while still continuing its operations during the appeal. This understanding aligns with Judge Easterbrook's recognition in *Olympia* that "[t]here should be a strong preference for a partial bond in the amount of the value of the claim" in order "to make the judgment creditor as well off during the appeal as it would be if it could execute at once, but no better off." 786 F.2d at 800 (Easterbrook, J., concurring).

In accordance with the principles in *Olympia* and *Alexander*, and reflecting the extent of its current inability to satisfy the judgment, QT Vascular offers the following in lieu of a supersedeas bond in the amount of the judgment:

- A mutually-agreeable Monitor will be appointed to confirm that the Company is maintaining the status quo during the pendency of the appeal;
- The Company will refrain from transferring assets out of the United States except as required in the ordinary course of its existing business; and
- The Company will post a supersedeas bond upon a major sale of operational assets or a change in control of the Company.

## **CONCLUSION**

For the foregoing reasons, the Corporate Defendants respectfully request that the Court grant the Motion to Stay Enforcement of Judgment, and exercise its discretion to permit the Corporate Defendants to provide a modified security as set forth in Section IV.

Respectfully submitted,

Dated: October 14, 2015

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: /s/ Dylan J. Liddiard
      DYLAN J. LIDDIARD

Attorneys for Defendants
TRIREME MEDICAL, LLC,
QUATTRO VASCULAR PTE LTD, and
QT VASCULAR LTD