JAMES C. OTTESON (SB No. 157781)
james.otteson@aporter.com
DAVID A. CAINE (SB No. 218074)
david.caine@aporter.com
THOMAS T. CARMACK (SB No. 229324)
tom.carmack@aporter.com
MICHAEL D.K.NGUYEN (SB No. 264813)
michael.nguyen@aporter.com
ARNOLD & PORTER LLP
1801 Page Mill Road, Suite 110
Palo Alto, CA 94304
Telephone:     (650) 798-2920
Facsimile:      (650) 798-2999

Attorneys for Defendants
TRIREME MEDICAL, LLC,
EITAN KONSTANTINO,
QUATTRO VASCULAR PTE LTD.,
and QT VASCULAR LTD.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| ANGIOSCORE, INC.,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>TRIREME MEDICAL, LLC (f/k/a TRIREME MEDICAL, INC.), EITAN KONSTANTINO, QUATTRO VASCULAR PTE LTD., and QT VASCULAR LTD. (f/k/a QT VASCULAR PTE. LTD.),<br><br>　　　　　Defendants. | CASE NO.:  4:12-CV-3393-YGR<br><br>**DEFENDANTS' NOTICE OF MOTION, MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR FINDING OF EXCEPTIONAL CASE AND AWARD OF ATTORNEY FEES**<br><br>Hon. Yvonne Gonzalez Rogers<br><br>DATE:  December 15, 2015<br>TIME:   2:00 pm<br>DEPT:  Courtroom 1, 4th Floor |

# **TABLE OF CONTENTS**

**Page**

NOTICE OF MOTION AND MOTION ...................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ..........................................................2

I.  STATEMENT OF THE ISSUES TO BE DECIDED................................................2

II.  INTRODUCTION ...................................................................................................2

III.  FACTUAL AND PROCEDURAL BACKGROUND................................................3

    A.  AngioScore's Real Purpose in Bringing a Patent Infringement Case was to Disrupt Defendants' Business and Obtain Discovery Sufficient to Allege a Breach of Fiduciary Duty. ...........................................3

    B.  AngioScore's Infringement Theories Were Exceptionally Meritless....................................................................................................5

    C.  AngioScore Repeatedly Attempted to Confuse the Jury by Comparing the "End-to-End" Limitation to Patent Applications and Prototypes that Were Different than the Accused Devices. ...................8

    D.  AngioScore Mischaracterized the State of the Art in an Attempt to Avoid Invalidity. ...................................................................................9

    E.  AngioScore Increased Defense Costs and Violated Applicable Rules and Court Orders Through Its Litigation Conduct.............................9

IV.  ARGUMENT ..........................................................................................................11

    A.  Legal Standard. ...........................................................................................11

    B.  This Case Is Exceptional.............................................................................13

        1.  AngioScore's Improper Motives in Filing, and Maintaining, its Patent Claims Render this Case Exceptional and Warrant Deterrence. .........................................................................13

        2.  AngioScore's Claims Were Objectively Unreasonable and Frivolous from the Start. ...............................................................16

        3.  AngioScore's Litigation Conduct Renders this Case Exceptional...............................................................................18

    C.  The Award of All Fees Billed Is Warranted Under 35 U.S.C. § 285. ......................................................................................................20

        1.  The Requested Fees are Well-Documented. ...................................22

        2.  The Requested Fees Are Reasonable and Reflect the Fees Actually Billed to Defendants..........................................................22

        a.     The requested rates are reasonable and reflect the rates actually charged.............................................................22

        b.     The time Defendants' counsel expended was reasonable and was actually billed to Defendants................24

CONCLUSION ..............................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Cambrian Sci. Corp. v. Cox Commc'ns, Inc.*,
  79 F. Supp. 3d 1111 (C.D. Cal. 2015)...................................................................... 12, 13, 17, 19

*Central Soya Co, Inc. v. Geo. A. Hormel & Co.*,
  723 F.2d 1573 (Fed. Cir. 1983)........................................................................................ 20

*Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*,
  Civil No. 01-2223, 2015 WL 4941793 (E.D. Pa. Aug. 19, 2015) ............................................ 12

*Classen Immunotherapies, Inc. v. Biogen Idec*,
  Civil No. WDQ-04-2607, 2014 WL 2069653 (D. Md. May 14, 2014) ...................................... 21

*Gilbreath Int'l Corp. v. Lionel Leisure, Inc.*,
  622 F. Supp. 478 (E.D. Pa. 1985), *aff'd*, 802 F.2d 469 (Fed. Cir. 1986).................................. 21

*GP Indus,. Inc. v. Eran Indus., Inc.*,
  500 F.3d 1369 (Fed. Cir. 2007)........................................................................................ 12

*Hearing Components, Inc. v. Shure, Inc.*,
  Civ. A. No. 9:07-CV-104, 2008 WL 5572824 (E.D. Tex. 2008) ............................................ 19

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983)................................................................................................. 21, 22

*Highmark, Inc. v. Allcare Health Management System, Inc.*,
  4-03-cv-01384, Dkt. No. 707, slip op. (N.D. Tex. Jun. 23, 2015) ............................................ 13

*Home Gambling Network Inc., v. Piche*,
  2014 WL 2170600 (D. Nev. May 22, 2014) ...................................................................... 21

*Howes v. Med. Components, Inc.*,
  761 F. Supp. 1193 (E.D. Pa. 1990) .................................................................................. 24

*Icon Health & Fitness, Inc. v. Octane Fitness, LLC*, Civil No. 09-319 ADM/SER,
  2015 WL 4041684 (D. Minn. July 1, 2015)........................................................................ 11

*In re Dahlgren Int'l Inc.*,
  819 F. Supp. 568, 27 U.S.P.Q.2d 1096 (N.D. Tex. 1992) .................................................. 24, 25

*Intellect Wireless, Inc. v. Sharp Corp.*,
  2014 WL 2443871 (N.D. Ill. May 30, 2014) ...................................................................... 21

*Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), *abrogated
  in part by Blanchard v. Bergeron*, 489 U.S. 87 (1989)...................................................... 21, 22

*JS Prods., Inc. v. Kabo Tool Co.*,
  No. 2:11–cv–01856 ........................................................................................................ 12

*Kilopass Tech., Inc. v. Sidense Corp.*,
  No. 10- cv-02066, 2015 U.S. Dist. LEXIS 30650 (N.D. Cal. Mar. 11, 2015) ............................ 20

*Kilopass Tech. Inc. v. Sidense Corp.*,
  No. C 10-02066 SI, 2014 WL 3956703 (N.D. Cal. Aug. 12, 2014) ................................. 13, 17, 21

*Lam, Inc. v. Johns-Manville Corp.*,
  718 F.2d 1056 (Fed. Cir. 1983) ............................................................................... 21, 22

*Lumen View Tech., LLC v. Findthebest.com, Inc.*,
  2014 WL 2440867 (S.D.N.Y. May 30, 2014) .............................................................. 21

*Mathis v. Spears*,
  857 F.2d 749 (Fed. Cir. 1988) ................................................................................ 21

*Nikko Materials USA, Inc. v. R.E. Serv. Co. Inc.*, No. C 03-2549 SBA, 2006 WL
  118438 (N.D. Cal. Jan. 13, 2006) ........................................................................ 20, 25

*Octane Fitness, LLC v. Icon Health & Fitness, Inc.*,
  134 S. Ct. 1749 (2014) ....................................................................................... *passim*

*Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*,
  478 U.S. 546 (1986) ........................................................................................... 22

*Powell v. Home Depot, U.S.A., Inc.*,
  No. 07-80435-CIV, 2010 WL 4116488 (S.D. Fla. Sep. 14, 2010) ............................... 20

*Segan LLC v. Zynga Inc*,
  2015 WL 5315945 (N.D. Cal. Sept. 10, 2015) .................................................... 13, 17

*Sunstar, Inc. v. Alberto-Culver Co.*,
  No. 01 C 0736, 01 C 5825, 2004 WL 1899927 (N.D. Ill. Aug. 23, 2004) ................................. 19

*Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*,
  549 F.3d 1381 (Fed. Cir. 2008) .............................................................................. 25

*Trend Products Co. v. Metro Indus. Inc.*,
  No. CV 84-7740 AHS, 1989 WL 418777, 10 U.S.P.Q.2d 1539 (C.D. Cal. Apr.
  11, 1989) ....................................................................................................... 20

*U.S. v. Alisal Water Corp.*,
  431 F.3d 643 (9th Cir. 2005) ................................................................................ 19

**STATUTES**

35 U.S.C. § 285 ............................................................................................. *passim*

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on December 15, 2015, at 2:00 p.m., before the Honorable Yvonne Gonzalez Rogers, Defendants TriReme Medical, LLC ("TriReme"), Eitan Konstantino ("Konstantino"), Quattro Vascular Pte Ltd. ("Quattro"), and QT Vascular Ltd. ("QT Vascular") (collectively, "Defendants") shall and hereby do move the Court for an order finding that this case is "exceptional" and awarding Defendants their attorneys' fees under 35 U.S.C. § 285, Federal Rule of Civil Procedure 54(d), and the Court's inherent power to impose sanctions.  This motion is based on the memorandum of points and authorities below, the trial record, all pleadings and papers on file in this action, such matters as are subject to judicial notice, and all other matters or arguments that may be presented in connection with this motion.

Pursuant to Northern District of California Civil Local Rule 54-5(b)(1), counsel for the Defendants met and conferred with counsel for AngioScore, Inc. ("AngioScore") on October 22, 2015, in an effort to resolve this motion.  *See* Declaration of David A. Caine in Support of Defendants' Motion for Attorney Fees Pursuant to 35 U.S.C. § 285 ("Caine Decl.") ¶ 28 & Ex. 4. The parties were not able to reach an agreement resolving this motion.  *See* Caine Decl. ¶ 28.

Dated:  October 28, 2015                    ARNOLD & PORTER LLP

By:      /s/ David A. Caine
              David A. Caine

Attorneys for Defendants

1    <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2    **I.    STATEMENT OF THE ISSUES TO BE DECIDED**

3         1.    Are the Defendants entitled to recover the attorneys' fees they incurred in defending

4    against AngioScore's patent infringement suit under 35 U.S.C. § 285, Federal Rule of Civil

5    Procedure 54(d), and the Court's inherent power to impose sanctions and, if so, in what amount?

6    **II.    INTRODUCTION**

7         Any of a number of factors are sufficient to independently render the present action

8    exceptional pursuant to 35 U.S.C. § 285, which requires only that this case "stand out from others."

9    *Octane Fitness, LLC v. Icon Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014).  The totality of

10   circumstances, including AngioScore's motives in bringing (and maintaining) suit, the objective

11   unreasonableness of its positions and its litigation conduct, confirm that an exceptional case finding

12   is warranted and fees should be awarded.

13        Roughly two years after filing its initial complaint, AngioScore's motive in bringing its suit

14   for patent infringement came into stark relief when AngioScore moved for leave to add new causes

15   of action to its complaint:  AngioScore wished to disrupt Defendants' business and take unfettered

16   discovery in furtherance of a claim for breach of fiduciary duty (and to do it in the Federal court

17   jurisdiction that AngioScore favored).  AngioScore's readiness to drop one of its two asserted

18   patents at the first challenge by Defendants and its unwillingness to offer any substantive support

19   for maintaining the second was the first clue to its true intent.  Early emails from AngioScore's

20   executives confirm it.  AngioScore discussed the fiduciary duty claim with its attorneys years before

21   filing its patent claim and its CEO boasted internally about "a big surprise" that would disrupt

22   Defendants' acquisition by a potential suitor.

23        AngioScore's substantive positions and litigation conduct related to its patent claim also

24   confirm that AngioScore's assertion of the '119 patent was nothing more than a pretext.  It is now

25   clear that AngioScore never had a reasonable argument with respect to the "end," "attached,"

26   "longitudinal expansion" and "longitudinally shorten" limitations.  From arguing that "end" means

27   "end region" in claim construction to violating an express order of the Court in presenting a

28   precluded DOE theory at trial, AngioScore continuously flailed about for—and never succeeded in

devising—a cogent argument on this limitation.  Likewise, AngioScore conducted no testing and had no explanation for how the Chocolate constraining structure could be "attached" to the catheter shaft, knowing all along that it was bonded to the balloon instead.  Evidence from *AngioScore's own experts* conclusively established that the accused Chocolate devices do not undergo "longitudinal expansion" and do not "longitudinally shorten."

In apparent recognition of the objective weakness of its case, AngioScore resorted to unreasonable litigation conduct that needlessly multiplied Defendants' legal fees.  Most egregiously, AngioScore knowingly withheld data and photographs underlying the only measurements of the accused devices taken by any of its five infringement experts.  After misleading Defendants regarding the production of this material and then obfuscating after the truth came out, AngioScore showed no remorse until faced with sanctions that were ultimately imposed.  AngioScore continued its sharp practices by unilaterally ending an expert deposition (requiring Defendants to seek the Court's intervention), retaining multiple experts on the same topics and forcing Defendants to incur fees to, *inter alia*, depose them and prepare for their cross-examinations.  AngioScore also induced its expert, Mr. Horzewski to violate a court order at trial.

In short, this case is exceptional.  Should the Court so find, Defendants have detailed their legal fees below—all of which are fees actually billed.  As shown below, and in the attached declarations, the billing rates and hours charged to Defendants are reasonable and should be awarded in their entirety in the total amount of $4,786,497.75, plus fees incurred for the present motion.  For these reasons, Defendants respectfully request that the Court grant their Motion.

## III.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    AngioScore's Real Purpose in Bringing a Patent Infringement Case was to Disrupt Defendants' Business and Obtain Discovery Sufficient to Allege a Breach of Fiduciary Duty.

AngioScore initiated this case with a complaint filed on Friday, June 29, 2012, alleging that Defendants' Chocolate® Angioplasty Balloon Catheter (the "Chocolate device") infringed two patents:  U.S. Patent Nos. 7,691,119 ("the '119 patent") and 7,931,663 ("the '663 patent").  Dkt. No. 1.  The following Monday, July 2, 2012, AngioScore trumpeted its lawsuit in a press release announcing the filing.  Caine Decl. Ex. 5.  Thus began AngioScore's strategic efforts to both disrupt

1     Defendants' business and use the patent infringement lawsuit as a pretext to obtain discovery in

2     support of its breach of fiduciary duty allegations.  In fact, in an e-mail sent only weeks before

3     AngioScore filed its complaint for patent infringement, AngioScore's CEO, Tom Trotter, confirmed

4     that the lawsuit was intended to disrupt investment in or acquisition of Defendants by a company

5     that his subordinate thought might be interested in TriReme:  "If so, they may be in for a big

6     surprise when they move toward a close and find TriReme is facing a potential major lawsuit."

7     Caine Decl. Ex. 6.  Mr. Trotter also boasted to AngioScore's sales team:  "They [Defendants] will

8     soon be hearing from us."  *Id.*

9         AngioScore's real purpose was clear from the outset.  On August 7, 2012, counsel for

10     Defendants wrote a detailed letter to counsel for AngioScore explaining why the Chocolate device

11     could not infringe any asserted claim of either the '119 or '663 patents.  Caine Decl. Ex. 7.  Days

12     later, AngioScore acknowledged that it lacked any good faith basis to assert infringement of the

13     '663 patent by filing a first amended complaint that removed all references to it.  Dkt. No. 12.  And,

14     even though AngioScore refused to withdraw the '119 patent, the August 16, 2012, response from

15     its counsel failed to identify any pre-suit analysis or justification for its infringement allegations.

16     Caine Decl. Ex. 8.  Indeed, AngioScore's counsel refused to engage in any discussion of the merits

17     after being informed that the struts of the Chocolate device (1) do not undergo longitudinal

18     expansion when the balloon inflated and (2) do not extend from the proximal end to the distal end.

19     *Id.*; *see also* Caine Decl. Exs. 9.  Although AngioScore denigrated the prevailing noninfringement

20     theories as "unpersuasive in the extreme" and "weak and incomplete," it avoided offering any

21     explanation as to why the Chocolate device infringed at the time.  Caine Decl. Ex. 10.  We now

22     know why.  Based on the case presented at trial, AngioScore never had any colorable evidence of

23     infringement on the very limitations identified as missing in correspondence sent at the outset of the

24     case.  But, the frivolity of AngioScore's claim was no deterrence because it was irrelevant to

25     AngioScore's dual objectives.

26         AngioScore clearly wanted to pursue a fiduciary duty claim long before it filed a complaint

27     alleging patent infringement.  On March 2, 2010, AngioScore's CFO, Jim Andrews, wrote to Mr.

28     Trotter that he had "just spoke with Steve Sawyer about a potential claim involving Eitan."  Caine

Decl. Ex. 11.  AngioScore's attorney, Mr. Sellers, confirmed that in the same time frame—March 2010—AngioScore's executives and directors had conversations about whether to bring a fiduciary duty claim against Dr. Konstantino.  Dkt. No. 617 at 305:15-306:25.  But AngioScore bided its time, and, after filing its complaint for patent infringement, set out to obtain discovery in support of the breach of fiduciary duty claim it had yet to bring.  In fact, in seeking leave to amend its complaint to add the fiduciary duty claim, AngioScore described how it questioned Dr. Konstantino in December 2013 on the timing of Chocolate's development and then took Mr. Feld's deposition for the same purpose.  *See* Dkt. No. 202, at 2, 9-10, 15; Dkt. No. 203-3 (12/17/13 Konstantino Dep. Tr. at 147-17-148:5, 148:21-153:16).  The timing of the Chocolate device's development, however, is not remotely relevant to the claim for patent infringement, and AngioScore's motion revealed its true intention in bringing the patent infringement claim:  "to obtain sufficient evidence of the breach of fiduciary duty by Konstantino to permit its counsel to plead causes of action arising from that breach."  Dkt. No. 202, at 15.  Consistent with that intention, AngioScore later urged the Court to try the fiduciary duty claim first, even though it had been filed second, and told the Court that a trial on the patent case was highly unlikely.  Dkt. No. 582 at 116:14-118:10 (AngioScore's counsel:  "The core of the wrong for which we're seeking redress is defendant's concealment of his duty -- of his development efforts regarding Chocolate. . . .  I have a high, high degree of confidence that however that fiduciary duty trial comes out, there will not need to be a trial on the patent case . . . .").

## B.    AngioScore's Infringement Theories Were Exceptionally Meritless.

As Defendants informed AngioScore at the beginning of the case, the Chocolate device lacks struts that:  (1) extend from end to end; and (2) undergo longitudinal expansion when the balloon inflated.  *Compare* Caine Decl. Exs. 7 & 9 *with* Caine Decl. Ex. 12.  In opposing Defendants' Rule 11 motion, AngioScore focused its argument on a purportedly alternative configuration for the Chocolate device.  Dkt. No. 32, at 4-8.  Yet, AngioScore knew from information provided by Defendants that this purportedly alternative configuration was never made or sold.  Dkt. No. 43.  AngioScore never came forward with any evidence to the contrary.

With respect to the actual Chocolate device, AngioScore proposed an untenable construction of the term "end" that would replace that plain English word with a different term, "region," having a different meaning.  Dkt. No. 32, at 8-16.  Subsequently, the Court correctly rejected AngioScore's claim construction as "unacceptable" and "out of step" with the intrinsic evidence:

> As to AngioScore's propose construction, it contains no limiting principle, that is, no way to determine where the "end region" ends and the rest of the device begins.  As such, it is unacceptably vague.  It also is out of step with the patent's own level of specificity, which distinguishes with reasonable care between the particular elements of the invention and sub-elements thereof.

Dkt. No. 218, at 13.

Indeed, AngioScore's proposed construction relied on a subterfuge.  AngioScore conflated the "end" of the stent with the "ends" of each strut.  In the illustrated embodiments, the latter had bends while the former did not.  Dkt. No. 218, at 11 ("This distinction, if accepted, would strongly contradict AngioScore's preferred construction, which conflates the 'end' of the stent with the bends in the struts.").  Additional portions of the specification also undermined AngioScore's proposed construction and demonstrated that it was implausible:

> [The] first sentence [of the paragraph starting at col. 2:50] states:  "As seen in FIGS. 1-4, each *end* of the linear, longitudinally aligned four struts 5 has a sinusoidal bend 6 that allows the laser cut hypo tube to expand longitudinally when the balloon 1 is inflated." ('119 Patent, col. 2:49-52 (emphasis supplied).)  This language, on which AngioScore heavily relies, places the bends at the end of the *strut*, not, as AngioScore suggests, the end of the *stent*.  AngioScore also points to the specification's use of the term "end" to refer to the necks at the proximal and distal ends of the balloon. (*Id.*, col. 2:24-25.)  In both instances, AngioScore reads the specification's description of the ends of the *struts* or of the *balloon* to inform the meaning of "end" as used in Claim 1, where it describes the ends of the *stent*. (Opp'n at 14; Pl. CC Brief at 15; Pl. CC Reply Brief at 11.)  The difficulty with AngioScore's position is that Claim 1 distinguishes between the component parts of the stent such that the end of a strut is not necessarily the end of the stent.  Rather, the patent teaches that the struts are located *between*, and *connect*, the ends of the stent.  The ends of the struts are distinct from the ends of the stent, of which the struts form a part. (*See* '119 Patent, col. 4:19-22 (contrasting the stent and strut in that the struts expand *longitudinally* to accommodate the stent's *radial* expansion).)  The patent specification does not support equating the bends of the struts with the end of the stent.  Since this is the bedrock upon which AngioScore's proposed construction rests, that construction founders.

*Id.* at 11-12 (emphasis in original).  Having rejected AngioScore's proposed construction, the Court then found, based in part on AngioScore's admissions, that Chocolate's struts did not extend from

the proximal end to the distal end of the constraining structure (which AngioScore characterized as the claimed hypo tube or stent).  *Id.* at 26-27.

AngioScore's doctrine of equivalents theory was that Chocolate's non-end-to-end struts were equivalent to the claimed struts because "a small portion of the strut had been removed," and that piece was inconsequential.  The Court permitted AngioScore to proceed on that theory, but recognized that equivalents had only been "minimally" set forth in AngioScore's infringement contentions.  *Id.* at 29.  At trial, however, AngioScore presented no evidence that Chocolate's struts ever had a "small portion" that was "removed."  *See* Dkt. No. 771 at 1985:6-1990:7 (instead offering evidence through Mr. Horzewski that Chocolate's struts are purportedly equivalent because the struts form part of a "continuous network made from a single piece of hypo tube")).  AngioScore never performed a function-way-result analysis of equivalents, and never presented any analysis of insubstantial differences beyond the conclusory statement in its infringement contentions.  Dkt. No. 749, at 7-8.  Moreover, AngioScore never disputed Defendants' evidence that, if the purportedly missing segments were added to the Chocolate device, the resulting struts would not work because they would jut out and dissect the patient's artery.  Dkt. No. 133-3 (¶ 9).

On the remaining disputed limitations, AngioScore never presented a theory of infringement under the doctrine of equivalents, and never obtained or presented any colorable evidence that Chocolate's structures satisfied the limitations identically.  The Court granted summary judgment with respect to AngioScore's doctrine of equivalents theories for the "longitudinal expansion" and "attached" limitations.  *See* Dkt. No. 218, at 33, 35-36.  With respect to literal infringement, AngioScore's own evidence—consistent with Defendants' evidence—demonstrated that Chocolate's struts do not change shape in the longitudinal dimension when the balloon inflates and deflates.  *See* Caine Decl. Exs. 13 & 14.  Furthermore, AngioScore never obtained or presented scientifically sound measurements of whether Chocolate's struts longitudinally expand or shorten upon balloon inflation and deflation.  Consequently, AngioScore never had any evidence that the Chocolate device satisfied either of these limitations.

Likewise, AngioScore adduced no evidence that the ends of Chocolate's constraining structure (i.e., the "lemons" or Pac-men") are attached to the proximal or distal ends of the catheter

1    shaft.  Early on and again at trial, Dr. Konstantino explained how Chocolate's constraining structure

2    is bonded to the balloon, not the catheter shaft, and that the balloon is not bonded to the distal shaft

3    (proximal) or guide wire member (distal) at the same place.  *See* Dkt. No. 133-3 (¶¶ 16-18); Dkt.

4    No. 772 at 2326:25-2328:10; 2359:6-2369:3.  Dr. Konstantino also explained how a bond strength

5    testing document proved that the bonds between the constraining structure and the balloon are

6    distinct from the bonds between the balloon and the distal shaft (proximal) or guide wire member

7    (distal).  *See* Dkt. No. 793 at 2389:8-2395:20; Caine Decl. Ex. 15.  Ignoring this evidence,

8    AngioScore relied solely on the conclusory opinions of Mr. Horzewski.  Mr. Horzewski, however,

9    was forced to admit that he never investigated Chocolate's bonding by either cutting a sample apart

10    or sending one to a materials analyzing facility.  *See* Dkt. No. 771 at 2078:10-2079:13, 2083:12-17.

11    Rather, he relied only on documents that expressly contradicted his opinions because they show that

12    Chocolate's constraining structure is not bonded to the catheter shaft.  *See* Caine Decl. Exs. 16-18.

### C. AngioScore Repeatedly Attempted to Confuse the Jury by Comparing the "End-to-End" Limitation to Patent Applications and Prototypes that Were Different than the Accused Devices.

15    Starting with its opening statement, AngioScore presented the jury with prototypes and

16    patent applications that showed devices with full-length struts.  Dkt. No. 768 at 1634:21-1635:20

17    (discussing PX3722, PX3751 and DX4011).  This practice continued with AngioScore's adverse

18    examination of Dr. Konstantino.  Dr. Konstantino, however, confirmed what a simple inspection

19    reveals:  No commercial Chocolate device has full-length struts as shown in one of the

20    embodiments in one of his patent applications.  Dkt. No. 769 at 1857:5-6.  Dr. Konstantino also

21    confirmed that no Chocolate device has full-length struts by design because all early prototypes

22    with full-length struts failed.  Dkt. No. 772 at 2336:24-2337:4, 2342:5-2343:1, 2343:15-24, 2344:3-

23    7.  Nevertheless, AngioScore went on to read selective deposition testimony from Mr. Feld

24    regarding an engineering diagram and prototype photograph with full-length struts.  Dkt. No. 769 at

25    1793:22-1795:5.  And, AngioScore returned to these document repeatedly all of the way through

26    the conclusion of its closing argument.  Dkt. No. 798 at 2858:7-25.  But AngioScore knew before

27    presenting this evidence that Mr. Feld's prototype was a failure because Mr. Feld had explicitly

28    testified, in a portion of his deposition that AngioScore chose not to read to the jury, that the RD12

1    prototype failed.  Caine Decl. Ex. 19 at 109:6-116:11.  He also referred to an additional photograph

2    of the prototype that showed its failure, which was produced in this litigation, but which

3    AngioScore did not show to the jury.  *Id.* at 113:17-114:10; Caine Decl. Ex. 20.

     **D.**      **AngioScore Mischaracterized the State of the Art in an Attempt to Avoid Invalidity.**

6    AngioScore premised its response to Defendants' invalidity defense on the assertion that

7    deployable stent references were outside the scope of relevant art, and thus could not be considered.

8    Among other things, Mr. Horzewski testified that prior art stents' avoidance of foreshortening was

9    somehow different than the '119 patent's allowance of longitudinal expansion.  Dkt. No. 781 at

10   2755:5-14.  The evidence, all of which AngioScore had prior to trial, contradicted this theory.  As

11   an initial matter, the '119 patent itself is defined in terms of stents—something that is self-evident

12   from its title:  Balloon Catheter with ***Non-Deployable Stent***.  Caine Decl. Ex. 12 (emphasis added).

13   Both the PTO and the inventor found deployable stents to be highly relevant art, listing several stent

14   patents as cited references during prosecution.  *See, e.g.*, Caine Decl. Ex. 12 (References Cited);

15   Caine Decl. Ex. 21; Caine Decl. Ex. 22.  More importantly, Mr. Farnan, the inventor, testified

16   specifically that he learned how deployable stents dealt with foreshortening "to incorporate that into

17   our design challenge."  Dkt. No. 781, Farnan Depo., at 40:03-41:05.  AngioScore's other validity

18   expert, Dr. Marmur, confirmed that a similar principle applied to both avoiding foreshortening and

19   allowing longitudinal expansion.  Caine Decl. Ex. 23 at 118:10-19.  Finally, Mr. Horzewski

20   acknowledged on cross examination that the bends perform the same function in prior art stents to

21   prevent foreshortening as they do in the '119 patent to allow longitudinal expansion.  Dkt. No. 781

22   at 2791 at 7-17.  After hearing Defendants' relatively brisk invalidity defense, and AngioScore's

23   inept response, the jury found all asserted claims invalid as obvious in under an hour.

     **E.**      **AngioScore Increased Defense Costs and Violated Applicable Rules and Court Orders Through Its Litigation Conduct.**

26   Throughout the case, AngioScore needlessly multiplied Defendants' legal fees by engaging

27   in conduct that either violated applicable rules and orders or served no legitimate purpose.  As noted

28   above, AngioScore failed to conduct a proper pre-filing investigation.  Defendants were forced to

1   litigate an infringement claim under the '663 patent that should never have been filed, and which

2   AngioScore only withdrew under threat of Rule 11 sanctions.  Similar behavior marked

3   AngioScore's litigation conduct throughout the case.  For example, AngioScore failed to produce all

4   of Dr. Levenston's testing material, maintained multiple experts on the same subjects through the

5   start of trial, cut off the deposition of one of its experts, and presented a doctrine of equivalents

6   argument at trial that the Court had precluded.

7           AngioScore served Dr. Levenston's report on February 7, 2014.  Dkt. No. 686 at 1.  The

8   report relies on two sessions in which Dr. Levenston took measurements of accused Chocolate

9   devices.  Dkt. Nos. 393-14 at 26; 769 at 1897:5-21.  Defendants, however, did not discover until

10   nearly a year later that AngioScore had failed to produce data, photos and other information relating

11   to the measurements.  Dkt. No. 686 at 3-4.  Dr. Levenston admitted that there was "no specific

12   reason" for withholding the missing information.  *Id*. at 3.  It was not until the eve of trial, nine

13   months later, when AngioScore proposed producing the missing material and presenting Dr.

14   Levenston for a supplemental deposition.  Dkt. No. 743 at 93:8-13.  Consequently, the Court barred

15   Dr. Levenston from relying on his measurements at trial and required AngioScore to make a proffer

16   before presenting any of his testimony.  Dkt. No. 749 at 7.  AngioScore's violation of Federal Rules

17   of Civil Procedure 26 and 37 required Defendants and Mr. Sheehan to spend significant resources

18   responding to Dr. Levenston's report, preparing for and taking his deposition, drafting a motion *in*

19   *limine* about his testimony, and preparing to cross examine him on precluded topics at trial.

20           AngioScore's presentation of multiple overlapping experts through trial also unduly

21   multiplied Defendants' expenses.  AngioScore served reports from five experts on infringement and

22   two on validity.  Dkt. No. 684 at 1-2.  Three of AngioScore's infringement experts testified at trial.

23   *See* Dkt. Nos. 768, 769.  Although, the Court precluded one of them from testifying with respect to

24   certain topics—and AngioScore agreed to limit another in response to Defendants' motion *in*

25   *limin*e—all three testified with respect to the end-to-end limitation.  Dkt No. 749 at 6-7; Dkt No.

26   768 at 1724:3-17:26:19 (Bleam); Dkt No. 769 at 1891:18-1892:22 (Levenston); Dkt No. 771 at

27   1985:6-1990:7 (Horzewski).  Both Mr. Horzewski and Dr. Levenston also testified about the

28   "longitudinal expansion" and "longitudinally shorten" limitations.  *See, e.g.*, Dkt. No. 769 at

1   1877:23-1878:6 (Levenston); Dkt No. 771 at 1990:8-1992:15, 2002:22-2005:18.  AngioScore listed

2   both its validity experts on its witness list, yet only informed Defendants that Dr. Marmur would not

3   testify halfway through the trial.  Dkt. No. 712 at 3; Dkt No. 798 at 27:28:5-2729:9.  Defendants,

4   Mr. Sheehan and Dr. Almedhychy spent significant resources responding to, deposing, and

5   preparing to cross examine the two infringement experts and invalidity expert who were not called

6   at trial, as well as Dr. Levenston and Mr. Bleam regarding the topics on which they were precluded

7   and the areas of the their trial testimony that were cumulative.  *See, e.g.*, Caine Decl. Ex. 24.

8            AngioScore's litigation conduct regarding its damages expert also needlessly multiplied

9   Defendants' fees.  Specifically, AngioScore instructed Mr. Olsen to walk out in the middle of the

10  deposition, requiring Defendants to seek relief from the Court.  Observing that AngioScore's

11  conduct "boggle[d her] mind" and was "consistent not with truth seeking, [but] only consistent with

12  obstructionism," Judge Corley ordered a second deposition.  Dkt. No. 493 at 9:6-11:7.

13           As a final, non-exhaustive example of its litigation conduct, AngioScore presented Mr.

14  Horzewski at trial to testify on a doctrine of equivalents theory regarding the end-to-end limitation

15  that the Court had expressly precluded.  In response to Defendants' motion *in limine*, the Court

16  barred Mr. Horzewski from offering an opinion "that the struts and rings of the accused device are

17  'part of a single integral structure.'"  Dkt. No. 749 at 8.  The entire basis for Mr. Horzewski's DOE

18  opinion at trial, however, was his testimony that the Chocolate constraining structure (*i.e.*, "the

19  struts and rings") "is this ***continuous network*** made from a ***single piece*** of hypo tube."  Dkt. No.

20  771 at 1985:6-1990:7 (emphasis added).  AngioScore's misconduct forced Defendants to address at

21  trial a DOE theory that the Court had precluded.

22  **IV.    ARGUMENT**

23           **A.    Legal Standard.**

24           The Patent Act provides that "[t]he court in exceptional cases may award reasonable

25  attorney fees to the prevailing party."  35 U.S.C. § 285.  An "'exceptional' case is simply one that

26  stands out from others with respect to the substantive strength of a party's litigating position

27  (considering both the governing law and the facts of the case) or the unreasonable manner in

28  which the case was litigated."  *Octane Fitness, LLC v. Icon Health & Fitness, Inc.*, 134 S. Ct.

1   1749, 1756 (2014).  "Section 285 discourages certain 'exceptional' conduct by imposing the cost

2   of bad decisions on the decision maker."  *Cambrian Sci. Corp. v. Cox Commc'ns, Inc.*, 79 F. Supp.

3   3d 1111, 1114 (C.D. Cal. 2015).

4          District courts determine whether a case is exceptional "considering the totality of the

5   circumstances."  *Octane Fitness*, 134 S. Ct. at 1756.  In this analysis, the cumulative impact of

6   individual factors may combine to make a case exceptional.  *See, e.g.*, *Icon Health & Fitness, Inc. v.*

7   *Octane Fitness, LLC*, Civil No. 09-319 ADM/SER, 2015 WL 4041684, at *9 (D. Minn. July 1,

8   2015) (holding on remand that cumulative impact of Plaintiff's behavior justified fee award).

9   Among the factors district courts may consider are "frivolousness, motivation, objective

10  unreasonableness (both in the factual and legal components of the case) and the need in particular

11  circumstances to advance considerations of compensation and deterrence."  *Octane Fitness*, 134 S.

12  Ct. at 1756 n.6 (listing factors).  In short, attorneys' fees under 35 U.S.C. § 285 are awarded where

13  "a party's  unreasonable conduct—while not necessarily independently sanctionable—is

14  nonetheless so 'exceptional' as to justify an award of fees."  *Id*. at 1757.  "A case presenting either

15  subjective bad faith or exceptionally meritless claims may sufficiently set itself apart from mine-run

16  cases to warrant a fee award."  *Id*.

17         Furthermore, "a patentee does not act in good faith if it raises an infringement claim in

18  which 'no reasonable litigant could realistically expect success on the merits.'"  *GP Indus,. Inc. v.*

19  *Eran Indus., Inc*., 500 F.3d 1369, 1374 (Fed. Cir. 2007) (citation omitted).  "For this reason, proper

20  investigation is an important pre-requisite to filing an infringement claim . . . ."  *JS Prods., Inc. v.*

21  *Kabo Tool Co*., No. 2:11–cv–01856 RCJ-GWF, 2014 WL 7336063, at *4 (D. Nev. Dec. 22, 2014).

22  Nor does it matter whether the case survived summary judgment and proceeded to trial.  A case

23  need not have been "objectively baseless" to justify the award of fees.  *See Octane Fitness*, 134 S.

24  Ct. at 1756.  A case that proceeds to trial given the summary judgment pleading standard may still

25  be particularly weak and justify the award of fees  *See, e.g.*, *Checkpoint Sys., Inc. v. All-Tag Sec.*

26  *S.A.*, Civil No. 01-2223, 2015 WL 4941793, at *5 (E.D. Pa. Aug. 19, 2015) (awarding fees after

27  having denied defendant's *Daubert* motion, motion for directed verdict, and motion for judgment as

28  a matter of law).

District courts have found cases exceptional and awarded fees where the plaintiff conducted an inadequate pre-filing investigation, asserted patents that were never commercialized, had anticompetitive motives for the suit, where plaintiff's own expert testimony cut against it, and where the plaintiff failed to articulate an infringement theory that met the court's claim construction. *See Icon Health & Fitness, Inc.*, 2015 WL 4041684, at \*4-6, 9 (awarding fees where plaintiff's literal and doctrine-of-equivalents infringement arguments were weak, plaintiff litigated in an unreasonable manner, plaintiff's litigation tactics had improper purpose and motivation, and the patent was uncommercialized); *Kilopass Tech. Inc. v. Sidense Corp.*, No. C 10-02066 SI, 2014 WL 3956703, at \*9 (N.D. Cal. Aug. 12, 2014) (awarding fees where plaintiff asserted baseless literal and doctrine-of equivalents infringement arguments, conducted an inadequate pre-filing investigation, and took inconsistent positions); Caine Decl. Ex. 25 (*Highmark, Inc. v. Allcare Health Management System, Inc.*, 4-03-cv-01384, Dkt. No. 707, slip op. at 3 (N.D. Tex. Jun. 23, 2015)) (awarding fees on remand where plaintiff failed to conduct adequate pre-filing investigation and maintained claims after its own experts showed they were without merit to maintain leverage against defendant); *Segan LLC v. Zynga Inc.*, 2015 WL 5315945, at \*5 (N.D. Cal. Sept. 10, 2015) (awarding fees where claim construction position was frivolous); *Cambrian Sci. Corp. v. Cox Commc'ns, Inc.*, 79 F. Supp. 3d 1111, 1115-16 (C.D. Cal. 2015) (awarding fees where plaintiff did not articulate infringement theory that met court's claim construction, experts did not evaluate the accused products, and counsel engaged in improper litigation behavior).  Entitlement to fees under § 285 may be shown by a preponderance of the evidence.  *See Octane Fitness*, 134 S. Ct. at 1758.

**B.**   **This Case Is Exceptional.**

It is undisputed that Defendants are "prevailing parties" as to the patent claims at issue.  The jury found in Defendants' favor and against AngioScore on every patent claim and defense.

**1.**   **AngioScore's Improper Motives in Filing, and Maintaining, its Patent Claims Render this Case Exceptional and Warrant Deterrence.**

The '119 patent is one that AngioScore purchased, as a patent application, from Novoste Corporation ("Novoste") in 2005 along with eight other patent applications for $150,000.  *See* Caine Decl. Ex. 26, at 1, 4; Dkt. No. 768 at 1700:23-1701:21, 1705:4-8.  No one ever made, used or

1    sold a single device embodying the claims of the '119 patent.  The named inventor, Robert Farnan,

2    testified that Novoste never succeeded in building a working prototype.  *See* Dkt. No. 793 at

3    2446:14-19 (Farnan Depo. Tr., at 62:21-24, 63:19-21, 64:10, 79:16-80:3, 80:5-22, 80:24-81:2, 81:4-

4    7, 81:19-21, 81:23-25, 82:3-10, 83:2-20, 272:24-273:4, 273:6-277:7, 278:2-280:6); Caine Decl. Ex.

5    27, at BP0007688-693.  Mr. Bleam, Mr. Trotter, Mr. Horzewski and Mr. Olsen all admitted that

6    AngioScore's AngioSculpt product does not embody any of the claims of the '119 patent.  *See* Dkt.

7    No. 768 at 1730:25-1731:7; Dkt. No. 772 at 2256:2-2259:4; Dkt. No. 794 at 2662:15-2663:11,

8    2665:11 (Trotter (8/28/14) Depo. Tr., at 131:20-132:6, 135:24-136:19, 142:23-143:9, 143:18-

9    144:11, 145:2-9, 147:23-148:1, 148:9-12, 148:14-21, 148:25-149-8); Dkt. No. 798 at 2797:6-22.

10   Indeed, AngioScore's primary corporate witness at trial, Mr. Andrews, had never even seen the

11   '119 patent prior to having his deposition taken in the case.  *See* Dkt. No. 758 at 1698:25-1699:5.

12          Dr. Konstantino, the inventor of the Chocolate device, and the inventor of AngioScore's

13   AngioSculpt product, testified that different patents—those listing him as an inventor—covered the

14   AngioSculpt product.  *See* Dkt. No. 772 at 2315:23-2316:25.  Mr. Trotter readily admitted that

15   AngioScore saw no reason to even attempt to commercialize the '119 patent because the

16   AngioSculpt device invented by Dr. Konstantino and others was a superior, more commercially

17   successful device.  *See* Dkt. No. 794 at 2662:15-2663:11, 2665:11 (Trotter (8/28/14) Depo. Tr., at

18   135:24-136:19, 143:18-144:11).  Accordingly, AngioScore sued Defendants for allegedly infringing

19   a patent that AngioScore did not practice, that no one ever succeeded in making and that never

20   resulted in a commercial product, let alone a commercial product of any significance.  AngioScore

21   also put forward a damages analysis for the '119 patent that this Court characterized as

22   "questionable."  Dkt. No. 749, at 11.  Based on these facts, it is clear that AngioScore brought and

23   maintained its patent infringement lawsuit ***not*** for the proper purpose of protecting its intellectual

24   property or recovering for its use, but rather to harm the Defendants in the marketplace with the

25   specter of an adverse judgment and in their pocketbooks with the burden of heavy legal fees.  Caine

26   Decl. Ex. 6 (AngioScore's CEO writing that a potential acquirer "may be in for a big surprise when

27   they move toward a close and find TriReme is facing a potential major lawsuit," and "They

28   [Defendants] will soon be hearing from us.").  AngioScore's improper motive for bringing and

1    maintaining a case on an uncommercialized patent warrants a finding that the case is exceptional.

2    *See Icon Health & Fitness, Inc.*, 2015 WL 4041684, at *6-9 (case exceptional where plaintiff's

3    litigation tactics had improper purpose and motivation, and the patent was uncommercialized).

4         The case is also exceptional because AngioScore brought it to for the improper purpose of

5    obtaining discovery for a breach of fiduciary duty claim that it wanted to bring against Dr.

6    Konstantino as long ago as March 2010.  *See* Caine Decl. Ex. 11 (AngioScore's CFO, Jim Andrews,

7    writing to Mr. Trotter on March 2, 2010, that he had "just spoke[n] with Steve Sawyer about a

8    potential claim involving Eitan"); Dkt. No. 617 at 305:15-306:25 (AngioScore's attorney, Mr.

9    Sellers, confirming that AngioScore's executives and directors had conversations about whether to

10   bring a fiduciary duty claim against Dr. Konstantino in March 2010).  Thus, in retrospect, it is not

11   surprising that AngioScore asserted two meritless, non-practiced patents against Defendants.

12   Similarly, it is not surprising that AngioScore refused to drop the '119 patent even though

13   Defendants immediately explained why Chocolate could not infringe, and even though Defendants

14   prevailed at trial for the exact same reasons as were explained over three years earlier.  *See* Caine

15   Decl. Exs. 7-10.

16        Immediately dropping the '663 patent is evidence that AngioScore's claim of infringement

17   with respect to that patent had no merit.  The reason why AngioScore refused to also drop the '119

18   patent as well was not that AngioScore believed the Defendants infringed.  As discussed herein, no

19   objectively reasonable litigant could have held that belief.  Rather, AngioScore needed to keep the

20   patent case going so that it could continue to fish for evidence upon which to allege a breach of

21   fiduciary duty.  AngioScore admitted this intention in its motion for leave to amend when it

22   described efforts "to obtain sufficient evidence of the breach of fiduciary duty by Konstantino to

23   permit its counsel to plead causes of action arising from that breach."  Dkt. No. 202, at 15.

24   AngioScore's attorneys even told the Court that AngioScore's goal was to try the fiduciary duty

25   case (first) and that it hoped never to have to try the patent case it had filed earlier.  Dkt. No. 582 at

26   116:14-118:10.  The Court's findings and conclusions on the fiduciary duty claim, however, do not

27   justify AngioScore's bringing or maintaining meritless claims for patent infringement.  *See Icon*

28   *Health & Fitness, Inc.*, 2015 WL 4041684, at *6-9 (awarding fees where Plaintiff's litigation tactics

1    had improper purpose and motivation); Caine Decl. Ex. 25 (awarding fees on remand where

2    Plaintiff failed to conduct adequate pre-filing investigation and maintained claims after its own

3    experts showed they were without merit to maintain leverage against Defendant).  Bringing and

4    maintaining a case for patent infringement as a pretext for obtaining discovery for a different claim

5    is another circumstance demonstrating that this case is exceptional.

6              2.      **AngioScore's Claims Were Objectively Unreasonable and Frivolous**
7                      **from the Start.**

8              As discussed above, AngioScore's claim for infringement of the '119 patent was

9    exceptionally meritless.  AngioScore's proposed construction of the term "end" of the stent was

10   inconsistent with the patent specification, which distinguished between the ends of the struts,

11   balloon and stent.  *See* Dkt. No. 218, at 11-13.  The Court rejected AngioScore's proposed

12   construction because it would have replaced the word "end" with an undefined and unlimited

13   "region."  *See id.*  Without the benefit of its flawed construction, AngioScore could not show that

14   Chocolate's struts literally extended from the proximal to the distal end of the stent.  Thus, the

15   Court granted summary judgment of no literal infringement.  *Id.* at 26-27.

16             AngioScore's equivalence theory was even worse than its flawed claim construction, relying

17   on the factually inaccurate and uninvestigated assumption "a small portion of the strut had been

18   removed" and the conclusory assertion this was an inconsequential difference.  *See* Caine Decl. Ex.

19   28.  AngioScore presented no evidence in support of this theory at trial, but rather offered evidence

20   in support of a different, "single integral structure" theory that the Court had ordered AngioScore

21   not to pursue.  *Compare* Dkt. No. 749, at 8 *with* Dkt. No. 771 at 1985:6-1990:7.  AngioScore also

22   never performed a function-way-result analysis of equivalents, never presented any analysis of

23   insubstantial differences beyond the conclusory statement in its infringement contentions, and never

24   disputed Defendants' evidence that, if the purportedly missing segments were added to the

25   Chocolate device, the resulting struts would not work because they would jut out and possibly kill

26   the patient.  *See* Dkt. No. 749, at 7-8; Dkt. No. 133-3 (¶ 9); Caine Decl. Exs. 29 & 30; Dkt. No. 793

27   at 2471:7-2477:19.  AngioScore's exceptionally weak claim construction position and infringement

28   theories render this case exceptional.  *See Icon Health & Fitness, Inc.*, 2015 WL 4041684, at *6-9

1  (plaintiff's literal and DOE infringement arguments were weak); *Kilopass Tech. Inc.*, No. C 10-

2  02066 SI, 2014 WL 3956703, at *9 (plaintiff asserted baseless literal and doctrine-of equivalents

3  infringement arguments); *Segan LLC*, 2015 WL 5315945, at *5 (claim construction position was

4  frivolous); *Cambrian Sci. Corp.*, 79 F. Supp. 3d at 1115-16 (plaintiff did not articulate infringement

5  theory under court's claim construction, and experts did not evaluate accused products).

6       AngioScore's infringement theory was also exceptionally weak with respect to the

7  "longitudinal expansion," "longitudinally shorten," "attached to the proximal end of the catheter

8  shaft" and "attached to the distal end of the catheter shaft" limitations.  AngioScore did not present

9  a theory that the Chocolate device had the equivalent of any of these limitations, *see* Dkt. No. 218,

10  at 33, 35-36, and its evidence that Chocolate had identical structures was ephemeral if not altogether

11  nonexistent.

12       On the "longitudinal expansion" and "longitudinally shorten" limitations, Defendants best

13  evidence came from AngioScore's experts, Mr. Bleam, Dr. Levenston and Mr. Horzewski.  *See*

14  Caine Decl. Exs. 13 & 14.  Mr. Sheehan also demonstrated using both quantitative and qualitative

15  analyses why these limitations were not met.  Caine Decl. Exs. 31-33; Dkt. No. 793 at 2480:23-

16  2493:25 and 2503:14-2508:1.  Under these circumstances, courts have found cases exceptional and

17  awarded fees.  Caine Decl. Ex. 25 (awarding fees on remand where Plaintiff maintained claims after

18  its own experts showed they were without merit to maintain leverage against Defendant).

19       On the "attached" limitations, AngioScore relied on nothing more than the conclusory

20  opinions of Mr. Horzewski who did not actually cut apart a sample Chocolate device to observe

21  how the structures were bonded or send one to a materials analyzing facility for the same purpose.

22  *See* Dkt. No. 771 at 2078:10-2079:13, 2083:12-17.  He also ignored the portions of the very

23  documents on which he purported to rely showing that Chocolate's constraining structure is not

24  bonded to the catheter shaft.  *See* Caine Decl. Exs. 16-18.  By contrast, each of Dr. Konstantino and

25  Mr. Sheehan explained without contradiction that Chocolate's constraining structure is bonded to

26  the balloon, not the catheter shaft, and that the balloon was not bonded to the distal shaft (proximal)

27  or guide wire member (distal) at the same place.  *See* Dkt. No. 772 at 2326:25-2328:10; 2359:6-

28  2369:3; Dkt. No. 793 at 2500:2-2503:11.  Dr. Konstantino also explained, again without

1    contradiction, just as he had early in the case, that Chocolate would not work if the balloon was

2    bonded to the catheter shaft at the same place as the constraining structure was bonded to the

3    balloon.  *See* Dkt. No. 133-3 (¶¶ 16-18); Dkt. No. 772 at 2326:25-2328:10; 2359:6-2369:3.  And,

4    Dr. Konstantino's explanation of the Chocolate bond strength report was irrefutable evidence,

5    available to AngioScore years ago, that Chocolate's constraining structure was not "attached" to the

6    catheter shaft.  *See* Dkt. No. 793 at 2389:8-2395:20; Caine Decl. Ex. 34.  The complete absence of

7    evidence presented by AngioScore contrasted with the irrefutable evidence of noninfringement is

8    further proof that AngioScore's infringement theories were exceptionally meritless.

9          In apparent recognition of the weakness of its own claims, AngioScore attempted to mislead

10    the jury with respect to both infringement and invalidity.  Throughout trial, AngioScore presented

11    prototypes and embodiments from patent applications that it characterized as Chocolate devices

12    with end-to-end struts.  AngioScore however, knew from the earliest days of the case that no device

13    with full-length struts had ever been sold.  Likewise, AngioScore based its invalidity response on

14    the fiction that a person of skill in the art would not have considered deployable stent prior art

15    because avoiding foreshortening allegedly bears no relationship to allowing longitudinal expansion.

16    Yet, AngioScore was aware before trial that not only did the inventor specifically consult

17    deployable stent references, but one of its own experts—whom AngioScore perhaps not

18    coincidentally elected not to call at trial—admitted that foreshortening and longitudinal expansion

19    were two sides of the same coin.  Although the jury resoundingly rejected AngioScore's attempts at

20    misdirection, these frivolous arguments reveal the objective weakness of AngioScore's claims.

21          **3.**      **AngioScore's Litigation Conduct Renders this Case Exceptional.**

22          A finding of exceptionality is warranted here because of "the unreasonable manner in which

23    the case was litigated."  *See Octane*, 134 S. Ct. at 1756.  At issue are AngioScore's expert discovery

24    and trial tactics, both of which were shameful.  These sharp practices had a significant, and undue,

25    impact on Defendants' fees.

26          As detailed in Defendants' motion *in limine* (Dkt. No. 686), and the Court's resulting order

27    (Dkt. No. 749), AngioScore purposefully withheld data and photographs underlying Dr.

28    Levenston's infringement testing and, worse, led Defendants to believe that all materials had been

1    produced.  After the truth came out at the deposition, AngioScore then strung Defendants along and

2    only offered to turn over the material and a supplemental deposition two days before the pre-trial

3    conference, more than a year and half after the data had been created.  The Court rightly prevented

4    Dr. Levenston from testifying regarding his measurements at trial.  AngioScore's conduct is

5    exceptional *per se* because it is an express violation of Federal Rules of Civil Procedure 26 and 37.

6         Likewise, removing Mr. Olsen in the middle of his deposition was discovery abuse.  Indeed,

7    Judge Corley noted that this behavior "boggles my mind," observing that it was "only consistent

8    with obstructionism."  Dkt. No. 493 at 9:6-11:7.  Certainly, "[AngioScore]'s litigation tactics are

9    "'uncommon," "rare," [and] "not ordinary'" in this Court."  *Cambrian* at 12 (quoting *Octane*

10   *Fitness*, 134 S. Ct. at 1756) (referring to plaintiff's "harsh" discovery tactics).

11        AngioScore's trial tactics were similarly improper.  Defendants suspected all along that

12   AngioScore would not call each of its many experts on infringement and validity at trial on the full

13   scope of their overlapping reports.  And sure enough, AngioScore's trial presentation excluded a

14   validity expert, two infringement experts and many of the overlapping opinions from the five

15   reports AngioScore served on infringement.  Any reasonable litigant would have been able to

16   narrow the scope of its expert testimony during discovery, or at any time prior to trial.  Given these

17   facts, it is now clear that AngioScore's true aim was to multiply Defendants' attorney's fees, engage

18   in a shell game at trial, and unduly influence the jury through the number, rather than the quality, of

19   its witnesses.  Courts routinely sanction such improper tactics.  *See* Dkt. No. 684 (citing *Sunstar,*

20   *Inc. v. Alberto-Culver Co.*, No. 01 C 0736, 01 C 5825, 2004 WL 1899927, at \*25 (N.D. Ill. Aug. 23,

21   2004) (precluding testimony of cumulative expert); *U.S. v. Alisal Water Corp.*, 431 F.3d 643, 660

22   (9th Cir. 2005) (same); *Hearing Components, Inc. v. Shure, Inc.*, Civ. A. No. 9:07-CV-104, 2008

23   WL 5572824, at \*4 (E.D. Tex. 2008) (same)).

24        AngioScore also flouted an order of the Court regarding the scope of Mr. Horzewski's

25   testimony on infringement.  Due to AngioScore's shifting-sands infringement allegations,

26   Defendants sought preclusion of certain infringement theories that were not disclosed in

27   AngioScore's Local Rule Infringement Contentions.  The Court both granted and denied relief with

28   respect to AngioScore's DOE theory relating to the end-to-end limitation.  Rather than preclude Mr.

1   Horzewski's testimony on this limitation in its entirety, the Court instructed that he could testify

2   that "'eliminating a very small segment of the strut is an insubstantial difference because the

3   missing segment is not necessary to allow longitudinal or radial expansion of the constraining

4   structure.'"  Dkt. No. 749 at 8 (quoting Dkt. No. 393-13 at ¶ 36).  At the same time, the Court ruled

5   that Mr. Horzewski could ***not*** testify that "the struts and rings of the accused device are 'part of a

6   single integral structure.'"  *Id.* (quoting Dkt. No. 352-2 at 15).  Yet, even though the Court had

7   outlined a specific avenue to pursue at trial, AngioScore directed Mr. Horzewski to re-word the

8   precluded "single integral structure" theory.  Accordingly, at trial, Mr. Horzewski testified that the

9   Chocolate constraining structure (*i.e.*, "the struts and rings") "is this ***continuous network*** made

10  from a ***single piece*** of hypo tube."  Dkt. No. 771 at 1985:6-1990:7 (emphasis added).  As this

11  conduct is independently sanctionable under Rule 37, it is intrinsically exceptional under Section

12  285.  It also suggests that AngioScore viewed its arguments as so weak that violating the Court's

13  order—with all the attendant risks—was preferable.

14  **C.     The Award of All Fees Billed Is Warranted Under 35 U.S.C. § 285.**

15      Based on a finding that this case qualifies as "exceptional," Defendants should be awarded

16  their full attorneys' fees.  35 U.S.C. § 285 ("The court in exceptional cases may award reasonable

17  attorney fees to the prevailing party."); *Kilopass Tech., Inc. v. Sidense Corp.*, No. 10- cv-02066,

18  2015 U.S. Dist. LEXIS 30650, at *20 (N.D. Cal. Mar. 11, 2015) (awarding defendant over $5

19  million in attorney's fees and explaining "there is nothing in the legislative history or applicable

20  case law to suggest that – once a determination that a case is 'exceptional' has been made – courts

21  should balk at awarding full fees").

22      The purpose of § 285 is "to compensate a prevailing party for its outlays in the prosecution

23  or defense of the suit."  *Central Soya Co, Inc. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1578 (Fed.

24  Cir. 1983) (citation omitted); *Powell v. Home Depot, U.S.A., Inc.*, No. 07-80435-CIV, 2010 WL

25  4116488, at *24 (S.D. Fla. Sep. 14, 2010); *Nikko Materials USA, Inc. v. R.E. Serv. Co. Inc.*, No. C

26  03-2549 SBA, 2006 WL 118438, at *5 (N.D. Cal. Jan. 13, 2006).  It is proper to include in the

27  award of attorney fees the time spent preparing the claim for attorney fees.  *Central Soya*, 723 F.2d

28  at 1578; *Trend Products Co. v. Metro Indus. Inc.*, No. CV 84-7740 AHS (JRx), 1989 WL 418777,

1   10 U.S.P.Q.2d 1539, 1541 (C.D. Cal. Apr. 11, 1989); *Gilbreath Int'l Corp. v. Lionel Leisure, Inc.*,

2   622 F. Supp. 478, 483 (E.D. Pa. 1985), *aff'd*, 802 F.2d 469 (Fed. Cir. 1986).

3       Indeed, in applying *Octane*, district courts have frequently awarded attorney fees to

4   prevailing defendants.  *Lumen View Tech., LLC v. Findthebest.com, Inc*., 2014 WL 2440867

5   (S.D.N.Y. May 30, 2014) (patent owner on notice of non-infringement at outset of the litigation

6   pressed ahead without a specific theory of infringement, applying the motivation and deterrence

7   "prongs" of *Octane*); *Intellect Wireless, Inc. v. Sharp Corp*., 2014 WL 2443871 (N.D. Ill. May 30,

8   2014) (noting that the purpose of Section 285 is not to punish the losing party, but rather, to

9   compensate the prevailing party for the costs incurred due to the losing party's unreasonable

10  conduct, citing *Octane* and *Kilopass*); *Classen Immunotherapies, Inc. v. Biogen Idec*, Civil No.

11  WDQ-04-2607, 2014 WL 2069653, at *3 (D. Md. May 14, 2014) (noting that "[a] party has an

12  obligation not to assert baseless infringement claims 'and must continually assess the soundness of

13  pending infringement claims during litigation.'"); *Home Gambling Network Inc., v. Piche*, 2014 WL

14  2170600, at *7-8 (D. Nev. May 22, 2014) (attempted recapture of disclaimed claim scope was

15  unreasonable and weighed in favor of exceptionality).  Accordingly, a full award of attorneys' fees

16  is appropriate here under 35 U.S.C. § 285.

17      The starting point for a reasonable attorney fees calculation is the "lodestar":  the number of

18  hours reasonably expended multiplied by a reasonable hourly rate.  *Hensley v. Eckerhart*, 461 U.S.

19  424, 433 (1983); *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1068 (Fed. Cir. 1983) ("In

20  determining the reasonableness of the award, there must be some evidence to support the

21  reasonableness of, *inter alia*, the billing rate charged and the number of hours expended.").  The

22  Court may consider the twelve factors outlined in *Johnson v. Georgia Highway Express, Inc.*, 488

23  F.2d 714, 717-719 (5th Cir. 1974), *abrogated in part by Blanchard v. Bergeron*, 489 U.S. 87, 91-96

24  (1989), although these factors "usually are subsumed within the initial calculation of hours

25  reasonably expended at a reasonable hourly rate."  *Hensley*, 461 U.S. at 434, n.9.  Where a

26  prevailing party obtains "excellent results," its attorney should recover a fully compensatory fee that

27  normally encompasses all hours reasonably expended on the case.  *Mathis v. Spears*, 857 F.2d 749,

28  755 (Fed. Cir. 1988) (citing *Hensley*, 461 U.S. at 435).

### 1.      The Requested Fees are Well-Documented.

Here, Defendants have been represented by Knobbe Martens Olson & Bear LLP ("Knobbe Martens"), Agility IP Law, LLP ("Agility"), and Arnold & Porter, LLP ("Arnold & Porter").  Caine Decl. ¶¶ 3, 6; Swaroop Decl. ¶ 2.  Knobbe Martens initially served as counsel for Defendants, and the representation was later transferred to Agility, and subsequently to Arnold & Porter (when the Agility attorneys representing Defendants moved to Arnold & Porter).  Caine Decl. ¶¶ 3, 6; Swaroop Decl. ¶ 2.  Defendants submit documentation with the instant motion to show the hours recorded by its attorneys and the rates charged for the work performed.  Caine Decl. ¶¶ 8-9 & Exs. 1-2; Swaroop Decl. ¶ 3, Ex. A.  These billings provide ample support for the fees requested. *Hensley*, 461 U.S. at 433; *Lam, Inc.*, 718 F.2d at 1068.

### 2.      The Requested Fees Are Reasonable and Reflect the Fees Actually Billed to Defendants.

Defendants request an award of $4,786,497.75 in reasonable attorney fees, of which $2,194,550.50 are attributable to Knobbe Martens, $1,286,683.75 are attributable to Agility, and $1,305,263.50 are attributable to Arnold & Porter.  Caine Decl. ¶ 8 & Ex. 9; Swaroop Decl. ¶ 3 & Ex. A.  As detailed below, both the rates charged and the number of hours billed are reasonable and appropriate.

#### a.      The requested rates are reasonable and reflect the rates actually charged.

"A strong presumption that the lodestar figure . . . represents a 'reasonable' fee is wholly consistent with the rationale behind the usual fee-shifting statute."  *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986).  The first lodestar prong is whether the hourly rates requested are reasonable, which is determined by considering the skill, experience, and reputation of the attorneys involved and the market in which they practice. *Hensley*, 461 U.S. at 433, 434, n.9; *Johnson*, 488 F.2d at 717-719.

The experience and reputation of the Knobbe Martens, Agility and Arnold & Porter attorneys, as well as their billing rates, are set forth in the Swaroop and Caine Declarations, respectively.  At the outset of the litigation, Defendants were represented by counsel at Knobbe

Martens, one of America's largest Intellectual Property firms.  Swaroop Decl. ¶ 2.  As reflected in their biographies, the Knobbe Martens attorneys who represented Defendants have extensive experience in patent litigation.  *Id.*, Exs. B-J.  Joseph Re, the attorney who was in charge of Knobbe Martens' representation of Defendants, is a nationally recognized trial and appellate attorney, known for handling high-stakes patent cases throughout the country.  *Id.*, Ex. C.  Mr. Re was assisted in Knobbe Martens' representation of Defendants by a team of attorneys, paralegals, and support personnel who performed their work efficiently and skillfully.  *Id.*, Exs. B, D-J.  The team included partners Sheila Swaroop and Joshua Stowell, each accomplished attorneys in their own right.  *Id., Exs.* B & E.  Knobbe Martens' rates, as reflected in its invoices, are those actually billed to Defendants.  *Id.* ¶ 3-13 & Ex. A.

Beginning in July 2014 Knobbe Martens transitioned its representation of Defendants to Agility.  Caine Decl. ¶ 3.  David Caine, Jim Otteson, Thomas Carmack and Michael Nguyen were the attorneys in charge of Agility's representation of Defendants, and they were assisted by other Agility attorneys and support staff.  Caine Decl. ¶¶ 11-20.  The Agility attorneys who represented Defendants have extensive IP litigation experience, with a primary focus on patent litigation in federal courts and the International Trade Commission.  *Id.*  Together, the Agility attorneys have decades of experience litigating patent cases and have been repeatedly recognized for their skills and accomplishments.  *Id.*  Mr. Otteson — who was recognized as a "Northern California Super Lawyer" from 2012-2015 and named by the Daily Journal as one of the "Top California IP Litigators" in 2010 and 2014 — has particular expertise trying complex patent cases, both in district court and the ITC.  *Id.*, ¶ 12.  He has successfully tried multiple cases and has litigated scores of other patent and intellectual property cases over the years.  Mr. Caine was recognized as a "Northern California Super Lawyers Rising Star" from 2010-2015 and has successfully represented clients in multiple patent trials.  *Id.*, ¶ 11.  Likewise, Mr. Carmack, who also specializes in intellectual property litigation and has litigated several patent cases to victory, was recognized as a "Northern California Super Lawyers Rising Star" from 2013-2015.  *Id.*, ¶ 14.  In April 2015, the Agility attorneys representing Defendants transitioned their practice to Arnold & Porter, a preeminent international law firm, and continued to represent Defendants through trial.  *Id.*, ¶ 6.

As reflected in the Caine and Swaroop Declarations, the billing rates charged to Defendants are reasonable—not only given the levels of skill, experience and reputation for the attorneys involved—but also compared to survey data.  Swaroop Decl. ¶ 14, Caine Decl. ¶ 21-27 & Ex. 3.  Further, the rates represent the rates actually billed to Defendants.  *See* Swaroop Decl. ¶ 3 & Ex. A; Caine Decl. ¶ 10.  Patent litigation is a highly specialized area of practice, and numerous courts have recognized that the rates charged by patent litigation attorneys exceed those of general practitioners.  *See, e.g.*, *In re Dahlgren Int'l Inc.*, 819 F. Supp. 568, 27 U.S.P.Q.2d 1096, 1106 (N.D. Tex. 1992); *Howes v. Med. Components, Inc.*, 761 F. Supp. 1193, 1196 (E.D. Pa. 1990) ("I believe that a party should be entitled to retain the most competent counsel available, particularly in the highly specialized area of complex patent litigation . . . .").  Based on the Caine and Swaroop Declarations, as supported by relevant survey data, the rates for national patent litigation counsel are demonstrably reasonable for the purpose of determining the attorney fee award under § 285.

### b.      The time Defendants' counsel expended was reasonable and was actually billed to Defendants.

David Caine and Sheila Swaroop have reviewed their firms' respective billing records and have attested that the amount of professional time was reasonable and necessary, and that they exercised their billing judgment with respect to the claimed number of hours worked and billed.  Swaroop Decl. ¶ 3; Caine Decl. ¶ 10.  Indeed, in the exercise of its business judgment, counsel wrote down or wrote off time entries over the course of the representation, as reflected in the submitted invoices.  Swaroop Decl. ¶ 3; Caine Decl. ¶  10.  Aside from those reductions, however, counsel billed Defendants for all of their time, and Defendants have paid for all invoiced time through June 2015.  *See* Swaroop Decl. ¶ 3 & Ex. A; Caine Decl. ¶ 10.

This was also a vigorously litigated case involving numerous fact and expert depositions and significant motion practice.  AngioScore unnecessarily prolonged the case by employing numerous experts, engaging in sharp discovery practices and using discovery on the patent claim to bring and then litigate the breach of fiduciary duty and related state law claims, as detailed above.  It cannot credibly contest the fees sought.

Other metrics confirm that the requested attorney fees are reasonable. *See* Caine Decl. ¶ 27 & Ex. 3. According to the 2015 AIPLA Economic Survey, corporate respondents to the survey reported that the median and third quartiles cost of litigation, were $2,750,000 and $5,000,000, respectively. Caine Decl. Ex. Ex. 3 at I-110. In the San Francisco Bay Area, the third quartile cost of litigation for cases in which between $1-$10 million is at risk was $4,375,000. Caine Decl. Ex. Ex. 3 at I-106. Moreover, courts have awarded significantly more in fees and costs than what Defendants request because "[p]atent cases frequently result in large awards of attorneys fees." *See Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 549 F.3d 1381, 1391 (Fed. Cir. 2008) (affirming award of $16,800,000); *Nikko*, 2006 WL 118438, at *10 (awarding over $3.4M in fees and costs); *In re Dahlgren Int'l Inc.*, 819 F. Supp. 568, 27 U.S.P.Q.2d at 1106-07 (awarding attorney fees of over $900,000 in 1992, and citing 1990 and 1991 cases in which fees and expenses were awarded in the range of $1-2 million). Defendants' request for an award of attorney fees in the amount of $4,786,497.75 is thus reasonable.[1]

## CONCLUSION

Accordingly, for the foregoing reasons, Defendants respectfully request that the court find this case "exceptional" and award Defendants their attorneys' fees under 35 U.S.C. § 285 in the amount of $4,786,497.75.

Dated: October 28, 2015            ARNOLD & PORTER LLP

By:    */s/ David A. Caine*
                 David A. Caine

          Attorneys for Defendants

---

[1]     Defendants have endeavored to include all attorney fees in its motion and supporting declarations. However, fees and expenses were incurred in the preparation of this motion. Defendants intend to supplement their briefing and evidence as appropriate to include these items.